**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| DUSTIN HYDE, individually and on Behalf of All Other Similarly Situated | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action File No: 2:22-cv-103-RWS |
| 316 TOWING & ROAD SERVICE, INC., and MAKSIM LISOVSKIY | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION**

COME NOW, Defendants 316 Towing & Road Service, Inc. ("316") and

Maksim Lisovskiy ("Lisovskiy") (collectively, the "Defendants"), by and through

their counsel of record and file this Memorandum of Law in Support of Defendants'

Motion for Decertification of Collective Action and state as follows:

**INTRODUCTION**

The clear record in this collective action for unpaid overtime warrants

decertification because of (i) the disparate factual and employment settings of the

individual plaintiffs, (ii) the various defenses available to Defendants that are

individual to each plaintiff, and (iii) fairness and procedural considerations. Indeed,

1

the individual factual differences between each of the plaintiffs require fact-intensive inquiry and analysis to resolve, defeating any judicial economy that would be achieved through allowing this case to proceed as a collective action. Accordingly, this Court should exercise its discretion to decertify this action, finding that the plaintiffs are not sufficiently "similarly situated" and fairness considerations support decertification here.

## STATEMENT OF FACTS

On June 1, 2022, Plaintiff Dustin Hyde ("Hyde") filed his Complaint seeking unpaid overtime on behalf of himself and all others similarly situated (each a "Plaintiff," collectively the "Plaintiffs"). (Dkt. 1.) On February 2, 2023, the Court entered its Order granting Plaintiff's Motion for Conditional Certification of the Collective Action, for Approval and Distribution of Notice, and for Disclosure of Contact Information. (Dkt. 26.) In addition to Hyde, opt-in plaintiffs Brent Johnson ("Johnson"), Reynaldo Brown ("Brown"), and Kevin Brindley ("Brindley") (collectively, the "Opt-Ins") have each filed a Consent to Join Collective Action. (Dkt. 2, 12, 35, 36.)

**Defendant 316's Local Towing Business**

316 is small towing company serving Winder, Georgia and the surrounding area.  (Lisovskiy Aff. ¶ 4[1])  316 retains tow truck drivers as independent contractors to respond to calls from 316's customers.  (Lisovskiy Aff. ¶ 13)  316 is also an authorized interstate motor carrier (MC-531312) within the meaning of 49 U.S.C. § 31502(b).  (Kudrin Aff. ¶¶ 3-5, Nov. 17, 2023.[2])

**The Plaintiffs' Agreements with 316**

As the general manager for 316, Elisha "Eli" Kudrin ("Kudrin") is responsible for recruiting, onboarding, scheduling, and terminating tow truck drivers. (Lisovskiy Aff. ¶ 19; Kudrin Aff. ¶ 6, Sept. 12, 2022.[3])  Before each Plaintiff began working for 316, Kudrin supplied each Plaintiff with an Independent Contractor Agreement ("Agreement").  (Kudrin Aff. ¶¶ 24-26, 39-40, Sept. 12, 2022; Hyde Dep. 31:17-24, Ex. 4;[4] Brown Dep. 45:2-19, Ex. 5;[5] Johnson Dep. 24:4-23, Ex. 5;[6] Brindley Dep. 37:25-38:11, Ex. 5.[7])   The Agreement states in pertinent part as follows:

---

[1] Attached as Exhibit "A" hereto.
[2] Attached as Exhibit "B" hereto.
[3] Attached as Exhibit "C" hereto.
[4] Relevant excerpts from Hyde Dep. are attached as Exhibit "D" hereto.
[5] Relevant excerpts from Brown Dep. are attached as Exhibit "E" hereto.
[6] Relevant excerpts from Johnson Dep. are attached as Exhibit "F" hereto.
[7] Relevant excerpts from Brindley Dep. are attached as Exhibit "G" hereto.

**D.     Independent Contractor Status.** It is the intent of the parties for Contractor to retain the status of an independent contractor in business for federal and state law purposes. Carrier's control over Contractor shall be limited to that control required by federal and state statutes and regulations governing the conduct of motor carriers. Contractor shall train all of its driver personnel in accordance with U.S. DOT requirements and shall submit all driver personnel to Carrier for qualification, safety and training to the extent required by federal regulations. . . .  Contractor shall have the right to substitute other qualified drivers to perform the services subject to Carrier's confirmation that Contractor's driver meets the driver qualifications established by the U.S. DOT and its insurers. . . .

**9.     <u>Alternative Dispute Resolution</u>**. The parties agree that any dispute concerning the terms of this Agreement will be submitted to mediation followed by binding arbitration before a tribunal convened under the rules of the American Arbitration Association at Atlanta, GA.

All Plaintiffs, except for Hyde, admit to receiving and then signing the Agreement before beginning any work for 316.  (Brown Dep. 45:2-19, 56:8-10; Johnson Dep. 24:4-23; Brindley Dep. 37:25-38:11.)

### The Plaintiffs' Different Roles within 316

Hyde and each of the Opt-Ins performed work for 316 at various times between 2019 and 2022.  (Hyde Dep. 20:8-21:8, 24:10-19, 99:12-17; Brown Dep. 101:1-2; Johnson Dep. 96:22-23; Brindley Dep. 24:11-18, 66:2-14.)  Hyde began working for 316 on or around December 5, 2019.  (Kudrin Aff. ¶ 26, Sept. 12, 2022, Dkt. 20-2; Hyde Dep. 42:3-5.)  Due to Hyde's many years of industry experience as a tow truck driver, Hyde eventually assumed the role of "driver manager" For 316.

(Kudrin Aff. ¶ 25, Sept. 12, 2022; Hyde Dep. 52:12-21.)  As driver manager, Hyde had duties, responsibilities, and authority unique to his role, as reflected by a significant increase in his rate of pay, as well as a later decrease in his rate of pay once he no longer held that role.  (Kudrin Aff. ¶ 25, Sept. 12, 2022; Hyde Dep. 156:1-6, 172:8-15.)  Although part of his job entailed performing work as a tow truck driver, a substantial portion of his daily time was spent performing duties that were unique to his position.  (Hyde Dep. 58:7-11.)  These unique duties included training and supervising other drivers, attending "manager" meetings with Kudrin, reviewing driver applications, thoroughly inspecting vehicles, coordinating repairs, purchasing supplies for the company, and recommending discipline for performance issues ("Manager Duties").  (Hyde Dep. 55:8-11, 58:12-59:9.)  Hyde estimates that he spent an average of "two to six hours a day" on Manager Duties.  (Hyde Dep. 58:7-11.)

By contrast, each of the Opt-Ins' duties consisted solely of responding to customer calls, towing vehicles, performing roadside service, and tasks incidental to those duties ("Driver Duties").  (Brown Dep. 59:5-60:23; Johnson Dep. 49:22-50:21; Brindley Dep. 56:11-57:5.)  Further, only some Plaintiffs performed towing jobs across state lines or processed payments from customers in interstate commerce. (Hyde Dep. 98:5-13, 99:12-17; Brown Dep. 82:1-22, 83:1-4, 83:14-22; 101:16-23; Johnson Dep. 75:22-76:7, 78:5-8; Brindley Dep. 82:3-8, 82:15-20.)

### The Plaintiffs' Various Work Schedules

From December 2019 through December 2020, Hyde had no defined schedule or "shift."[8]  (Hyde Dep. 67:5-10, 71:10-15, 72:1-22.)  Rather, Hyde alleges he had to be available to respond to any calls that came through at any time, but was free to do as he pleased while awaiting dispatch for a customer call.  (Hyde Dep. 76:14-77:12.)   Unlike Hyde, the Opt-Ins each allege having a set "shift," typically consisting of a 12-hour period each day for five consecutive days, during which time he was only required to be available to accept or reject any dispatch calls.  (Brown Dep. 69:3-8; Johnson Dep. 102:24-103:1; Brindley Dep. 67:7-17.)  No Plaintiff was ever disciplined for rejecting a job.  (Hyde Dep. 105:1-106:18; Brown Dep. 84:4-6; Johnson Dep. 82:12-16; Brindley Dep. 81:8-16.)

### The Plaintiffs' Timekeeping in Towbook

All time that drivers spent responding to customer calls and actively driving or towing vehicles was captured by a software application called "Towbook." (Lisovskiy Aff. ¶ 18; Kudrin Aff. ¶ 16, Sept. 12, 2022.)  316 has maintained accurate and complete Towbook records for each Plaintiff.  (Kudrin Aff. ¶¶ 7-10, Nov. 17, 2023.)  As discussed below, much of each Plaintiff's "shift" consisted of time spent

---

[8] Plaintiffs' characterization of their scheduled on-call periods as "shifts" is disputed by Defendants, but resolution of such dispute is not needed for this Motion.

waiting for calls, but not actually working.  No Plaintiff has been able to identify a single instance from Towbook where he performed more than 40 hours of actual work during any week.  Further, no Plaintiff has produced any record or evidence of any calls or towing jobs not captured by the Towbook application.  In fact, as each Plaintiff has admitted, there is no basis for any Plaintiff's allegation that he worked more than 40 hours a week, besides a belief among some Plaintiffs that all non-working hours of a driver's "shift" should be compensated.  (Hyde Dep. 142:14-20, 151:22-152:3, 153:13-19; Brown Dep. 99:23-100:1; Johnson Dep. 107:24-108:21; Brindley Dep. 88:1-12.)

## The Plaintiffs' Use of On-Call Time

Plaintiffs were not required to report to an office or any other specific location while waiting for dispatch.  (Hyde Dep. 71:16-25, 90:17-23, 173:24-174:11, 178:5-12, 180:15-18; Brown Dep. 59:14-17, 73:1-21; Johnson Dep. 63:12-14, 65:7-9, 148:21-149:12; Brindley Dep. 68:4-12, 69:24-70:3, 90:14-17.)  Only one Plaintiff, Brown, claims that he was restricted insofar as he was required to wait in a parking lot of his choosing between calls.  (Brown Dep. 73:16-19.)  Brown's testimony, however, is contrary to the evidence developed by Defendants, which reflects that at all drivers had freedom to wait where they chose.  (Hyde Dep. 71:16-25, 90:17-23, 173:24-174:11, 178:5-12, 180:15-18; Brown Dep. 59:14-17,

73:1-21; Johnson Dep. 63:12-14, 65:7-9, 148:21-149:12; Brindley Dep. 68:4-12, 69:24-70:3, 90:14-17.)   Indeed, when the drivers were not attending to Manager Duties or Driver Duties, they were free to engage in personal activities such as running errands, sleeping, visiting with friends, or even working a second job ("Personal Activities").   (Hyde Dep. 77:9-15, 79:25-80:4, 81:6-19, 83:10-14, 88:14-17, 127:6-9, 129:10-25, 179:7-12, 180:5-9, Ex. 12; Brown Dep. 77:16-78:1; Johnson Dep. 64:12-65:9; Brindley Dep. 70:7-17, 72:5-74:1.)   No Plaintiff alleges that he was ever corrected or disciplined for doing so.

## ARGUMENT AND CITATION TO LEGAL AUTHORITY

Under the Fair Labor Standards Act, 29 U.S.C. § 207, *et seq.* (the "FLSA"), a collective action may be maintained only if the representative employee can demonstrate that all employee plaintiffs are "similarly situated."   29 U.S.C. § 207(a)(1).   The Eleventh Circuit has adopted a two-tiered approach to determine whether putative class members are similarly situated.   Hipp v. Liberty Nat'l Life Ins., 252 F.3d 1208, 1219 (11th Cir. 2001).   In the first stage before discovery occurs, a collective action may be "conditionally certified" where the plaintiff meets a "fairly lenient" burden to show similarity.   *Id.* at 1218.

In the second stage, however, the plaintiff's burden is less "lenient," and the plaintiff must demonstrate, by evidence developed during discovery, that all

claimants are "similarly situated." Anderson v. Cagle's, Inc., 488 F.3d 945, 953 (11th Cir. 2007). "At this stage, as discovery is largely complete, 'the court has much more information on which to base its decision and makes a factual determination on the similarly situated question.'" Rindfleisch v. Gentiva Health Services, Inc., 22 F.Supp.3d 1295, 1302 (N.D. Ga. 2014) (analyzing the second stage under the standard set forth in Anderson). Because the court has a more extensive factual record, the standard is less lenient, and the plaintiff bears a heavier burden than at the first stage. Rindfleisch, 22 F.Supp.3d at 1302.

As Rindfleisch notes, the Eleventh Circuit has not drawn any "bright lines" in defining "similarly situated" for the purposes of the second stage of this analysis. Id. at 1302-3. Instead, district courts in this district generally consider three factors when exercising their discretion to decertify: (i) the disparate factual and employment settings of the individual plaintiffs; (ii) the various defenses available to defendants that appear to be individual to each plaintiff; and (iii) fairness and procedural considerations. See Florence v. Deli Mgmt., Inc., No. 1:18-cv-04303-SCJ, 2021 WL 2488910, at *2 (N.D. Ga. Mar. 8, 2021). These three factors are not mutually exclusive, however, as "there is considerable overlap among them" and "[e]ach factor directly influences the others." Id. at *3. Indeed, the similarity of the class "must extend beyond the mere facts of job duties and pay provisions" and

encompass the defenses to some extent.  <u>Benton v. Deli Mgmt., Inc.</u>, 396 F. Supp. 3d 1261, 1284 (N.D. Ga. 2019).  The record in this matter clearly reflects that decertification is warranted in this action.

## I. THE DISPARATE FACTUAL AND EMPLOYMENT SETTINGS OF THE INDIVIDUAL PLAINTIFFS WARRANT DECERTIFICATION.

For the first decertification factor, "the important question at this stage is whether, on the whole record, Plaintiff and the Opt-Ins had factually similar employment experiences. . . ."  <u>Florence</u>, 2021 WL2488910, at *3.  Here, the clear record precludes Plaintiff Hyde from satisfying his burden to show that he and the Opt-Ins had a factually similar employment experience or setting.  Moreover, as discussed in Section II, below, the clear record here also precludes Plaintiff Hyde from satisfying his burden to show that Defendants' defenses to his claims are similar to those of the Opt-Ins.

### a. Plaintiffs Had Disparate Day-to-Day Duties and Responsibilities.

"For putative class members to be similarly situated, one opt-in plaintiff's experience must be sufficiently representative of the class."  <u>Florence</u>, 2021 WL2488910, at *4.  In <u>Florence</u>, this Court analyzed disparities in the day-to-day duties among a class of "assistant managers" at a deli franchise.  Where the testimony of individual opt-in plaintiffs revealed differences in the responsibilities surrounding employee training, evaluations, and setting schedules, as well as time

spent supervising, the Court found that the class did not have a "sufficiently similar employment settings" due to the "wide variety of work assignments" among the plaintiffs. *Id.* at *7. Here, the undisputed record reflects numerous clear differences in the duties performed among the various Plaintiffs.

The collective action's representative, Plaintiff Hyde, held the unique and distinct role of the "driver manager." (Hyde Dep. 23:9-11, 52:19-24, 53:17-24, 54:7-16, 55:7-13.) No Opt-In that Hyde seeks to represent held such a role or performed the Manager Duties that comprised a significant portion of Hyde's day. (Hyde Dep. 53:25-54:23, 58:7-11; Brown Dep. 61:20-62:6; Johnson Dep. 52:10-53:14, 53:20-54:24, 55:5-24; Brindley Dep. 57:12-58:1.) Instead, the Opt-Ins in this action performed only Driver Duties. (Brown Dep. 59:5-60:23; Johnson Dep. 49:22-50:21; Brindley Dep. 56:11-57:5.) Although Hyde also performed Driver Duties, Hyde has admitted that he allocated between "two to six hours per day" to Manager Duties. (Hyde Dep. 58:7-11.)

Just like in <u>Florence</u>, there is a significant disparity here in this action in the duties performed among the various Plaintiffs. Unlike <u>Florence</u>, however, the class here is even more disparate because the class in <u>Florence</u> dealt with a collective action of plaintiffs who all performed at least some management duties. Indeed, the named Plaintiff, Hyde, performed significant Manager Duties, while the Opt-Ins

performed no Manager Duties at all. The disparities between the Plaintiffs' duties here far exceeds what warranted decertification in <u>Florence</u>.

### b. Plaintiffs Worked Disparate Hours.

As the sole driver manager, Hyde also maintained a working schedule that was unique to his role. While the Opt-Ins each allege a set twelve-to-seventeen-hour "shift" during which he would be expected to respond to any customer calls that came through, Hyde had a different arrangement. (Hyde Dep. 67:5-10, 71:10-12, 72:1-22, 76:14-77:8; Brown Dep. 69:3-8; Johnson Dep. 57:18-22, 71:20-22, 102:24-103:1; Brindley Dep. 67:7-17.) Indeed, Hyde's testimony reflects that he had no articulable "shift" but describes being on-call "24-7" during the first year that he worked for 316 (from December 2019 to December 2020). (Hyde Dep. 67:5-10, 71:10-12, 72:1-22, 76:14-77:8.) Thus, Plaintiffs describe two different systems that translate to vastly different employment settings in some cases. For example, Hyde testified that, while he was required to answer any calls that came through at any time, he could have been home sleeping or working a second job while waiting for calls. (Hyde Dep. 77:13-15, 81:20-25, 83:10-14, 88:14-17, 127:6-9, 180:5-9, Ex. 12.) On the other hand, Brown had a 12-hour "shift," but his contradictory testimony reflects that he was required to wait for calls in his truck. (Brown Dep. 69:3-8, 72:22-73:4.)

With few exceptions, all time spent performing Driver Duties would have been accurately captured by Towbook.  (Kudrin Aff. ¶¶ 8-10, Nov. 17, 2023; Johnson Dep. 60:24-61:23, 68:4-11; Brindley Dep. 53:5-7, 75:16-77:3, 79:6-11.) The alleged instances where jobs or tasks would not have been reflected in Towbook were minimal.  (Johnson Dep. 61:13-23; Brindley Dep. 53:5-7, 75:16-77:3.)  Indeed, the record contains no other evidence reflecting that any Plaintiff actually worked more than 40 hours in any given week.  Instead, Plaintiffs' claims derive from a common, mistaken belief that the non-working hours of every "shift" should be compensable.  (Hyde Dep. 143:9-144:3, 153:13-19; Johnson Dep. 107:24-108:21; Brindley Dep. 88:1-12.)  Ultimately, this Court has held that the key distinction between compensable and non-compensable waiting time boils down to whether the employee is "engaged to be waiting" or "waiting to be engaged."  Smith v. Ideal Towing, LLC, No. 1:16-CV-1359-TWT, 2017 WL 5467154, at *3 (N.D. Ga. Nov. 13, 2017).

In Smith, the Court noted that "the question of whether the employees are working during this time for purposes of the FLSA depends on the degree to which the employee may use the time for personal activities."  Id.  "The FLSA requires employers to compensate an employee for on-call time only where the employee's on-call duties severely restrict the employee's use of his or her personal time."  Id.

Further, "the 'severely restricted' standard is a stringent one and employees are not entitled to on-call pay under the FLSA absent unusually onerous on-call duties." *Id.*; *see also* <u>Fleming-Armstrong v. Superior Surgical Associates, Inc.</u>, No. 1:22-CV-3935-TWT, 2023 WL 7389002 (N.D. Ga. Nov. 8, 2023).

Here, Plaintiffs clearly were neither "severely restricted" in the use of their personal time while on-call, nor did they suffer any "unusually onerous on-call duties." While waiting for calls, Plaintiffs were largely unrestricted in what they could and could not do. As discussed herein in greater detail, Plaintiffs had varying degrees of freedom to spend their time between calls engaging in Personal Activities. To the extent that any Plaintiff claims that he was restricted in where and how he could spend his time, his experience is individual and different from the rest, necessitating individual inquiry not suited for a collective action and thereby warranting decertification of this action.

### c. Plaintiffs Had Disparate Uses of "On-Call" Time.

As discussed above, Brown testifies that he was required to wait in his truck for calls to come through despite the testimony from Hyde that there was no such policy. Although Brown admits that he occasionally returned home for breaks, the requirement he describes is undeniably different than those described by the other Plaintiffs. (Brown Dep. 76:6-11.) In contrast to Brown, other Plaintiffs paint a

14

portrait of their on-call hours that reflects ample time and freedom to do what they wished.  Hyde even admits that he had the freedom to work a second job and could decline assignments during his shift under the guise that he was working at this second job.  (Hyde Dep. 127:6-9, 128:16-17.)

### d.  Plaintiffs Worked Under Different Policies and Managers.

Plaintiffs did not operate under any "common policy or practice" of misclassification as defined by the FLSA.  While Defendants maintain that no Plaintiff was misclassified, Plaintiffs have testified that some policies varied from Plaintiff to Plaintiff.  As discussed in Sections I(b)-(c), above, Plaintiffs allege that they adhered to different policies and practices concerning their respective on-call "shifts."  (Hyde Dep. 79:25-80:4, 80:12-81:19, 129:10-25, 179:7-12, 180:7-18; Brown Dep. 72:22-73:4, 74:15-24; Johnson Dep. 64:7-24; Brindley Dep. 70:4-17, 72:14-18.)

Further, Plaintiffs did not all work under the same managers.  Hyde and Brindley both reported to Kudrin, while Brown and Johnson reported directly to Hyde.  (Hyde Dep. 65:9-11; Brown Dep. 61:13-19; Johnson Dep. 52:10-53:14; Brindley Dep. 58:2-4.)  Indeed, Hyde was responsible for training each driver and communicating certain policies and practices.  (Hyde Dep. 56:24-57:9.)  Although Johnson believed that the policies communicated to him by Hyde came from upper

management at 316, Johnson has no factual basis to support his belief.  (Johnson Dep. 132:17-133:6.)  Accordingly, in light of the foregoing, this Court should hold that Plaintiff Hyde cannot satisfy his burden to show that Plaintiffs shared similar facts and "sufficiently similar employment settings" required to maintain this collection action.

## II.   THE VARIOUS DEFENSES INDIVIDUAL TO EACH PLAINTIFF WARRANT DECERTIFICATION.

For the second decertification factor, decertification is appropriate where adjudication of *just one* defense would be too individualized to decide collectively. Florence, 2021 WL 2488910, at *7.  Here, there is not just one individualized defense to adjudicate, but numerous defenses that require individualized adjudication warranting decertification: (i) arbitration, (ii) independent contractor status, (iii) the Motor Carrier Act ("MCA") exemption, (iv) coverage under the FLSA, and (v) failure to perform overtime work.

### a. Individual Analysis Will Be Needed to Determine Whether All Plaintiffs Agreed to Arbitrate.

Despite Plaintiff's early written discovery responses where admissions were not forthcoming, three out of four Plaintiffs in this action have ultimately admitted—during their depositions—to signing the Agreement with 316, which contains Plaintiffs' express agreement to submit disputes to "mediation followed by binding

16

arbitration." (Brown Dep. 45:2-19; Johnson Dep. 24:4-25:13; Brindley Dep. 38:3-15.)  Only one Plaintiff, Hyde, denied having signed the Agreement during his deposition.  (Hyde Dep. 32:4-21, 34:7-15; 35:3-11.)

Thus, whether this matter is subject to mandatory arbitration requires an individualized determination as to whether Hyde entered into an enforceable agreement requiring arbitration.  *See* Lambert v. Austin Ind., 544 F.3d 1192 (11th Cir. 2008) (whether there is an enforceable agreement is the first step of a two-prong test for determining whether an action is subject to arbitration).  Because Hyde disputes having entered into an enforceable agreement requiring arbitration of this action, separate inquiry and analysis will be needed to determine whether this defense applies to all Plaintiffs.

**b. Individual Analysis Will Be Needed to Determine Whether Any Plaintiffs Are Employees.**

The Eleventh Circuit will typically consider several factors in determining whether an individual is an employee subject to the FLSA's overtime provisions.  Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1312 (11th Cir. 2013).  These factors include (i) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (ii) opportunity for profit or loss; (iii) investment in equipment or employment of workers; (iv) special skills required; (v) the degree of permanency and duration of the working relationship; and

17

(vi) whether the service rendered is an integral part of the alleged employer's business. *Id.*

Solely by way of example, for the first factor, the clear record here does not support any contention that 316 exercised a similar degree of control across the board. As discussed above, Plaintiffs describe different degrees of freedom to engage in Personal Activities while waiting for calls. Plaintiffs' testimony also reflects varying degrees of supervision in how they performed their daily work. (Brown Dep. 61:13-19; Johnson Dep. 52:4-6; Brindley 58:2-4.) Only some Plaintiffs have testified that they were required to wear 316 uniforms. (Hyde Dep. 119:16:18; Brown Dep. 86:7-11; Johnson Dep. 92:14-16.)

Indeed, each Plaintiff who signed an Agreement with 316 expressly acknowledged his classification as an independent contractor within the Agreement without objection. Further, two of the four Plaintiffs owned and generated revenue for towing companies of their own during the time they worked for 316. (Brown Dep. 105:7-21; Johnson Dep. 119:1-10, 120:22-25.) And at least one Plaintiff, Johnson, actually processed the payments he received from 316 through his company, Relief Roadside Services LLC. (Johnson Dep. 120:22-121:9.)

With respect to the degree of permanency and duration of the working relationship, the court will be required to consider Hyde's sporadic "stints"—or

occasions in which he stopped working and then came back—in the context of his classification status, alongside Brown's short two-week tenure.  (Hyde Dep. 20:8-21:8, 156:1-6; Brown Dep. 101:1-2.) As another court in the Eleventh Circuit noted, "[i]n order to determine who is an independent contractor and who is an employee, the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's relationship with [defendant]. . . . Where this is the case, certification of a collective action under the FLSA is inappropriate." Demauro v. Limo, Inc., No. 8:10–cv–413–T–33AEP, 2011 WL 9191, at *4 (M.D. Fla. Jan. 3, 2011).  Thus, while not an exhaustive independent contractor analysis, the record here clearly reflects differences between the Plaintiffs and their relationship with 316 as an independent contractor versus employee.

### c. Individual Analysis Will Be Needed to Determine Whether Any Plaintiffs Are Subject to the Overtime Provisions of the FLSA.

While Defendants maintain that all Plaintiffs are exempt from the overtime provisions of the FLSA, individual analysis will be needed to determine the specific way in which each driver is exempt from coverage under the FLSA.  On the one hand, the FLSA "exempts from its overtime pay requirement 'any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of the Motor Carrier Act ('MCA')." Swan v. Nick Grp., Inc., No. 1:11–cv–1713–WSD, 2013 WL

19

5200508, at *3 (N.D. Ga. Sept. 13, 2013) (quoting 29 U.S.C. § 213(b)(1)).   There are two requirements for an employee to be subject to the MCA exemption: (1) his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA; and (2) the employee's business-related activities must directly affect the safety of operation of motor vehicles in transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA].  *Id.*

A motor carrier is subject to the Secretary of Transportation's jurisdiction under the MCA where its "activities directly affect the safety of operations" of motor vehicles, and where it is "engaged in interstate commerce."  *Id.*  316 is a motor carrier authorized by the Federal Motor Carrier Safety Administration under motor carrier number MC-531312, and whose activities directly affect the safety of operations of motor vehicles.  (Kudrin Aff. ¶¶ 4-5, Nov. 17, 2023; Hyde Dep. 56:4-10.)   Because 316 also transports vehicles interstate, 316 is subject to the jurisdiction of the Secretary of Transportation.  (Kudrin Aff. ¶ 3, Nov. 17, 2023.)  Only some Plaintiffs, however, have testified to performing work across state lines.  (Hyde Dep. 97:25-98:14; Brown Dep. 82:13-18; Johnson Dep. 75:22-76:7; Brindley Dep. 82:3-8.)  At least one Opt-In, Brown, testified he never performed any interstate trips.  (Brown Dep. 82:13-18.)  Thus, the MCA exemption may not be available to all Plaintiffs—

i.e., those who drove purely intrastate.  29 C.F.R. § 782.2(a) (the MCA Exemption applies to safety of operations *in interstate or foreign commerce*) (emphasis added).

On the other hand, those Plaintiffs who did not perform work *in interstate* commerce would not be subject to coverage under the FLSA's overtime provisions in the first instance.  To establish a claim under the FLSA, Plaintiffs must show either that (i) they were engaged in commerce or in the production of goods for commerce (individual coverage), or that 316 is an enterprise engaged in commerce or in the production of goods in commerce (enterprise coverage).  29 U.S.C. § 207(a)(1).  For an enterprise to be covered under the FLSA it must have both (i) employees engaged in commerce or in the production of goods for commerce; and (ii) annual gross volume of sales made or business done is an amount not less than $500,000.  29 U.S.C. § 203(s)(1)(A).  Here, solely by way of example for illustration, Brown worked only during 2021, one of the years in which 316 grossed less than $500,000 in sales made or business done.  (Kudrin Aff. ¶ 12, Nov. 17, 2023; Brown Dep. 80:5-8, 92:7-10.)  Thus, 316 would not be subject to enterprise coverage for 2021.  And because Brown did not perform interstate trips, accept customer payments, or introduce any other facts supporting a showing that he was engaged in commerce, 316 would not otherwise be subject to individual coverage under the

FLSA.  (Brown Dep. 82:13-22, 83:1-11.)  Therefore, different exemptions will apply to the Plaintiffs warranting decertification, requiring individual analysis.

### d. Individual Analysis Will Be Needed to Determine Whether Any Drivers Performed Overtime Work.

Moreover, whether the Opt-Ins worked overtime hours "creates a disparate factual setting among the individual Plaintiffs as the issue of liability is not susceptible to common proof." Rindfleisch, 22 F.Supp.3d at 1303.  In Rindfleisch, this Court found that because some plaintiffs did not actually work overtime and "do not actually have a viable claim for damages, disparate factual settings and individual defenses exist[ed]," which warranted decertification of the collective action.  Id. at 1304.  As discussed in Section I(b), above, the record reflects that Plaintiffs performed no overtime work.  Because at least some Plaintiffs did not work overtime, the issue of liability as to each Plaintiffs' claims "is not susceptible to common proof."  Id. at 1303.

Accordingly, in light of the foregoing, this Court should hold that Plaintiff Hyde cannot satisfy his burden to show no "disparate factual setting and individual defenses" among the Plaintiffs required to maintain this collective action and decertification should therefore be granted and the Opt-Ins dismissed.

## III.   FAIRNESS AND PROCEDURAL CONSIDERATIONS WARRANT DECERTIFICATION.

Finally, for the third decertification factor, as further discussed in Rindfleisch, the fact that some Plaintiffs did not actually perform overtime work also necessitates decertification for fairness considerations.  Rindfleisch, 22 F.Supp.3d at 1304.  Such a record would result in "a miscarriage of justice for [Defendants] to pay overtime damages to a subset of Plaintiffs who are not actually owed any overtime damages." Id.  The Court in Rindfleisch further noted that "awarding damages for non-existent overtime hours is exactly the type of result the fairness consideration . . . seeks to prevent."   Id.   Due to the numerous factual differences among the individual Plaintiffs, this collective action must be decertified in the interests of judicial economy.  "Because of the individualized nature of Plaintiffs' claims, fairness and procedural considerations also warrant decertification."  Grayson v. K–Mart Corp., 849 F.Supp. 785, 791 (N.D.Ga.1994) (holding that a trial involving separate factual situations for each plaintiff "would be intolerable").  As illustrated below, the clear record here reflects that no Plaintiff is factually similar to any other:

|  | Hyde | Johnson | Brown | Brindley |
|---|---|---|---|---|
| **Admits to Signing Agreement** |  | X | X | X |
| **Privately Owns a Towing Business** |  | X | X |  |
| **Performed Interstate Trips** | X | X |  | X |
| **Accepted Payments from Customers** | X |  |  | X |

| | | | | |
|---|---|---|---|---|
| **Had Manager Duties** | X | | | |
| **Admits to Spending On-Call Time at Home** | X | X | | X |
| **Reported Directly to Eli Kudrin** | X | | | X |
| **Reported Directly to Dustin Hyde** | | X | X | |
| **Alleges Set On-Call "Shift"** | | X | X | X |
| **Required to wear uniform** | X | | X | |

If this case is allowed to proceed as a collective, the result would be a waste of the parties' and the Court's resources because "mini-trials" would become necessary to parse out the individual factual evidence and legal issues necessary to resolve the Plaintiffs' claims—precisely the type of record that warrants decertification.  Even if judicial economy could be maintained, however, "[t]he efficiencies to be gained by holding one trial as opposed to many cannot be obtained at the expense of [the Defendants'] due process rights."  Knott v. Dollar Tree Stores, Inc., 897 F. Supp.2d 1230, 1241 (N.D. Ala. 2012).

## CONCLUSION

In light of the foregoing, the clear record in this collective action warrants decertification because of the disparate factual and employment settings of the individual Plaintiffs, the various defenses available to Defendants that are individual to each Plaintiff, and fairness and procedural considerations.  Indeed, the individual factual differences between each of Plaintiff requires fact-intensive inquiry and analysis to resolve, defeating any judicial economy that would be achieved through

allowing this case to proceed as a collective action.  This Court should exercise its discretion to decertify this action, finding that Plaintiffs are not sufficiently "similarly situated" and that fairness considerations support decertification here.

Accordingly, Defendants respectfully request that this Court decertify the collective action and dismiss all Opt-Ins, taxing all recoverable costs associated with the Opt-Ins against Plaintiff, and award all other relief this Court deems just.

Respectfully submitted this 20th day of November 2023.

MITCHELL - HANDSCHUH
LAW GROUP
3390 Peachtree Road, NE, Suite 520
Atlanta, Georgia 30326
T: (404) 262 - 9488
F: (404) 231 - 3774
E: jeremy@m-hlawgroup.com
E: amanda@m-hlawgroup.com

/s/Jeremy R. Handschuh
Jeremy R. Handschuh, Esq.
Georgia Bar No. 418099
Amanda I. Elliott, Esq.
Georgia Bar No. 137633
*Counsel for Defendants*

*Counsel for Defendants certify that this document complies with N.D.Ga. L.R. 5.1B and the N.D.Ga. Standing Order No. 04-01.*