# Exhibit E

**In the Matter Of:**

HYDE V. 316 TOWING & ROAD SERVICE

2:22-cv-103-RWS

---

**REYNALDO BROWN**

*September 28, 2023*

---



800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit E, Brown Dep.**

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF GEORGIA
2                     GAINESVILLE DIVISION

3
   DUSTIN HYDE, Individually,    )
4  and on Behalf of All Other    )
   Similarly Situated,           )
5                                )  CIVIL ACTION FILE
             Plaintiff,          )
6                                )  NO. 2:22-cv-103-RWS
        vs.                      )
7                                )
   316 TOWING & ROAD SERVICE,    )
8  INC., and MAKSIM LISOVSKIY,   )
                                 )
9             Defendants.        )
   _____)
10

11

12           Deposition of REYNALDO BROWN, taken on

13      behalf of the Defendants, pursuant to Notice

14      and agreement of counsel, in accordance with

15      the Federal Rules of Civil Procedure, before

16      Cynthia B. Gatewood, Certified Court Reporter,

17      at 3390 Peachtree Road NE, Suite 520, Atlanta,

18      Georgia, on the 28th day of September 2023,

19      commencing at the hour of 3:10 p.m.

20

21

22  _____

23

24

25
```



1                    INDEX TO EXAMINATIONS

2    EXAMINATION                                        PAGE

3    Cross-Examination by MR. Handschuh                    4

4

5                     INDEX TO EXHIBITS

6    DEFENDANTS'
         EXHIBIT             DESCRIPTION             PAGE
7
         D-1        Third Amended Notice to Take        5
8                   Deposition of Reynaldo Ricardo
                    Brown
9
         D-2        Driver Application                 34
10
         D-3        not tendered
11
         D-4        Responses to Defendants' First     30
12                  Interrogatories, Requests for
                    Production, and Requests for
13                  Admission

14       D-5        Independent Contractor and Lease   44
                    Agreement
15
         D-6        Towbook Log                        78
16
         D-7        Canceled Job Log                   81
17
         D-8        Damages Table                      97
18
         D-9        Invoice                           100
19
         D-10       IRS Response                      103
20

21

22                         -   -   -

23

24

25



800.211.DEPO (3376)
EsquireSolutions.com

**Exhibit E, Brown Dep.**

```
 1   APPEARANCES OF COUNSEL:

 2

 3   On behalf of the Plaintiff:

              SEAN SHORT
 4            Attorney at Law
              Sanford Law Firm PLLC
 5            Suite 510, Kirkpatrick Plaza
              10800 Financial Centre Parkway
 6            Little Rock, Arkansas 72211
              Phone:  (501) 904-1650
 7            Email:  sean@sanfordlawfirm.com

 8

 9   On behalf of the Defendants:

              JEREMY R. HANDSCHUH
10            AMANDA I. ELLIOTT
              Attorneys at Law
11            Mitchell-Handschuh Law Group
              3390 Peachtree Road NE
12            Suite 520
              Atlanta, Georgia 30326
13            Phone:  (404) 262-9488
              Email:  jeremy@m-hlawgroup.com
14            Email:  amanda@m-hlawgroup.com

15

16   Also Present:

17            Maksim Lisovskiy
              Eli Kudrin

18

19                          -   -   -

20

21            (Disclosure, as required by the Georgia
         Board of Court Reporting, was made by the court
22       reporter, a written copy of which is attached
         hereto.)
23

24

25
```



**Exhibit E, Brown Dep.**

1   do my initials for sure.

2       Q.    Okay.  Flipping to page -- once we get to

3   the signature line on this Exhibit Number 5.

4       A.    On the back?

5       Q.    Yes.  You see here where it sets forth that

6   this agreement is dated June 1st, 2021?

7       A.    Yes.

8       Q.    Okay.  And then it has your name, and is

9   that your signature underneath your name?

10      A.    Yes.

11      Q.    Okay.  So you did sign this document.

12      A.    Yes.

13      Q.    Okay.  Turning to the following page and

14  then actually three or four pages later to Addendum to

15  Contractor Agreement.

16      A.    All right.

17      Q.    And does that appear to be your signature at

18  the bottom of that page?

19      A.    Yeah.

20      Q.    Okay.  And is that June 1st, 2021?

21      A.    This isn't mine though down here.

22      Q.    Right.

23      A.    Yeah.

24      Q.    Do you know -- you know, do you have any

25  idea as to who may have set forth your initials if it



1      Q.    Okay.  And so that would refer to the

2   contractor.  And here it states that there was an

3   understanding between 316 and yourself that you were to

4   be an independent contractor.

5      A.    All right.

6      Q.    Is that correct?

7      A.    Yes.

8      Q.    Okay.  Further, if you could go to the page

9   with the signature pages on it.

10     A.    Yes, that's my signature.

11     Q.    Okay.

12     A.    I looked at it.

13     Q.    If you could go to the paragraph 9 above

14   that signature.

15     A.    All right.

16     Q.    Do you see there where it states that "The

17   parties agree that any dispute concerning the terms of

18   this agreement will be submitted to mediation followed

19   by binding arbitration before a tribunal convened under

20   the rules of the American Arbitration Association at

21   Atlanta, Georgia"?

22     A.    I don't know what none of those words mean,

23   but I see it.

24     Q.    You do see it.  Okay.  Do you know whether

25   or not your participation in this matter, did you



1        A.    It was soon.  I just don't know the date.

2        Q.    Okay.  Do you think it was a matter of

3   months or just relatively quick?

4        A.    Relatively quick.

5        Q.    Okay.  Can you describe your duties while

6   you were a driver?

7        A.    Yeah.  It was a tow truck driver.  My job

8   was to tow cars.

9        Q.    Go ahead.  I'm listening.

10       A.    Give jump starts, change tires, do

11  lock-outs.  That's where someone locks their keys in

12  their car.

13       Q.    Okay.

14       A.    And just wait for -- you know, wait for a

15  call.  I'd sit at a gas station close by the house or a

16  parking lot, like Walmart or any store really, and just

17  do calls as they come in.

18       Q.    Okay.  So it sounds as though, if I can

19  summarize, they were all driver-type duties related to

20  responding to calls.

21       A.    Driver type, like driving to go get calls?

22       Q.    Correct.  Meaning did you have any other

23  duties that wasn't related to driving the truck?  And,

24  if so, what were those?

25       A.    Do you mean like changing a tire?



1    Q.    I under -- right.  So at least responding to

2  calls, whatever type of service they would have needed,

3  a changed tire, lock-out, maybe fill up the gas --

4    A.    And jump starts.

5    Q.    -- if they ran out of gas and jump starts.

6    A.    Yeah.

7    Q.    But then aside from responding to the caller

8  and the needs that they had and driving the vehicle,

9  were you performing any other duties on behalf of 316?

10   A.    Oh, no, that was it.

11   Q.    Okay.  So there was no need to go to the

12 office to fill out paperwork or to place ads?  You

13 weren't in charge of any -- I just want to be certain

14 that you don't recall any other types of duties while

15 you were working there.

16   A.    No.

17   Q.    Okay.  You weren't in charge of any office

18 type work or administrative type work?

19   A.    Just a tow truck driver.

20   Q.    Okay.  Just to be clear, and you think that

21 was consistent and remained the same the entire time

22 that you were a driver?

23   A.    Yes.

24   Q.    Okay.  If for any reason during our depo

25 right now -- deposition rather -- you think you had



REYNALDO BROWN                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                           61

1    more duties, please let me know.

2          A.    (Witness nods head affirmatively.)

3          Q.    Okay?

4          A.    All right.

5          Q.    I just want to be clear on that.  If you

6    thought you did more, just let me know.

7          A.    Copy.

8          Q.    So no one ever asked you to perform any

9    other duties beyond being a driver.

10         A.    Like what?

11         Q.    I don't know.

12         A.    Me neither.

13         Q.    Okay.  All right.  Who was your supervisor

14   while -- or someone that you reported to while you

15   worked at 316?

16         A.    If I'm not mistaken, I think they made

17   Dustin the supervisor or the go-to guy for me to report

18   stuff to.  But I spoke to -- I think I spoke to Eli

19   kind of regularly doing a text message.

20         Q.    Okay.  Now, when you speak to Dustin, did

21   Dustin at that time have the title of driver manager?

22         A.    Something like that.

23         Q.    You understood that --

24         A.    Yeah.

25         Q.    -- he was perhaps, you know, in a position



1   of supervision higher than the drivers --

2        A.    Well, I just knew he trained me, so I

3   figured --

4        Q.    Oh, okay.

5        A.    -- just call him, you know, if I needed

6   advice on a car.

7        Q.    Did he ever disclose his title of driver

8   manager saying to you, "I'm the driver manager"?

9        A.    I would just say he's, you know -- I don't

10  think he ever said it, but I would just --

11       Q.    Did you understand that to be true, meaning

12  he would train you but also other drivers?

13       A.    I don't know about other drivers, if he

14  trained any others or not.

15       Q.    Really?  Okay.

16       A.    But I know he trained me.  So if I needed

17  help with something, I'd just ask him, "Hey, I can't

18  find the hook points underneath this car."  He'll tell

19  me where to look, and I'll find it, and then --

20       Q.    Okay.

21       A.    -- stuff like that.

22       Q.    But if it wasn't Dustin, then you recall it

23  was Eli; correct?

24       A.    Oh, I wouldn't ask Eli for advice to tow a

25  car because it would be like you don't know what you're



 1  read the whole thing.

 2      A.    All right.

 3      Q.    Okay.  So we were -- prior to reviewing

 4  Interrogatory Number 3 and its response, you had

 5  mentioned that your schedule was for 12-hour shifts,

 6  whether those were from 7:00 a.m. to 7:00 p.m. or vice

 7  versa; is that correct?

 8      A.    Uh-huh, yes.

 9      Q.    Do you recall about how long you worked for

10  316?

11      A.    No.  I think you said about two weeks;

12  right?

13      Q.    Yeah.  Does that sound about right?

14      A.    It's possible.

15      Q.    Okay.  Do you think it was longer?

16      A.    It might have been; it might have not have

17  been.  I honestly don't remember --

18      Q.    Okay.

19      A.    -- how long I worked there.

20      Q.    Was it a short period of time?

21      A.    Yes.

22      Q.    Okay.  Can you identify here what types of

23  jobs you were doing after your regular shift, what that

24  means?  It says, "There could be an extra job after my

25  shift ended at 7:00 p.m. that I would have to do, which



REYNALDO BROWN                                          September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                                      72

1         A.    No.

2         Q.    Okay.  Was it a lot of times or just maybe

3    once or twice?

4         A.    A few.

5         Q.    Okay.  Was there ever variation -- I know

6    you mentioned you went from what appeared to be a

7    nighttime shift to a daytime shift.  Do you recall when

8    that might have occurred?

9         A.    No.

10        Q.    Okay.  Was it pretty consistent?  Did it

11   switch around each week, or was this --

12        A.    I just switched once.

13        Q.    Switched once.

14        A.    I can't remember from what to what though.

15   I can't remember if I started off working 7:00 a.m. and

16   stopped at 7:00 p.m. or if I started off the other way

17   around.

18        Q.    Okay.  Did you ever have to report to the

19   316 office for work, meaning drive there for some

20   reason?

21        A.    If I'm not mistaken, I did.

22        Q.    You did drive there from time to time.  But

23   in order -- were you allowed to during your shift drive

24   to where you'd like while you weren't responding to a

25   job awaiting the next dispatch?



1        A.    I had to either wait at a parking lot or a
2    gas station.  Usually I would wait at a Walmart parking
3    lot in the back away from other cars so I'm not in the
4    way.
5        Q.    Okay.  Who told you that you had to wait
6    somewhere?
7        A.    You always have to wait somewhere when you
8    drive a tow truck.  If you keep driving, you'll burn
9    the gas up.
10       Q.    I'm just asking did anyone point out the
11   specific location, or could you chose?
12       A.    It depends on the area.  Like if I have a
13   call and it's going that way, I have to wait somewhere
14   that way.  It just depends on wherever I drop the car
15   off at.
16       Q.    But, to make it more clear, I'm inquiring --
17   Eli and Max didn't give you like certain places where
18   you had to --
19       A.    As long as it was a parking lot.
20       Q.    As long as it was a parking lot.
21       A.    Yeah, as long as I'm like out on the road.
22       Q.    Were you allowed to return home during the
23   times you were on your shift?
24       A.    While I was on the clock?
25       Q.    Excuse me?



1       A.    Like between the 12 hours while working?

2       Q.    Sure.

3       A.    No.

4       Q.    Okay.  Did you ever try?

5       A.    I'd try to go home to try to get a sandwich

6   or something, but usually I just eat in the street.

7       Q.    Okay.  But you could from time to time go

8   home to eat.

9       A.    No.

10      Q.    You didn't?

11      A.    No.  I ate McDonald's, Burger King, Taco

12  Bell.

13      Q.    But you don't -- was anything prohibiting

14  you, if you so chose, to go home and eat at home?

15      A.    If I'm on the clock, no.  Yeah, I can't go

16  there.

17      Q.    You can't go?

18      A.    No.  Home and eat, no.

19      Q.    Who told you that?

20      A.    The bosses.

21      Q.    Who are they?

22      A.    Max and Eli.

23      Q.    They said you can't go home?

24      A.    From what I recall, yeah.

25      Q.    Okay.  Do you know if that was in writing



1   "During the time you were scheduled to be on call, you

2   would spend at least part of your on-call period at

3   home or engaged in personal activities."  And you

4   admitted the same and stated, "Plaintiff would go home

5   for like 10 or 15 minutes" --

6        A.    I went home twice to use the bathroom while

7   I've been working for 316, but that was it -- it wasn't

8   personal activities -- because I would hate to use the

9   bathroom in a gas station.  But other than that,

10  sometimes, if I'm not around the house.  But if I'm

11  somewhere close, I go there to make a number 2.

12       Q.    Okay.

13       A.    But that was it.

14       Q.    Okay.  Any restriction based on your

15  response to Admission -- Request for Admission Number

16  24 which says that, you know, even if you didn't, you

17  know, choose to spend time at home, you weren't

18  restricted from spending that time at home; is that

19  right?

20       A.    Let me try to read that one more time.  I

21  don't know what personal activities are, but --

22       Q.    Okay.  Just to make it simpler, would you

23  change your response to Admission Number 24 in any way?

24       A.    Yeah, because personal activities is no.

25  Like I said, I only went home probably twice since I



REYNALDO BROWN                                     September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              77

 1   worked there, and that was just to use the bathroom.

 2        Q.    Okay.

 3        A.    And that was it.

 4        Q.    Turning now to Request for Admission Number

 5   26, which is on the next page.

 6        A.    Uh-huh (affirmative).

 7        Q.    If you could read that one and let me know.

 8        A.    All right.

 9        Q.    Did you -- here it appears you denied the

10   personal responsibilities piece; is that correct?

11        A.    I don't know -- I don't even know what that

12   means.

13        Q.    Okay.  Or personal errands, meaning little

14   tasks you need to do throughout the day.

15        A.    What about it?

16        Q.    It asks while you were on call whether you

17   would attend to personal responsibilities, which you

18   don't understand, or whether you would attend to

19   personal errands while you were on call.  And you

20   denied that.

21        A.    That means like driving a tow truck to go do

22   stuff for myself?

23        Q.    Correct.

24        A.    I never did that.

25        Q.    Okay.  Were you prohibited from doing that?



1      A.    I never needed to.  I never did ask to.

2      Q.    Okay.

3      A.    I just was there to do my job.  I could do

4  errands when I'm off.

5      Q.    And while you weren't responding to a job,

6  you were parked in I think you mentioned a parking lot

7  of some kind.

8      A.    Yeah.

9      Q.    And you could choose which parking lot.

10     A.    Yes.  I just parked -- just parked wherever

11  the closest call was.  Like if I drop a car off here,

12  find a gas station nearby, and wait for the next call.

13     Q.    Okay.  You mentioned earlier that you were

14  familiar with the Towbook tracking app and having

15  installed it on your phone; correct?

16     A.    Yes.

17     Q.    Okay.  Were you ever issued any phone from

18  316?

19     A.    No.

20     Q.    Okay.  Were you ever issued any kind of iPad

21  or --

22     A.    No.

23     Q.    -- any other product?  Okay.

24           (Exhibit Number D-6 was marked for

25           identification.)



1        A.    No.

2        Q.    So do you have any reason to believe that

3    these particular trips are inaccurate in any way?

4        A.    No.

5        Q.    Do you have any other veri -- or documents

6    that would reflect any work on behalf of 316 beyond the

7    month of June 2021?

8        A.    No, I don't.

9        Q.    Okay.  If you do have such documents, will

10    you produce them for your attorney to give to us?

11        A.    Uh-huh (affirmative).

12        Q.    Okay.  Had you ever seen the Towbook reports

13    for you prior to today?

14        A.    This one?

15        Q.    Uh-huh (affirmative).

16        A.    No.

17        Q.    Okay.  Do you have any reason to believe

18    that this report is inaccurate?  I think you testified

19    no; correct?

20        A.    No.

21        Q.    Okay.  Do you recall an ability to accept or

22    reject jobs?

23        A.    No.

24        Q.    Okay.

25        A.    I wasn't able to reject a job.



**Exhibit E, Brown Dep.**

REYNALDO BROWN                                        September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                                    82

1   someone came and fixed the tire for them before I got

2   there, stuff like that.  But I never turned down a job.

3   I never pressed ignore.  When the phone ring, it give

4   you two options, accept or cancel.  I never pressed

5   cancel on neither one ever.

6         Q.    Okay.

7         A.    I just go do the job.

8         Q.    What does "car too big for wheel lift," what

9   does that mean?

10        A.    I don't know.  I never drove a wheel lift.

11        Q.    You never -- okay.

12        A.    I had a flatbed.

13        Q.    Do you recall whether or not any of the tow

14  trips that you would have undertaken, did any of those

15  cross into another state?

16        A.    No.

17        Q.    Okay.  Did you ever go to South Carolina?

18        A.    Another state?  No.

19        Q.    No?  Okay.  So just with certainty, you

20  don't recall South Carolina or another state.

21        A.    Unless I just didn't know I was in another

22  state, but I don't think so.

23        Q.    Okay.  This was in the Winder, Georgia,

24  area?

25        A.    Yes.



1       Q.    Okay.  While you worked for 316, were you

2    ever involved in collecting any payments from any of

3    the customers?

4       A.    No.  Used Towbook.

5       Q.    No?  Okay.  When you say "used Towbook,"

6    does that mean you used Towbook to collect payments, or

7    am I misunderstanding that?

8       A.    I didn't personally collect money.  I just

9    towed the cars.  If I did collect, I don't remember.

10   But it's possible because I have done it before, but

11   it's been so long.

12      Q.    Okay.  But you just don't recall

13   regularly --

14      A.    I don't recall collecting anything

15   from working 316, no.

16      Q.    Okay.  That would include collecting cash?

17      A.    Yeah.

18      Q.    And collecting it by some type of telephone

19   system like Square or Clover?

20      A.    I get you.  Okay.

21      Q.    You didn't do either one of those?

22      A.    No.

23      Q.    Okay.  Do you think you may have done that

24   just once or just never?

25      A.    It's possible that I don't remember doing



1    it.  I don't remember doing it.

2         Q.    But it wasn't something that was routine?

3         A.    No.

4         Q.    Okay.  Were you ever disciplined for

5    rejecting a job?

6         A.    I never rejected a job.

7         Q.    Okay.  Fair enough.  Hey, easy.  You drove a

8    Dodge Ram 5500?

9         A.    Yes, I think so.

10        Q.    Okay.

11        A.    Sounds about right.

12        Q.    Do you know that particular vehicle to have

13   a gross vehicle weight rating of about 19,000 pounds?

14        A.    I don't know how much it -- I wasn't taught

15   that part.

16        Q.    Do you know if it was over 10,000 pounds?  I

17   mean, I know you might not know 19, but did you know it

18   was over 10,000?

19        A.    The tow truck?  I don't know how much a tow

20   truck weighs.

21        Q.    Okay.  If the tow truck simply set forth a

22   gross vehicle weight rating on the door, would you have

23   any reason to doubt that?

24        A.    If it said how much the tow truck weighs on

25   the door?



REYNALDO BROWN                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              86

1        A.    All right.

2        Q.    -- different sizes.  Who owned that Dodge

3   Ram that you were using?

4        A.    Max.

5        Q.    Okay.  But not you.

6        A.    No.

7        Q.    Okay.  Were you ever required to were

8   uniforms?

9        A.    I had a T-shirt.

10        Q.    T-shirt?  It said 316?

11        A.    Uh-huh (affirmative).

12        Q.    Okay.  Did you buy that T-shirt?

13        A.    No.

14        Q.    Okay.  It was just given to you?

15        A.    Yes.

16        Q.    Okay.  Were you ever provided a system to

17   track your hours?

18        A.    Not that I recall.

19        Q.    Okay.  Do you recall back in this

20   application -- if you'd turn back to Exhibit 2, and

21   then the last page --

22        A.    Which one?

23        Q.    It's got 2 at the front.

24        A.    On the last page?

25        Q.    Uh-huh (affirmative).



REYNALDO BROWN                                      September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              92

1        A.    It would have refreshed my memory if it had

2    the vehicles I was towing on it.

3        Q.    Do you think any jobs are missing from this

4    Towbook?

5        A.    I don't know what jobs because I don't see

6    it.  I don't see the vehicles on here.

7        Q.    Okay.  Do you have any reason to believe

8    that you did not work for 316 Towing for any time other

9    than the month of June 2021?

10       A.    No.

11       Q.    Can you explain the reason for your

12   departure?

13       A.    They didn't tell me.

14       Q.    Okay.  Can you -- just tell me the story.

15   What happened?

16       A.    I think the first was a text saying that --

17   I think I might have got a text saying I was not to

18   come back in.  And then I called and asked --

19       Q.    Who sent you that?

20       A.    I think Eli sent it to me.

21       Q.    Eli?  Okay.

22       A.    And then when I called and asked him, he

23   told me that Max didn't want me working.

24       Q.    Really?

25       A.    Yeah.  And then that was the last that I



1   Towing in any given week between the years 2019 through

2   '22.  And you denied that admission, and I'd like to

3   know why that was denied.

4       A.    I probably heard the question wrong because

5   it sounds backwards.

6       Q.    Okay.  So do you think --

7       A.    "Please admit that" --

8       Q.    -- you should have admitted?

9       A.    I'm not sure how -- hang on.  "Please admit

10  that you never performed" --

11      Q.    Okay.  Did you ever work over 40 hours?

12      A.    Yes.

13      Q.    Okay.  When was that?

14      A.    I don't know.

15      Q.    Okay.

16      A.    Because when I --

17      Q.    Every week that you were there?

18      A.    Yeah, because I never got off at -- I don't

19  know the dates and the times.  But when I wasn't --

20  when I wasn't doing the Towbook call, like I said, I'd

21  get a call through a text.  But, like I said, I don't

22  have it.  So --

23      Q.    Okay.  I'm just asking just whether or not

24  you have any basis for determining what amount of

25  overtime you think you're due.



1          A.    No.

2          Q.    Okay.  With respect to this final check, can

3     you explain or recall how many checks in total you

4     received?

5          A.    Two.

6          Q.    Two?  Okay.

7                (Exhibit Number D-9 was marked for

8          identification.)

9                MS. ELLIOTT:  I'm handing you what's been

10         marked as Exhibit 9.

11    BY MR. HANDSCHUH:

12         Q.    Could you take a look at this document and

13    let me know.

14         A.    All right.

15         Q.    Was this an invoice prepared by you and sent

16    to 316 Towing for payment?

17         A.    I don't know.

18         Q.    Okay.  Do you have any other invoices that

19    refer to this period of time?

20         A.    Invoices?

21         Q.    Correct.  Do you recall --

22         A.    I don't know what an invoice is.

23         Q.    Okay.  Do you recall for purposes of your

24    pay that each week you would prepare an invoice and

25    send it to 316?



1        A.    So I worked two weeks for 316, so I got two

2   checks.

3        Q.    Okay.

4        A.    All right.  I was mistaken then.  Because

5   if -- I thought I worked three weeks.

6        Q.    And this was at least for -- it's labeled

7   Invoice Number 2.  This appears to be the second of

8   your invoices.

9        A.    Checks?

10       Q.    Invoice.  I'm just pointing that out, the

11  document itself that we're looking at.

12       A.    All right.

13       Q.    Had you ever seen this document?

14       A.    No, I don't think so.

15       Q.    You never prepared this?

16       A.    I don't think so.  I might -- I don't

17  recall.

18       Q.    Okay.  Do you know whether or not there are

19  any other invoices that you haven't produced in this

20  action that --

21       A.    I don't know what an invoice is.

22       Q.    I think you -- I want to make sure I'm

23  getting this clearly.  When you were hired as an

24  independent contractor driver, you were then asked to

25  submit invoices to receive your pay.  Do you recall



REYNALDO BROWN                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                            105

 1  could -- let's see.  It's not numbered, so I'm going to

 2  have to draw your attention to it.  Can I borrow yours

 3  for a moment?  I'll turn to it.

 4       A.    Sure.

 5       Q.    Thanks.

 6       A.    You're welcome.

 7       Q.    Drawing your attention to Form 8995, we

 8  mentioned that A1 Quality Towing was an entity that you

 9  claimed was created but never had a truck and never

10  started operating; correct?

11       A.    Yes.

12       Q.    Do you know why on this tax return it sets

13  forth an income for A1 Quality Towing of 13,000?

14       A.    No.

15       Q.    Okay.  So you don't have any personal

16  understanding as to why that company reflected $13,000

17  in income that year?

18       A.    No.

19       Q.    Okay.  Do you know whether that to be an

20  error?

21       A.    No.

22       Q.    Okay.  Was --

23       A.    I know we used the card.  I know she had

24  a -- like a credit card in her name for it, for the

25  company.  We used it, but we never did any work with



## INDEPENDENT CONTRACTOR AND LEASE AGREEMENT

This Independent Contractor Agreement is made between 316 Towing and Road Service (hereinafter referred to as "Carrier") and REYNALDO RICARDO BROWN, (hereinafter referred to as "Contractor").

WHEREAS, Carrier is a for-hire motor carrier operating in interstate commerce and subject to the rules and regulations of the Federal Motor Carrier Safety Administration, the U.S. Department of Transportation, and other federal and state agencies; and

WHEREAS, Contractor is a (check where applicable):  (1) A Sole Proprietorship ☐; (2) Limited Liability Corporation or Partnership ☑; or (3) A Corporation ☐ which owns or leases the equipment identified in Appendix A attached hereto; and

WHEREAS, the parties desire to enter an independent contractor relationship and lease agreement in accordance with applicable law;

NOW, THEREFORE, the parties agree as follows:

This Agreement shall govern the lease of equipment identified on Appendix A with driver by Contractor to Carrier for the continuing performance of a series of separate transportation contracts, the payment for which shall be determined in accordance with the agreed compensation set forth in Appendix B.

1.    <u>Compliance with Federal Statutes and Regulations</u>.  The parties acknowledge and agree that this contract is governed by Federal Regulation, to wit: 49 C.F.R. 376 and it is the intent of the parties that this Agreement fully comply with such regulations without creating indicia of control which would otherwise frustrate the intent of the parties to create an independent contractor relationship. See 49 C.F.R. 376.12(c)(4).

Accordingly, the parties agree as follows:

A.    Carrier shall exercise that level of dominion and control over the leased equipment required by Federal Motor Carrier Safety Regulations including the execution of an original and 2 copies of this Lease by the parties with a copy or notice of this Lease to be kept on the equipment during its term in accordance with 49 C.F.R. 376.11(a) and 49 C.F.R. 376.12(l).

B.    Receipts specifying the identity of the equipment and stating the date and time possession is transferred shall be issued in the form set forth in Appendix C in the time and manner as required by 49 C.F.R. 376.11(b).

C.    During the period of the Lease, Carrier shall identify the equipment in accordance with FMCSA requirements found at 49 C.F.R. 390.21 and Contractor warrants that it will immediately execute a receipt for return of the equipment as provided for in Appendix C, and remove or submit for removal all identification that the equipment is operated subject to the safety duties and obligations of Carrier. Within five calendar days of termination of the lease,

Initial Here: RRB



EXHIBIT

5

**Exhibit E, Brown Dep., Ex. 5**

Contractor shall return to Carrier by mail or in person all identification devices, other than those painted directly on the equipment, as well as the executed receipt. Carrier may withhold final payment to Contractor, pursuant to 49 C.F.R. 376.12(f) until this requirement is complied with.

        D.    <u>Records of Equipment</u>. Carrier shall keep records covering each separate job or trip for which Contractor's services are retained in accordance with 376.11(d). Contractor warrants that it will instruct its driver to issue, obtain and carry while in transit bills of lading covering each trip which identify the lading and indicating the point of origin, the time and date of departure, the point of final destination, and confirm that the transportation is provided under the responsibility of Carrier.

        E.    Contractor warrants that it is the title holder or has equitable ownership of the leased equipment in accordance with 49 C.F.R. 376.12(a).

        F.    The Lease shall commence with the time of the giving of the receipt for possession and shall continue from month to month until terminated by either party in accordance with the termination provisions herein.

        G.    To fulfill the exclusive possession and responsibilities of the regulations, the authorized Carrier shall have exclusive possession, control and use of the equipment for the duration of the lease and the concomitant safety duties imposed by the Federal Motor Carrier Safety Administration's regulations. See 49 C.F.R. 376.12(c) and the safety regulations found at 49 C.F.R. 390-399.

        H.    Contractor recognizes Carrier's regulatory duty to *inter alia* maintain driver qualification files, monitor driver's hours of service, conduct pre-employment and random drug and alcohol screening, verify equipment maintenance and repair, ensure proper securement, transport of freight in accordance with reasonable dispatch and highway restrictions governing the transportation of hazardous and overweight and over-dimensional loads. Contractor certifies that it is familiar with these regulatory requirements, will so instruct its driver personnel in proper compliance and will indemnify and hold Carrier harmless from any breach by it or its employees of this duty or failure to offer reasonable cooperation.

        I.    <u>Calculation of Compensation</u>. Compensation set forth in Appendix B is based upon a percentage of the line haul revenue derived from each load or trip tendered by Carrier to Contractor and accepted for transport. Line haul revenue shall be that amount reflected upon the rated freight submitted by Carrier to its customer for payment for the services rendered by Contractor and accordingly shall exclude charges paid to interline carriers, pickup and delivery fees for services not performed by Contractor, expenses for over-dimensional permits, escort service and accessorial charges not earned by line haul equipment or its drivers such as lumpers or rigging expenses. Other expenses not attributable to the services rendered by Contractor shall also be excluded from line haul revenue. In accordance with 49 C.F.R. 376.12(g), Carrier will give Contractor before or at the time of settlement a copy of the rated freight bill or computer-generated document containing the same information. Upon request, Contractor may view other documents as required by regulation. In addition to the agreed

Initial Here: RRB

percentage of line haul revenue, Contractor shall receive 100% of any fuel surcharge, if any, collectible by Carrier as reflected on its rated freight bill.

        J.      <u>Non-Reimbursable Expenses</u>. For the consideration specified above, Contractor agrees to be solely responsible for the following additional expenses:

        (1)    Identification Devices. (At its expense upon termination of lease, Contractor removing identification devices, offering suitable evidence to Carrier that such devices have been removed, or submit the equipment to Carrier for its removal.)

        (2)    Cost of Fuel.

        (3)    Fuel Taxes.

        (4)    Permits of all types.

        (5)    Tolls, ferries, accessorial services, base plate and licenses.

        (6)    The hiring and settling of wages for its drivers and the payment of all employment taxes, worker's compensation insurance,

        (7)    The maintenance of all equipment in accordance with DOT standards.

        (8)    The payment of all operating expenses including Federal Highway Use Taxes, personal property taxes, fines incurred by it.

        (9)    Furnishing all tools, including tie-downs and load securement equipment, and safety equipment required by the DOT and/or FMCSA.

      (10)    Cost pertaining to the proper training and instruction of Contractor and its employees.

      (11)    Compatible on-board computer and tracing technology to meet Shipper's requirements. Attached hereto as Appendix D is a list of tools and other devices which Contractor is required to provide pursuant to this Agreement which can be purchased or rented to Contractor by Carrier for the fees stated therein. If Contractor elects to purchase or rent these items by executing the addendum in the place provided, the cost of same will be charged back to settlements until such time as the tool or device is returned in good condition, ordinary wear and tear excepted.

Initial Here: *RRB*

(12)  <u>Property Damage to Carrier's Trailer</u>.  Contractor shall be responsible for any property damage to Carrier's trailer equipment or other equipment beyond ordinary wear and tear.

(13)  <u>Fines for Oversize or Overweight Shipments</u>.  Unless trailers are preloaded and sealed or containerized, Contractor or its employees shall be responsible for confirming that all lading is suitable for transportation in accordance with applicable weight and dimensional limitations imposed by in-transit states or authorized by special permits obtained for transportation of the shipment. Contractor shall be responsible for all fines, penalties and claims resulting from failure to comply with this obligation.

(14)  With respect to fuel purchases set forth in Subparagraph 3 above, Contractor recognizes that Carrier is required by IFTA to file taxes governing fuel taxes for its services and accordingly agrees to purchase sufficient fuel within each state in which its equipment operates to assure payment of fuel taxes.  Contractor agrees to provide Carrier with satisfactory proof of such purchases and to pay any applicable deficiency.

(15)  With respect to base plates, if purchased in the name of Carrier, upon termination of the lease Carrier will transfer the plates to another unit if possible, crediting Contractor with any refund or credit it received.  If Carrier is unable to transfer the plates to another unit, then no refund or credit will be due to Contractor.

(16)  Detention time.

K.  <u>Payment</u>.  In accordance with 49 C.F.R. 376.12(f) Carrier agrees to pay Contractor within 15 days after submission of necessary delivery documents to secure payment from shipper and driver log books required by the U.S. DOT.  Because the parties recognize that the U.S. DOT regulations now require the Carrier to maintain supporting documents including but not limited to trip reports, weight tickets, evidence of toll receipts and fees, as well as other documents, Contractor agrees to submit these additional documents with its settlement.  If such documentation is not provided within 5 working days of Carrier's request, Contractor agrees to a settlement deduction of $50 per occurrence to reimburse Carrier for the administrative expense of re-requesting the documentation.  I

L.  <u>Chargeback Options</u>.  Carrier shall be entitled to chargeback to Contractor and deduct from settlement the following: (1) all payments paid by Carrier for authorized advances and costs incurred by Carrier on behalf of Contractor as a result of Contractor's obligations enumerated in J above.  In addition, any advance specifically confirmed in writing, the purchase of any goods or services from Carrier by Contractor as specifically authorized in this Agreement or otherwise and specifically enumerated fine or penalty may be deducted for the

Initial Here: _ℓℓβ_

**Exhibit E, Brown Dep., Ex. 5**

specific amount provided for herein or at Carrier's cost without markup. Contractor will be afforded copies of documents necessary to determine the validity of any charge.

     M.    Products, Equipment or Services from Carrier. Contractor is not required to purchase or rent any products, equipment or services from Carrier as a condition of entering this Lease. Any product, equipment or service which Contractor elects to purchase shall be enumerated in Appendix D or by subsequent addenda.

     N.    Insurance. Carrier has a legal obligation under federal statute to provide bodily injury and property damage insurance to the public for the use of the leased equipment pursuant to 49 U.S.C. 13906 during the term of this Lease. Contractor agrees to carry non-trucking liability (so-called "deadhead and bobtail") insurance with a combined single limit of not less than $500,000 and will provide proof of such coverage to Carrier during the term of this Agreement. Contractor further agrees that it is its sole duty to require and maintain at its expense worker's compensation insurance or other insurance required by the provision of any applicable employer's liability law on all drivers and any other employees required by Contractor or hired by Contractor to perform the services under this Agreement. A certificate of worker's compensation will be furnished upon request. If Contractor elects to obtain and if Contractor maintains that worker's compensation is not required due to statutory exemption, it will provide evidence of comparable occupational accident insurance and otherwise warrants that it will indemnify and hold harmless Carrier against any allegation of cut-through liability.

     If Contractor elects to purchase any insurances from sources available through Carrier, such coverage will be set forth in Appendix D and Carrier will provide Contractor with a copy of each policy upon request, providing to Contractor a certificate of insurance naming the insurer, the policy number, the effective dates, the amount of coverage, the cost to lessor and any deductible.

     O.    Cargo and Accident Deductible. Notwithstanding any public liability insurance or cargo insurance maintained by Carrier, Contractor agrees to pay to Carrier an amount equal to the first $2500 of the expense incurred by Carrier and paid to it any cargo claimant or accident victim as a result of the negligence of Contractor or its employees in the performance of this contract. Prior to any such deductions, Carrier shall provide to Contractor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to Contractor.

     P.    Notification Requirement. Contractor further agrees to immediately notify Carrier of any potential cargo claim, accident, fine, citation or out-of-service order incurred by Contractor or its employees in order to ensure Carrier's compliance with its customer and safety obligations.

     If for any reason Contractor fails to return Carrier's equipment or remove placards within 24 hours of termination, Contractor acknowledges that Carrier may seek a writ of replevin and agrees to pay all attendant attorney's fees and costs as well as the cost of recovery incurred by Carrier in recovering its equipment and removing its placards.

Initial Here: RRB

**Exhibit E, Brown Dep., Ex. 5**

    Q.    <u>Escrow of Funds</u>. T he Contractor shall deposit with the Carrier a performance bond issued by a Surety Company approved by Carrier in the amount of $2,500.00 per vehicle, or at his option, may furnish in lieu thereof a $500.00 cash bond to guarantee the full, complete and competent performance of the Contractor's obligations under this contract. These obligations include the settlement of all accounts between Contractor, its employees or agents, and Carrier, reimbursement of authorized chargeback items, and the return of all regulatory agency permits, tags and identifications issued in the name of the Carrier and the Contractor upon expiration or termination of the Contract or upon the execution of a receipt for the equipment.

    The Contractor shall receive notice through the settlement process of any transaction involving the escrow funds, to include any withdrawals or any other adjustments to the escrow account. Contractor shall have the right to an accounting for transactions involving the escrow fund at any time. The Carrier shall compute interest on the escrow funds at least quarterly. For purposes of calculating the balance of the escrow fund on which interest must be paid, the Carrier may deduct a sum equal to the average advance made to the Contractor during the period of time for which the interest is to be paid. The interest rate that is to be applicable to said interest payments shall be set at a rate equal to the average yield or equivalent coupon issue yield on 13-week Treasury Bills as established in the weekly auction by the Department of Treasury at the beginning of each period for which interest is to be calculated.

    If for any reason Contractor fails to return Carrier's equipment or remove placards within 24 hours of request, Contractor acknowledges that Carrier may seek a writ of replevin and agrees to pay all attendant attorney's fees and court costs as well as the cost of recovery incurred by Carrier in recovering its equipment and removing its placards.

    Carrier shall return any remaining escrow funds to Contractor no later than 45 days from the date of termination.

    R.    <u>Impermissive Use of Equipment</u>. The parties contemplate that Contractor may use trailer equipment owned by Carrier to provide the contracted services. Such equipment may be used without additional charge for the purpose of providing services for Carrier or with Carrier's express permission. During the term of this Agreement, if Contractor moves or pulls Carrier's trailer from Carrier's terminal or other location without Carrier's authorization, Contractor will be assessed 15¢ per mile for the total number of miles and all other charges incurred in securing and returning such trailer subject to a minimum charge of $50 per day.

    2.    <u>Contractor Independence/Control of Operations</u>.

    A.    <u>Federal and State Laws</u>. At all times, Independent Contractor shall remain solely responsible for payment of all federal and state taxes accruing as a result of its maintenance and use of the leased vehicle, retention and payment of driver personnel to perform services under this agreement. Contractor warrants that it is familiar with and shall comply with all applicable employment laws and applicable taxes including and not limited to federal and state income tax, state worker's compensation, unemployment compensation taxes, and overtime

Initial Here: RRB

**Exhibit E, Brown Dep., Ex. 5**

requirements which may be applicable.  Contractor shall indemnify and hold Carrier harmless from these obligations.

To the extent not inconsistent with federal, state and safety regulations, including but not limited to hours of service requirements, highway speed limits and other restrictions, Contractor shall be free to set the method and time of performance for all delivery of loads accepted by it. The parties agree and understand that federal and state laws and regulations impose duties on carriers including the maintaining of records of Contractor operations, equipment maintenance, hours of service, reporting for state tax purposes all miles run by the vehicle as well as additional obligations imposed by Carrier's insurer whose federal filings are a prerequisite of operations. Contractor agrees to comply with these federal duties and statutes with respect to the equipment leased to Carrier and will provide all necessary supporting documents as required by law. Contractor warrants that it will only permit driver personnel to perform service under this Contract who have been credentialed and approved by Carrier in accordance to US DOT requirements.

B.    Customer-Specific Requirements.  The parties agree that in the performance of this contract, Carrier in its sole discretion will tender Contractor individual loads, subject to its equipment availability on a load-by-load basis.  It is agreed that any load may have customer-imposed service requirements which will be conveyed to the Contractor at time of tender.  Contractor agrees to accept or reject the load tender and is not subject to forced dispatch. In accepting the load, Contractor agrees to perform in accordance with any special ground rules imposed by the customer and further warrants that the expected service can be provided in a safe and non-negligent fashion in accordance with its drivers' available hours of service.

C.    Routes and Methods.  The parties agree that federal regulation requires a Carrier to be responsible for accounting for all miles run by the involved commercial vehicle while under lease and for the hours of service of the driver operating the leased vehicle, regardless of whether the truck is under dispatch.  Notwithstanding these requirements, Contractor is free to select the routing for performing any dispatch consistent with state and federal highway speed limits, weight and other restrictions.  Carrier will assist Contractor by providing practical routing information for its use. Contractor agrees to indemnify and hold harmless Carrier from any claim, fine, loss or damage which arises from the "deadhead or bobtail" use by it of the equipment.

Contractor agrees to indemnify and hold harmless Contractor from any claim, fine or assessment arising out of its failure to comply with the warranties and representations contained in this paragraph.

D.    Independent Contractor Status.  It is the intent of the parties for Contractor to retain the status of an independent contractor in business for federal and state law purposes. Carrier's control over Contractor shall be limited to that control required by federal and state statutes and regulations governing the conduct of motor carriers.  Contractor shall train all of its driver personnel in accordance with U.S. DOT requirements and shall submit all driver personnel to Carrier for qualification, safety and training to the extent required by federal regulations. Neither Contractor nor its driver employees shall be required to attend other employment

Initial Here: RRB

**Exhibit E, Brown Dep., Ex. 5**

training meetings held by the company nor shall they be subject to the company employment manual. Contractor shall have the right to substitute other qualified drivers to perform the services subject to Carrier's confirmation that Contractor's driver meets the driver qualifications established by the U.S. DOT and its insurers.

Contractor warrants that no driver will be used until the driver has been qualified by Carrier in accordance with federal safety requirements. At all times, Contractor shall remain responsible for hiring and supervising his employees and for paying their salaries and all relevant taxes. Contractor warrants compliance with all federal and state employment laws and shall indemnify and hold Carrier harmless from its failure to discharge such obligations.

Contractor shall at all times be free to set its hours of operations consistent with the federally imposed hours of service requirements and the scope of the work accepted and the customer's service expectations. Contractor is free to work when and where it chooses and shall accept or reject work assignments on a load by load basis. Contractor agrees to comply with any scope of work requirement imposed by the customer service conditions when accepting a job assignment but is otherwise free to schedule the order of its work.

Where shipper requires same and to facilitate efficient dispatch, Contractor agrees to provide electronic notification of its operating status including when equipment is loaded, unloaded or otherwise available to dispatch. Otherwise no oral or written report other than the supporting documents and logs required by the DOT, bills of lading and shipping documents required by the customer for payments and fuel taxes as required by IFTA shall be required.

Contractor shall be solely responsible for furnishing the power equipment used to provide service and shall keep same in good repair in accordance with federal regulation and inspection requirements. Contractor shall be solely responsible for the payments on the leased equipment on the subject equipment and shall have the right to make all crucial decisions with respect to the maintenance and operation of such equipment.

Consistent with the leasing regulations which require Carrier to have exclusive possession and control of the equipment, Contractor shall be free with notice to work for other carriers or customers. When Contractor works for other carriers or customers, Contractor shall not operate under, or display, the placards or other identifying equipment of Carrier. Contractor shall have the right to discharge any driver it employs at any time. Contractor agrees that it shall reassign any driver which Carrier in its sole discretion determines is unqualified to comply with Carrier's federal imposed safety duties.

Contractor warrants as a condition of this contract that all equipment will be continually operated in accordance with U.S. DOT safety regulations in a non-negligent fashion.

Contractor shall accept work assignments on a job by job or load by load basis and agrees to comply with any ground rules or scope of work requirements established by the shipper as a service condition imposed on the work provided. Carrier does not guarantee Contractor a profit or limit its profit margin for contracts performed.

Initial Here: RRB

3. <u>Standard Operating Procedures</u>. Because Carrier's customers require on-board communication to track delivery times, confirm pickups and deliveries and obtain advice about in-transit conditions, Contractor agrees to obtain on-board communication devices compatible with Carrier's system. Such equipment may be obtained and installed by Contractor in leased unit at its choosing. If purchased or leased from Carrier, Contractor's decision will be reflected in Appendix D and deduction from settlement will be authorized.

Unless Contractor or its driver notifies Carrier to the contrary, for the parties' mutual benefit, Carrier will tender loads to Contractor's driver using such on-board communications in real time based upon the availability of shipments, the equipment, and notice provided electronically that the leased equipment is available for a new contract consistent with the driver's available hours of service and its location. To facilitate these standard operating procedures, Contractor agrees to afford Carrier reasonable notice if its driver or unit is otherwise unavailable to accept additional loads.

4. <u>Contractors, Warranties, and Indemnification.</u> As consideration for entering into this agreement, Contractor warrants as follows:

     a. that it is properly licensed and authorized to conduct its independent trade or business in accordance with local and state laws;

     b. that it will comply with all federal, state, and local taxing authorities that are applicable to its trade or business and will pay all applicable withholding and employment taxes and insurance payments as they come due by reason of its retention of personnel to provide the contracted service;

     c. that it will not accept or incur any payment obligation on behalf of Carrier without its express written approval; and

     d. that it will promptly notify Carrier of any acts that result in any type of loss, shortage, citation, fine, or out of service order incurred in the course of its use or maintenance of the lease equipment during the period of this lease.

5. Contractor agrees to indemnify and hold Carrier harmless from any breach of the above warranties or if other claim laws or damage arising out of the negligent or willful acts or omission of it, its officers, directors, employees, or agent

6. <u>Integrated Claim</u>. The Parties agree that this contact sets forth the full understanding of the Parties and shall not be modified or changed in any way except by express written addendum.

7. <u>Termination.</u> This Contract may be terminated by either party on fifteen (15) days written notice. If, in the sole opinion of Carrier, the driver qualified by Contractor to provide services fails to comply with the Federal Motor Carrier Safety Regulations, Carrier may terminate this Agreement at any time.

Initial Here: _RRB_

**Exhibit E, Brown Dep., Ex. 5**

8.    <u>Claims Notification</u>. The Parties recognize in accordance with federal statute, Carrier has 6 months from the issuance of any freight invoice to file an undercharged claim with its Shipper. Accordingly, the Parties agree that Contractor will review its settlements and notify Carrier not later than 165 days after issuance of its disputed amount or thereafter will be barred.

9.    <u>Alternative Dispute Resolution</u>.  The parties agree that any dispute concerning the terms of this Agreement will be submitted to mediation followed by binding arbitration before a tribunal convened under the rules of the American Arbitration Association at Atlanta, GA.

10.    <u>Venue and Jurisdiction</u>. This agreement is made pursuant to the requirements of federal law and otherwise subject to the laws of the State of Georgia.  The parties agree that that any lawsuit shall be filed in a court of competent jurisdiction in Gwinnett County.

Dated this ___1ST___ day of __JUNE__ , 20 _21_.

[CARRIER]:316 Towing and Road Service        [CONTRACTOR]: REYNAUDO BROWN

_____        _____
Signature                                    Signature

Eli Kudvin                              REYNAUDO R. BROWN
Print Name                               Print Name

Manager                               Driver
Title                                     Title

Initial Here: RRB

**APPENDIX A**

**IDENTIFICATION OF EQUIPMENT**

|  | Make | Year | Serial No. |
|---|---|---|---|
| Tractor | _____ | _____ | _____ |
| Trailer | _____ | _____ | _____ |
| Trailer | _____ | _____ | _____ |
| Trailer | _____ | _____ | _____ |
| Trailer | _____ | _____ | _____ |
| Trailer | _____ | _____ | _____ |

Name of Contractor: *REYNALDO RICARDO BROWN*

Phone: ███████████    Fax: _____

Address: ████████████████████ *BUFORD, GA 30519*

FID No. _____ or SSN: ███████████

I certify that the above named Contractor is the title holder or beneficial owner of the identified equipment authorized to receive payments for the use of this equipment pursuant to the terms of this Agreement.

_____
Signature

*6/1/21*
_____
Date

Initial Here: *RRB*

**Exhibit E, Brown Dep., Ex. 5**

**III. BANK FEES:**

Electronic Financial Transaction Charges – The CARRIER utilizes ComData/Fleet One/EFS services for electronic financial transactions. The following ComData/Fleet One/EFS fee schedule applies and will be deducted as incurred regardless of cost to Company:

| | |
|---|---|
| Service Fee for 1st time card use per day | $ _____ |
| Service Fee for each card use per day after initial 1st time use | $ _____ |
| ATM Withdrawal (U.S.) | $ _____ |
| ATM Withdrawal (international Fee) | $ _____ |
| ATM Balance Inquiry | $ _____ |
| ATM Decline | $ _____ |
| Transfer money to a bank account | $ _____ |
| POS Debit Transactions | $ _____ |
| Comcheck Draft | $ _____ |
| Comdata Answer Plus Phone Service | $ _____ per minute* |

* A per call charge of $ _____ applies to all calls originating from a payphone.
See ComData informational sheet for additional information regarding ComData services.

**IV. REIMBURSABLES TO CONTRACTOR**

Amount to be reimbursed on the first settlement for travel expense to orientation:

_____ X _____ = _____
Total Miles                Travel Pay                Total Reimbursement

Travel Pay will be paid at the rate of $ _____ per mile for all miles up to 499 from drivers' place of residence to orientation location and at the rate of $ _____ per mile for all miles 500 and greater from drivers' place of residence to orientation location.

**V. MAINTENANCE RESERVE**

Maintenance Reserve Participation (circle one)                Accept      Decline

A minimum of $ _____ will be deducted from each settlement

2290 Reserve Participation (circle one)                Accept      Decline

A draw will be made until a maximum of $ _____ has been escrowed towards payment of your 2290.

I have reviewed this schedule of initial leasing costs and other associated costs and agree to these deductions from my settlements. I have received a complying certificate of insurance for any insurance which I elect to purchase through Company and understand that a copy of the policy/policies will be provided upon request.

Contractor: REYNALDO R. BROWN      Date: 6/1/21
Witness: Eli Rudnik                Date: 6/18/21

Initial Here: RRB

**Exhibit E, Brown Dep., Ex. 5**

## <u>ADDENDUM TO CONTRACTOR AGREEMENT</u>

The parties agree as follows:

(a)   Contractor is free to accept or reject assignments of any load from 316 Towing and Road Service

(b)   Contractor's remuneration is based upon trips or deliveries accomplished.

(c)   Services provided by Contractor will be performed utilizing the vehicle or vehicles leased by Contractor pursuant to the lease.

(d)   The written Lease to which this addendum is attached is in compliance with O.C.G.A. 34-8-35(n)(17).

(e)   Contractor warrants that it knows it is responsible to pay estimated Social Security taxes and federal and state income taxes.

    (i)   **Social Security tax Contractor must pay is higher than the Social Security tax an individual would pay if he or she were an employee.**

    (ii)   **The services or work provided by Contractor are not covered by unemployment compensation laws of Georgia.**

(f)   The written contract does not prohibit Contractor from pickup, transportation or delivery of property for more than one common carrier or any other person or entity when utilizing a motor vehicle agreement other than that leased hereunder.

Contractor Signature

Date: 6\1\21

Initial Here: _RRB_

**Exhibit E, Brown Dep., Ex. 5**

## APPENDIX C

### RECEIPT FOR EQUIPMENT

This Receipt is issued by Carrier to the beneficial owner REYNALDO R. BROWN
for VIN No. _____ this date for possession of the
equipment pursuant to an Independent Contractor Agreement. This Receipt shall serve as
compliance with 49 C.F.R. '376.11 as evidence of a continuing 30 day lease for Carrier to
transport general commodities without exception. A copy of the original Lease is kept by Carrier
at _796 Bill Rutledge Rd, Winder, GA 30680___ [address].

Received this _____ day of _____, 20 _____ at _____ A.M. / P.M.

By: _____ (Authorized Agent of Carrier)

_____

**RELEASE OF EQUIPMENT** (To be completed upon termination of agreement)

Independent Contractor hereby acknowledges receipt of Equipment described in this Agreement.

Hour _____A.M. / P.M.  Date_____  Place_____

Independent Contractor Signature_____

_____

Initial Here: RRB

**Exhibit E, Brown Dep., Ex. 5**



| Call # | Invoice # | Account | PO # | Truck | Dispatched | Enroute | Completed | Invoice Total | Enroute | On Scene | Towing | Total Time | Unloaded | Loaded |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2135 | | (No Account Specified) | | Truck 416 2020 Dodge Ram 5500 (black) | 6/14/2021 6:23 PM | 6/14/2021 8:26 PM | 6/14/2021 8:26 PM | $130.00 | 0m | 10m | 0m | 0m | 0 | 0 |
| 2137 | | (No Account Specified) | | Truck 416 2020 Dodge Ram 5500 (black) | 6/14/2021 9:14 PM | 6/14/2021 9:30 PM | 6/14/2021 10:14 PM | $110.00 | 28m | 16m | 44m | 0 | 0 | 2 |
| 2138 | | Allstate | 1048195258 | Truck 416 2020 Dodge Ram 5500 (black) | 6/14/2021 10:30 PM | 6/15/2021 1:50 AM | 6/14/2021 1:50 AM | $202.50 | 23m | 21m | 2h 23m | 3h 7m | 48.3 | |
| 2156 | | Allstate | 1048150379 | Truck 416 2020 Dodge Ram 5500 (black) | 6/15/2021 8:05 PM | 6/15/2021 8:17 PM | 6/15/2021 9:21 PM | $202.50 | 15m | 30m | 1h 4m | 23.8 | 8.2 | |
| 2157 | | Agero | 544135885 | Truck 416 2020 Dodge Ram 5500 (black) | 6/15/2021 10:09 PM | 6/15/2021 11:23 PM | 6/15/2021 11:23 PM | $576.90 | 19m | | 1h 4m | 23.1 | 11.9 | |
| 2155 | | Allstate | 1048204776 | Truck 416 2020 Dodge Ram 5500 (black) | 6/16/2021 11:18 PM | 6/16/2021 11:23 PM | 6/16/2021 12:13 AM | $45.00 | 37m | 1m | 0m | 3.3 | | |
| 2171 | | Agero | 479247165 | Truck 416 2020 Dodge Ram 5500 (black) | 6/16/2021 8:19 PM | 6/16/2021 8:53 PM | 6/16/2021 10:36 PM | $122.55 | 14m | 57m | 1h 43m | 15.2 | 34.9 | |
| 2187 | | Allstate | 1048215579 | Truck 416 2020 Dodge Ram 5500 (black) | 6/17/2021 6:31 PM | 6/17/2021 7:18 PM | 6/17/2021 8:41 PM | $63.00 | 24m | 42m | 1h 43m | 14.5 | 8 | |
| 2188 | | Allstate | 1048220849 | Truck 416 2020 Dodge Ram 5500 (black) | 6/17/2021 8:47 PM | 6/17/2021 8:49 PM | 6/17/2021 10:21 PM | $50.70 | 1h 31m | 17m | 1h 32m | 9 | 6.9 | |
| 2190 | | Agero | 353668479 | Truck 416 2020 Dodge Ram 5500 (black) | 6/17/2021 9:51 PM | 6/17/2021 11:05 PM | 6/17/2021 11:05 PM | $53.25 | 21m | 23m | 0m | 10.3 | | |
| 2191 | | Agero | 680383350 | Truck 416 2020 Dodge Ram 5500 (black) | 6/17/2021 11:18 PM | 6/18/2021 12:40 AM | 6/18/2021 12:40 AM | $47.35 | 11m | 32m | 1h 6m | 14.9 | 2.9 | |
| 2192 | | Allstate | 1048227466 | Truck 416 2020 Dodge Ram 5500 (black) | 6/18/2021 6:57 PM | 6/18/2021 7:33 PM | 6/18/2021 8:26 PM | $55.40 | 18m | 34m | 1m | 4.2 | | |
| 2206 | | Agero | 199939416 | Truck 416 2020 Dodge Ram 5500 (black) | 6/18/2021 9:15 PM | 6/18/2021 9:34 PM | 6/18/2021 11:40 PM | $72.65 | 1h 21m | 26m | 53m | 15.2 | 4.2 | |
| 2209 | | Allstate | 1048229055 | Truck 416 2020 Dodge Ram 5500 (black) | 6/18/2021 10:24 PM | 6/18/2021 11:59 PM | 6/19/2021 12:45 AM | $239.86 | 1h 58m | 19m | 2h 6m | 19.6 | 12.3 | |
| 2234 | | Allstate | 1048246683 | Truck 416 2020 Dodge Ram 5500 (black) | 6/21/2021 6:54 PM | | 6/21/2021 10:19 PM | $60.60 | 1h 1m | 2h 58m | 2h 46m | 44.4 | | |
| 2235 | | Allstate | 1048248115 | Truck 416 2020 Dodge Ram 5500 (black) | 6/21/2021 7:21 PM | | 6/21/2021 8:59 PM | $51.60 | 0m | 1h 5m | 0m | 6.2 | | |
| 2238 | | Allstate | 1048249003 | Truck 416 2020 Dodge Ram 5500 (black) | 6/21/2021 9:11 PM | | 6/22/2021 1:03 AM | $148.20 | 0m | 1h 32m | 0m | 13.3 | 0 | |
| 2256 | | Allstate | 1048254618 | Truck 416 2020 Dodge Ram 5500 (black) | 6/22/2021 1:41 PM | | 6/22/2021 3:56 AM | $815.26 | 0m | 0m | 2h 36m | 39.4 | | |
| 2256 | | Allstate | 770544568 | Truck 416 2020 Dodge Ram 5500 (black) | 6/22/2021 6:57 PM | 6/22/2021 5:00 PM | 6/23/2021 8:32 PM | $105.45 | 1h 51m | 41m | 10h 46m 9h 57m | 14.3 | 134 | |
| 2256 | | Agero | | Truck 416 2020 Dodge Ram 5500 (black) | | | | | | | | | 30.3 | 4.4 |

**Exhibit E, Brown Dep., Ex. 6**

EXHIBIT
6

tabbles

| Call # | User | Invoice # | Account | Total Calls | PO # | Total Invoiced | Truck | Avg Invoice | Total Enroute | Dispatched | Total On Scene | Enroute | Total Towing | Completed | Total Time | Invoice Total | Avg Time Enroute | On Scene | Unloaded | Towing | Loaded | Total Time | Avg Miles Unloaded | Loaded |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2350 | | | Agero | | 812460056 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/22/2023 7:52 PM | | 6/22/2023 9:44 PM | | 6/22/2023 10:32 PM | | $43.40 | 45m | 0m | 0m | | 0m | | 12.1 | 5.1 |
| 2261 | | | Allstate | | 1048235738 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/22/2023 10:10 PM | | 6/22/2023 11:32 PM | | 6/22/2023 11:32 PM | | $51.30 | 59m | 33m | 0m | 59m | | 1h 38m | 5.4 | 7.1 |
| 2271 | | | Agero | | 358623317 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/23/2023 6:41 PM | | 6/23/2023 9:57 PM | | 6/23/2023 11:20 PM | | $56.50 | 28m | 28m | 0m | 27m | | 1h 23m | 4.7 | 11.6 |
| 2272 | | | Allstate | | 1048264540 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/23/2023 7:18 PM | | 6/23/2023 7:37 PM | | 6/23/2023 9:39 PM | | $130.00 | 2h 0m | 0m | 0m | 2h 2m | | 2h 2m | 0 | 0 |
| 2274 | | | Agero | | 187824064 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/23/2023 11:13 PM | | 6/24/2023 12:23 AM | | 6/24/2023 12:25 AM | | $42.40 | 0m | 30m | 0m | 1m | | 30m | 11.6 | 3.9 |
| 2290 | | | Agero | | 413972255 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/24/2023 6:09 PM | | 6/24/2023 7:38 PM | | 6/24/2023 8:56 PM | | $172.00 | 3m | 11m | 1h 4m | | | 1h 18m | 15.5 | 54.5 |
| 2291 | | | (No Account Specified) | | | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/24/2023 11:01 PM | | 6/24/2023 11:45 PM | | 6/25/2023 1:52 AM | | $110.00 | 57m | 37m | | 33m | | 2h 7m | 0 | 0 |
| 2292 | | | (No Account Specified) | | | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/24/2023 11:44 PM | | | | 6/25/2023 11:44 PM | | $100.00 | 0m | 0m | | 0m | | 0m | 0 | 0 |
| 2303 | | | Allstate | | 1048280566 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/25/2023 8:02 PM | | 6/25/2023 8:03 PM | | 6/25/2023 10:03 PM | | $152.20 | 52m | 24m | | 44m | 26.0m | 2h 0m | 23.4 | 31.8 |
| 2304 | | | Agero | | 328672561 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/25/2023 8:19 PM | | 6/25/2023 10:11 PM | | 6/25/2023 11:43 PM | | $76.90 | 18m | 34m | | 39m | 1h 32m | 1h 32m | 18.6 | 14.6 |
| 2305 | | | Agero | | 120383495 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/25/2023 10:18 PM | | 6/26/2023 12:11 AM | | 6/26/2023 12:59 AM | | $68.60 | 13m | 23m | | 0m | 0m | 0m | 13.4 | 14.5 |
| 2306 | | | Agero | | 508828061 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/26/2023 8:53 PM | | 6/26/2023 8:55 PM | | 6/26/2023 10:32 PM | | $95.10 | 8m | 20m | | 1h 9m | 1h 9m | 1h 37m | 18.4 | 22 |
| 2307 | | | Allstate | | 1048288257 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/26/2023 10:47 PM | | 6/26/2023 10:53 PM | | 6/27/2023 12:04 AM | | $38.70 | 29m | 42m | | 0m | 1h 11m | 1h 11m | 13 | 15.9 |
| 2308 | | | Allstate | | 1048288308 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/27/2023 11:35 PM | | 6/27/2023 11:46 PM | | 6/27/2023 2:54 AM | | $63.30 | 9m | 9m | | 1h 8m | 1h 8m | 1h 37m | 21.9 | |
| 2309 | | | 867304647 | | | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/27/2023 12:44 AM | | 6/27/2023 1:46 AM | | 6/27/2023 1:42 AM | | $67.80 | 20m | 20m | | 56m | 56m | | 21.2 | 9.4 |
| 2325 | | | Agero | | 149059322 | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/28/2023 8:29 PM | | 6/28/2023 9:36 PM | | 6/28/2023 11:12 PM | | $204.15 | 36m | 17m | | 1h 36m | 1h 36m | | 28.6 | 33.5 |
| 2354 | | | (No Account Specified) | | | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/28/2023 6:54 PM | | 6/28/2023 7:04 PM | | 6/28/2023 7:43 PM | | $55.00 | 17m | 12m | | 10m | | 39m | 0 | 0 |
| 2327 | | | (No Account Specified) | | | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/28/2023 10:44 PM | | 6/28/2023 9:36 PM | | 6/29/2023 2:10 AM | | $110.00 | 15m | 19m | | 41m | | 1h 45m | 0 | 0 |
| 2330 | | | (No Account Specified) | | | | Truck 416 2020 Dodge Ram 5500 (black) | | | 6/29/2023 4:43 AM | | 6/29/2023 5:14 AM | | 6/29/2023 7:03 AM | | $100.00 | 32m | 0m | | 0m | | 1h 49m | 0 | 0 |

**Exhibit E, Brown Dep., Ex. 6**