# Exhibit 1

**In the Matter Of:**

HYDE V. 316 TOWING & ROAD SERVICE

2:22-cv-103-RWS

---

**DUSTIN L. HYDE**

*September 28, 2023*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF GEORGIA
2                       GAINESVILLE DIVISION

3
DUSTIN HYDE, Individually,      )
4   and on Behalf of All Other    )
Similarly Situated,             )
5                                 )   CIVIL ACTION FILE
                 Plaintiff,       )
6                                 )   NO. 2:22-cv-103-RWS
         vs.                      )
7                                 )
316 TOWING & ROAD SERVICE,      )
8   INC., and MAKSIM LISOVSKIY,   )
                                  )
9                Defendants.      )
_____ )
10

11

12                Videotaped deposition of DUSTIN L. HYDE,

13           taken on behalf of the Defendants, pursuant to

14           Notice and agreement of counsel, in accordance

15           with the Federal Rules of Civil Procedure,

16           before Cynthia B. Gatewood, Certified Court

17           Reporter, at 3390 Peachtre Road NE, Suite 520,

18           Atlanta, Georgia, on the 28th day of September

19           2023, commencing at the hour of 10:06 a.m.

20

21

22

23

24

25



```
 1                    INDEX TO EXAMINATIONS

 2    EXAMINATION                                       PAGE

 3    Cross-Examination by Mr. Handschuh                  6

 4

 5                     INDEX TO EXHIBITS

 6    DEFENDANTS'
         EXHIBIT              DESCRIPTION              PAGE
 7

 8       D-1        Notice of Deposition                15

 9       D-2        Complaint                           17

10       D-3        Driver Application                  18

11       D-4        Independent Contractor and Lease    31
                    Agreement
12
         D-5        Invoices                            40
13
         D-6        Invoices                            41
14
         D-7        Responses to Defendants' First      48
15                  Interrogatories, Requests for
                    Production of Documents and
16                  Admissions

17       D-8        3/10/21 Text Message                59

18       D-9        6/17/21 Text Message                60

19       D-10       6/24/21 Text Message                63

20       D-11       1/21/21 Text Message                84

21       D-12       6/20/21 Text Message                84

22       D-13       Towbook Log                         91

23       D-14       Canceled Job Log                    91

24       D-15       5/11/21 Text Message               123

25
```



```
 1                     INDEX TO EXHIBITS
                          (Continued)
 2
       DEFENDANTS'
 3       EXHIBIT          DESCRIPTION              PAGE

 4
          D-16      Damages Spreadsheet            144
 5
          D-17      Declaration of Dustin Hyde     145
 6
          D-18      7/16/21 Text Message           153
 7
          D-19      IRS Response                   156
 8

 9
                          -   -   -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1   APPEARANCES OF COUNSEL:

 2

 3   On behalf of the Plaintiff:

 4           SEAN SHORT
             Attorney at Law
             Sanford Law Firm PLLC
 5           Suite 510, Kirkpatrick Plaza
             10800 Financial Centre Parkway
 6           Little Rock, Arkansas 72211
             Phone:  (501) 904-1650
 7           Email:  sean@sanfordlawfirm.com

 8

 9   On behalf of the Defendants:

10           JEREMY R. HANDSCHUH
             AMANDA I. ELLIOTT
             Attorneys at Law
11           Mitchell-Handschuh Law Group
             3390 Peachtree Road NE
12           Suite 520
             Atlanta, Georgia 30326
13           Phone:  (404) 262-9488
             Email:  jeremy@m-hlawgroup.com
14           Email:  amanda@m-hlawgroup.com

15

16   Videographer:

17           Rick Richey
             Esquire Deposition Solutions
             Phone:  (404) 495-0777
18

19   Also Present:

20           Maksim Lisovskiy
             Eli Kudrin
21

22                          -   -   -

23

24           (Disclosure, as required by the Georgia
         Board of Court Reporting, was made by the court
         reporter, a written copy of which is attached
25       hereto.)
```



1              (VIDEO CAMERA ON.)

2         THE VIDEOGRAPHER:  Good morning, ladies and

3    gentlemen.  This is the beginning of Media Number

4    1 in the video-recorded deposition of Dustin L.

5    Hyde.  Today's date is September 28th, 2023.  It's

6    10:06 a.m. Eastern Daylight Time.  The case is

7    Dustin Hyde, individually, and on behalf of all

8    others similarly situated versus 316 Towing & Road

9    Service, Inc., and Maksim Lisovskiy, Case Number

10   2:22-cv-103-RWS in the United States District

11   Court, Northern District of Georgia, Gainesville

12   Division.

13        Today's deposition is being held at the Law

14   Offices of Mitchell and Handschuh, 3390 Peachtree

15   Road, Atlanta, Georgia 30326.  My name is Rick

16   Richey.  I'm the videographer.  The court reporter

17   is Cindy Gatewood, and we represent Esquire

18   Deposition Solutions.

19        Would the attorneys please introduce

20   themselves.

21        MR. SHORT:  Sean Short of Sanford Law Firm

22   for the plaintiff.

23        MR. HANDSCHUH:  Jeremy Handschuh on behalf

24   of the defendants, along with co-counsel, Amanda

25   Elliott.



1          THE VIDEOGRAPHER:  Would the court reporter

2     please swear the witness.

3          (Whereupon, the witness was duly sworn.)

4          MR. HANDSCHUH:  This deposition is conducted

5     pursuant to the Federal Rules of Civil Procedure,

6     pursuant to notice and agreement of counsel, and

7     it may be used for any purpose authorized by the

8     Federal Rules of Civil Procedure.

9          Sean, do you agree that all objections,

10    except as to the form of question, are reserved

11    until trial?

12         MR. SHORT:  Yes.

13         MR. HANDSCHUH:  Okay.  And we will check

14    back, but we'll ask regarding waiver of signature

15    at the end.

16         MR. SHORT:  Okay.

17         MR. HANDSCHUH:  I will do my best to

18    remember.  This will be a group effort there.

19                 DUSTIN L. HYDE,

20  having been first duly sworn, was examined and

21  testified as follows:

22                 CROSS-EXAMINATION

23  BY MR. HANDSCHUH:

24    Q.    My name is Jeremy Handschuh.  I'm an

25  attorney.  I represent 316 Towing & Road Service, Inc.,



1   as well as Maksim Lisovskiy, as been identified on the

2   record previously.  And this is a deposition in which

3   I'll ask you questions, and you must answer them

4   truthfully, unless your attorney tells you clearly and

5   distinctly not to answer.  Is that understood and

6   acceptable to you?

7       A.    It is.

8       Q.    Okay.  And although no judge is present,

9   this is a formal legal proceeding just as if you were

10  testifying in court.  And you are under the same legal

11  obligation to tell the truth, the whole truth, and

12  nothing but the truth.  I ask that if you don't

13  understand any of my questions, please let me know that

14  before you answer, and I'll do my best to rephrase it.

15  If you do answer a question, you'll be assumed to

16  understand it.  Is that agreed?

17      A.    It is.

18      Q.    Okay.  Is there anything that's on your mind

19  today that might make it difficult to concentrate on

20  what's being asked?

21      A.    No.

22      Q.    Okay.  What will you do if you realize an

23  answer that you have given was wrong at some point or

24  inaccurate?  Will you try to let us know right away?

25      A.    My best attempt.



1    Q.    As you know, there is a videographer here

2    today, but I will ask that during this proceeding that

3    we try to verbalize our responses.  So there may come

4    times where I ask you to audibly answer yes.  That's

5    just so that the court reporter can hear the answer

6    versus just --

7    A.    Understood.

8    Q.    -- in common conversation head nods or

9    uh-huhs or uh-huhs.  So I'll do my best to clarify

10   those.  Let's try to allow me to ask the entire

11   question before you begin to answer, and then I'll give

12   you an opportunity to fully answer before I ask the

13   next question.  Is that agreeable to you?

14   A.    Understood.

15   Q.    Could you please state your name for the

16   record and spell it.

17   A.    Dustin L. Hyde, D-u-s-t-i-n, L., H-y-d-e.

18   Q.    And can you state your current residence.

19   A.    _____    Winder, Georgia.

20   Q.    Okay.  And how long have you lived there?

21   A.    Approximately seven years.

22   Q.    Okay.  And where did you live before the ██

23   address?

24   A.    Cleveland, Georgia.

25   Q.    Cleveland, Georgia?  Okay.  How long did you



```
 1   live at that Cleveland address?
 2        A.    About ten years.
 3        Q.    Ten years?  Okay.  Can you state your date
 4   of birth.
 5        A.    ███████████
 6        Q.    Okay.  Are you married?
 7        A.    No.
 8        Q.    Do you have any children?
 9        A.    No.
10        Q.    Are you divorced?
11        A.    No.  I'm sorry.  Yes, I'm divorced, but it's
12   been ten years.
13        Q.    Ten years.  Okay.  No children of that
14   marriage?
15        A.    No.
16        Q.    What was your ex-wife's name?
17              THE WITNESS:  Does that have anything --
18              MR. SHORT:  You should -- you have to
19        answer.
20        A.    Christy.
21   BY MR. HANDSCHUH:
22        Q.    Okay.  Remember, we talked about that deal.
23   Unless your attorney advises you not to answer, you're
24   to answer the question.  You understand?
25        A.    I do.
```



1       Q.    Okay.  Do you suffer any condition or

2   illness today that would affect your testimony?

3       A.    No.

4       Q.    Have you ever been arrested?

5       A.    Yes.

6       Q.    What were you arrested for?

7       A.    Grand theft auto and burglary.

8       Q.    When were those convictions?

9       A.    20 years ago.

10      Q.    Where were they?

11      A.    Florida.

12      Q.    What city?

13      A.    Pensacola.

14      Q.    Did you serve any prison time?

15      A.    I did.

16      Q.    How long?

17      A.    Four years, six months, 23 days.

18      Q.    Okay.  Do you remember the approximate time

19  for that incarceration?

20      A.    No.

21      Q.    Okay.  You don't remember -- was it in the

22  '90s or '80s?

23      A.    It was in 2000.

24      Q.    Okay.  Have you ever been arrested in

25  addition to the -- was that the same arrest, or were



```
 1   those separate incidents?

 2        A.    It's all the same thing.

 3        Q.    Okay.  Aside from that event that you

 4   described, any other arrests?

 5        A.    No.

 6        Q.    Okay.  Have you ever been detained by law

 7   enforcement?

 8        A.    Not other than that.

 9        Q.    Okay.  Did you graduate high school?

10        A.    No.

11        Q.    Okay.  What level of education did you

12   reach?

13        A.    Tenth.

14        Q.    Okay.  Did you ever obtain a CDL?

15        A.    No.

16        Q.    Okay.  Have you ever applied for one?

17        A.    No.

18        Q.    And you know that to be a commercial

19   driver's license?

20        A.    Yes, sir.

21        Q.    Okay.  Are you currently employed?

22        A.    Yes.

23        Q.    Where are you employed?

24        A.    Klamuel Towing.

25              THE REPORTER:  I'm sorry?
```



1    BY MR. HANDSCHUH:

2         Q.    Can you say that again?

3         A.    Klamuel.

4         Q.    Can you spell that for the court reporter?

5         A.    K-l-a-m-u-e-l.

6         Q.    Okay.  Where is that located?

7         A.    Hoschton.

8         Q.    Georgia?

9         A.    Yes.

10        Q.    Okay.  And what position do you have there?

11        A.    Driver.

12        Q.    Okay.  What are your responsibilities at --

13   you said it's Klamuel?

14        A.    Klamuel.

15        Q.    Klamuel?  Okay.  What are your

16   responsibilities at Klamuel as a driver?

17        A.    Roadside service.

18        Q.    What does that mean?

19        A.    Tire change, jump starts.

20        Q.    Okay.  Any towing?

21        A.    Yes.

22        Q.    Okay.  In addition to the roadside service

23   and jump starts, that would include towing?

24        A.    That is all roadside service, yes, sir.

25        Q.    Okay.  So everything that one can do with a



1   tow truck you do for folks --

2        A.    Yes, sir.

3        Q.    -- that call in.  Okay.  Do you have any

4   other jobs in addition currently to Klamuel?

5        A.    No, sir.

6        Q.    Okay.  Do you earn any income in other ways

7   besides Klamuel?

8        A.    No, sir.

9        Q.    Okay.  So prior to working at Klamuel -- I'm

10  going to go back a few years.  Did you at one point in

11  time work for a Snappy Recovery?

12       A.    No.

13       Q.    Okay.  You've never worked at Snappy

14  Recovery?

15       A.    No.  Never heard of it.

16       Q.    What about Hemphill Towing?

17       A.    Yes.

18       Q.    Okay.  How long did you work there?

19       A.    I don't actually recall the amount of time.

20       Q.    Okay.  Did you ever work at American Towing

21  & Recovery?

22       A.    Yes.

23       Q.    Okay.  Do you remember how long you worked

24  there?

25       A.    No, sir, I don't.



1      Q.    Did you ever work at Impact Staff Leasing,

2   Inc.?

3      A.    I don't actually recall that name, but I

4   have worked -- I have worked for staffing agencies,

5   yes.

6      Q.    Okay.  And does Impact Staff Leasing, Inc.,

7   sound like one of them?  Does that ring bell?

8      A.    Honestly, I'm not sure because the names

9   that you have don't go along with the name of the

10   business that I was working for.

11      Q.    Okay.  Because you were loaned out or --

12      A.    Yes.

13      Q.    -- leased out.  Okay.  And then I think

14   Avitus or Avitus, Inc.?  That's A-v-i-t-u-s, Inc.?

15      A.    Again, I'm not sure with that, with the

16   branding names.

17      Q.    Okay.  But that sounds like at least

18   something that may or may not have been a staffing

19   agency?

20      A.    If it was a staffing agency, the chances are

21   I may have worked for them, yes.

22      Q.    Okay.  What about B & G Service Solutions?

23      A.    Never heard of it.

24      Q.    Okay.  What about GPS Hospitality?

25      A.    I believe that to be a parent company to



 1 | Burger King maybe.  If so, then yes.
 2 |        MR. HANDSCHUH:  Rick, may we go off the
 3 |    record for a moment?
 4 |        THE VIDEOGRAPHER:  10:17, we're off the
 5 |    record.  This is the end of Media Number 1.
 6 |           (VIDEO CAMERA OFF.)
 7 |      (An off-the-record discussion was held.)
 8 |           (VIDEO CAMERA ON.)
 9 |        THE VIDEOGRAPHER:  10:18, we're back on the
10 |    record.  This is the beginning of Media Number 2.
11 |        (Exhibit Number D-1 was marked for
12 |    identification.)
13 | BY MR. HANDSCHUH:
14 |    Q.    Back on the record.  Handing you -- yes --
15 | what's been previously marked as Exhibit 1.  I'll
16 | represent to you that this is the notice of taking your
17 | deposition today.  Do you recognize this document?
18 |    A.    Yes.
19 |    Q.    Okay.  Have you seen this document before?
20 |    A.    Not in this form, but yes.
21 |    Q.    Okay.  So drawing your attention now --
22 | previously before we took a short break I mentioned a
23 | handful of different businesses and asked whether you
24 | had worked there.  Do you recall that?
25 |    A.    Yes.



1      Q.    Okay.  Drawing our attention to the subject

2  relationship here with 316 Towing, did you at one point

3  work for 316 Towing?

4      A.    Yes.

5      Q.    Okay.  Can you describe the process by which

6  you came to find the opportunity at 316 Towing?

7      A.    If I recall correctly, it was a job posting

8  on either Indeed or Facebook that I responded to.

9      Q.    Okay.  So you responded to an ad, whether it

10  was Facebook or LinkedIn but online, looking for tow

11  truck drivers, and you responded to that.

12      A.    I called the company and asked if they were

13  hiring.  They stated yes, and I went down for an

14  interview.

15      Q.    Okay.  And during that interview, did they

16  happen to have you fill out an application?

17      A.    It wasn't a standard application, just basic

18  info.

19      Q.    Okay.  And do you recall that period of time

20  being on or about November 21st, 2019?

21      A.    Yes, sir.

22      Q.    Okay.  If you may have alleged in the

23  complaint that you started working in December of 2018,

24  given that your application was in November of 2019,

25  would you agree that perhaps the allegation within the



1   complaint may have been misstated?

2        A.    I would have to go back and check the

3   records for dates to answer that.

4        Q.    Okay.  But if the application is dated

5   November 2019, you would agree that that would have

6   been the date that you filled it out?

7        A.    I do not agree.  I haven't seen that

8   particular piece of paper.

9        Q.    Okay.

10             MS. ELLIOTT:  This will be marked as

11        Exhibit 2.

12             (Exhibit Number D-2 was marked for

13        identification.)

14   BY MR. HANDSCHUH:

15        Q.    Drawing your attention to what's been marked

16   as Exhibit 2, could you please for me go to allegation

17   19, paragraph 19.  It's page 3.

18        A.    3?

19        Q.    Can you read that and let me know when

20   you're finished.

21        A.    It says, "Defendant employed plaintiff from

22   December of 2018 until April '22 as driver."

23        Q.    Okay.  Do you see that that's an allegation

24   that you began working for 316 in December of 2018;

25   correct?



1        A.    That's what the paper states.

2        Q.    Okay.  Do you recall being hired by 316 on

3  or about December 5th, 2019?

4        A.    Again, I'm not sure the exact date.  I would

5  have to refer to my records.

6              MS. ELLIOTT:  This is marked as Exhibit 3.

7              (Exhibit Number D-3 was marked for

8        identification.)

9  BY MR. HANDSCHUH:

10       Q.    If you would for me, please, you've been

11 handed what's been marked as Exhibit 3.  If you could,

12 please flip through those pages.  And then once you're

13 finished, please let me know.

14       A.    Okay.

15       Q.    All right.  Along -- you've had a chance to

16 review what's been marked as Exhibit 3; correct?

17       A.    Uh-huh, yes, sir.

18       Q.    Okay.  And if you look at the bottom, you'll

19 see that these have been stamped with 316 Towing and

20 then a number.

21       A.    Yes.

22       Q.    I'll ask that you please turn to pages that

23 begin with 316 Towing 101, please.  It's about six

24 pages in.  And, if you could, please look through 101

25 through 105.



1        A.    Okay.

2        Q.    Okay.  Does that document appear to be a

3   portion of the driver's application for 36 Towing --

4   316 Towing that you filled out?

5        A.    Yes.

6        Q.    Okay.  What is the date of that application?

7        A.    11/21/2019.

8        Q.    Okay.  Is that November 21st, 2019?

9        A.    Yes.

10        Q.    Is that the day that you applied for 316

11   Towing?

12        A.    I do believe so.

13        Q.    Okay.  And so with that date in mind, would

14   you now, referencing back now to allegation 19, would

15   you say that this is a mistake within the pleading that

16   your occupation began December of 2018?

17        A.    I'm not quite -- because I did work for them

18   a couple of times where I worked for them a while and

19   then something happened, I quit or whatever, and then

20   come back.  So I would say there's possibly an error,

21   but I would honestly have to look back at my own

22   records to be certain.  But this does appear to be the

23   start date of 11/21/2019, or the application date.

24        Q.    Okay.  If you happen to have such an

25   application that predates this one, would you agree to



1  please produce it?

2      A.    I'm sorry.  It wouldn't be an application

3  for sure.

4      Q.    Okay.

5      A.    I'm just saying if I have any other records

6  showing any other earlier date that I would more than

7  happily submit that to y'all.

8      Q.    Okay.  But you do see that if it appears

9  that if this was, in fact, November 21st, 2019, that's

10 when your employment as a driver for 316 Towing would

11 have began; correct?

12     A.    I do see that, yes.

13     Q.    Okay.  And you spoke about a first

14 departure.  So having been hired in early

15 December 2019, do you recall about how long that first,

16 you know, period of time when you worked at 316, how

17 long that last?

18     A.    I would say it was after the first year.  I

19 would have to double-check dates and times.  During

20 the -- well, the first break, it was literally a

21 two-day break.  I ended up leaving on a Friday -- or

22 Thursday and started back a couple of days later.

23     Q.    Okay.  But then you mentioned that aside

24 from that, you know, essentially a weekend, there was a

25 period of time where you left and it was a few weeks,



1    if not months, where you didn't come back; correct?

2         A.    Yes, sir, there was a time where it was a

3    couple of months.

4         Q.    Okay.  Would the end of July, specifically

5    July 31st, 2021, sound about right for that time

6    period?

7         A.    It sounds about right, but I can't confirm

8    the actual date.

9         Q.    Okay.  Do you recall at that point in time

10   the reason for your departure?

11        A.    Feeling hostility in the work environment.

12        Q.    Okay.  And what -- can you describe that and

13   to whom you reported or who you, you know, interacted

14   with for purposes of notifying them of no longer being

15   a driver?  What happened?

16        A.    I mean, any instance where I had an issue

17   and tried to talked to management, it wasn't

18   reciprocated.

19        Q.    Okay.  And that -- did you happen to have a

20   discussion in late July of 2021 about those issues?

21        A.    I could say I attempted.

22        Q.    Okay.  And with whom did you attempt to

23   speak?

24        A.    With Eli and Max.

25        Q.    Okay.  And what were the nature of those



1   conversations?

2       A.    Dismissed.

3       Q.    What was the substance that you were

4   bringing to their attention?

5       A.    Various issues, whether it be something

6   needed for a truck or an issue with another employee.

7       Q.    Okay.  Anything else?

8       A.    No.

9       Q.    Okay.  And you mentioned that this was late

10  July 2021.  You stopped working for a few months.  Does

11  the date November 2nd, 2021, sound, on or about that

12  time, correct for the date when you came back?

13      A.    I can't be sure of that.

14      Q.    Okay.  What was your reason for coming back?

15      A.    Towing is what I do.  I mean, when I'm

16  not -- when I wasn't there and trying to locate another

17  job, it's just not my field of interest.  It's not what

18  I've been known to do.

19      Q.    Okay.  Can you explain to me who initiated

20  the contact with whom at that point in time for

21  expressing your desire to come back?

22      A.    I got wind from another employee that they

23  would have me back aboard, so -- excuse me -- I texted

24  Eli and he said yes, we could talk.  So we talked, and

25  I started driving again.



1    Q.   Okay.  Do you remember who that employee was

2    that may have told you about an opportunity there?

3    A.   Brent Johnson.

4    Q.   Okay.  When you were hired for -- or rehired

5    for the second time, do you recall whether or not you

6    had a different position?  Did you become a driver only

7    versus a driver manager?

8    A.   Once I came back, yes, it was driver only.

9    Q.   Okay.  But previously you had served as

10   driver manager.

11   A.   Somewhat, yes.

12   Q.   Okay.  For that period of early August 2021

13   through essentially all of October 2021, a period of

14   about three months, did you work during that period of

15   time?

16   A.   During the time away from 316?

17   Q.   Correct.

18   A.   I believe I started Burger King for a short

19   time.

20   Q.   Okay.  Did you work anywhere else?

21   A.   No, not that I recall.

22   Q.   What location Burger King was that?

23   A.   Winder.

24   Q.   Okay.  What was your position there?

25   A.   Grill.



1        Q.    Okay.

2        A.    I'm not real sure what they call it

3    nowadays.

4        Q.    And did you quit Burger King to return to

5    316?  Am I tracking that?

6        A.    No.  I quit Burger King beforehand.

7        Q.    Really?  Okay.  About how soon or what was

8    the time of quitting Burger King?

9        A.    I would say a couple of weeks.

10       Q.    Okay.  After you were hired in November 1st,

11   2021, when did you depart from your role as a driver

12   with 316 after that point in time?

13       A.    Honestly, I don't have the dates with me.

14       Q.    Okay.

15       A.    I'm not sure.

16       Q.    Would about August 8th, 2022, sound correct

17   to you?

18       A.    Again, I don't know for sure.  But I imagine

19   that time line is close.

20       Q.    Okay.  What was the reason for your

21   departure then?

22       A.    Just static issues with the company.

23       Q.    Okay.  Can you elaborate on static issues

24   for me?

25       A.    When you have issues and you bring them to



1  the person that you're supposed to be working with or

2  bringing your issues to and they don't reciprocate

3  those issues or do anything about it.

4  　　　Q.　　Okay.  Can you identify with whom you were

5  speaking?

6  　　　A.　　Eli.

7  　　　Q.　　Okay.  And what were you speaking to Eli

8  about?

9  　　　A.　　General work purpose stuff.

10  　　　Q.　　Okay.  Can you give more detail?

11  　　　A.　　I mean, attitudes, the way people talk to

12  people.  I mean, I'm not sure.

13  　　　Q.　　Anything else?

14  　　　A.　　I'm not really sure what you're looking for,

15  but that's what I -- I mean, it was just issues between

16  each other.

17  　　　Q.　　Okay.  By that you mean between employees at

18  316 or different drivers and Eli.

19  　　　A.　　No, mostly between myself and Eli.

20  　　　Q.　　Oh, just between -- okay.  Are there any

21  specific issues that stick out between you and Eli,

22  anything that comes to mind?

23  　　　A.　　Just continuous disagreement on things.

24  　　　Q.　　Like what?

25  　　　A.　　Whether it be times worked or calls taken or



1   just reporting issues to him.  He'd just blow it off,

2   so there was no need to talk if somebody's not going to

3   listen.

4        Q.    Okay.  And so just so I can understand, the

5   reason you left was that you were bringing issues to

6   Eli's attention, but you didn't think they were getting

7   sufficient attention from him.

8        A.    They weren't.

9        Q.    Okay.  Can you provide one example of --

10  concrete example of what that was?

11       A.    Okay.  For instance, Eli made the statement

12  that if the in -- if the gas receipts wasn't inputted

13  into Towbook that they would be holding my check.

14  Okay.  I find that something I disagree with.  As far

15  as I'm aware, it is illegal in the state of Georgia to

16  withhold someone's check from them.

17       Q.    Okay.  At that time was that happening to

18  you?

19       A.    You asked for a specific thing.  I gave it

20  to you.  That's --

21       Q.    Was that a -- I'm just asking for the time

22  of that issue, was that something that --

23       A.    It wasn't an ongoing offense.  I'm giving

24  you something that he did.  Like that's what he said at

25  a particular time.



1      Q.    Was it a recurring problem?

2      A.    No.

3      Q.    Okay.  Where have you worked since 316

4   Towing?  Has it always been at this -- and apologies

5   for this name.  If you could repeat it for me.  I think

6   it's --

7      A.    Klamuel.

8      Q.    Klamuel Towing?  Did you -- when did you get

9   hired from Klamuel after 316 Towing?

10     A.    I don't have that date available.

11     Q.    Okay.  Going back to the beginning of your

12  role as an independent contract driver for 316 Towing,

13  can you advise who hired you?

14     A.    From my understanding, Eli hired me under

15  Max's approval.

16     Q.    Okay.  How do you know that Max had approved

17  that?

18     A.    Because Max is the owner of the company.

19     Q.    Did you see Max and Eli speak on that?  Did

20  you overhear them?

21     A.    No.  But, I mean, Eli went in his office and

22  had a discussion and come out and said, "Okay.  You can

23  start such and such."

24     Q.    Okay.  So you're just presuming without

25  knowing the substance of the conversation.



1    A.    Yes, sir.

2    Q.    Okay.  But you, in fact, never heard

3  actually what the substance of the conversation between

4  Eli and Max was.

5    A.    No.

6    Q.    Okay.  Turning your attention again to -- we

7  have it turned here, Exhibit 3, with the page 101.  I

8  want to come back around to some earlier comments.  And

9  if you could turn to page 104 for me.  Okay.  You

10  testified earlier that you weren't -- do you see

11  page 104?

12    A.    Uh-huh, yes, sir.

13    Q.    Okay.  You have a chance to review it, and

14  then let me know when you're finished.

15    A.    I'm good.

16    Q.    Okay.  Do you see at the bottom there Snappy

17  Recovery?

18    A.    I do.

19    Q.    Is that your handwriting?

20    A.    It is.

21    Q.    Okay.  So when you testified earlier that

22  you may not have been aware of Snappy Recovery, does

23  this refresh your recollection as to Snappy Recovery?

24    A.    It refreshes my recollection of something

25  that doesn't exist.



1        Q.    Can you explain that for me.  What does that

2   mean?

3        A.    I wrote that on there to fluff my

4   application.

5        Q.    Oh, so Snappy Recovery doesn't --

6        A.    They don't exist.

7        Q.    Okay.  Turning your attention to I think --

8   well, one moment.  Going back to what's been stamped at

9   the bottom page 101, could you turn to that for me.

10  Turning your attention to the line that states have you

11  been convicted.

12       A.    Okay.

13       Q.    Do you see that, and can you read that out

14  for me with the answer supplied?

15       A.    It says, "Have you ever been convicted of a

16  crime?"  My response was, "No."  "Are you currently on

17  parole or probation?"  My answer was, "No."

18       Q.    Okay.  And was that response, "No," false at

19  the time?

20       A.    I mean, legally, yes.

21       Q.    Okay.  Going back to page 104, reviewing

22  here it appears that there is an All American Towing.

23  Does that entity exist?

24       A.    It used to.

25       Q.    Okay.  Did you work for them for a period of



1   2012 through '16?

2        A.    I can't be sure of the dates, but I did work

3   for them until they closed down.

4        Q.    Okay.  Was that for a period of four years?

5        A.    It -- I'm not sure of the dates.  It was for

6   a while.

7        Q.    Was it less than one year, do you recall?

8        A.    I really don't.  That -- I have a lot going

9   on to remember dates from that far back.

10       Q.    Okay.  Hemphill Towing, does that entity

11  exist?

12       A.    Yes, it does.

13       Q.    Okay.  And did you work there?

14       A.    Yes, I did.

15       Q.    Did you work there between March '16 and

16  June of '19?

17       A.    I'm going to say that's as close to accurate

18  as I can get.  I worked for them three different times

19  as well.

20       Q.    Okay.  And so, again, here this is where you

21  stated that you worked with them until June of '19.

22  Would that tend to also correct your earlier allegation

23  of starting in December of 2018 for 316?

24       A.    I'm not sure.

25       Q.    Do you think that that was accurate at the



1    time that you put that down?

2        A.    Sir, I honestly don't recall.  I wrote it

3    down to put stuff on an application to get a job, and

4    it worked.

5            (Exhibit Number D-4 was marked for

6        identification.)

7            MS. ELLIOTT:  I'm handing you what's been

8        marked as Exhibit 4.

9            THE WITNESS:  Is this going to be closed?

10           MR. HANDSCHUH:  Sure.

11           MS. ELLIOTT:  For the moment.

12           THE WITNESS:  Okay.

13   BY MR. HANDSCHUH:

14       Q.    We may have a pile here.

15       A.    That's fine.  I'm just trying to keep where

16   I can see everything.  That's all.

17       Q.    If you have a moment, please thumb through

18   that document, which has been marked as Exhibit 4, and

19   let me know when you're finished.

20       A.    Okay.

21       Q.    Okay.  Back during the time of onboarding in

22   December of 2019, do you remember reviewing and

23   initialing this document?

24       A.    Yes, sir.

25       Q.    Okay.  Do you recall whether or not you had



 1  ever signed this document?

 2      A.    Do not recall, and I don't see a signature

 3  other than initials.

 4      Q.    But you do -- just drawing your attention to

 5  the pages within Exhibit 4, you note that there are

 6  initials on each page and that is your initial?

 7      A.    Yes, sir, it appears to be.

 8      Q.    Okay.  Do you recall at the end at the

 9  signature block -- this is going to be marked as 316

10  Towing 141.

11      A.    All right.

12      Q.    Do you see what appears to be your name,

13  Dustin Hyde, written there?

14      A.    Yeah, I see that.

15      Q.    Is that your handwriting?

16      A.    No, it's not.

17      Q.    Okay.  Is that your initial at the bottom of

18  that page on the bottom left?

19      A.    After looking at this, it looks like all of

20  these were written by the same person and doesn't look

21  like that is actually my handwriting.

22      Q.    Do you recall whether or not you initialed

23  this?

24      A.    I mean, to be quite honest with you, there's

25  a lot of papers that I initialed.  I mean, I don't have



1  records saying that these particular papers are what I

2  initialed.

3       Q.    But you do recall at the time initialing --

4       A.    I do recall initialing papers, yes.

5       Q.    Okay.  If you could turn to me to page

6  what's been marked 138.  Do you see at the bottom the

7  subparagraph D entitled Independent Contractor Status?

8       A.    Yes.

9       Q.    Okay.  Do you see the first sentence?  Can

10  you read that first sentence for me?

11       A.    "It is the intent of the parties for a

12  contractor to retain the status of independent

13  contractor in businesses for federal and state law

14  purposes."

15       Q.    Okay.  And was that an understanding at the

16  time when you initialed this page marked 138?

17       A.    At the time I didn't know the difference

18  between employee and private contracting.

19       Q.    Okay.  But you do understand or recall

20  having initialed this page as a part of the page of

21  your applications.

22       A.    Again, you can try to attach me to this

23  paper all you want.  I do not know that I actually

24  initialed this particular paper.  I did initial some

25  papers, yes.



1        Q.     Okay.  Is or is that not your initial --

2        A.     I cannot confirm that.

3        Q.     Okay.  But you can't deny it either.

4        A.     I'm not trying to.

5        Q.     Okay.  So you're just not sure.

6        A.     I'm not sure.

7        Q.     Okay.  So if these were maintained as the

8   records of 316 during the time of the application,

9   would you have any other different documentation of

10  that which you initialed?

11       A.     I'm unsure of that as well.  However, when

12  it comes to my initials on these papers, when I look

13  down and see my name written and I know 100 percent

14  well that it's not my handwriting, I cannot confirm any

15  other pages in this docket.

16       Q.     And that's the only basis for not being able

17  to confirm is just that handwritten name at the end?

18       A.     I mean, if it's not my signature and I

19  didn't sign it, then --

20       Q.     Is that a signature or is that your name

21  written out?

22       A.     It's my name written out.

23       Q.     Okay.  Okay.  Do you know who may have

24  written that?  Was that Eli?

25       A.     I mean, you're asking me to make



1   presumptions on something I wasn't there when it was

2   signed or written, so --

3       Q.    Okay.  But you have no -- other than your

4   testimony that the fact that your name is written down,

5   no other basis or other documentation to show that this

6   is not the version that you initialed during --

7       A.    As far as I'm concerned, sir, this right

8   here is fraudulent.

9       Q.    Okay.  And what is the basis for your

10  contention?

11      A.    That is not my handwriting.

12      Q.    Okay.  Anything else?

13      A.    I don't have anything else.

14      Q.    Okay.  But you don't have any other

15  documentation that you purport to be any agreements

16  that you signed --

17      A.    No.

18      Q.    -- that you haven't produced in this action.

19      A.    No.

20      Q.    Okay.  But you do recall initialing

21  documents, paperwork.

22      A.    Yeah, I initialed some documents, sure.

23      Q.    All right.  Looking in the -- what's been

24  marked as Exhibit 3, could you identify for me within

25  this packet what other documents you initialed?



1        A.    In Exhibit 3?

2        Q.    Correct.

3        A.    And you're asking if there's anywhere else

4   where I have initialed?

5        Q.    Correct.

6        A.    I don't see any other initials in that

7   document, sir.

8        Q.    Okay.  So just to clarify, you recall

9   initialing, but you haven't been able to identify, at

10   least within Exhibit 3, any other documentation that

11   may have been initialed by you.

12        A.    No, sir.

13        Q.    Okay.  Drawing your attention to what's been

14   marked as 316-127 and 128, I'll ask that you please

15   turn to that.  That's going to be found in Exhibit 3.

16   Turn to page 127, 128.  Review that.  Let me know when

17   you're finished.

18        A.    Okay.

19        Q.    If you could go back, this is a two-page

20   document, the first page preceding it.  You've had a

21   chance to review this?

22        A.    Yes.

23        Q.    Okay.  Do you recognize this document?

24        A.    I would say part of the paperwork I was

25   given.



1      Q.     Okay.  Turn to page 128.  In the questions

2    there, does that appear to be your handwriting for the

3    responses?

4      A.     You're asking about check marks and circles.

5      Q.     Correct.

6      A.     Presumably.

7      Q.     Okay.  Is that your signature at the bottom?

8      A.     Yes.

9      Q.     Okay.  And here in this document, does this

10   document ask you to recognize that you're being hired

11   as an independent contractor for 316?

12     A.     I mean, that's from what I'm seeing.

13     Q.     Okay.  So in -- underneath "The Work," you

14   see where it says, number 1, "You will be an

15   independent contractor driver and responsible for your

16   own food and lodging on the road unless authorized.  Do

17   you understand this?"  And you circled yes?

18     A.     Uh-huh, yes, sir.

19     Q.     Okay.  And then, "As an independent

20   contractor driver, you could be subjected to a

21   preemployment, random, post accident, and/or reasonable

22   cause drug test."  And you were asked, "Do you

23   understand this," and you circled yes.

24     A.     Uh-huh, yes, sir.

25     Q.     And then you have, "316 Towing and RS pays



1   independent contractors when contracts, including

2   drivers daily logs and support paperwork, are complete

3   and turned in.  All settlements and advances are on the

4   Comdata system.  Do you understand?"  And you circled

5   yes.

6          A.    Yes, sir.

7          Q.    Okay.  Then it continues with "As an

8   independent contractor, you will receive a 1099 form at

9   the end of the year and not a W-2 form.  You will be

10  responsible for your own taxes.  This means that 316

11  Towing and RS will not withhold any taxes or Social

12  Security from your settlement, and you will receive

13  your full settlement.  Do you understand this?"  And

14  you circled yes.

15         A.    Yes, sir.

16         Q.    Okay.  Then it speaks to, "If transporting

17  vehicles over 10K" -- which is shorthand for over

18  10,000 pounds; correct?

19         A.    I don't know.  It just says 10K.  I mean, it

20  could be 10,000 miles.  I don't know.

21         Q.    Okay.  But it continues to say, "10K on this

22  job, you are required to keep a DOT logbook.  Do you

23  know how to keep a DOT logbook or can someone teach you

24  before you become an independent contractor?"  And you

25  circled no.



1        A.    Okay.

2        Q.    Okay.  And then it asks finally, "Do you

3   still wish to apply for independent contractor status?"

4   And you circled yes.

5        A.    That's what's there.

6        Q.    Okay.  So was there an understanding at the

7   time of hire that you would be serving in an

8   independent contractor role?

9        A.    No, sir.

10       Q.    Okay.  And what do you base that on?

11       A.    Because when all these papers were put in

12   front of me for me to sign up or do the application, it

13   was really just marking stuff down just to get me in a

14   truck.  We ran through this paperwork.  There was

15   nothing discussed.  There was nothing -- I ran through,

16   signed, dated, and we started working.

17       Q.    Okay.

18             (An off-the-record discussion was held.)

19   BY MR. HANDSCHUH:

20       Q.    Do you recall who you discussed how you

21   would be paid initially?

22       A.    The only person I discussed that with was

23   Eli.

24       Q.    Okay.  Do you remember the amount that you

25   agreed to?



1      A.    I believe it was 750, but it changed

2    afterwards.

3      Q.    Okay.  But about $700 initially?

4      A.    Yes, sir.

5      Q.    Okay.  And what was the basis for the

6    payments?  Was that a weekly amount?

7      A.    Yes.

8      Q.    Okay.  And at some point in time did you

9    begin to submit invoices for the amounts that were due

10   to you from 316 Towing?

11     A.    I didn't submit invoices until I was told to

12   by Eli.

13     Q.    Okay.  And do you recall about when that

14   started?

15     A.    I don't.

16           (Exhibit Number D-5 was marked for

17     identification.)

18   BY MR. HANDSCHUH:

19     Q.    Handing you what's been marked as Exhibit 5.

20   If you'd take a moment, this is a relatively lengthy

21   document.  Flip through these for me, and then let me

22   know when you're finished.

23     A.    Okay.  These are all the invoices that I

24   submitted, I guess.

25           MS. ELLIOTT:  Handing you also what's been



1        marked as Exhibit 6.

2               (Exhibit Number D-6 was marked for

3        identification.)

4    BY MR. HANDSCHUH:

5        Q.    Handing you what's been marked as Exhibit 6.

6    If you would, please, review those documents and let me

7    know when you're finished.  Have you had a chance to

8    review Exhibit 6?

9        A.    Yes.

10       Q.    Okay.  Do those appear to be additional

11   invoices from you to 316 Towing?

12       A.    I mean, they should be the same.  I mean, I

13   don't see where they would be different, where you say

14   additional.  I sent in invoices.

15       Q.    Okay.  So the process was you were being

16   paid weekly, and at that point in time, taking a look

17   at Exhibit 5, the first page, there appears to be a

18   note at the top.  Do you recognize that?

19       A.    Yes.

20       Q.    Is that your handwriting?

21       A.    It is.

22       Q.    Okay.  What does that say?

23       A.    "Invoices did not start until this one for

24   me."

25       Q.    Okay.



1     A.    So from that it was a self note that

2   everything before 35 was done by the office.

3     Q.    Okay.  But this acknowledges that your start

4   date with 316 was on or about December 2019; correct?

5     A.    About, yes.

6     Q.    Okay.  Not 2018.

7     A.    Again, that could have been an error.

8     Q.    Okay.  Is this an error?

9     A.    No.

10     Q.    It's not.  Okay.  And so at the time

11   initially you had agreed to $700 a week.  And the

12   process, just so I understand, is that you would

13   generate an invoice and submit it to 316 for payment?

14     A.    That's what I was told to do, yes.

15     Q.    Okay.  You mentioned earlier that at some

16   point in time you did have changes in your weekly pay

17   amount; is that correct?

18     A.    Yes.

19     Q.    Okay.  Do you recall what your next jump

20   from 700 may have been?  And feel free to take a look

21   at some of these invoices to refresh your memory.

22     A.    The very next one says, "Quit on Friday,

23   returned on Saturday, pay rate $300."

24     Q.    Okay.  What does that mean?

25     A.    It means I quit and I came back and I got a



1   raise.

2       Q.    Okay.  Was that -- that one, the date, just

3   so I can track this, is the date -- and you're looking

4   at what's been marked Hyde 2, is that correct, on the

5   bottom right?

6       A.    Yes.

7       Q.    The little stamp?  Okay.  Can you identify

8   the date of that invoice?

9       A.    It's 10/2/2020.

10      Q.    Okay.  And so that note there is about --

11  whatever day of the week 10/2/2020 falls on, on or

12  about that time, that's when you returned and received

13  a raise of $300?

14      A.    It would have been for that previous week,

15  yes.

16      Q.    Okay.  But that's the first time you

17  mentioned having quit, but it was just for that short

18  weekend obviously.

19      A.    That's one of the few times, yes.

20      Q.    Okay.  Continuing to the next one, what's

21  been marked Hyde 3, does this track?  It reflects an

22  invoice date of October 9, 2020.  That would have been

23  the next invoice?

24      A.    It does.

25      Q.    Okay.  And then at that point in time you



1  were invoicing 316 for $1,000.

2      A.   That is correct.

3      Q.   Okay.  Do you recall who you spoke to at the

4  time for purposes of receiving a raise at that time?

5      A.   It was through Eli.

6      Q.   Okay.  And what was the substance of your

7  conversation?

8      A.   Needed more money.

9      Q.   Okay.  Was there anything else other than

10 that?

11     A.   I don't recall the exact conversation.

12     Q.   Okay.  Do you know if you asked for a

13 thousand or did you happen to ask for more?

14     A.   I don't recall the exact conversation.

15     Q.   But you do recognize that at least by

16 October 9, 2020, they were paying you then a thousand

17 dollars a week.

18     A.   Yes, sir, they were.

19     Q.   Okay.  Have you ever been docked for pay

20 from missing work?

21     A.   No, because I don't miss work.

22     Q.   Okay.  If you would, take a look at

23 Exhibits 5 and 6.  And I'll give you a moment to do

24 this, but please flip through looking for any instance

25 where you may have seen a notation of docked pay.



1        A.    I mean, you want me to look for something
2   that's not here.
3        Q.    I just want you to take a moment, and we'll
4   take the time, but please just flip through.  I'd like
5   you to just let me know whether or not you see any
6   invoice with docked pay on it.
7        A.    Okay.  Again, so you're wanting me to look
8   for something that's not here.  I'm acknowledging what
9   you're saying.  There's not a docked pay invoice.
10       Q.    Okay.  Do you recall whether or not on
11  certain invoices you may have received advances?
12       A.    There's no advances.
13       Q.    No advances.  Okay.  At any point in time
14  before your weekly pay was to be paid by 316 Towing,
15  you never asked for an advance?
16       A.    No.
17       Q.    Drawing your attention to 179 within
18  Exhibit 6, the Bates stamp 316 Towing 179.  Review that
19  document, and let me know when you're finished.
20       A.    Okay.
21       Q.    Okay.  What is this document?
22       A.    An invoice.
23       Q.    Okay.  Do you know the date of this
24  document?
25       A.    It appears on the document.  11/11/21.



1       Q.    Okay.  And there on that line, a line item

2   states "Advance: $500."  Do you see that?

3       A.    I do see that.

4       Q.    Okay.  Is that a instance where there may

5   have been an advance to you?

6       A.    It was not an advance to me.  That was for

7   the occupational insurance that they changed.  They

8   would tell us to write it on and then write it off.  I

9   didn't get a $500 advance.

10      Q.    Okay.  Right below that, do you see minus

11  50?

12      A.    Yes.

13      Q.    Is that the occupational insurance item

14  you're speaking about?

15      A.    I guess that's how they got it.

16      Q.    Okay.  So you're saying that the advance

17  $500 and occupational insurance minus 50, that's the

18  same thing?

19      A.    What I'm saying is this is Invoice Number 2.

20  This was not done by me.  This was done by the office

21  so I have no recollection of why there's an advance or

22  the occupational insurance on this document as such.

23      Q.    Okay.  Did you ever discuss this particular

24  invoice?

25      A.    No, sir.  I never had anything to do with



1    this particular invoice.  Again, my invoices did not

2    start until 35, so this was not my doing.

3         Q.    Okay.  Do you have -- are you saying that

4    you don't believe this was the invoice for

5    November 2021?

6         A.    Sir, I'm speaking in plain English.  I did

7    not submit this particular invoice.

8         Q.    Okay.

9         A.    This was done by the office.

10        Q.    Can you tell me how you can tell the

11   difference between those that you submitted and --

12        A.    I can.  It says 316 with a tag at the top,

13   and this was done by me.

14        Q.    Okay.

15        A.    The invoices that are plain, that's from the

16   office.

17        Q.    Do you believe that there may be another

18   invoice -- each week you invoiced; correct?  Do you

19   think there was a period you weren't invoicing?

20        A.    Off the same template.  All I did was change

21   the date on the template.  This is not mine.

22        Q.    Is the advance there, is that reflective of

23   any kind of docked pay, do you know?

24        A.    I don't know what you -- I never got an

25   advance, so I don't know what this is about.



1        Q.    Okay.  My question is does that reflect
2    docked pay to you?
3        A.    I haven't had docked pay, so I can't -- I
4    can't answer to what that's about.
5        Q.    Okay.  If you would, please for me flip
6    through 178 all the way to the end of 208.
7        A.    Okay.
8        Q.    Do those invoices appear to span a period
9    between November 2021 through and including about
10   April 2022?
11       A.    Yes.
12       Q.    Okay.  Are these the invoices submitted by
13   you during that period?
14       A.    No.  I did not submit these invoices.
15       Q.    Okay.  Looking over to what's been marked
16   earlier as Exhibit 5.  Could you look through these,
17   please, and identify for me those invoices that you
18   submitted for this period of time?
19            (Exhibit Number D-7 was marked for
20        identification.)
21            MS. ELLIOTT:  I'm going to go ahead and hand
22        you what's been marked as Exhibit 7.
23       A.    These appear to be invoices that I
24   submitted.
25   /  /  /



1   BY MR. HANDSCHUH:

2       Q.   Okay.  Do any of those invoices that you

3   submitted cover the period November 2021 up to

4   April 2022?

5       A.   It does not appear to show those dates that

6   I can find.

7       Q.   With that said, do you believe now that the

8   invoices within Exhibit 6 for that time period happen

9   to be the ones that you submitted?

10      A.   No, sir, I did not submit them invoices.

11      Q.   Okay.  So your testimony is that for a

12  period of time from November 2021 to up to April 2022

13  you no longer submitted invoices?

14      A.   They were done in the office.

15      Q.   Who did them?

16      A.   The office staff.

17      Q.   Okay.  But I'm asking do you have a

18  different document --

19      A.   I do not.

20      Q.   -- that you have produced?

21      A.   No.

22      Q.   Okay.  So with that said, was there any

23  other document you believe -- I want to make sure that

24  we have some that 316 contends were the ones you

25  submitted.  Do you have any others?



1      A.    No.

2      Q.    Okay.

3      A.    What I have is right here (indicating).

4      Q.    Okay.  So do you recall a period of time

5  where you stopped invoicing?

6      A.    There was times that I was busy and didn't

7  invoice.  And Eli would say, "Well, Susan's got it in

8  the office" or "I printed it in the office."  The

9  office has done invoices before for us.

10      Q.    Oh, they did.  Okay.  So I just want to be

11  clear that you don't think you produced a different set

12  for that time period.

13      A.    I don't -- I do not recall -- these are the

14  ones that I submitted.

15      Q.    Okay.  Drawing your attention now to what's

16  been marked previously as Exhibit 7.  And I'm just

17  going to ask you to thumb through this and let me know

18  when you're finished reviewing it.  It's 28 pages long.

19  I just want to make sure you have a chance to acquaint

20  yourself with this document.

21      A.    Okay.

22      Q.    If you could, turn to page 2.  And for

23  Interrogatory Number 3, the answer number 3, if you

24  could take a review of that, let me know when you're

25  finished.



1        A.    Okay.

2        Q.    Do you notice at the end there it states,

3    "If I called in sick, I would be punished by having

4    $100 docked out of my pay"?

5        A.    I do.

6        Q.    Was that a misstatement given your earlier

7    testimony that you never had your pay docked?

8        A.    No, that's not a misstatement.  That's what

9    we were told.

10       Q.    What does told mean?

11       A.    We were told by Eli if people kept calling

12   in sick that they was going to dock a hundred dollars

13   from your pay.

14       Q.    Okay.  But your response here, that response

15   does not indicate that a hundred dollars had ever been

16   docked out of your pay; correct?  Just, in fact, it

17   never happened?

18       A.    True.

19       Q.    It was just, in fact, your belief that it

20   would have happened.

21       A.    That's what was stated.

22       Q.    Okay.  Where was that stated?

23       A.    Verbally from him to the drivers.

24       Q.    By whom?

25       A.    Eli.



1      Q.    Okay.  But you don't recall an incidence

2   where that actually happened to you.

3      A.    No, because I hardly rarely ever got sick,

4   so --

5      Q.    Okay.  During your time of onboarding, did

6   you ever happen to discuss whether you would receive

7   any stock or ownership interest in 316 Towing?

8      A.    No.

9      Q.    What about any benefits, employment benefits

10   or the like?

11      A.    No.

12      Q.    And when you were hired, did you have the

13   role of driver manager?

14      A.    Not in the beginning.

15      Q.    Okay.  How were you hired initially?

16      A.    I was the only driver.

17      Q.    Okay.  So you were hired as a driver, and

18   then later on --

19      A.    As they hired more employees, I became --

20      Q.    Then you became --

21      A.    -- driver manager.

22      Q.    Go ahead.  I'm sorry.

23      A.    Then that was when the driver manager

24   started.

25      Q.    Okay.  Do you recall I think based on the



1  invoices -- if you look with me, this would have been

2  Exhibit 5 -- would that point in time when you became

3  driver manager have been about on or about

4  October 2020?  And I'm looking at Hyde Number 2.

5         A.    May have been.  May have been right after

6  that.

7         Q.    Was your raise of $300 tied to your

8  assuming --

9         A.    No.

10        Q.    -- driver manager roles?

11        A.    No.

12        Q.    Okay.  So you had been assigned that role

13  prior to the raise.

14        A.    Yes.

15        Q.    Do you recall about how long?

16        A.    No, not really.

17        Q.    Okay.  Can you explain what your -- who

18  proposed the title for you as driver manager?

19        A.    It was something that Eli and myself

20  discussed.

21        Q.    Okay.  And what was the job description for

22  driver manager?

23        A.    In general to try to maintain the trucks and

24  drivers to a reasonable standard.

25        Q.    Okay.  Did you ever manage Kevin Brindley?



1        A.    I think Kevin came after I was no longer
2    driver manager.  I'm not sure.
3        Q.    Okay.  What about Brent Johnson?
4        A.    I believe so.
5        Q.    Okay.  What about Anthony Lewis?
6        A.    Yes.
7        Q.    Were there any other driver managers --
8        A.    No.
9        Q.    -- during your time?
10       A.    No other driver managers.
11       Q.    So if there were other drivers that happened
12   to work while you were working, you were their manager.
13       A.    Uh-huh (affirmative).
14       Q.    Okay.  Were there any other driver managers
15   during your time --
16       A.    No.
17       Q.    -- at 316 Towing?  Okay.  Do you recall why
18   this manager role may have been offered initially?
19       A.    Again, it wasn't really offered.  It was
20   something me and Eli discussed between us to try to
21   help move the company forward.  He would be more so
22   managing the dispatchers and office side, and I would
23   answer to him about the drivers.
24       Q.    Okay.  And did you have any other duties?
25   Were you still acting as a driver at that time?



1        A.    Yes.

2        Q.    So that was driver manager function on top

3   of being a driver.

4        A.    Yes.

5        Q.    Okay.  And as a driver, is their primary

6   responsibility to tow cars?

7        A.    Tow cars and do roadside service.

8        Q.    Okay.  Did your role as driver manager

9   include reporting to office for meetings in person with

10  Eli?

11       A.    Whenever he summoned.

12       Q.    How often would that occur?

13       A.    Random.

14       Q.    Okay.  Multiple times a day or --

15       A.    No.  Just random.

16       Q.    Okay.  Just the frequency of which I'm just

17  interested in.  A few times a week?

18       A.    Maybe once a week.  Maybe twice every two or

19  three weeks.  It was random.

20       Q.    Okay.  But not -- that sounds like it's a

21  few times a month.

22       A.    Potentially.

23       Q.    Okay.  Is it greater than a few times?

24       A.    Sir, a few times a month.  That's the best I

25  can give you on that.



1       Q.    And your responsibility included inspecting

2    the trucks?

3       A.    Yes, sir.

4       Q.    Okay.  What were you doing when you were

5    inspecting the trucks?

6       A.    Check the tires, check the fluids, look over

7    the equipment.

8       Q.    So that was a safety related role?

9       A.    I mean, if you want to look at it that way,

10   yeah.

11      Q.    Okay.  Did you ever buy supplies for the

12   business?

13      A.    Not with my personal money.

14      Q.    Okay.  Did you ever buy supplies with money

15   that was either advanced to you or, you know, payment

16   was given to you for that purpose?

17      A.    There was never an advance of anything.  If

18   I did purchase something with -- for the company, it

19   was with the company card on the approval of being sent

20   to Blackburn to purchase said items.

21      Q.    Okay.  But that may have happened from time

22   to time.  "Please go to Blackburn --

23      A.    Like maybe two or three times max.

24      Q.    Okay.  Can you describe what your role of

25   managing the drivers was?  Can you explain what that

DUSTIN L. HYDE                                      September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              57

1   entailed?

2        A.    Pretty much if someone didn't report to

3   work, report it to Eli.  If they didn't complete a

4   call, report it to Eli.  If something got tore up,

5   report it to Eli.  Pretty much I was the middleman

6   between the drivers and Eli.

7        Q.    Okay.  Did you ever assist with training of

8   drivers?

9        A.    If a driver needed assistance, sure.

10       Q.    Okay.  Did you ever assist with reviewing

11  driver applications?

12       A.    No.

13       Q.    What about the interviewing process?

14       A.    No.

15       Q.    What about anytime where you may have been

16  involved in deciding whether the drivers could take

17  their trucks home?

18       A.    No.  That was all Eli and Max's doing.

19       Q.    Okay.  Were you hired at any point in time

20  for purposes of advising or consulting with 316 Towing

21  on how to operate a towing business?

22       A.    No.

23       Q.    You weren't?

24       A.    No.

25       Q.    You never explained that your background in



1  the towing industry would have been valuable to 316?

2      A.    Potentially could have been, but that wasn't

3  why I was hired.  I was hired because I can do the job.

4      Q.    Okay.  So you just -- you never spoke about

5  your ability to operate a towing business with them?

6      A.    Why would I?  It wasn't my business.

7      Q.    Okay.  In your role as a manager, can you

8  describe on say a weekly basis how much time was

9  devoted to your manager duties?

10     A.    Anywhere from two to six hours a day

11  potentially.

12     Q.    Okay.  So break that down for me.  What

13  would two hours of management time, what would that

14  break out into?  What would you be doing?

15     A.    Getting things for the drivers' trucks or

16  changing different things for them to be able to switch

17  trucks or to get out on the road with what they got to

18  do.  I mean --

19     Q.    When you --

20     A.    -- it could have been getting supplies for

21  the truck.

22     Q.    When you refer to things, are you referring

23  to equipment --

24     A.    Yeah --

25     Q.    -- repair parts?



1        A.    -- straps, yes, equipment.

2        Q.    So in addition to those items, getting

3    straps and other equipment, what else were you doing,

4    you know, for those two hours?

5        A.    It really varied.  I mean, it could have

6    been an employee who was coming in late that I needed

7    to talk to.  I mean, it could have been a huge numerous

8    amount of different things from a manager's point of

9    view.

10       Q.    Were you ever involved in the decision to

11   hire or fire any drivers?

12       A.    No.

13            (Exhibit Number D-8 was marked for

14       identification.)

15            MS. ELLIOTT:  I'm handing you now what has

16       been marked as Exhibit 8.

17   BY MR. HANDSCHUH:

18       Q.    Will you please take a moment and read

19   Exhibit 8.  Let me know when you're finished.

20       A.    Okay.

21            MS. ELLIOTT:  I'm also going to hand you --

22            MR. HANDSCHUH:  I need my copy.

23            MS. ELLIOTT:  Oh, of course.  I'll also hand

24       you what's been marked as Exhibit 9.

25   /  /  /



1              (Exhibit Number D-9 was marked for

2       identification.)

3       A.    Okay.

4   BY MR. HANDSCHUH:

5       Q.    Is this a WhatsApp exchange between you and

6   Eli?

7       A.    It appears that way.

8       Q.    Okay.  And it appears that you -- it's dated

9   March 10, 2021?

10      A.    Yes.

11      Q.    And this would have been after the period of

12  time when you had become driver manager.

13      A.    I believe so.

14      Q.    Okay.  When did you become driver manager?

15      A.    Again, I'm not sure on the dates.

16      Q.    Okay.  But did it coincide at least with at

17  some point on or before the raise?

18      A.    The promotion to driver manager was after

19  the raise.  We've already discussed that.

20      Q.    Okay.  What was the date of that?

21      A.    I don't recall.

22      Q.    Okay.  Here it states -- you're writing to

23  Eli and it says, "Good morning, Brother.  Applications

24  for new drivers are ready."  Do you see that?

25  Number 8.



1       A.    Okay.

2       Q.    Okay.  You testified earlier that you didn't

3  have any interactions or, you know, duties with respect

4  to applications.  But does this refresh your memory

5  that perhaps you were involved?

6       A.    Okay.  So if you want me to say that I was

7  involved by him handing me applications to hand out to

8  people and then turning around and handing them

9  applications back to him, that has nothing to do with

10  me deciding on whether to hire or fire said individual.

11  I was simply passing the application.

12       Q.    Okay.  But you do -- your testimony now is

13  that you may have been involved in applications --

14       A.    I passed applications.  I was never involved

15  with hiring and firing process.  Passing applications

16  only.

17       Q.    Okay.  But just to clarify, it does appear

18  that you were involved in the process, correct, the

19  application process?

20       A.    I don't understand your term, sir.  I did

21  pass applications.  I was not involved in a process of

22  hiring and firing.

23       Q.    You never spoke to Eli whether or not you

24  thought someone should have been hired or fired?

25       A.    Even if I did, it had no effect on anybody.



1      Q.    Did you or did you not?  Not whether you

2  did.

3      A.    I have made comments about somebody may

4  should have been fired.

5      Q.    Okay.  Turning your attention to Exhibit 9.

6  Can you read this document and let me know when you're

7  finished?

8      A.    I'm ready.  Ready when you are.

9      Q.    Does this appear to be a WhatsApp exchange

10  between you and Eli?

11      A.    Yes, it is.

12      Q.    Okay.  And is this you telling Eli that

13  you're going to make the decision to not allow any of

14  the other drivers to take the trucks home?

15      A.    It appears as such, yes.

16      Q.    Okay.  And so that may have been a decision

17  that you were involved in in your role as a driver

18  manager?

19      A.    It wasn't my decision.  I see the way that

20  it looks, but it was Eli's decision and call to whether

21  or not that happened.  I was simply frustrated and

22  going with anger out of that message.

23      Q.    Okay.  But you did communicate that opinion

24  to him at that time.

25      A.    Yes.  That's what it says.



1    Q.   Do you recall whether or not you ever were

2  involved in terminating Reynaldo Brown for violating

3  any rules?

4    A.   I was given a message that he was to be let

5  go per Eli.

6         (Exhibit Number D-10 was marked for

7     identification.)

8         MS. ELLIOTT:  I'm handing you what's been

9     marked as Exhibit 10.

10 BY MR. HANDSCHUH:

11   Q.   If you would, please read this Exhibit 10.

12 Let me know when you're finished.

13   A.   Uh-huh (affirmative).

14   Q.   Do you recognize this WhatsApp exchange

15 between you and Eli?

16   A.   I do.

17   Q.   Okay.  And what is the substance of this

18 exchange?

19   A.   Me reporting to Eli what Reynaldo was doing

20 with the truck, and previous messages before that was

21 talking about how much longer we were going to decide

22 to let him keep tearing things up and then this

23 message.

24   Q.   Okay.  But this message essentially is you

25 discussing with Eli your decision as to the performance



1   issues with Brown; correct?

2        A.    Yes.

3        Q.    Okay.  And at this point in time, it appears

4   it had reached the level of a decision as to whether or

5   not to let Mr. Brown go, correct, or fire him?

6        A.    Yeah.  I mean, that's where it led to, yes.

7        Q.    Okay.  And so your input was at least

8   supplied for purposes of Brown's status as a driver

9   within 316.

10       A.    Sure.  I mean, I could speak, and he could

11  choose to listen or not.

12       Q.    Now, we spoke about that brief moment where

13  you quit on a Friday and then were rehired on a

14  Saturday.  And then we're coming up to a period of time

15  in which we had another instance where you no longer

16  worked for 316; correct?

17       A.    At some point, yes.

18       Q.    Was that on or about August of 2021?

19       A.    Potentially.  I don't know the exact dates.

20       Q.    When you were rehired, do you recall when

21  you were rehired?

22       A.    I don't.

23       Q.    Could it have been around or about

24  November 2021?

25       A.    Potentially.



1       Q.    Okay.  At the time of rehire, did you no

2   longer have the role as driver manager?

3       A.    If that's the last time that there was a

4   separation, then yes.  When I came back, I was no

5   longer driver manager.

6       Q.    Okay.  So the last period of time you worked

7   for 316, you were no longer a driver manager.

8       A.    That's correct.

9       Q.    Okay.  While you were a driver for 316, who

10  supervised you?

11      A.    Eli.

12      Q.    Okay.  Did you ever get managed by Maksim --

13  he goes by Max -- Mr. Lisovskiy?

14      A.    I mean, theoretically he manages the whole

15  show.  He's the owner.

16      Q.    Okay.  But did he in his day to day

17  supervise you?

18      A.    No, not on a regular basis.  He was busy

19  with other duties.

20      Q.    Okay.  When may have Max supervised you, or

21  when did you interact with Max individually?

22      A.    Only if I couldn't get something through to

23  Eli and chose to speak to Max.

24      Q.    Do you recall any instances of that?

25      A.    I mean, there were a couple of times, but I



1   don't have date and times for them.

2       Q.   Do you recall the like just -- without

3   knowing when it happened, do you remember what the

4   substance was about?

5       A.   One of the issues was pertaining to Eli.

6       Q.   What was that?

7       A.   I mean, I don't recall now.  It was an issue

8   with work, I mean, and I took it to Max, and it was

9   brushed off.

10      Q.   Okay.  Do you recall specifically the

11  complaint?

12      A.   Sir, I just said I do not remember that

13  instance.

14      Q.   Okay.  What about I think you mentioned

15  maybe it happened twice.  What was the second instance?

16      A.   Sir, I do not remember those instances.

17      Q.   You don't.  Okay.  So there may have been

18  two times you dealt with Max, but you don't recall the

19  substance.

20      A.   Right.

21      Q.   Okay.  Who set your work schedule while you

22  were employed as a driver for 316?

23      A.   Eli.

24      Q.   Okay.  Did Max ever set it for you?

25      A.   Sir, I didn't talk to Max.  I mean, Max was



1   a once-in-a-while, occasional talk when I bumped into

2   him getting my check or if -- again, the few instances

3   about Eli or whatever.  I mean, Max was pretty much

4   doing his own thing.

5        Q.   Okay.  While you were working for 316, what

6   was your schedule, your weekly schedule?

7        A.   It depends on through what time we're

8   talking about, and I can't specify.  But it was always

9   12-hour shifts other than in the beginning when I was

10  24 hours a day on call.

11            MR. HANDSCHUH:  Rick, if we could go off the

12       record.  It's been about an hour and a half.  I'm

13       just going to take a quick bathroom break.

14            THE VIDEOGRAPHER:  11:33, we're off the

15       record.  This is the end of Media Number 2.

16                 (VIDEO CAMERA OFF.)

17         (An off-the-record discussion was held.)

18                 (VIDEO CAMERA ON.)

19            THE VIDEOGRAPHER:  11:46 a.m.  We're back on

20       the record.  This is the beginning of Media

21       Number 3.

22  BY MR. HANDSCHUH:

23       Q.   All right.  Picking back up after our break,

24  Mr. Hyde, if you would, please take a look at

25  Exhibit 7.  You testified earlier that your discussions



 1  regarding pay were directed to Eli; correct?

 2      A.    Yes.

 3      Q.    Did you ever direct those discussions to

 4  Max?

 5      A.    No.

 6      Q.    Okay.  Turning your attention to Request for

 7  Admission Number 30, and this is going to be in the

 8  back on page 27 of Exhibit 7.

 9      A.    You said page 27?

10      Q.    Yes.  Oh, I'm sorry.  Hold on one moment.

11  Yeah, we need the bigger stapler.

12           THE VIDEOGRAPHER:  Do you want to go off the

13      record, sir?

14           MR. HANDSCHUH:  No.

15           MS. ELLIOTT:  May I borrow those, please?

16      Thank you.

17           MR. HANDSCHUH:  Bring it in here.

18           THE VIDEOGRAPHER:  Ma'am, could you move

19      that?

20           MS. ELLIOTT:  Of course.

21           THE VIDEOGRAPHER:  Thank you.

22  BY MR. HANDSCHUH:

23      Q.    So Request for Admission Number 30 within

24  Exhibit 7, do you see that?

25      A.    Yes.



1      Q.    And that request asked you to "admit that

2    you" -- Dustin Hyde -- "never raised objections to 316

3    Towing that the compensation you received was

4    inadequate for the amount of work you performed."  And

5    the response there was "Deny."  You state that

6    "Plaintiff often complained about his compensation to

7    Defendant Lisovskiy, which caused him to receive a

8    raise at times."  Was that response in error given that

9    you spoke to Eli about compensation?

10     A.    I believe the wording is in error because

11   for me to get more money I would have to discuss that

12   with Eli, and then Eli would in turn have a meeting

13   with Max to discuss it and then come back with a yes or

14   a no.

15     Q.    Okay.  So you, in fact, did not discuss your

16   compensation with Defendant Lisovskiy; correct?

17     A.    I don't believe there was a conversation

18   directly about the pay, no.

19     Q.    Okay.  And were you ever physically present

20   or overhear any discussions between Defendant Lisovskiy

21   and Eli regarding your compensation?

22     A.    Not directly, no.

23     Q.    So you don't know whether or not they

24   discussed your compensation or not?

25     A.    Not by direct, no.



1        Q.    Okay.  And when we speak to Eli, are we
2    speaking to Eli Kudrin?
3        A.    Yes.
4        Q.    K-u-d-r-i-n?
5        A.    That's the only Eli I know, sir.
6        Q.    Okay.  You testified earlier that you recall
7    having an opportunity, going back to Exhibit 3, to have
8    filled out the application; is that correct?
9        A.    I'm sorry.  You said I had an opportunity to
10   fill out an application?
11       Q.    Correct, pages --
12       A.    Yes.
13       Q.    -- on Exhibit 3?  Do you recall during that
14   time having an opportunity to take the application and
15   contracts home with you to review and sign?
16       A.    I mean, I may have.
17       Q.    Is that a yes, you did take it home?
18       A.    I took some papers home.  I mean, some
19   papers were filled out right there.  So I can't
20   decipher which ones were which.  I did take some papers
21   home, yes.
22       Q.    Okay.  But they didn't require an initial --
23   an immediate return of the documentation at any
24   particular time.  You had a chance to take it home if
25   you want to.



1        A.     Yes, sir.

2        Q.     And you, in fact, for a portion of the

3   application did take it home.  You just can't remember

4   which part.

5        A.     Presumably, yes.

6        Q.     Presumably or is that your test -- that's

7   what you're testifying to?

8        A.     I took some papers home.  I can't decipher

9   which ones were which, yes.

10       Q.     Okay.  You mentioned that initially you were

11  on a 24/7 shift; is that right?

12       A.     I was on call 24/7.

13       Q.     Okay.  What does on call mean?

14       A.     Simply that.  You get called; you go do the

15  work.

16       Q.     Okay.  What -- did you have to be in any

17  particular location during the on call?

18       A.     In our home area.

19       Q.     Okay.  Did you have to be at 316's property?

20       A.     Are you talking about the physical address?

21  No.

22       Q.     Okay.  So you weren't required to report

23  while on call to their physical address.

24       A.     Not unless called up for paperwork or

25  something.



1      Q.    Okay.  And then you said that your -- when

2  did the 24/7 on call, when did that end and switch to a

3  12-hour on call?

4      A.    When we hired other drivers.

5      Q.    Okay.  And do you recall about when that

6  occurred?

7      A.    I do not recall the exact date.  Whenever

8  they hired another driver is when it got split up, and

9  I believe that would have been Jay.

10      Q.    Okay.  Do you think that may have started at

11  least -- you were hired back in December of '19.  Did

12  the beginning of 2021 sound like the period of time

13  when there would have been new drivers?  How long were

14  you working there solo?

15      A.    It's been a little over a year.  So, I mean,

16  again, I don't know the specifics, but whenever they

17  hired Anthony is about the time that they started

18  divvying up 12-hour shifts.

19      Q.    Okay.  So if that's a year after you were

20  hired, that puts us into December of 2020, which is

21  right before early 2021?

22      A.    Yes.

23      Q.    Okay.  And can you explain to me what being

24  on call for 12 hours meant?  Does that just mean it's a

25  shorter period than 24/7?



1      A.    Nobody was on call for 12 hours.  You have

2  12-hour shifts.  I was the only one on call 24 hours a

3  day.

4      Q.    Okay.  Can you explain what a 12-hour shift

5  means?

6      A.    I think that's pretty explanatory.  12 hours

7  a shift.  You work 12 hours.

8      Q.    Okay.  And this is as a driver.  Is that

9  driver always working, or are they responding to calls?

10      A.    That is working.

11      Q.    Okay.  But is there instances where they may

12  not be driving to or from a call?

13      A.    Sure, in between calls.

14      Q.    Okay.  How -- during, you know, any

15  particular time, a 12-hour shift, how often would the

16  driver actually be driving?

17      A.    I can't answer that.

18      Q.    Would it be the entire 12 hours?

19      A.    I can't answer that.

20      Q.    Okay.

21      A.    It merely goes on call volume.  If you have

22  a call, you're driving.  If you don't have a call,

23  you're sitting.  So I can't answer that, especially for

24  other drivers.

25      Q.    Okay.  What about for purposes of sitting?



1   Does that just mean that you aren't required to be

2   driving, and you're just awaiting the next dispatch?

3          A.     Yes.

4          Q.     Okay.  Do they -- is there any requirement

5   as to where you wait?

6          A.     In the home area.

7          Q.     Okay.  What does the home area mean?

8          A.     They've got a map.  It's mapped out.

9          Q.     Can you show me?  I think you pointed to an

10  exhibit.  Which exhibit?

11         A.    I mean, if y'all have a map in here, then --

12  there you go.

13         Q.     Okay.  What is this map a map of?  You're

14  pointing to --

15         A.    It's a map of the state of Georgia and the

16  home area with a dot on it.  That's the map y'all

17  provided.  Y'all should know more about it than me.

18         Q.     Okay.  Pointing out 100, you're claiming

19  this is a home area map.  Does it say at the top that

20  it's a registry of certified medical examiner search?

21         A.    I mean, I'm just saying in general of the

22  map, we have a home area.  Y'all presented this to me.

23  I don't -- I'm just telling you, using this image as a

24  basis, we have a home area, and that's where we stayed.

25         Q.     Where does it say home area on this



DUSTIN L. HYDE                                        September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                                   75

 1  document?

 2      A.    Sir, it doesn't on the document.  I was

 3  using the picture for reference.

 4      Q.    Okay.  So you're -- are you claiming you've

 5  seen the home area map?  I haven't seen it.

 6      A.    There was a map hanging in Eli's office with

 7  pins in it.  It is a 15- or 20-mile radius map from the

 8  home location of the shop.

 9      Q.    Okay.  And how would the dispatch know

10  whether or not you were resting in the home area?

11      A.    I mean, if you're on schedule, you're in the

12  home area.

13      Q.    Okay.  Was there any kind of transportation

14  management system that may have been tracking GPS at

15  the time?

16      A.    Could have been.  I don't know.  It ain't my

17  truck.

18      Q.    I just mean in your role as driver manager

19  were you aware whether or not there was any technology

20  that handled on behalf of 316 dispatch?

21      A.    I mean, they could have used Towbook for GPS

22  location.

23      Q.    Okay.  So you're familiar with a

24  transportation management system referred to as

25  Towbook?



1        A.     Yes.

2        Q.     Okay.   During your time on call -- and is

3    there a distinction between on call and a shift?

4        A.     Yes, there's a distinction.

5        Q.     Okay.   Can you explain what that was?

6        A.     If you have a shift and you're on for

7    12 hours, then literally you're there to work in

8    between that 12 hours.   When they send you a call, you

9    go do the work.

10       Q.     Okay.   And how is that -- how is that

11   different from -- I'm just asking what you're doing

12   differently between what you're referring to as on call

13   and a shift.

14       A.     Okay.   So use me as an example for the -- I

15   guess during the manager part, if I'm scheduled 7:00 to

16   7:00, that is my working hours.   Then me being a

17   manager, they call me after that, I am on call.

18   Literally, as it says, on call.   So you either have a

19   shift that you work, which every employee did other

20   than myself who was on call after-hours.

21       Q.     What would drivers need to do differently

22   while on call -- or while on a shift rather while they

23   weren't driving to or from a location, what was

24   different between not driving during a shift and being

25   on call?



```
 1        A.    I mean, I feel like you're trying to
 2   separate something that's not separated.  There's no
 3   difference.  Either you were on your 12-hour shift that
 4   you were scheduled every week to work or you weren't.
 5   I was the only one that got -- well, Jay had some on
 6   call in the beginning until we got more drivers, but
 7   primarily I was the only one that was on call without a
 8   time frame per se.
 9        Q.    Okay.  But I'm just asking was there
10   anything different between what you were permitted to
11   do while on a shift but not driving and while on call?
12        A.    No.
13        Q.    Okay.  Did you while on call spend time, and
14   even on a shift, at home waiting for dispatch?
15        A.    Yeah.
16        Q.    Okay.  So you were permitted while you
17   weren't driving to or from a location to assist a
18   customer to choose the location that you wanted to
19   wait.
20        A.    As long as it was in the home area, yes.
21        Q.    Okay.  And did you spend most of the time
22   waiting in the truck, or did you spend most of the time
23   waiting at home?
24        A.    Depended on where my last call left me.
25   Depended on where I was going next.  Depended on a lot
```



DUSTIN L. HYDE                                          September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                                      78

 1  of things.

 2       Q.    Okay.  But you had the option should you,

 3  you know, decide to go home at that point in time?

 4       A.    If there was nothing pending, then sure.

 5       Q.    Okay.  Meaning nothing pending not under

 6  dispatch, meaning to a --

 7       A.    If that's your phrasing, yes.

 8       Q.    Okay.  Do you know being called out to a

 9  job, do you refer to dispatch as something else?

10       A.    I'm not understanding what you're saying.

11       Q.    When you receive a notice from Eli or 316

12  for a job, what was the terminology you would refer to

13  it while you were driving to and from the --

14       A.    You got a call.

15       Q.    Okay.  So you were just responding to a

16  call.

17       A.    Uh-huh (affirmative).

18       Q.    I'm referring it to dispatch, but --

19       A.    Okay.

20       Q.    -- is that -- can we agree that's roughly

21  equivalent?

22       A.    I mean, sure.

23       Q.    Okay.  Would you at times attend to personal

24  errands when you weren't responding to a call?

25       A.    Not really.  I mean, I can't recall really



 1    doing nothing personal while being on a clock or on

 2    call.

 3         Q.    Okay.  Turning your attention back to

 4    Exhibit 7, Request for Admission Number 34.  Excuse me,

 5    27, Request 27.

 6         A.    Okay.

 7         Q.    It asks, "Please admit that during at least

 8    part of the time you were scheduled to be on call you

 9    would attend to personal responsibilities and errands,"

10    and your responded, "Admit.  Admitted to the extent

11    that on occasion plaintiff did spend some time

12    attending to personal responsibilities and errands

13    while he was scheduled to be on call."

14         A.    Okay.  So, I mean, what are you saying?  I

15    can't go get a hamburger if I'm on call?  Like

16    literally --

17         Q.    I'm just asking --

18         A.    No.  I'm trying to help you on this one.

19    Literally, if you take the word as you can't do

20    anything, then, no, that's not accurate because there

21    may have been a time I went and got something in

22    between calls.  But it wasn't like I just had time to

23    go do personal errands willy-nilly whenever I wanted

24    to.

25         Q.    But you did, you know, during your



1    employment as a driver with 316, you did attend to
2    personal responsibilities; correct?
3         A.    If you want to call going out to get
4    something to eat, sure, I may have done that.
5         Q.    Okay.  Does that mean that your response to
6    Admission Number 27 is incorrect?
7         A.    I'm not sure.
8         Q.    Okay.  If it is, will you change that for
9    us?
10        A.    I mean, I would need to understand a little
11   better of what you're wanting.
12        Q.    Well, here you testified just that it may
13   have been just to go get lunch, I believe, or a meal.
14   But here in response to Admission Number 27, when it
15   came to time that you weren't responding to a call, you
16   did, in fact, from time to time handle personal
17   responsibilities or errands.
18        A.    Okay.  But you're trying to make it seem
19   like I could just go for a random party at someone's
20   house.  That's not how that is operated.  When you're
21   on call, you're in an area.  You have to respond within
22   a certain time frame.  So, no, I'm not off just doing
23   whatever.  I may have grabbed something.  I may have
24   stopped and paid a phone bill on my way in, but I am
25   still actively ready to go and on call.



1        Q.     But you did pay a phone bill.  If you didn't

2   have to be on to respond to the next call --

3        A.     Yes, sir.

4        Q.     -- back to back, you had the opportunity --

5        A.     Yes, sir.

6        Q.     -- if you so chose.  Okay.  Meaning, to

7   summarize --

8        A.     Yes.

9        Q.     -- if you weren't responding to back-to-back

10  calls, during those breaks you were free to attend to

11  personal responsibilities and errands at your

12  discretion.

13       A.     If that's the way you so choose to see it,

14  yes, sir.

15       Q.     Okay.  Would you change how I stated it?

16       A.     I don't have a comment.

17       Q.     Okay.  Will you let me know if you need to

18  change that?

19       A.     Sure.

20       Q.     Do you recall whether or not during this

21  time perhaps that you were, as you mentioned, on call

22  that you may have been sleeping during that point in

23  time?

24       A.     Doubtful.  But I'm sure if I was sick I may

25  have nodded off a time or two.

1       Q.    Okay.

2       A.    So, yes.

3       Q.    But at least -- your shift, when it turned

4    into a 12-hour shift, were you always, say, the night

5    shift?

6       A.    I believe so.

7       Q.    Okay.  And so your regular shift would have

8    included 8:00 p.m. to 8:00 a.m.  Does that sound about

9    right?

10      A.    It -- yes, but it did change from like 7:00

11   to 7:00, 8:00 to 8:00, 9:00 to 9:00, depending on the

12   needs of the company.

13      Q.    Okay.  But you were for all intents and

14   purposes working the night shift --

15      A.    Yes.

16      Q.    -- versus the day shift.  Okay.  And so

17   while you were on call, which is -- would have been, in

18   the vernacular you're using, the daytime that you're

19   not on call, you were permitted to be at home, and you

20   could be sleeping during that time; correct?

21      A.    Are you saying during the daytime?

22      Q.    Correct.

23      A.    So if I worked at night, then obviously,

24   yes.  If I'm off, I can do whatever I choose to in my

25   house.



1      Q.    Okay.  But you were still on call during

2   that time.

3      A.    Again, going back to your dates, it depends

4   on when you're referring to.  Because when I was on

5   call 24/7, there wasn't a 12-hour time frame.  You

6   can't get the two mixed up.  I was either on call

7   during the first part of it, and then after drivers

8   were hired I went to a 12-hour shift.  Those two cannot

9   be confused with each other.

10     Q.    Okay.  So during the 12-hour shift period,

11  during that point in time were you ever permitted to

12  sleep during your shift?  Say there were no calls

13  coming in.  Could you sleep during that time?

14     A.    I mean, I'm sure someone could.  I didn't.

15     Q.    You never did?

16     A.    No.  If I'm at work, I'm at work.

17     Q.    Okay.  From 8:00 a.m. -- excuse me -- 8:00

18  p.m. --

19     A.    8:00 a.m. --

20     Q.    -- to 8:00 a.m.?

21     A.    -- to 8:00 p.m., 8:00 p.m. to 8:00 a.m.  If

22  you're -- if I'm scheduled on, I'm not asleep.

23     Q.    Did you ever use the company truck for

24  personal errands?

25     A.    No.



```
 1                  (Exhibit Number D-11 was marked for

 2          identification.)

 3                  MS. ELLIOTT:  I'm handing you now what's

 4          been marked as Exhibit 11.

 5   BY MR. HANDSCHUH:

 6          Q.    If you would, please review Exhibit 11.  Let

 7   me know when you're finished.

 8          A.    Okay.

 9                  (Exhibit Number D-12 was marked for

10          identification.)

11                  MS. ELLIOTT:  I'm also handing you now

12          what's been marked as Exhibit 12.

13   BY MR. HANDSCHUH:

14          Q.    So if you look here, this appears to be

15   Exhibit 11, a WhatsApp communication between you and

16   Eli; correct?

17          A.    Uh-huh (affirmative).

18          Q.    And here it's dated January 22nd, 2021, at

19   7:58.

20          A.    Yes.

21          Q.    Okay.  And as we mentioned, your shift would

22   have been at that point in time ending at 8:00 a.m.;

23   correct?

24          A.    Yes.

25          Q.    If you continue to the next page of
```



1  Exhibit 11, do you see where you explain to Eli that

2  your -- you express your dislike, that you hate being

3  woke up for nothing?

4        A.    Okay.   What --

5        Q.    So does that mean that at that point in time

6  as you're discussing this issue about a particular trip

7  to the woman identified there before she canceled that

8  Eli happened to wake you up at 8:00 a.m., the time

9  which would have been your shift?

10       A.    I can't confirm that because we don't see

11  the whole context of the message here.

12       Q.    Okay.   But you admit that this text message

13  reflects that, while discussing this, you were woken up

14  by Eli.

15       A.    I mean, you're reading what's said here in

16  the papers.   Sure.   I mean --

17       Q.    Okay.   Does it mean anything else different

18  to you?   Were you referring to a different day?

19       A.    I don't know.   I don't have a time clock.   I

20  can't go back and see what I was doing at that time, so

21  I can't refute that.

22       Q.    But do you have any reason to believe that

23  you weren't sleeping during this particular point in

24  time, which would have been your shift?

25       A.    I really don't know.   Again, I can't go back



1  and see what I was doing then.  So I can't give you an

2  answer on something I don't know.

3      Q.   Could you be sleeping so long as you were

4  available to Eli if he reached out to you?

5      A.   Again, with these dates, I do not know what

6  I was doing at that time, so I can't answer that

7  question.

8      Q.   I'm just asking do you recall ever during

9  your -- when your schedule turned into a 12-hour shift,

10  do you remember ever sleeping during that time?

11      A.   I do not recall sleeping during my shift,

12  no.

13      Q.   Okay.  So you don't believe that this

14  WhatsApp text message reflects that Eli happened to

15  wake you up during your shift.

16      A.   Again, I don't even know what day this is

17  on, whether it be a Monday, a Friday, a Saturday.  I

18  don't know the context behind the full message, so I

19  cannot give you a definitive answer.  I do not know.

20  Is it possible that I was asleep?  Could be.  I don't

21  have a time clock to go back in time to give you a

22  definitive answer on that.

23      Q.   Okay.  Turning your attention to what's been

24  marked as Exhibit 12.

25      A.   Uh-huh (affirmative).



1        Q.    If you could read this and then let me know
2   when you're finished.
3        A.    I'm finished.
4        Q.    Okay.  Does that reflect a text message, a
5   WhatsApp message between you and Eli?
6        A.    It does.
7        Q.    And does it reflect that you were going to a
8   flea market and that you were going to use the 316
9   truck instead of your personal car to pick up a filing
10  cabinet?
11       A.    I did ask if I could, yes.
12       Q.    Okay.  So you here in this instance, this is
13  an instance where you used the 316 truck for
14  personal --
15       A.    No, I did not.  I said I asked, yes.
16       Q.    "I asked, yes."  Okay.  Did you use it?
17       A.    No, I did not use the truck that day.
18       Q.    Okay.  Were you permitted to?
19       A.    He said I could.
20       Q.    Okay.  If I represented to you that
21  January 21st, 2021, was a -- excuse me -- 22nd was a
22  Friday, going back to Exhibit 11 --
23       A.    Okay.
24       Q.    -- having looked at -- I'll represent I've
25  looked at a calendar back at that time.  If that was a



DUSTIN L. HYDE                                            September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                                       88

1   Friday, would that change your response as to whether
2   or not -- you mentioned it could have been a Saturday.
3   It appears it wasn't a Saturday.
4        A.    Okay.
5        Q.    It was a Friday.  Does that change your
6   response that you're just not sure whether or not you
7   were sleeping during that time?
8        A.    I'm pretty sure I wasn't.  But, again, I
9   don't have a time clock to go back.  I could have been
10  sick during that time.  I do not recall that day as we
11  live.
12       Q.    Okay.
13       A.    I'm just saying.
14       Q.    But it was possible that you may have been
15  sleeping when Eli reached out to you during --
16       A.    Sir, as I said awhile ago, yes, it is
17  possible.
18       Q.    Okay.  So we mentioned Towbook.  Do you
19  remember when that was implemented at 316?
20       A.    In the beginning.
21       Q.    Okay.  And is Towbook a software that is
22  developed for tow companies?
23       A.    As you know, yes.
24       Q.    Okay.  And does it help tow companies
25  with -- you're recalling it responding to a call or



1  dispatch with -- for purposes of being able to tell

2  drivers where to go and to track the drivers as they

3  go?

4        A.    Yes.

5        Q.    Okay.  And does that require downloading an

6  app to your phone?

7        A.    It does.

8        Q.    Okay.  And then that app will track your

9  GPS?

10       A.    It has a potential to, but that's not

11  necessarily what the app is for.  But yes.

12       Q.    Okay.  Were you aware as to whether or not

13  for purposes of your shifts whether your GPS was being

14  logged by Towbook?

15       A.    All Towbook is logged.  But if you're asking

16  if I was logged, I don't know, and I don't care.

17       Q.    Okay.  You don't know --

18       A.    I didn't do anything wrong, so -- I mean, I

19  don't care if they know where I'm at.

20       Q.    Okay.  But at least you can admit that

21  Towbook would have the ability to track you while --

22       A.    Absolutely.

23       Q.    -- you're responding to a call.

24       A.    Yes, sir, it does.

25       Q.    Okay.  So the software knows if you are



1    moving, driving, or if you're stopped.

2         A.    As per typical GPS, yes, sir.

3         Q.    Okay.  And so for those shifts, if you're

4    responding to calls, the Towbook would have recorded

5    your GPS coordinates responding to the call and then

6    driving away from the call; is that correct?

7         A.    It should, yes.

8         Q.    Okay.  And that's the time that you were

9    responding to a call and actively driving; correct?

10        A.    Isn't that what it's for?

11        Q.    Correct.  And there's no -- you weren't

12   necessarily driving, even though you were on a shift

13   from 8:00 p.m. to 8:00 a.m. or 7:00 p.m. or 7:00 a.m.,

14   you weren't always driving; correct?  You weren't

15   driving for 12 hours straight?

16        A.    No.

17        Q.    Okay.  So there were times where you were

18   stopped waiting for the next call.

19        A.    Yes.

20        Q.    Okay.  And that could have been anywhere, I

21   think your testimony is, so long as it was within the

22   home radius.

23        A.    Yes.

24        Q.    Okay.  Were you able to at any point in time

25   reject calls?



1              (Exhibit Number D-13 was marked for

2        identification.)

3              MS. ELLIOTT:  I'm handing you now what's

4        been marked as Exhibit 13.

5        A.    I mean, if you're looking for a yes-or-no

6    answer, yes, you can potentially reject a call, yeah.

7    BY MR. HANDSCHUH:

8        Q.    Okay.  Do you recall for yourself having

9    done so?

10       A.    I mean, there's been instances where I've

11   had issues with a call and has needed to cancel, yes.

12       Q.    Okay.  What were those issues?

13       A.    Can't locate a vehicle, irate customer that

14   is yelling at you.  I mean, there's a number of

15   different reasons why a call can cancel.

16       Q.    Okay.  Turning your attention to Exhibit 13,

17   if you could, please, thumb through that.  Let me know

18   when you're finished.

19       A.    Okay.  It's call logs.

20             (Exhibit Number D-14 was marked for

21        identification.)

22             MS. ELLIOTT:  I'm also going to hand you

23        what's been marked Exhibit 14.

24       A.    Okay.

25   /  /  /



1    BY MR. HANDSCHUH:

2        Q.    Turning your attention to Exhibit 13, have

3    you seen this Towbook report before?

4        A.    No.

5        Q.    Okay.  Have you had a chance to thumb

6    through it?

7        A.    Yeah.

8        Q.    Okay.  Do you know whether or not, just

9    based upon this report, it appears that it is both

10   tracking the time that you're under dispatch as well as

11   en route and then completed with time stamps.

12       A.    Okay.

13       Q.    Is that correct?

14       A.    It appears that way.

15       Q.    Okay.  And so during your shift, if you were

16   under dispatch and driving, then Towbook would have

17   been picking up your location and the fact that you're

18   moving; correct?

19       A.    (Witness nods head affirmatively.)

20       Q.    Okay.

21       A.    Yes.

22       Q.    And so do you have any reason to believe

23   that Towbook was not properly tracking the times that

24   you were responding to a call or --

25       A.    I can't answer that.  I have no affiliation



1   with Towbook or its services other than using the
2   product.  So if something was wrong, I cannot answer
3   that.
4          Q.   But you don't know if it was wrong or
5   correct.
6          A.   I -- all I can say is I see the papers
7   you've given me.  I can't dispute them being wrong.  I
8   don't know the service.
9          Q.   Okay.  And you testified earlier as well
10  that you weren't driving all 12 hours of each shift;
11  correct?
12         A.   That is true.
13         Q.   Okay.  There were certainly times in which
14  you weren't responding to a call, and we've discussed
15  what you could be doing during that time; correct?
16         A.   Uh-huh, yes, sir.
17         Q.   Pointing your attention to Exhibit
18  Number 14, if you could thumb through that document.
19         A.   Okay.
20         Q.   All right.  So looking in the left-hand
21  column, I'd like you to go to 132, 1032.
22         A.   Okay.
23         Q.   And do you see that one?  It's a date of
24  February 24, 2021?
25         A.   Uh-huh (affirmative).



1      Q.    And it has a time entry stamp of 1:18 a.m.?

2      A.    Okay.

3      Q.    And it appears that the dispatch who's

4   identified as -- are you familiar with a Valeria

5   Brovkina?

6      A.    I believe Valeria was a dispatcher.

7      Q.    Okay.  So you recognize that name.

8      A.    I don't know the last name, but I know we

9   had a Viktoria and a Valeria.  And, I mean, those names

10  are there, so --

11     Q.    Okay.  So during your shift you may have

12  been dispatched or asked to respond to a call by

13  Valeria.

14     A.    Okay.

15     Q.    Valeria, as you mentioned it; is that

16  correct?

17     A.    Okay.

18     Q.    Okay.  And on this particular date, it

19  appears that a note is set forth.  And this is I'll

20  represent to you a canceled job log from Towbook.  And

21  it states that "Dustin Hyde advised that he had a

22  family issue and he could not assist."  And that's at

23  1:18 a.m.  Does that refresh your recollection that you

24  had an opportunity -- you mentioned being able to

25  reject certain, you know, trips.



DUSTIN L. HYDE                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                            95

1        A.    As I've already said.

2        Q.    Okay.  And so here, and just as a specific

3   instance of that, it appears you rejected one for a

4   family issue.

5        A.    I can't confirm that.  I don't know who

6   printed this.  I don't know any -- I haven't talked to

7   my counsel about it.  Anybody could have put this in.

8        Q.    Do you recall never having told a dispatcher

9   that you had a family issue for a reason not to respond

10  to a call?

11       A.    I do not recall that date, so I couldn't

12  tell you if that took place or not.

13       Q.    Okay.  So you just -- you can't confirm or

14  deny.

15       A.    True.

16       Q.    Okay.

17       A.    And, like I said, I'm not saying that calls

18  hasn't been canceled or we can't cancel a call.  I just

19  do not recall that specific day and time for that

20  reason.

21       Q.    Okay.  Drawing your attention now to 1317.

22       A.    Okay.

23       Q.    And this one is just March 26, 2021, 10:50

24  p.m., and it just reflects that there was even no

25  reason for a canceled call.



1       A.    Again, that would be something that they

2   would need to discuss with their dispatcher of why

3   there wasn't a reason.  I didn't do this.  I wasn't

4   able to change these notes, so I don't know what you're

5   looking for.  I already gave you your answer that we

6   could cancel calls.  So you're still digging, and I

7   don't know what for.

8       Q.    Okay.  Well, thank you for helping me out

9   there.

10      A.    I mean, I'm not here to be a problem.  I

11  mean --

12      Q.    I just want to make sure I'm understanding.

13      A.    Some of it's pretty self-explanatory.

14      Q.    So drawing your attention back to

15  Exhibit 13.

16      A.    Yes, sir.

17      Q.    And specifically just whether or not in a

18  conceptual, you know, viewpoint here, if Towbook is

19  recording the time you're responding to calls or under

20  dispatch, as I mentioned, then we would be able to

21  track when you were actually driving; is that correct?

22      A.    You should be able to, yes.

23      Q.    Okay.  And so aside from that driving time,

24  that would have been the time that you were actually

25  working for 316; correct?



1      A.    If that's the way you want to phrase it,

2  yes.

3      Q.    And so during that 12-hour shift, were you

4  performing any other kind of work that wasn't being

5  recorded by Towbook?

6      A.    Not if it wasn't for 316.

7      Q.    Okay.  I'd like to talk a little bit about

8  geography.  You mentioned home area.  Was this just

9  something spoken to you about, like a 15 or 20 air mile

10 radius that you considered your home radius or you said

11 there were pins on a map?

12     A.    Yes.

13     Q.    Okay.  And the pins outlined the

14 circumference --

15     A.    That is --

16     Q.    -- of the area?

17     A.    That is between Eli, Max, and the insurance

18 companies that they provided service for about what

19 area that they would cover.

20     Q.    Oh, so it's the coverage area for --

21     A.    Right.

22     Q.    -- the customers.  Okay.  Okay.  And so

23 these would have been primarily in Georgia; correct?

24     A.    Yes.

25     Q.    Okay.  But there were instances from time to





1  time that you made trips out to South Carolina.

2      A.    Okay.

3      Q.    Is that correct?

4      A.    Very few, yes.

5      Q.    Okay.  But you did, in fact, go to a

6  dealership in South Carolina to retrieve vehicles and

7  transfer them or transport them to a dealership here in

8  Georgia.

9      A.    I don't recall the status of the tow, but I

10  do know that we went to Georgia -- I mean, to Carolina

11  to get one and bring it back here, and we've had

12  instances where we've had cars here that were getting

13  towed there.

14      Q.    Okay.

15      A.    So, I mean, it goes both ways.

16      Q.    Okay.  And this is -- this is going to be in

17  Georgia your home area is in or near Winder?

18      A.    Uh-huh (affirmative).

19      Q.    Okay.

20      A.    Yes, sir.

21      Q.    And then that's the home area, but then

22  there were instances, just to summarize, that you were

23  transporting -- were they always cars if you were going

24  to South Carolina?

25      A.    Yes.



1    Q.    Okay.  So there wasn't some other type of

2    equipment or cargo you were hauling?

3    A.    No.

4    Q.    Okay.  Was it always the same dealership?

5    A.    No, sir.  See, again, there were only a few

6    instances where we went over state lines, whether it

7    was to get a van to bring it back to Athens dealership

8    or whether it was a car going to South Carolina's

9    dealership.  It wasn't a dealership-to-dealership

10   thing.  It was from a location to a dealership or a

11   shop to be repaired.

12   Q.    And so during your period of employment, you

13   know, as an independent contractor driver for 316, this

14   is December of '19 all the way up to April of '22.  Do

15   you recall about how often you made trips to South

16   Carolina?

17   A.    Maybe three to four times.

18   Q.    Three to four?  Okay.  Drawing your

19   attention back to Exhibit Number 7 and this time

20   Interrogatory Number 9, which is on page 8.  Well, it's

21   split between 7 and 8.

22   A.    If I could find 7 first.

23   Q.    Sorry.

24   A.    All right.  So you said 7 on what now?

25   Q.    Page 7.



1      A.    7 on 7?

2      Q.    Yeah.

3      A.    Okay.

4      Q.    Now, just flip to Interrogatory Number 9.

5   Please review the question and then your response on

6   the following page.  Let me know when you're done.

7      A.    Okay.

8      Q.    So there this refers to -- you mentioned it

9   happened a few times, and here it stated you did it at

10   least six times, meaning making trips to and from South

11   Carolina.

12      A.    Okay.  So the only thing I can tell you, if

13   y'all want to go back and search Towbook to find every

14   call, have at it.  But I don't know the exact number.

15   I will say between three, six could be potentially, but

16   it's not more than that.  It was very rare that we went

17   out of state like that.

18      Q.    Okay.  And in Towbook what you're stating is

19   that -- was there ever a time that you may have gone to

20   South Carolina but not under dispatch under Towbook?

21      A.    No, sir.

22      Q.    They would have been reflected in Towbook.

23      A.    Yes.

24      Q.    Okay.  Do you think there's a chance that,

25   just based on your recollection, it was more than six?



1   You've given a range between three to four, six.  Was

2   it more?  You just know it was --

3         A.    Sir, I gave an answer.  I don't know what

4   else to tell you.  I genuinely think it was between

5   three and six.

6         Q.    Okay.

7         A.    I mean, y'all literally have all the facts

8   here.  Y'all should know how many times I went, if that

9   was the case.  I haven't been able to look through all

10  this to go back and count to give you a solid answer.

11        Q.    But you do agree that you did make trips out

12  of state to South Carolina.

13        A.    As I told you, yes.

14        Q.    Okay.  To and from.

15        A.    As I said, yes.

16        Q.    Can you describe your interactions with the

17  customers that you were -- on, you know, responding to

18  a call for?  Would you take payments, or did dispatch

19  handle that, Viktoria and Valeria?

20        A.    Most of the time, if there was a payment,

21  they usually paid card, which would go through the

22  office.  Very rarely did we, I, take cash.  I don't

23  like to.

24        Q.    Okay.  So you rarely took cash.  Did you --

25        A.    Okay.  Before that even -- so if you got



1  dispatch to call and the call was covered for a hundred

2  dollars and the service renders $113, that customer's

3  responsible for paying that $13 overage.  That would be

4  what you collected, not the entire call.  It would be

5  the overage charge.

6       Q.    Okay.  And how often were you collecting --

7  it sounds as though the -- what did you call it?  The

8  base rate or you said --

9       A.    I can't give you -- I mean, because each

10  insurance covers a different coverage limit per

11  customer.  You may be covered for a hundred miles.  I

12  may be covered for ten.  So what you're going to pay

13  out of pocket is different from what I'm going to pay.

14       Q.    But at least the --

15       A.    It goes on the insurance policy.

16       Q.    They collect -- the home office for 316

17  collects from the insurers for the coverage portion; is

18  that correct?

19       A.    I don't know that.  I didn't work in the

20  office.  That was between the office and the insurance

21  companies how they paid.

22       Q.    You weren't involved in collecting anything

23  other than overages.

24       A.    That's it.

25       Q.    Okay.  When you did collect overages, did



1  you -- you stated you didn't collect it -- you know,

2  you weren't collecting the cash; right?

3        A.    From time to time, if somebody had only cash

4  as a payment for like the 12 or $13 overage, we would

5  have to take that, and then we'd turn it in with our

6  paperwork on Friday.

7        Q.    About how often would you say, you know,

8  there was an underestimate based on the coverage?  How

9  often were overages occurring?

10       A.    I couldn't possibly give you an answer.

11       Q.    Were they infrequent, seldom, a lot of them?

12       A.    Random.  It really is random.  I can't give

13  you an answer.

14       Q.    Random?  Okay.  So would you say that for

15  each shift it was always occurring?

16       A.    No.

17       Q.    Okay.  Would you say that for each week you

18  would always --

19       A.    Sir, you can try to beat me up all you want.

20  There is no positive answer I can give you.  It's so

21  random, you can't pinpoint how many times in a week you

22  may get a cash overage.

23       Q.    What about cash overage or overage of any

24  kind?

25       A.    Again, you can try to beat me up all you



1  want.  I cannot give you a definitive answer when it's

2  so random you cannot put a number on it.

3      Q.   I'm sorry.  I'm not trying to beat you up.

4  I'm just trying --

5      A.    It seems that way.

6      Q.    I'm trying to understand because I'm trying

7  to understand --

8      A.    Well, it's very clear.  You've got an

9  overage.  The customer pays the overage.  It may happen

10  once this week.  It may happen 30 times this week.  I

11  cannot give you a definitive answer on it.

12      Q.    Okay.  And so with that, was the home

13  office, the dispatcher, ever responsible for collecting

14  the overage by card?

15      A.    Yes.

16      Q.    Okay.  So they would handle collecting by

17  card.  You would only handle it by collecting by cash.

18      A.    If there was an adjustment that needed, yes.

19      Q.    Okay.  So you weren't handling the

20  collection of overages in the field.

21      A.    Not unless there was a cash only option

22  where they couldn't pay with a card.

23      Q.    Okay.  Okay.  I appreciate that clarity.

24  Were you ever disciplined for rejecting a job?

25      A.    I'm sorry?



1        Q.     If you ever declined or canceled or rejected

2   a job, was there ever discipline?

3        A.     I wouldn't say that I have personally been

4   disciplined, but there was definitely verbal notations

5   that if you denied calls that, you know, there could be

6   a potential punishment.

7        Q.     Okay.  You mentioned potential.  Does that

8   mean did it ever happen to you?

9        A.     I just said it didn't happen to me.  But if

10  we denied calls, there was a verbal agreement with

11  everybody that you could potentially be punished.

12       Q.     Okay.  And we went over and testified and we

13  looked.  We never saw any invoices where your pay had

14  been docked; correct?

15       A.     That was my personal pay.  No, it hasn't

16  been docked.

17       Q.     Okay.  So you were never docked for

18  rejecting other calls.

19       A.     That's exactly what I just said.

20       Q.     Okay.  And did you ever overhear threats

21  made to other drivers?

22       A.     I don't recall.

23       Q.     So you're not sure whether or not you even

24  heard about anyone being subject to discipline for

25  rejecting jobs.



1      A.    I know what I was verbally told by Eli.  And

2  other than that, then I can't give you an definitive

3  answer.

4      Q.    Okay.  And what was -- what did he say?

5      A.    That if the drivers kept refusing to do

6  calls he'd start docking their pay.

7      Q.    Okay.  But that never happened to you.

8      A.    Again, to me, no.

9      Q.    Do you know who was -- you said was anyone

10  else involved in whether or not the issue of docking

11  pay was going to be threatened or assessed against

12  drivers?  Was that just a conversation between you and

13  Eli?

14      A.    That part of the conversation was only

15  between me and Eli, yeah.

16      Q.    Okay.  You didn't talk to anybody else about

17  it.

18      A.    Not my business to tell.

19      Q.    Okay.

20           (An off-the-record discussion was held.)

21  BY MR. HANDSCHUH:

22      Q.    Are you aware whether or not any of the

23  other drivers for 316 actually -- I know you didn't,

24  and you've stated that, and I appreciate that very

25  much.  But any other drivers, are you aware of any



1  examples that it actually occurred of docking their

2  pay?

3       A.    I do not know.

4       Q.    Okay.  Now, we mentioned this is obviously a

5  tow truck company; correct?

6       A.    Yes, sir.

7       Q.    And in the tow truck business, different

8  pieces of equipment are utilized; is that right?

9       A.    Yes, sir.

10      Q.    Okay.  And then those pieces of equipment

11  will have what's called a gross vehicle weight rating.

12  Are you familiar with that?

13      A.    That is not equipment that -- no, I don't

14  know what you're --

15      Q.    You're not familiar with gross vehicle

16  weight --

17      A.    I know what GVWR is, yes, sir.

18      Q.    Okay.  Is that a way to classify the size of

19  a truck?

20      A.    You could potentially, yes.

21      Q.    Okay.  And so at some point in time did you

22  operate a Dodge Ram 4500?

23      A.    I did.

24      Q.    Okay.  And was that gross vehicle weighting

25  for that vehicle over 15,000 pounds?



DUSTIN L. HYDE                                        September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                               108

1        A.    I don't know.

2        Q.    Okay.  But you wouldn't have anything to

3   suggest that it's not 15,000.

4        A.    I'm sure we could Google GVWR on that year,

5   make, and model truck, and it would tell us.

6        Q.    Okay.  If I represented to you that it's

7   15,000, would you have any reason to believe that's

8   incorrect?

9        A.    I mean, I wouldn't necessarily believe what

10  you say; but, I mean, it could be.

11       Q.    Okay.  And then at some point in time did

12  you ever then upgrade to a Ram 5500?

13       A.    Same truck.

14       Q.    What does that mean?

15       A.    Same truck.

16       Q.    The other one is a Dodge Ram 4500.

17       A.    Same truck.

18       Q.    You're just saying they're almost

19  indistinguishable.

20       A.    Yes.

21       Q.    Okay.  But do you know whether or not the

22  gross vehicle weight rating of the 5500 --

23       A.    It would depend on if you were talking about

24  flatbed or wheel lift.  But if they were both flatbeds,

25  they're going to weigh about the same.



DUSTIN L. HYDE                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                            109

1        Q.    Okay.  Would that have been over 15,000 for
2   the 4500?
3        A.    I don't know.  I'm not an auto engineer.
4        Q.    Okay.  But at least whatever the gross
5   vehicle weight rating --
6        A.    What the GVWR says on the door of the truck
7   is -- I'm sure is what it is.
8        Q.    And then for -- did you at some point ever
9   operate a Kenworth T270?
10       A.    I did.
11       Q.    Okay.  And would that gross vehicle weight
12  rating have been over 26,000 pounds?
13       A.    I don't know.
14       Q.    Okay.  Was that a tractor?
15       A.    No.
16       Q.    Was that --
17       A.    You don't farm with it.
18       Q.    -- more of a --
19       A.    It's a tow truck.
20       Q.    -- style of commercial vehicle?
21       A.    It could.  Yeah, it's a commercial vehicle.
22       Q.    Was it red in color?
23       A.    Yes.
24       Q.    Okay.  And so these were just the variations
25  of the pieces of equipment that were used.



1          A.    But it's definitely not a tractor as in what
2    you were referring to as a tractor trailer.  That is a
3    smaller truck than the reference that you're making.
4    Same style, smaller truck.
5          Q.    Okay.  Okay.  I appreciate that.  Any other
6    pieces of equipment that you believe were utilized
7    during the time?
8          A.    That's it.
9          Q.    Okay.  Did you ever utilize your cell phone
10   while on your shift?
11         A.    Yes.  It's kind of a requirement.
12         Q.    Okay.  And what were you doing with your
13   cell phone?
14         A.    Towbook.
15         Q.    Towbook?  Okay.  Were you doing anything
16   else with your cell phone while on shift?
17         A.    Maybe.
18         Q.    Okay.  What would that maybe have included?
19         A.    Whatever I felt like I wanted to on my
20   phone.
21         Q.    Okay.
22         A.    Like I don't know -- I mean, I'm not going
23   to sit here and pinpoint three years ago what I was
24   doing on a certain day on my phone.
25         Q.    Sure.  So you knew Towbook was running in



1   the background.

2        A.    Yes.

3        Q.    Okay.  You would text Eli from time to time

4   in WhatsApp.

5        A.    Yes.

6        Q.    Anything else?

7        A.    So obviously you know I was using my phone.

8        Q.    Okay.

9        A.    We've got --

10       Q.    But I'm just asking --

11       A.    -- that established.

12       Q.    -- were you using your phone for anything

13  else?

14       A.    Probably some points in time, sure.

15       Q.    Okay.

16       A.    It is my phone.

17       Q.    What were those things?

18       A.    Whatever --

19       Q.    Browsing the Internet?

20       A.    Potentially, yeah.

21       Q.    Okay.

22       A.    Maybe looking up directions.

23       Q.    Okay.

24       A.    Maybe looking at a pair of panties to buy my

25  wife.



1      Q.    Okay.  Anything else?

2      A.    Regular activities.

3      Q.    Okay.  You testified earlier I believe you

4  weren't married.  You have a wife?

5      A.    I claim her as my wife.  She is my long-term

6  partner.

7      Q.    Okay.  And what's her name again?

8      A.    That's -- she's not in this case.  My

9  ex-wife is Christy, is the name I gave you.

10      Q.    Okay.  Hold on.  Can you please spell her

11  name?  For purposes of qualifying the jury pool, we

12  need to know who your wife, current wife and ex-wife --

13      A.    I don't have a current wife.

14      Q.    Okay.  Please spell the name of your

15  ex-wife.

16      A.    C-h-r-i-s-t-y.

17      Q.    Last name?

18      A.    She's got multiple.

19      Q.    Please supply the names.

20      A.    Okay.  You've got Phillips, Smith, Hyde.  I

21  don't know her other maiden name.

22      Q.    So do you know whether she changed from

23  Hyde?

24      A.    I don't.  I haven't talked to her in over

25  ten years.



DUSTIN L. HYDE                                         September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                                    113

1       Q.    Okay.  So she may or may not have kept the

2    name Hyde.

3       A.    Maybe.  I don't know.

4       Q.    Okay.  And this current -- I believe you say

5    you consider her your wife.

6       A.    Uh-huh (affirmative).

7       Q.    What is her name?

8       A.    Cora.

9       Q.    Can you spell that?

10      A.    C-o-r-a.

11      Q.    And last name?

12      A.    Millholland.

13      Q.    Okay.  Can you spell that?

14      A.    M-i-l-l-h-o-l-l-a-n-d.

15      Q.    Okay.  Do you have any reason why you may

16   have denied having been married earlier today?

17      A.    Again, that was well over ten years ago.

18   And I didn't really deny it.  I just don't think about

19   that person anymore.

20      Q.    Okay.  So aside from making purchases for

21   Cora, anything else that you were using your cell phone

22   for?  We mentioned overcharges would have been handled

23   by cash.  Anything else?

24      A.    Personal use.  It's my cell phone.

25      Q.    Okay.  So personal use.  And that's true



1  throughout your time as a driver or driver manager for

2  316.

3        A.    It's true from the time I purchased my

4  phone.  I don't understand what you're getting at.

5  Like --

6        Q.    Okay.

7        A.    -- everybody uses their personal phone.

8        Q.    Okay.  But at least for work you haven't

9  left out any other activities that you were using for

10  work.

11       A.    No.  Towbook and messaging the company,

12  that's it.

13       Q.    Okay.  And just to be clear, you never

14  collected payment via your cell phone.

15       A.    No.

16       Q.    Okay.

17             MR. HANDSCHUH:  Complaint.  Has this one

18       been marked?

19             MS. ELLIOTT:  Yes.  It's been marked as

20       Exhibit 2.

21  BY MR. HANDSCHUH:

22       Q.    Okay.  Going back to Exhibit 2, if you want

23  to dig that up from the bottom.

24       A.    Okay.

25       Q.    Turning your attention to allegation 18.



1    Can you read that and let me know when you're finished?

2         A.    Okay.

3         Q.    This is an allegation by you that while

4    working for 316 -- we just went over what you did with

5    your cell phone -- that you were, you know, using your

6    cell phone perhaps for the Internet, but then it states

7    here that you were running customer credit cards.  And

8    that, based on your earlier testimony, appears to be

9    incorrect?

10        A.    No.  We're talking -- you were questioning

11   me about my personal cell phone.  You wasn't

12   questioning me about the iPhone that was provided from

13   them at the beginning of the time when I started

14   working when he had me using the Square app on an

15   iPhone to collect payments.  That is different.  I did

16   not do that on my phone.

17        Q.    Okay.  So you were issued a work phone for

18   316.

19        A.    For a while, yeah.

20        Q.    When did that happen?

21        A.    Again, I just told you at the beginning of

22   the employment.

23        Q.    Okay.  And so did all of the drivers, were

24   they all issued --

25        A.    I was the only driver.  I was the only one



1    that had a phone.  Once they started hiring other

2    drivers, they did away with the phone.  Everybody used

3    their personals.

4         Q.    Okay.  So at least how -- what time period,

5    because again --

6         A.    From the beginning of employment until --

7         Q.    The drivers were hired.

8         A.    There you go.  That is the extent.  That's

9    when I had the iPhone.

10        Q.    That may have been the point in time when

11   you may have been utilizing your cell phone to

12   collect --

13        A.    No, I was not utilizing my cell phone.

14        Q.    The 316 --

15        A.    I may have been --

16        Q.    -- cell phone.

17        A.    -- using their cell phone, yes.

18        Q.    Okay.  So just for that short time before we

19   have drivers --

20        A.    And I'm not trying to be difficult.  I just

21   want to be clear --

22        Q.    Sure.

23        A.    -- that we have the right --

24        Q.    Yes.

25        A.    Yes.



1   Q.   So the only -- because before I understood

2   you were never collecting the overcharges via a cell

3   phone, but it appears this was the business --

4   A.   On my personal cell phone, no, I've never

5   collected on my phone.

6   Q.   After that period of time when the business

7   cell phone went away, did you ever collect the

8   overcharges by credit card in any other means, whether

9   your phone or some other device?

10   A.   No.

11   Q.   Okay.

12   A.   I mean, when -- I think they had a Clover --

13   I think Clover, something, a little card reader that

14   they had for a while that was used intermediately in

15   the beginning, and then it was the iPhone.  I mean --

16   Q.   How often would you say you used that iPhone

17   during that time to collect overcharges?

18   A.   I wouldn't even be able to -- I wouldn't be

19   able to answer that.  It's too far back.  I --

20   Q.   Was it seldomly or very common?

21   A.   It was maybe a couple of times a week.  I

22   mean, I cannot give you a definitive answer on that.

23   You'll have to look back into Towbook to see what

24   charges were overcharges, and that will be your answer.

25   Q.   Okay.  But then at least the overcharges in



DUSTIN L. HYDE                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              118

1   Towbook for the period of time when you had the iPhone.

2        A.    It should reflect.

3        Q.    Okay.  But then after the iPhone was turned

4   back in, you were no longer collecting credit card --

5        A.    No.

6        Q.    I just want to make sure because I want to

7   make sure --

8        A.    I'm being very clear with you.  Not after

9   the Clover and iPhone thing we never took cards.  They

10  did it through the office.

11       Q.    Okay.  And just to be clear, you were hired

12  on or about the beginning of December of '19.  And then

13  the additional drivers, as we stated, you were there

14  for -- or you testified for about a year.  So this

15  would have been early 2021 --

16       A.    Yes.

17       Q.    Okay.  So it was essentially -- you know, we

18  know you had that iPhone for about that period of time.

19       A.    Roughly, yes.

20       Q.    Okay.  And so you've clarified now the

21  extent of your allegations in allegation 18 of the

22  complaint; correct?

23       A.    If that's what you need to say, yes.  I

24  mean --

25       Q.    Well, is there anything else that you'd like



1   to elaborate on --

2        A.    No.

3        Q.    -- Number 18?  Okay.

4        A.    I answered your question.

5        Q.    I'm just giving you an opportunity to tell

6   your experience and the facts here.  I'm learning them

7   as you're telling me them.  Who owned the equipment,

8   the trucks?

9        A.    I would presume the owner's name is on the

10  side of the door, 316 Towing.

11       Q.    Did you own them?

12       A.    No.

13       Q.    Okay.  Did you ever own any of the

14  equipment?

15       A.    I haven't seen any receipts for anything.

16       Q.    Okay.  At any point in time were you

17  required to start wearing uniforms?

18       A.    They wanted it, yes.

19       Q.    Okay.  And what -- can you explain the

20  uniform rollout?  Was that when the new drivers came

21  onboard?

22       A.    Yep.

23       Q.    Okay.  So that would have -- can you

24  describe what the uniforms were?

25       A.    Basic safety uniforms, blue with stripes on



 1   them.

 2        Q.    Explain that to me.  What is --

 3        A.    The uniforms were blue with high visibility

 4   stripes on them.  That's all I can give you.  It was a

 5   uniform.

 6        Q.    Was it a jacket that you wore --

 7        A.    It is a uniform suit, sir.  I don't

 8   understand.  Like it's a uniform.

 9        Q.    Okay.

10        A.    If you wanted images, they should have

11   provided images of the uniforms.

12        Q.    I'm just asking you to describe it to me.

13        A.    I did.  A uniform.

14        Q.    Who was responsible for purchasing the

15   uniforms?

16        A.    316.

17        Q.    Okay.  And would you wash them, or were they

18   washed for you through a service?

19        A.    They -- we were told to bring them in and

20   drop them off on Fridays so that they could be washed

21   through the laundry service.

22        Q.    Okay.  And that's what you did after that

23   period of time.  You would wear your uniform and drop

24   them off on Fridays?

25        A.    If that's what you want to call it.



1        Q.    Okay.  Anything else about --

2        A.    No, sir.

3        Q.    -- the uniforms?

4        A.    They were uniforms.

5        Q.    Did they ever change the style?  They were

6    always the blue stripes?

7        A.    They were blue uniforms with high visibility

8    stripes.

9        Q.    Okay.  Did the discussion of hours of

10   service logs ever come up while you were driving for

11   316?

12       A.    No.

13       Q.    No?  Okay.  Do you know whether or not at

14   one point in time it would have become a possibility

15   when you were starting that the driver, namely you, may

16   have needed to maintain hours of service logs?

17       A.    No.

18       Q.    Okay.  Were you ever provided a system by

19   316 to keep track of your hours?

20       A.    I think I recall some kind of paper in the

21   beginning that didn't stick around.

22       Q.    Would that have been the hours of service

23   logs perhaps?

24       A.    Maybe.  I don't recall.

25       Q.    Do you happen to have any copies of those?



1      A.     If I did, I'd have presented them to the

2  case, sir.

3      Q.     Okay.   Was Towbook the means by which you

4  relied on tracking your time spent responding to calls?

5      A.     That's what we used.

6      Q.     Okay.   Drawing your attention to what's been

7  previously marked Exhibit 3.

8      A.     Okay.

9      Q.     If you could turn the page to 122.

10     A.     Okay.

11     Q.     Can you read this document and when you're

12  done let me know?

13     A.     Yeah, I read it.

14     Q.     This document states that -- at the top it's

15  entitled Driver's Daily Log Compliance.   Do you see

16  that?

17     A.     I do.

18     Q.     And it states that you "acknowledged receipt

19  of a copy of 316 Towing and Road Service, Inc.,

20  Driver's Daily Log Compliance policy.   I am further

21  aware that I must keep an updated medical card on my

22  person when driving or operating vehicles over 10,000

23  GVW."

24     A.     Okay.

25     Q.     Is this your signature down at the bottom?



1     A.    Appears to be.

2     Q.    Okay.  And is it dated November 21st, 2019?

3     A.    It is.

4     Q.    Okay.  And so were you aware at least

5  initially in the beginning that you were asked to

6  maintain logs?

7     A.    If that's what they want to call that, sure.

8     Q.    Do you recall whether or not you were

9  involved in any discussions whether logs were needed

10  for the operation similar to 316?

11     A.    Not other than the gas receipts they wanted

12  logged.  Other than that, no.

13          (Exhibit Number D-15 was marked for

14     identification.)

15          MS. ELLIOTT:  I'm handing you now what's

16     been marked as Exhibit 15.

17  BY MR. HANDSCHUH:

18     Q.    Before we go to 15, within the driver

19  application, before we move on, return to what's been

20  marked at the bottom page 128 for me.

21     A.    Okay.

22     Q.    And you should have -- we went over this

23  document earlier.  Do you remember reviewing this with

24  me?

25     A.    Yes.



1        Q.    And there it states that "If transporting

2   vehicles over 10,000 on this job, you are required to

3   keep a DOT logbook."

4        A.    Uh-huh (affirmative).

5        Q.    Do you know what that means?

6        A.    Nope.

7        Q.    Okay.  But you see --

8        A.    And you can clearly see my answer there is

9   no too.

10       Q.    Okay.  But you're just not -- you see that

11  316 advised you that maintaining a logbook, at least

12  initially, was going to be required.

13       A.    They should have provided it.

14       Q.    Okay.  Did they ever provide it to you?

15       A.    They started with some paper to write down

16  in-and-out hours, but that was never followed up on,

17  and it shortly quit going in.

18       Q.    Okay.  And drawing your attention to what's

19  been marked as Exhibit 15.

20       A.    Absolutely.

21       Q.    If you could look, that is a WhatsApp

22  message between you and Eli, and it's dated May 11,

23  2021.  This would have been after the other drivers

24  were hired; correct?

25       A.    Okay.



DUSTIN L. HYDE                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                         125

```
 1        Q.    Is that right?

 2        A.    I presume.

 3        Q.    Okay.  We established earlier that was early

 4   2021.

 5        A.    Okay.

 6        Q.    So this is May, so the other drivers were

 7   here.  You refer --

 8        A.    Okay.

 9        Q.    -- to one, Lionel.  Do you see that?

10        A.    I do.

11        Q.    Okay.

12        A.    I mean, what do you want to know, sir?

13        Q.    And then you go on and said, "And we need

14   hourly logbook.  Apparently Max thinks we have to do

15   logs."

16        A.    Uh-huh (affirmative).

17        Q.    "No other tow company that has a 12-hour

18   shift does hourly logs.  That's just more BS we don't

19   have extra time for."

20        A.    Yeah.

21        Q.    What is -- can you explain to me what that

22   means?

23        A.    Exactly what it said.

24        Q.    Okay.  So it's meaning that while Max

25   thought he needed logs, you were saying we don't
```



1    actually need logbooks.

2        A.    I was simply telling Eli from experience in

3    towing the companies that are running aren't running

4    like this.

5        Q.    Okay.  But that's notwithstanding the fact

6    that you were aware that 316 was trying to implement

7    the use of the hours of service logs.

8        A.    Okay.  Yeah, he asked me about it, and I

9    made a comment.

10       Q.    Okay.  Going back, while you were working

11   for 316, did you ever have an opportunity to have an

12   additional job or --

13       A.    No.

14       Q.    -- means of income?  You never worked for

15   another company?

16       A.    I just stated no, sir.

17       Q.    Okay.  Did you have any other means of

18   income?

19       A.    Sir, I just stated no.

20       Q.    Okay.  So if it wasn't 316, you weren't

21   earning monies from any other person or entity.  Is

22   that correct?  Sir, you need to answer unless your

23   attorney advises you.

24       A.    I'm trying to, but I just answered you the

25   same question three different ways.  I get you're an



1   attorney and you're clever and you can flip things

2   around.  The answer is still the same:  No.

3        Q.    I'm not trying to flip around.  I want to be

4   thorough.

5        A.    And I'm being thorough.  The answer is no.

6        Q.    Okay.  Okay.  And so did you at any point in

7   time advise Eli that you were working a second job?

8        A.    I did lie to Eli and tell him I was working

9   somewhere else.  I did.

10        Q.    Oh, you did.  Okay.  Why did you feel the

11   need to lie?

12        A.    Because I wanted time away.  I couldn't get

13   a break, couldn't get time off.

14        Q.    Okay.

15        A.    So I lied to get time away, to have a break,

16   so I could spend some time with my family.

17        Q.    Okay.

18        A.    That's why I lied to him.

19        Q.    Are you claiming you never had an

20   opportunity while you worked for 316 for a vacation?

21        A.    No.

22        Q.    You never had a single day of vacation.

23        A.    No.

24        Q.    Okay.  So you don't consider going from 24/7

25   down to 12-hour shifts, you didn't have an opportunity



1   to see your family?

2          A.    That's ridiculous.

3          Q.    Were you working 12-hour shifts every day?

4          A.    Yeah.

5          Q.    Every single day?

6          A.    Pretty much.

7          Q.    Okay.  And that never fluctuated.  That

8   never -- the Towbook will reflect that.

9          A.    I mean, it doesn't matter what it reflects.

10  I was ready when the time was -- when I was supposed to

11  be ready.

12         Q.    Okay.  And why did you feel the need to lie

13  to Eli versus tell him the truth?

14         A.    Because I needed time away, as I just said.

15         Q.    Okay.  So there are times that you lie.

16         A.    I told him I took another job so I could get

17  my hours cut back to where I could have time away.

18         Q.    That was a lie; correct?

19         A.    It was.  And I just told you that I

20  purposely lied to him.

21         Q.    Okay.  Were you working ever remotely for

22  any job?

23         A.    No.  That was that same lie.

24         Q.    Okay.  Did you at any point in time ever

25  claim any ownership interest in 316?



DUSTIN L. HYDE                                            September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                                       129

```
 1        A.    No.
 2        Q.    Did they -- I think you testified earlier
 3   they never offered any stock incentive or --
 4        A.    No.
 5        Q.    -- ownership?  Okay.  Do you know why if --
 6   you may have claimed an ownership in 316 at some point?
 7        A.    I don't recall that I ever did.
 8        Q.    Okay.
 9        A.    Other than being a driver manager.
10        Q.    Okay.  Aside from responding to calls in
11   Towbook, could you describe to me whether or not, you
12   know, any of -- other than sitting in your truck or
13   taking a personal errand or, you know, waiting at home
14   or some other place of your choosing while not
15   responding to a call, what else were you doing on
16   behalf of 316?
17        A.    I don't recall.
18        Q.    You don't remember?
19        A.    I mean, what was I supposed to be doing?
20   Twiddling my thumbs waiting on them to call me?  I
21   mean, I really don't have an answer.
22        Q.    Okay.  So you just don't recall a, you know,
23   common set of responsibilities you were undertaking
24   while you weren't responding to a call.
25        A.    (Witness shakes head negatively.)
```



1      Q.     Okay.

2      A.     Not necessarily.

3      Q.     Did you ever have -- you know, have to, you

4   know, haul pipe or tow cars?

5      A.     Ain't towing cars my job?  That's what I was

6   doing.

7      Q.     Sure.  Well, let me clarify.  Tow any cars

8   perhaps for Max's friends or the like?

9      A.     I don't know if they were his friends.

10     Q.     Okay.  So aside -- just your testimony now

11   is just that you just don't recall performing any

12   additional work.  I'm asking what you consider to be

13   work that was for 316 not responding to calls.

14     A.     I mean, you mentioned pipe.  There was a

15   pipe that I hauled to Max's house one day.  I mean --

16     Q.     So that -- okay.  That's what I'm saying.

17   So here we have you're either responding to a call or

18   we have an instance where you hauled pipe for Max.

19   Anything else like that where you're --

20     A.     No, that was -- yeah, as far as I -- I mean,

21   I didn't sit there every single day thinking about,

22   Okay, let me just watch what I'm doing today because

23   five years from now we're going to be going through a

24   lawsuit and I've got to remember today.  I don't

25   remember every day.  I know we towed cars.  That was my



1   job.  That's what I was doing.  There was one

2   particular day he said, "Hey, my driveway washed out.

3   Can you haul this up there to my house?"  I did it.  I

4   don't care what for.  It's his truck, his yard, his

5   property.  I was helping him.  That's my employer.

6       Q.    Okay.  So your testimony now, just to be

7   clear so I can move on, is that you weren't doing any

8   other work unless you were responding to a call.

9       A.    If it wasn't 316 derivative, no.

10      Q.    What do you mean 316 derivative?

11      A.    Again, you mentioned the pipe.  I hauled the

12  pipe to his house.  That's one instance.

13      Q.    One instance.  Any others?

14      A.    Not that I can recall.

15      Q.    Okay.  Do you know what would help you

16  recall?

17      A.    I mean, maybe if you know something I don't

18  recall.  I mean --

19      Q.    Okay.  I'm asking you.  I just want to make

20  sure that I've got this, you know, solid here, that if

21  it's not captured in Towbook for responding to a call,

22  then you weren't performing any other work for 316.

23      A.    Not that I'm aware of.

24          MR. HANDSCHUH:  Okay.  Sure.  Let's go

25      ahead.  I think we have an hour left.  Off the



```
 1        record.
 2               THE VIDEOGRAPHER:  1:03 p.m.  We're off the
 3        record.  This is the end of Media Number 3.
 4               (A brief recess was taken.)
 5               THE VIDEOGRAPHER:  1:17 p.m.  We're back on
 6        the record.  This is the beginning of Media
 7        Number 4.
 8               MR. HANDSCHUH:  Thank you, Rick.
 9   BY MR. HANDSCHUH:
10        Q.    Earlier, Mr. Hyde, before we took a break,
11   you had been testifying regarding whether or not you
12   performed any other work for 316 that would not have
13   been reflected within Towbook.  And I --
14        A.    Yes, sir.
15        Q.    -- believe your testimony was that you
16   weren't.
17        A.    That I really don't recall any, yes.
18        Q.    Okay.  If you could, please return your
19   attention to Exhibit 7.  This will be response to
20   Request Number -- for Admission Number 6 on pages 20 to
21   21.
22        A.    20 and 21?
23        Q.    Yeah.  Just one of those split.
24        A.    Okay.
25        Q.    So if you'd read the Request Number 6 and
```



1  then continue to the answer you wrote.

2       A.    Okay.

3       Q.    So in connection with your testimony that

4  you weren't performing any other work, here we have a

5  response in this request for admission that states that

6  "Plaintiff," meaning you, "spent answering calls,

7  driving to and from customers, and performing roadside

8  services for 316 Towing was captured in Towbook.

9  Denied in part to the extent that not all time spent

10 answering calls, driving to and from customers, and

11 performing roadside services for 316 was captured in

12 Towbook.  If a dispatcher input a job incorrectly,

13 plaintiff would receive the job through his personal

14 cell phone and would not be recorded in Towbook."

15          Does that change your earlier testimony, or

16 does that just simply state that on occasion --

17      A.    No, there were occasions where if, for

18 instance, there's been times Towbook's went down and

19 they've had to digitally send it via text for your call

20 information.  So there could be calls that didn't

21 necessarily go through Towbook, but everything was like

22 updated with the dispatcher en route, on location,

23 service complete.  That way they knew to what step we

24 were at in a call.

25      Q.    Okay.  Is -- that refers to just when it's



```
 1   not a job that's being routed through Towbook --

 2        A.    Right.

 3        Q.    -- right?

 4        A.    But other than that, everything went through

 5   Towbook.

 6        Q.    Okay.  I'll represent to you that other than

 7   perhaps one such trip, we don't have any text messages

 8   produced by you of these trips.  Do you recall how

 9   often they were occurring?

10        A.    No, it was rare.

11        Q.    Okay.  So it was very rare.

12        A.    Yeah.

13        Q.    Okay.  Do you think does one sound about

14   right?

15        A.    I couldn't -- I couldn't answer that.  I

16   mean, it could be as many as let's say ten for the

17   entire duration of employment, but I would say very

18   much more so very at the beginning of time.

19        Q.    Okay.

20        A.    And, I mean, I wouldn't have no record of

21   it.

22        Q.    Okay.  Was there any other -- in terms of

23   your response, is there any other job or work you were

24   performing that's not captured in Towbook other than

25   those --
```



1        A.    No.

2        Q.    -- cell phone text messages?  Okay.  And

3    you're sure about that?

4        A.    Yes.

5        Q.    Okay.  Turning your attention now, if you

6    would, to Request for Admission Number 5, the preceding

7    one.

8        A.    Okay.  Okay.

9        Q.    One moment.  Excuse me.  That was

10   Interrogatory Number 5, so that will be on page 4.

11       A.    On page 4?

12       Q.    Correct.  This one spans --

13       A.    Okay.

14       Q.    -- pages 4 to 5.

15       A.    I got it.

16       Q.    If you would, read Interrogatory Number 5

17   and the answer, and then just let me know when you're

18   finished.

19       A.    Okay.

20       Q.    Can you read it all the way through, meaning

21   all the way until you get to Interrogatory Number 6.

22       A.    Okay.

23       Q.    You see you testified there that "After I

24   became driver manager, I would have to do other job

25   duties.  I would have to have meetings with Eli,



1  inspect trucks, buy supplies for the business, or other
2  various things, and I wouldn't finish until 11:00 a.m.
3  to 1:00 p.m., depending on what I had to do."
4          Back to your earlier testimony, you
5  testified that Towbook captured all of your work except
6  for those that were set forth in a text message outside
7  of Towbook for some reason.  Can you explain your
8  response to Interrogatory Number 6?
9      A.    Exactly what it says.  There would be times
10  I would have to talk to drivers or I would have to go
11  get straps for the truck or I would have to go meet Eli
12  at the shop.  It's exactly what it says here.
13      Q.    Okay.  And how often for these -- you know,
14  I'm just not sure why you didn't include these types of
15  things when we were talking a little while ago.  Is
16  there anything else that you can recall?
17      A.    I'm sorry my brain don't function to what
18  you would like, sir, but I'm telling you what I'm
19  telling you.  Like there -- yes, I had other little
20  things to do.
21      Q.    Okay.  About how much time would the
22  meetings with Eli take?
23      A.    There would be times it would be five, ten
24  minutes, maybe times it may be 25, 30 minutes.  Or we
25  may stand in my front yard and have a chat for about



1   three hours.  I mean, it really went all over the

2   place.

3        Q.   Okay.  But at least -- you know, was the

4   chat personal in nature, or was that for business?

5        A.   Both.  It would be mixed.

6        Q.   Okay.  How often were those occurring?

7        A.   I mean, there for a while we talked every

8   day.

9        Q.   Okay.  But every day how long were you

10  talking to Eli?

11       A.   I mean, again, it could be ten minutes.

12  Some days it was -- we'd sit there and talk for 20, 30,

13  45 minutes.

14       Q.   Were the 20, 30, 45 minutes the exception,

15  or was it more the five-to-ten minutes per day?

16       A.   I mean, it just really was random on what we

17  were talking about.  If we were talking about the

18  trucks and the drivers, sure, we may stand there for

19  30 minutes talking about how, you know, maybe they need

20  to be taught better or we need to do this or that.  But

21  there may be times that -- just general conversation,

22  nothing's going on, Hey, Bud, how are you doing, and

23  that's it.

24       Q.   Okay.  And how often a week were you having

25  those types of meetings?



1    A.    Well, in the beginning when we were closer,

2  like I said, it was almost every day that we were

3  talking.  But then as time progressed and he hired more

4  drivers, then maybe once, twice a week.

5    Q.    Okay.  And then what about inspecting

6  trucks?  How long and how often would that happen?

7    A.    Every day.

8    Q.    Okay.  And how long --

9    A.    Every day that I'd see a truck, I'd inspect

10  it.

11    Q.    How long does a truck inspection take?

12    A.    About five to seven minutes.

13    Q.    Okay.  When would you see the other trucks?

14    A.    When there was a chance to.  If they're out

15  on calls, I can't see them.  If they work a different

16  shift, I may not be available to see them.

17    Q.    And how many trucks would typically be

18  there, you know, in terms of if you were inspecting how

19  many trucks would you --

20    A.    One or two at a time.

21    Q.    Okay.  How often each week would that occur?

22    A.    I mean, every day.  Every day when a truck

23  gets swapped, there was an inspection on it.

24    Q.    Okay.  What about buying supplies for the

25  business?  How long did that take?



1        A.    Like I said earlier, he sent me to Blackburn

2   like two or three times.  And you're looking at a

3   45-minute drive, time to purchase the equipment, maybe

4   about two hours, two-and-a-half hours round trip.

5        Q.    But that only happened --

6        A.    A couple of times.

7        Q.    -- a couple of times.  Okay.  What about

8   other various things?  What were those?

9        A.    Straightening the chains, fixing the

10  bird-nested winches on the trucks, putting the

11  appropriate straps where they need to go, make sure the

12  jump boxes are charged, making sure all the trucks have

13  their lockout kits, so on and so forth.

14       Q.    Okay.  Anything else?

15       A.    No, sir.

16       Q.    How long would that process you just spoke

17  about -- was that a part of inspecting the trucks,

18  those items you mentioned?

19       A.    As they should be looked at with inspection,

20  yes.

21       Q.    Okay.  So when you're speaking to those

22  other various things, that was a part of the inspecting

23  the trucks.

24       A.    Not necessarily it means it's a part of the

25  inspection.  You could be doing that on another part.



1   If a truck's being out all day and you have a strap at

2   3 o'clock in the evening that breaks, you need a

3   replacement.  Is that during my inspection time in the

4   morning?  No, sir.  So, yes, there's instances for

5   different things.

6          Q.    Okay.  And about how much time per week were

7   you spending on, you know, the fixing a winch, jump

8   boxes?

9          A.    I can't answer that.  It depends on what

10   came in.

11          Q.    Okay.  Do you know an estimate?

12          A.    No, sir.

13          Q.    Okay.  Do you know what would help you

14   remember what the estimate would be?

15          A.    There -- no.  You can't -- I mean, you can't

16   put time on that.

17          Q.    Okay.  So you just don't know.

18          A.    No.

19          Q.    Was it, you know, three hours?

20          A.    Sir.

21          Q.    Okay.  I'm just asking in your response if

22   your shift was ending at 11:00 -- 8:00 a.m. --

23          A.    And I just told you I cannot give you a

24   precise time when things are different.  If a winch

25   comes in that's bird-nested, it may take you three



1  hours to dig that thing out.  It may take you ten

2  minutes.

3       Q.    How often was bird-nesting occurring?

4       A.    Twice, three times a week with these new

5  drivers.

6       Q.    Okay.  Was that in the beginning?

7       A.    Yeah.

8       Q.    Okay.  Then --

9       A.    When they started hiring new drivers.

10      Q.    Later on did the bird-nesting stop?

11      A.    Yes.

12      Q.    Okay.  Do you remember about when that

13  stopped?

14      A.    I mean, when they got rid of Mr. Brown.

15      Q.    Okay.  And he -- we saw his text message.

16  He ended up with a bird-nesting issue at one time.

17      A.    Quite a bit.

18      Q.    Quite -- okay.

19      A.    Every day he touched that truck.

20      Q.    Okay.  And let's see.  You also state here

21  that it would sometimes break 40 hours before the first

22  eight months, meaning when it got really busy.  Are you

23  referring to once the drivers were there that's when

24  you started working over 40 hours?

25      A.    No.  I mean, sometimes that could happen



1  before they come in.  If I got called to go do a call,

2  I got called to go do a call.  I mean, if y'all want to

3  add up the hours, Towbook's there for you.  You can

4  look it up.

5       Q.    Okay.  But you're stating here that at

6  least -- and I just want to make sure I understand --

7  that there was a point in time that you would only

8  occasionally, based on your allegation, break 40 hours,

9  but that was about the first eight months.  Am I

10  understanding that?

11      A.    You can understand it however you want to,

12  sir.  The times are in Towbook.  It'll show you what I

13  worked.  I can't answer that.

14      Q.    Okay.  So you don't -- what about this 60 to

15  80 hours?  Do you believe that Towbook reflects 60 to

16  80 hours of responding to calls?

17      A.    It may not.

18      Q.    Okay.

19      A.    But if I'm scheduled to be on call, you're

20  going to pay me for that.

21      Q.    Okay.  Do you know any reason why that

22  contention would be different or --

23      A.    No.

24      Q.    Okay.  So you do believe that Towbook was

25  properly and adequately tracking the --



1      A.    I can't answer that.  I'm not a software

2   engineer, and I don't work with Towbook.  I cannot

3   answer what Towbook does.

4      Q.    Okay.  But you have no reason to doubt

5   what was --

6      A.    Exactly.  I'm not saying it's wrong, but I

7   don't control Towbook.  I can't tell if their service

8   was down or not.

9      Q.    Where -- how do you derive in your estimate

10  this allegation or response in the interrogatory

11  working 60 to 80 hours per week?  I think you're

12  referring to being on call is how you're deriving that

13  time; is that right?

14     A.    I could put it to you like this.  If you're

15  scheduled six days a week from 7:00 in the morning

16  until 7:00 at night, then you should be getting paid

17  those hours.

18     Q.    Okay.  That's your contention for explaining

19  what's written here.

20     A.    If you're employed to work a shift, you

21  should be paid for that shift.  That's all I can say.

22     Q.    Okay.  And any other explanation for the 60-

23  to 80-hour estimate?

24     A.    I don't know what you're wanting me to say.

25  I mean, I literally just --



1      Q.    I'm just asking if this --

2      A.    If you're scheduled to work, you're

3  scheduled to work.

4      Q.    Okay.  And we testified earlier to the fact

5  that you sometimes received messages for dispatch via

6  cell phone.  And if you did and you have them, we've

7  asked for them, and you'll make sure that they're

8  produced in this matter?

9      A.    Y'all have got what I have.

10      Q.    Okay.  During the period of time that your

11  shift was 8:00 a.m. -- excuse me -- 8:00 p.m. to

12  8:00 a.m., what was your normal sleeping schedule at

13  that point in time?

14      A.    During the day when I got off work.

15      Q.    What were those hours?

16      A.    Usually I'd lay down probably about 10:00 or

17  11:00, get up at like 4:00 or 5:00 p.m.

18      Q.    And you think that was pretty consistent

19  throughout the whole experience?

20      A.    Yes.

21            (Exhibit Number D-16 was marked for

22      identification.)

23            MS. ELLIOTT:  I'm handing you now what's

24      been marked as Exhibit 16.

25            MR. HANDSCHUH:  Before we turn to 16, I'd



DUSTIN L. HYDE                                          September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                                      145

1          like to introduce 17.

2               (Exhibit Number D-17 was marked for

3          identification.)

4               MS. ELLIOTT:  I'm handing you what's been

5          marked as Exhibit 17.

6     BY MR. HANDSCHUH:

7          Q.   Take a look at that and let me know once

8     you've had a chance to review it.

9          A.   Okay.

10         Q.   I want to turn your attention to

11    paragraph 32.

12         A.   Okay.

13         Q.   We -- your testimony earlier was that you

14    were paid weekly; correct?

15         A.   Yes.

16         Q.   Okay.  And you would, at the various times

17    of the agreed-upon weekly rate, set forth your invoice

18    to 316; correct?

19         A.   Yes.

20         Q.   Okay.  In 32, you testify that other

21    drivers -- when you refer to other drivers in this

22    declaration, can you identify specifically who you're

23    talking about?

24         A.   Exactly what's written there.

25         Q.   Does that mean all of the other drivers?



1  Are you speaking for all of them?

2      A.   Could have been one or two or could have

3  been all of them.  I just said the other drivers.

4      Q.   Okay.  So just my asking for

5  clarification --

6      A.   I mean, it could have been Brent, could have

7  been Kevin, could have been Jay.  The other drivers is

8  what I'm saying.  That's what it -- that's what you

9  asked me.

10     Q.   Did you ever talk to them about your

11  allegation 32 in testifying to this?  How do you know

12  that you can speak on behalf of other drivers?

13     A.   Guess we talked about it.

14     Q.   Okay.

15     A.   May have had conversation.

16     Q.   Who did you have that conversation with?

17     A.   Could have been Kevin, could have been

18  Brent.  I've had many conversations with them guys.

19     Q.   Anyone else you had a conversation with?

20     A.   Not if they didn't work there.

21     Q.   Okay.  Other than Kevin and Brent, those

22  that worked there, who else did you have this

23  conversation with?

24     A.   I don't recall.

25     Q.   Okay.  So did you?



1       A.    You're bearing down on me asking me did I.
2  I'm telling you I don't recall.  I don't know --
3       Q.    But at least -- at least for purposes of
4  now --
5       A.    Okay.
6       Q.    -- you can say that you're not representing
7  that other than Brent --
8       A.    I ain't representing none of them.  I'm
9  represent myself.  And if they join the case, that's
10  good on them.
11      Q.    Okay.  So here you don't have any basis to
12  allege the other drivers piece.  I'm asking --
13      A.    No.
14      Q.    -- on what basis do you --
15      A.    No, no, none.
16      Q.    And so you were invoicing weekly.  At what
17  point in time did you ever raise the issue that your
18  salary wasn't sufficient?
19      A.    Whenever I talked to them about it.
20      Q.    Okay.  Is it reflected in any of the
21  invoices that we've looked at, any type of salary
22  dispute?
23      A.    Yeah, when I left and came back for a $300
24  raise.
25      Q.    Okay.  But you then were paid the additional



1  300 you wanted; correct?

2      A.    Right.

3      Q.    Okay.  Where else was there ever on an

4  ongoing basis while you worked there any type of issue

5  where you stated you didn't feel as though you were

6  being adequately compensated?

7      A.    I mean, general discussion could have been

8  anytime.

9      Q.    Okay.  With whom?

10      A.    Could have been Kevin, could have been

11  Brent.  I talked a lot to them guys.

12      Q.    Okay.  So you were talking to the drivers

13  you were managing --

14      A.    I'm not going to sit here and specifically

15  say I spoke to Kevin and said this because I can't

16  recall.  But I do know that me and those guys were

17  close enough that we probably talked about finances.

18      Q.    Okay.  But I'm asking your testimony here is

19  that "I never agreed that our salary would be

20  sufficient to cover all hours worked."  I'm asking --

21      A.    And I never agreed.  So --

22      Q.    Okay.  If you didn't agree, why were you

23  submitting invoices for a weekly amount?

24      A.    Because that was my employer, and that's

25  what they told me to do.



1      Q.    Okay.  Did you ever reject that and submit

2   differing --

3      A.    No, because I wouldn't have been paid.

4      Q.    Okay.  But you never did --

5      A.    We submit what we were told to.

6      Q.    Okay.  Did you ever try to submit more?

7      A.    No, because it would have been rejected.

8      Q.    Okay.  And at one point who did you ever

9   testify to -- or talk to about whether or not your

10  compensation was adequately sufficient?

11     A.    I've spoken to Eli about it.

12     Q.    When did you speak to him?

13     A.    I mean, we've had conversations.  I can't

14  specify when.

15     Q.    Did you ever speak to Max about it?

16     A.    I believe at one point we had that one

17  meeting, but that was shameful.  I mean --

18     Q.    What was that meeting?

19     A.    Dismissal pretty much.  You'd go tell him

20  anything, they don't listen.  So --

21     Q.    But what are you referring to?  I'm trying

22  to find out in this time line when you had that

23  conversation.

24     A.    I don't know.

25     Q.    You don't know?



1      A.    I don't recall the day or the time, so to

2  tell you the details of the conversation is ludicrous.

3      Q.    Did you ever write a letter --

4      A.    No.

5      Q.    -- or a text message --

6      A.    No.

7      Q.    -- complaining about your --

8      A.    No.

9      Q.    -- compensation?

10      A.    I was a little employee.  I went to work and

11  done what I was told.  That was my job.

12      Q.    Okay.  Did you ever say, "Hey, I'm not

13  coming back until I get paid what I think I'm due"?

14      A.    No, because you know what?  Some of us have

15  to work for a living and have to worry about how we're

16  going to get our next meal.  So if we say the wrong

17  things, we could be out of a job.  And I valued my

18  paycheck.

19      Q.    Okay.  Did you ever try to change the

20  invoice amount to ask for more --

21      A.    Sir, didn't I tell you I said no because

22  they wasn't going to change it?

23      Q.    Okay.  But you never did.  You never tried.

24      A.    Because I was verbally told it wasn't going

25  to be passed, so what was the point of wasting my time?



1    Q.    What was that verbal conversation?

2    A.    With me and Eli.

3    Q.    What was the substance of it?

4    A.    About getting more money, and he said Max

5    wouldn't approve it.

6    Q.    But was that more money similar to the time

7    that you quit, that you wanted more for the --

8    A.    Yes.  It was later on in employment.

9    Q.    Okay.  And then you went from a thousand

10   to -- you ultimately bumped up to 1,100; correct?

11   A.    1,200.

12   Q.    Okay.  1,200?

13   A.    I mean, if we're just talking facts here.

14   Q.    So you did ultimately --

15   A.    Eventually, yes.

16   Q.    Okay.  So was that sufficient at the time

17   when you got the bump?

18   A.    Knowing what I know now, hell no.

19   Q.    Okay.  What were you owed now?

20   A.    I'm just saying knowing what I know now, no,

21   it wasn't enough.

22   Q.    Okay.  How are you basing the amount that

23   you were asking for?

24   A.    My feelings.

25   Q.    That's all?



1    A.    Yeah.

2    Q.    Okay.

3    A.    Purely my feelings.

4    Q.    So there was no other basis for why --

5    A.    No --

6    Q.    -- you were asking --

7    A.    -- I didn't feel there needed to be.

8    Q.    Turning your attention to Exhibit 16, have

9  you seen this document before?

10   A.    No, sir.

11   Q.    Okay.  Are you familiar with whether, if I

12  represent to you this is the demand that we received

13  from your attorneys for your time in this case -- and

14  it notes there in one column, it says hours EST for

15  hours estimate.

16   A.    I mean, I see it, but this paper means

17  nothing to me, sir.

18   Q.    Okay.  So did you ever -- and I don't want

19  to know about communications, but you've never seen

20  this document?

21   A.    No, sir.

22   Q.    Okay.

23   A.    I mean, I just -- it just means -- I don't

24  have an answer.

25   Q.    So if they were claiming let's say



1    hypothetically amounts that were due, you know, for

2    that first eight months when you claimed you weren't

3    working over 40 hours, would that be incorrect?

4         A.    I don't know.  I would have to discuss that

5    with them.  Like I said, I don't even know about this.

6    So --

7         Q.    Okay.  What about should you be seeking any

8    payments for time when you weren't working for 316?

9         A.    I can't answer that until I know more about

10   what we're even talking about.  I mean, I understand

11   your question, but your question to this paper full of

12   numbers that's Chinese to me means nothing.

13        Q.    Okay.  Are you familiar, have you ever

14   asserted that you've worked 95 hours per week?

15        A.    I don't know.

16        Q.    Okay.  Would 95 hours sound incorrect to

17   you?

18        A.    I don't know.  I really don't.  I live my

19   life one day at a time.  I don't keep up with all that.

20        Q.    Were you ever paid for off-call jobs?

21        A.    No.

22        Q.    Received any extra pay?

23        A.    No.

24              (Exhibit Number D-18 was marked for

25        identification.)



1            MS. ELLIOTT:  I'm handing you now what's

2      been marked as Exhibit 18.

3      A.    Okay.

4  BY MR. HANDSCHUH:

5      Q.    If you would, let me know when you're

6  finished reading this.

7      A.    Go ahead.

8      Q.    All right.  So this appears to be another

9  WhatsApp message between you and Eli; correct?

10     A.    Okay.

11     Q.    And this is you mentioning to him that if he

12 wanted you to work for an additional period of time,

13 you responded -- he says, "Will you be able to cover

14 from 12:00 to 7:00 tomorrow?"  You responded, "Well, I

15 have plans; but, I mean, if I can get extra pay or

16 something."  And he states, "We could think of adding

17 $50."

18     A.    Okay.

19     Q.    Was that an opportunity for you to negotiate

20 additional pay for additional work?

21     A.    No.

22     Q.    It wasn't?

23     A.    No.

24     Q.    Why not?

25     A.    Because he wanted us to work extra time for



1   $50, and that's not sufficient pay.  Therefore, he

2   couldn't keep nobody to work it.

3       Q.    Okay.  But at least it speaks for itself in

4   that there was opportunities from time to time for

5   extra pay.

6       A.    I mean, if you want to sell yourself out and

7   call it that, sure.  I mean, I don't work for free.

8       Q.    What do you mean sell yourself out?  What

9   does that mean?

10      A.    To work for free pretty much.

11      Q.    Okay.  And you mentioned raising complaints

12  about compensation, and we mentioned how you got that

13  first bump from 700 to a thousand.  And then also --

14  and I want to make sure that I'm -- time line -- here

15  we go -- make sure I'm tracking this correctly.  Does

16  April 2021 sound correct to receive a raise from a

17  thousand up to 1,200, as you mentioned?

18      A.    Possibly.  I don't know.

19      Q.    Okay.  Do you have any reason to believe it

20  was a different period of time?

21      A.    Not without confirming with my lawyers and

22  records.  I don't know.

23      Q.    Okay.  But you would have produced those

24  documents --

25      A.    If I had them, they'd be there.



1      Q.    Okay.  When you came back after that, you

2   know, second time that you quit, you no longer -- back

3   in November of 2021, you were no longer serving as the

4   driver manager, and so your compensation per week

5   actually went down to a thousand; is that correct?

6      A.    Yes.

7      Q.    Okay.  Are you familiar with the fact that

8   we have asked in discovery, subject to a court order,

9   for production of your personal tax returns?

10     A.    Okay.

11     Q.    And that we submitted documentation to the

12   IRS to produce those tax returns they have on file?

13     A.    Okay.

14     Q.    Are you familiar with that?

15     A.    Did you find what you was looking for?

16     Q.    Okay.

17           (Exhibit Number D-19 was marked for

18      identification.)

19           MS. ELLIOTT:  I'm handing you what's been

20      marked as Exhibit Number 19.

21     A.    Okay.

22   BY MR. HANDSCHUH:

23     Q.    If you would, flip through this.  Have you

24   seen this document before?

25     A.    No, because somehow they failed to send this



 1  to me.
 2      Q.    In requesting -- and this is just for you to
 3  clarify for me.  In requesting your tax returns for the
 4  years 2020, '21, and '22, the IRS responded with no
 5  production.  Does that track with you?  Were you
 6  expecting to have been produced any tax returns for
 7  those years?
 8      A.    If I did, wouldn't they be there?
 9      Q.    Okay.  So does that mean you didn't file
10  your tax returns for --
11      A.    That's exactly what that means, I believe.
12      Q.    Okay.  And so for the --
13      A.    As I've told seven different people who's
14  asked me the same question, I didn't file taxes.
15      Q.    Okay.  You didn't?  Did you ever file for an
16  extension?
17      A.    No.
18      Q.    Okay.  Are you operating under some kind of
19  other extension of a deadline to file taxes that we
20  haven't talked about?
21      A.    No.
22      Q.    Are you going to file your taxes?
23          MR. SHORT:  Mr. Hyde, it is within your
24      rights to invoke the Fifth Amendment in response.
25          THE WITNESS:  Then I do.



1  BY MR. HANDSCHUH:

2      Q.   Well, in this production from the IRS, we

3  received documentation only for the tax returns for

4  2019.

5      A.   Okay.

6           (An off-the-record discussion was held.)

7  BY MR. HANDSCHUH:

8      Q.   If you would, take a look at the, let's see,

9  page -- it starts with Schedule C.

10          MR. HANDSCHUH:  Sean, it's roughly in the

11      middle.  If you could hand Sean -- yours to Sean.

12          MS. ELLIOTT:  It's about 17 or 18 pages

13      through, but I'll hand you mine if you want to

14      hand me yours, unless you've marked on it.

15          THE WITNESS:  And I don't know what this is.

16      So --

17  BY MR. HANDSCHUH:

18      Q.   Okay.  This was a document produced by the

19  IRS for your filings for the year 2019.

20      A.   Okay.

21      Q.   It appears to purport to show, at least in

22  C, this is called a Schedule C, Profit or Loss From

23  Business.  Do you see your name there, name of

24  proprietor?

25      A.   Yes.



1       Q.    And then the business name, 316 Towing and
2   Road Services?
3       A.    Okay.  I see it on the next line, yeah.
4       Q.    Okay.  Is this you -- you know, and if you
5   filled out your taxes and you don't know these answers,
6   let me know.  But is this you claiming an interest in
7   316 Towing, any kind of ownership interest?
8       A.    No.
9       Q.    Okay.  Did you have a 1090 -- I'm just
10  asking why there was a Schedule C created.
11      A.    I don't know.  I don't file my taxes like
12  that.
13      Q.    Okay.  Do you --
14      A.    I have them done for me.
15      Q.    Do you know who filed your taxes --
16      A.    I do not recall who done that.
17      Q.    -- in '19?  Okay.  Do you see in question G
18  it asked, "Did you materially participate in the
19  operation of this business during 2019," and you
20  clicked off yes.
21      A.    Okay.
22      Q.    Is that correct?  What does that mean?
23      A.    Does it not mean that I worked for that
24  business?
25      Q.    Okay.  So you don't know what the materially



800.211.DEPO (3376)
EsquireSolutions.com

 1  participate means.

 2       A.    Sir, I done told you I don't know about

 3  this.  I don't file my taxes.  I have other people do

 4  it for me.  I don't understand this.

 5       Q.    Do you think that someone filed it for 2020

 6  through '22?  Right?  No?

 7       A.    I don't know.

 8       Q.    Okay.

 9       A.    You know what I know.  You're seeing the

10  same thing I'm seeing.  I don't know about this.

11       Q.    Okay.  It states in H, it asks if you

12  started or acquired this business during 2019, and then

13  you had a checkmark for yes.  Do you see that?  Is that

14  just a misunderstanding?  I'm just trying to --

15       A.    It has to be because as -- I don't know if

16  it's not conveying to you or if it's not coming through

17  clear.  I never had any part of this business.

18       Q.    Okay.  So if it's reflected here that you

19  did, that's an error.

20       A.    Then obviously it's an error.

21       Q.    Okay.  Was it an error, or were you just not

22  telling the truth back then?

23       A.    Sir, I do not file my taxes.  Other people

24  do it for me.  So what's here is an error.  I don't

25  know.



1      Q.    Who filed this for you?

2      A.    I do not know.  I don't know that person's

3    name.

4      Q.    What's -- did it have a name, like H & R

5    Block?

6      A.    I was referred to someone who does taxes,

7    yes.

8      Q.    What was that person's name?

9      A.    I just told you I do not recall that

10   person's name.

11     Q.    Okay.  So you had no participation in

12   creating this Schedule C.  Is that what you're --

13     A.    No.

14     Q.    -- stating?  Okay.  So when it reflects down

15   in part 1, number 1, and it lists gross receipts or

16   sales for 316 and it lists $4,700, do you know why that

17   was put there?

18     A.    Sir, I don't understand what you're not

19   getting.  I don't under -- I don't know anything about

20   this.  Whatever is filled out here, I don't know about

21   it.

22     Q.    Okay.

23     A.    I'm trying to be as compliant as I can with

24   you.  If I tell you I didn't do the document, I didn't

25   do it.



DUSTIN L. HYDE                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                          162

1      Q.    Okay.  I'm just asking if you had

2    discussions to convey to the person filling this out --

3      A.    Sir, I never owned a part of their company.

4    I never got bonds and stocks.  I never talked to them

5    about owning part of the company.  I never participated

6    in ownership of the company.  None of that.

7      Q.    Did you review --

8      A.    I was simply an employee.

9      Q.    Did you review the tax return before it was

10   filed?

11     A.    I did not.  And I'm learning now I probably

12   should have, and I'll need to get on to that.

13     Q.    Okay.  What about down at line 28, you don't

14   know where total expenses came from?

15     A.    If I don't know where the 4,700 come from,

16   why are you going to think I'm going to know where the

17   2,300 come from.

18     Q.    I'm just asking.

19     A.    Okay.  And I'm just telling you I did not

20   have nothing to do with this.

21     Q.    Okay.  So you don't know where that came

22   from either.

23     A.    Am I not speaking English?

24     Q.    I'm just asking to summarize here.

25     A.    And I have said it four times.  I do not



1    know where this came from.

2         Q.    Okay.

3         A.    I mean, and, really, I don't know if you

4    think I'm being cute --

5         Q.    There's no question --

6         A.    -- with you or nothing --

7         Q.    There's no question pending, sir.

8         A.    Okay.

9         Q.    Turning your attention back to the

10   declaration marked as Exhibit 17.

11        A.    Okay.

12        Q.    Allegation number 6 where it states -- I'd

13   like you to read that allegation.  Let me know when

14   you're finished.

15        A.    Okay.

16        Q.    Who are the other drivers you're referring

17   to there?

18        A.    The drivers of that company.

19        Q.    Can you name them, meaning who you're

20   referring to?  It just speaks to other drivers.  I'd

21   like to know their names.

22        A.    Brent, Kevin, Anthony.

23        Q.    So just those three?

24        A.    Alan.

25        Q.    What's his name?  Alan?



1        A.    Alan, yeah.

2        Q.    No, his last -- full name.

3        A.    Hugh.

4        Q.    Can you spell that?

5        A.    I think it's like H-u-g-h or something.

6        Q.    Okay.  And then Anthony, is that Anthony

7   Lewis?

8        A.    Yes.

9        Q.    Okay.  It states, "The duties of other

10  drivers and I performed were rote and routine, and we

11  sought input from supervisors when our duties were not

12  rote and routine."  What does that mean?

13       A.    Exactly what it says.  If we had to do

14  something that wasn't normal, I mean, it had to be ran

15  by somebody, i.e., Eli.

16       Q.    Okay.  Anyone else?

17       A.    No, just generally Eli so he could pass the

18  message on if need be.

19       Q.    Okay.  What about what duties did you have

20  would you consider rote and routine?

21       A.    I'm sorry.  What -- what are you --

22       Q.    I'm asking.  You stated the duties you

23  performed were rote and routine.  I'd like to know what

24  duties those were.

25       A.    Towing cars, providing roadside service.



DUSTIN L. HYDE                                        September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                                   165

1        Q.     Okay.  So what duties were not rote or

2    routine?

3        A.     For instance, carrying the pipe.

4        Q.     Okay.  What else?

5        A.     It could be a number -- it could have been

6    when they asked me to go get parts from Blackburn.

7        Q.     Okay.  What else?

8        A.     I don't know.

9        Q.     Any other non-rote or routine?

10       A.     Not that I'm aware of or I can recall.

11       Q.     Then in allegation number 7 it says, "In

12   carrying out our duties, other drivers and I followed

13   the processes put in place by defendants and others."

14   Are you speaking to the same three drivers you

15   identified --

16       A.     I'm speaking to the whole company.  We were

17   employees at a company doing a job, sir.  That's what I

18   was referring to.

19       Q.     Okay.  What processes were put in place by

20   defendants?

21       A.     The whole process of the company.

22       Q.     Okay.  And you stated that that was

23   primarily Eli operating 316; correct?

24       A.     Eli was used as the face of 316, yes.

25       Q.     Okay.  So what process was put in place by



1  Max?

2      A.    The whole thing.  It wouldn't have happened

3  without Max, would it?

4      Q.    What do you mean the whole thing?  Elaborate

5  on that.

6      A.    Do you think there would be a business, 316

7  Towing?

8      Q.    How does -- that's not responsive to what

9  process was put in place.  I'm asking --

10     A.    That is.  That is the process.

11     Q.    So just establishing the company is the

12  process.

13     A.    That is a process.

14     Q.    In addition to establishing the company,

15  what other process?

16     A.    I don't know the company's processes.

17     Q.    Okay.  So you don't know.

18     A.    I mean, if that's the way you want to take

19  it.  But --

20     Q.    I'm just asking --

21     A.    -- we had a process of a job to do.

22     Q.    I'm just asking which processes you

23  believe --

24     A.    I mean, do you want the process of changing

25  a tire?  Do you want the process of towing a car?  Do



1   you want the process of a jump start?

2          Q.    No.  I'm asking which ones --

3          A.    That's what --

4          Q.    -- were put in place by Max.

5          A.    The whole thing.

6          Q.    He put in place the ones for jump start and

7   for tire --

8          A.    He put the company together, sir.  That's

9   what the process is.

10         Q.    So --

11         A.    You work for the company.  You do the jobs.

12  That's a process.

13         Q.    But is he involved -- so the process is

14  everything that occurs at the company?

15         A.    Uh-huh (affirmative).

16         Q.    So he's involved in all of it despite --

17         A.    He should be if he's company owner,

18  absolutely.

19         Q.    Okay.  But you don't know whether he was or

20  not.

21         A.    Okay.

22         Q.    Do you?  Was he involved in creating the

23  processes you identified?

24         A.    I don't know.

25         Q.    Okay.  Going down to paragraph 10,



1    "Defendants also employed other drivers, and I am

2    personally familiar with the conditions under which

3    other drivers worked.  I'm aware of the policies that

4    defendants applied to all their drivers."

5           Can you identify for me, number one, the

6    other drivers, as well as the conditions?

7       A.    The drivers of the company.

8       Q.    Okay.  And was it all of them?

9       A.    They all had to comply with the company

10   rules.

11      Q.    Okay.  And you're familiar with the working

12   conditions for all of the drivers?

13      A.    Not 24/7, no, but I am aware of the

14   conditions, yes.

15      Q.    Okay.  What about the policies that apply to

16   all of the drivers?  What policies were those?

17      A.    Wear your uniform, take the calls, do the

18   calls.  Like the policies of how things are ran.

19      Q.    Okay.  And at some point the uniform, was

20   that just short-lived just for a matter of a few months

21   until Cintas no longer, you know --

22      A.    I don't know what they did with Cintas after

23   I left.

24      Q.    Okay.  But do you recall the uniforms being

25   long in duration, or was it just a short period of



1  time?

2       A.    I can't tell you that.  I mean, the uniforms

3  came in right before I left, so what they did with the

4  uniforms is on them.

5       Q.    Okay.  So you don't know.  You were just

6  there for a short period with the uniforms.

7       A.    Yeah.

8       Q.    Okay.  Was it uniforms the entire time you

9  were working there?

10      A.    No.

11      Q.    Okay.  So it was a short period of time at

12  the end.

13      A.    To the best of my knowledge, yes.

14      Q.    Okay.  Did any of the other drivers have the

15  position as driver manager while you were there?

16      A.    No.

17      Q.    So in 14 you allege here that "The

18  defendants controlled mine and the other drivers' work

19  schedules."  Does that mean just setting forth the

20  shifts that they were working on, at least once the new

21  drivers were hired?

22      A.    I mean, like literally you just said it.

23  They dictate who worked what shift.

24      Q.    Okay.  But were those shifts, those

25  schedules, did they fluctuate much, or was it pretty



1   much you took the day shift or the night shift?

2        A.    No, they dictated what shift you got because

3   you -- you have more drivers during the day than at

4   night.  You're not going to have five drivers at night

5   and three during the day.  So obviously when they hired

6   they hired for day shift, and you either -- if you

7   wasn't me, you had to be there for a little while

8   before you were put on night shift.

9        Q.    Okay.  But I'm just asking, in your

10  experience as the driver manager, this was a pretty

11  consistent, you know, day or night shift and the

12  drivers would be assigned to one of them, or did the

13  schedule get --

14       A.    It was consistent.  I was the night shift

15  driver, and then, if the guys needed help during the

16  day, I would help them.

17       Q.    I'm just asking --

18       A.    They ran day shift.

19       Q.    I'm asking for the work schedules, we know

20  they were 12-hour shifts.

21       A.    Okay.

22       Q.    Did that ever change?

23       A.    Not that I'm aware of.

24       Q.    Okay.  And you testified earlier that you

25  never received any CDL, commercial driver's license?



1    A.    No.  No need to.

2    Q.    Did you receive any certificate or

3  endorsement on your license to operate the tow trucks?

4    A.    Don't need to.

5    Q.    Okay.  Did you have at least a license for

6  that purpose?

7    A.    I would hope so.

8    Q.    Okay.  But you did.

9    A.    I would hope so.

10    Q.    Did you?

11    A.    I mean, would I -- why would they drive --

12  hire me as a driver if I didn't have a license?  Like

13  they just kind of --

14    Q.    I'm asking the question if you had a

15  license.

16    A.    Obviously.

17    Q.    Okay.  You did.  It wasn't revoked?

18    A.    Obviously.

19    Q.    Was it revoked?

20    A.    Sir, I've never had anything against my

21  license ever.

22    Q.    So in 19 you state that "Defendants

23  determined mine and other drivers' pay scale for

24  services without input from or negotiation with us."

25  How would you square that with the raises that you



 1 | received?

 2 |      A.    Exactly that.  I mean, you couldn't just

 3 | walk up to them and talk about a raise because they'll

 4 | say, "Well, we're not going to go for that right now."

 5 |      Q.    Okay.  But --

 6 |      A.    So you had to do something like drastic like

 7 | quitting to get their attention.

 8 |      Q.    Okay.  But it worked.  If you quit, you were

 9 | able to extract --

10 |      A.    I mean, yeah.

11 |      Q.    -- okay, a raise.  And then later on we had

12 | the -- you know, the driver manager, that increased up

13 | to 1,200.  Then you left, and then you were put down on

14 | a negotiated rate for a thousand; correct?

15 |      A.    Yes.

16 |      Q.    In 24, if you could read that for me.  Let

17 | me know when you're finished.

18 |      A.    Okay.

19 |      Q.    So we spoke about no docking of pay and then

20 | the canceled trip logs, some with no reason; correct?

21 |      A.    Uh-huh (affirmative).

22 |      Q.    What discipline were you threatened with if

23 | an assignment was refused?

24 |      A.    I mean, it's been told many times.  I mean,

25 | if you don't want to go do the work, then you're fired.



1  So --

2      Q.    Who -- who did you overhear, and which

3  defendant threatened which drivers?

4      A.    It was between Eli and Brent.

5      Q.    Okay.  Was there anyone else?

6      A.    Not that I'm aware of.

7      Q.    Did they ever threaten to fire you?

8      A.    I don't recall.

9      Q.    Okay.  Did they ever threaten for refusing

10  an assignment to discipline you?

11     A.    Yeah, I mean, verbally.

12     Q.    What was the nature of that threat?

13     A.    If you don't go do it, you ain't getting

14  paid.

15     Q.    Okay.  They would withhold your entire

16  week's pay?

17     A.    That's what was stated.  But, no, it never

18  happened.

19     Q.    Okay.  And when did -- who told you that?

20     A.    Eli.

21     Q.    Okay.  And do you recall about when he told

22  you that?

23     A.    I do not.

24     Q.    Looking at 25, this speaks to "I and other

25  drivers were required to arrive at work at the time



1  determined by defendant and remain until the end of our

2  scheduled shifts."  What does that mean?

3      A.    Exactly what it says.  If you're scheduled

4  at 7:00, you better be ready to work at 7:00, and

5  you'll stay until 7:00.

6      Q.    Okay.  So that means being either near your

7  truck or resting in your truck; correct?

8      A.    Ready to go.

9      Q.    Okay.  Did it ever require you to arrive at

10  some location?

11      A.    No.

12      Q.    Okay.  Do you know why -- is that just a

13  poorly worded phrase, meaning should it state, "We were

14  required to be ready to work by the time" --

15      A.    Probably so.

16      Q.    Okay.  Probably so or yes?

17      A.    Probably so.

18      Q.    In 26 it states, "Defendant sent the

19  policies and rules regarding mine and other drivers'

20  employment, and defendants required me and the other

21  drivers to follow these policies and rules."  Do you

22  know which of the two defendants set these rules and

23  policies?

24      A.    I don't understand what you're asking.

25      Q.    You stated that the defendants, 316 and Max,



1  set the policies.  And I'm asking you to identify what

2  policies that say Max developed.

3       A.    I'm going to give you the answer you're

4  looking for.  None.

5       Q.    Okay.  What about the rules that Max

6  developed?

7       A.    There's nothing to show, sir.

8       Q.    Okay.  What -- here, what other drivers are

9  you referring to?

10      A.    The drivers employed at this company, sir.

11      Q.    Okay.  All of them at the time --

12      A.    Yes, sir.

13      Q.    -- while you were there.  Okay.  And then

14  Max specifically required you and the other drivers to

15  follow the policies?

16      A.    Yeah, or we wouldn't have a job.

17      Q.    When did he do that?

18      A.    I guess never, sir.

19      Q.    Going to 28, "Other drivers worked similar

20  schedule to me.  I know this because defendants

21  regularly or occasionally scheduled other drivers to

22  work more than 40 hours per week.  I observed other

23  drivers working schedules similar to mine and discussed

24  the hours we worked with other drivers."

25              For the purposes of this paragraph, which



1  other drivers are you referring to?

2       A.    Same employees.

3       Q.    Okay.  So all of the drivers --

4       A.    Yes, sir.

5       Q.    -- at 316.  And here it states that they

6  were being asked to work 40 -- more than 40 hours per

7  week.  How do you know that to be true?

8       A.    If you have a six-day work schedule at

9  12 hours a day, I am certain anybody can see that's

10 more than 40 hours.

11      Q.    Okay.  So that's the basis for

12 determining --

13      A.    Yes.

14      Q.    -- over 40 hours is that shift.

15      A.    Yes.

16      Q.    Okay.  Would it not be more correct to track

17 the hours in the Towbook?

18      A.    No, sir.

19      Q.    No?  Why is that?

20      A.    Because if you're scheduled to work, you're

21 scheduled to work.  You should be scheduled to get paid

22 for that time.

23      Q.    Okay.  Now, did you or other drivers at 316

24 refer to what you're referring to as a shift as being

25 on call?



1      A.    You can be on call after your shift.

2      Q.    Okay.  Do you know who -- what the, you

3  know, method for determining who was on call was while

4  you were there?

5      A.    It was primarily me and Anthony.

6      Q.    Okay.  And you mentioned that earlier --

7      A.    A little bit of Brent and a little bit of

8  Kevin.

9      Q.    Okay.  You mentioned earlier that you were

10  on call for some period of time 24/7 I believe.

11      A.    Yes.

12      Q.    What was your on call while you were working

13  what you refer to as a shift?

14      A.    Exactly what you're saying, on call.  It

15  doesn't have a time frame.  If I'm over my shift, if I

16  get off at 7:00 p.m. or 7:00 a.m. and they call me

17  saying, "Hey, we're backed up.  Can you take this one

18  at 8:00 a.m.," that's on call.

19      Q.    Okay.  Were you also on call during your

20  shift?

21      A.    No, because you're working your shift.

22  You're not on call.

23      Q.    But as we've -- as you testified earlier --

24      A.    As I said, it can't be mixed between the

25  two.  They're two different things.



DUSTIN L. HYDE                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                               178

1    Q.    Okay.

2    A.    You have a shift that you're responsible for

3  taking the calls coming in on that shift.  After your

4  shift, if you get a call, that's -- you're on call.

5    Q.    But, again, we've -- your testimony is such

6  that during the shift there was no requirement to be at

7  316; correct?

8    A.    Right.

9    Q.    And then you -- all you needed to do was to

10  be in or near your truck ready to go to respond to a

11  call.

12    A.    I'm glad it sounds that easy, but yes.

13    Q.    Okay.  And then there is an opportunity

14  while you're waiting to be dispatched on a call to run

15  personal errands or to do with that time whatever you

16  deemed fit.

17    A.    No, not necessarily.  You can't say it like

18  that, not whatever I deem fit.  I can't go to my

19  nephew's birthday party if I'm scheduled to work.

20    Q.    Could you possibly not have been called

21  during a shift?

22    A.    Potentially.

23    Q.    Okay.

24    A.    But that don't mean I can go out of the area

25  or go be tied up doing something else.  Because when



 1  that call comes in, you have to respond to that call.

 2  Those calls have ETAs, estimated time of arrival.  If

 3  you don't meet that ETA, you get flagged.  You get

 4  flagged, you stop getting calls.  It's all a process.

 5  So when you're on call or you're on your shift, you

 6  better be ready to go.

 7       Q.    Okay.  But for the time that you may be

 8  waiting for a call, right, during your shift, your

 9  testimony earlier was that you -- if the timing is

10  right, you could make a decision whether to run a

11  personal errand or some other item; correct?

12       A.    Maybe so.

13       Q.    Okay.  Were you prohibited from doing that?

14       A.    If you get a call.  I mean, you are there

15  for work.  You're not there for pleasure.

16       Q.    But the calls were not consistent each

17  shift.  It was sporadic.

18       A.    It doesn't matter.  You've still got to be

19  ready to go.

20       Q.    But, again, you didn't have to be at some --

21       A.    But I could have been taking a bath, but I

22  didn't have time because you've got to be ready to go.

23       Q.    But the amount -- so you're just saying you

24  had difficulty knowing how long you might not be --

25       A.    No.



1        Q.      -- on call.

2        A.      No, sir.  It's not nothing about knowing.

3   You don't care how much time there is between calls

4   because you're always ready to go.

5        Q.      But you were able to run personal errands.

6        A.      But it doesn't matter.  You're there to go.

7        Q.      Okay.  But it did happen that you were able

8   to run personal errands.

9        A.      Sure, once in a while.

10       Q.      Okay.  Were you prohibited from doing that?

11       A.      Once in a while.

12       Q.      Who prohibited you?  Does that just mean --

13       A.      No.  I mean, when the calls come in, you've

14   got to go.

15       Q.      Okay.  But no one said you need to be here

16   waiting at this location while you're on your shift.

17       A.      No.  But you better respond to that call

18   when it comes in, which is the same authoritative move.

19       Q.      Again, you could respond -- you could do

20   with the time that you had on your shift what you

21   desired, unless you were on a call.

22       A.      If that's the way you see it, yes.

23       Q.      Is that the way you see it?

24       A.      No, sir.

25       Q.      How would you see it?



1      A.    I just told you.

2      Q.    How is that?  How is that different?

3      A.    You have to be ready to go at all times.

4  You don't have three hours that you can go down to

5  Susie's house and play a game of pool.  Like you have

6  to be where you're supposed to be and be ready to go

7  get them calls.

8      Q.    And where were you supposed to be?

9      A.    In the area.

10     Q.    In the area.  And then second to that is

11  just simply you mentioned a birthday party and to visit

12  a friend.

13     A.    What I mentioned was irrelevant.  It could

14  be anything.

15     Q.    But just you were free to do with the time

16  that which you desired, unless you were under a call.

17     A.    No, sir, I don't see it that way.

18     Q.    Okay.  So you --

19     A.    My time was hindered by being on shift.

20  Therefore, if I'm on shift, I should be paid for my

21  time.

22     Q.    Okay.  That's your contention.

23     A.    Yes, sir.

24     Q.    But were you permitted during the time that

25  you weren't on call as you testified to earlier --



1       A.     As I said, potentially you have time to,

2   yes.

3       Q.     Okay.  And there was no prohibition from Eli

4   or Max --

5       A.     Again --

6       Q.     -- to the contrary.

7       A.     -- I don't see it that way.

8       Q.     I'm just asking did either one of them tell

9   you you couldn't?

10      A.     Pretty much.  I mean, you don't have them

11  telling me you couldn't.  You have a responsibility.

12  It's not about getting to that point.  You either go do

13  the call, or you suffer the consequences.  Point

14  proven.  You go do the call.

15      Q.     But, to clarify, you just stated they didn't

16  tell you that you couldn't.  You just felt that it was

17  upon you to be ready, as you put it.

18      A.     I guess.

19      Q.     Okay.

20             (An off-the-record discussion was held.)

21             MR. HANDSCHUH:  I think I need one moment.

22      Check over our notes.  We should be good.

23             (An off-the-record discussion was held.)

24             MR. HANDSCHUH:  Mr. Hyde, I appreciate your

25      time today, sir.  I have no further questions.



 1  Thank you, Sean.

 2       MR. SHORT:  Thanks.  Nothing at this time

 3  from the plaintiffs.

 4       MR. HANDSCHUH:  Signature?

 5       MR. SHORT:  We'll read and sign.

 6       MR. HANDSCHUH:  Okay.

 7       THE VIDEOGRAPHER:  2:18, we're off the

 8  record.  This is the end of Media Number 4.  This

 9  concludes the deposition.

10            (VIDEO CAMERA OFF.)

11       (Deposition concluded at 2:18 p.m.)

12            -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25



1          E R R A T A   S H E E T

2

3          Pursuant to Rule 30(e) of the Federal Rules of
    Civil Procedure and/or O.C.G.A. 9-11-30(e), any changes
4   in form or substance which you desire to make to your
    deposition testimony shall be entered upon the
5   deposition with a statement of the reasons given for
    making them.

6
           To assist you in making any such corrections,
7   please use the form below.  If supplemental or
    additional pages are necessary, please furnish same and
8   attach them to this errata sheet.

9
                          -  -  -
10

11          I, the undersigned, DUSTIN L. HYDE, hereby
    certify that I have read the foregoing deposition and
12  that said transcript is true and accurate, with the
    exception of the following changes noted below, if any:

13

14

15  Page_____/Line_____/Should Read:_____

16  _____

17  Reason:_____

18

19  Page_____/Line_____/Should Read:_____

20  _____

21  Reason:_____

22

23  Page_____/Line_____/Should Read:_____

24  _____

25  Reason:_____



```
1   Page_____/Line_____/Should Read:_____

2   _____

3   Reason:_____

4

5   Page_____/Line_____/Should Read:_____

6   _____

7   Reason:_____

8

9   Page_____/Line_____/Should Read:_____

10  _____

11  Reason:_____

12

13  Page_____/Line_____/Should Read:_____

14  _____

15  Reason:_____

16

17  Page_____/Line_____/Should Read:_____

18  _____

19  Reason:_____

20

21                      _____
                        DUSTIN L. HYDE,

22  Sworn to and subscribed before me,

23  _____, Notary Public.

24  This _____ day of _____ 2023.

25  My Commission Expires:_____.
```



1                    C E R T I F I C A T E

2

3   STATE OF GEORGIA:

4   PAULDING COUNTY:

5

6          I hereby certify that the foregoing

7       transcript was taken down, as stated in the

8       caption, and the questions and answers thereto

9       were reduced to the written page under my

10      direction and that the foregoing pages 1 through

11      185 represent a true and correct transcript of the

12      evidence given.

13          I further certify that I am not of kin or

14      counsel to the parties in the case, am not in the

15      regular employ of counsel for any of said parties,

16      nor am I anywise interested in the result of said

17      case.  The witness did reserve the right to read

18      and sign the transcript.

19          This, the 10th day of October 2023.

20

21

22

23      _____
        CYNTHIA B. GATEWOOD, CCR-B-1400

24

25



1                              DISCLOSURE

2    STATE OF GEORGIA:
     COUNTY OF PAULDING:
3
                     Deposition of DUSTIN L. HYDE
4
             Pursuant to Article 10.B of the Rules and
5    Regulations of the Board of Court Reporting of the
     Judicial Council of Georgia, I make the following
6    disclosure:

7            I am a Georgia Certified Court Reporter.  I am
     here as a representative of Regency-Brentano, Inc.
8

9            I am not disqualified for a relationship of
     interest under the provisions of O.C.G.A. §9-11-28(c).
10

11           Regency-Brentano, Inc., was contacted by Esquire
     Deposition Solutions to provide court reporting
12   services for this deposition.

13
             Regency-Brentano, Inc., will not be taking this
14   deposition under any contract that is prohibited by
     O.C.G.A. §15-14-37 (a) and (b).
15

16           Regency-Brentano, Inc., has no exclusive
     contract to provide reporting services with any party
17   to the case, any counsel in the case, or any reporter
     or reporting agency from whom a referral might have
18   been made to cover this deposition.

19
             Regency-Brentano, Inc., will charge its usual
20   and customary rates to all parties in the case, and a
     financial discount will not be given to any party to
21   this litigation.

22

23                        _____

24
                          CYNTHIA B. GATEWOOD, CCR-B-1400
25                        Date:  September 28, 2023



**Exhibits**

10069142 Du
stin.L.
 Hyde.
EXHIBIT1
  2:8 15:15

10069142 Du
stin.L.
 Hyde.
EXHIBIT2
  2:9
  17:11,16
  114:20,22

10069142 Du
stin.L.
 Hyde.
EXHIBIT3
  2:10
  18:6,11,
  16 28:7
  35:24
  36:1,10,
  15 70:7,
  13 122:7

10069142 Du
stin.L.
 Hyde.
EXHIBIT4
  2:11
  31:8,18
  32:5

10069142 Du
stin.L.
 Hyde.
EXHIBIT5
  2:12
  40:19
  41:17
  48:16
  53:2

10069142 Du
stin.L.
 Hyde.
EXHIBIT6
  2:13
  41:1,5,8
  45:18
  49:8

10069142 Du
stin.L.
 Hyde.
EXHIBIT7
  2:14
  48:22
  50:16
  67:25
  68:8,24
  79:4
  99:19
  132:19

10069142 Du
stin.L.
 Hyde.
EXHIBIT8
  2:17
  59:16,19

10069142 Du
stin.L.
 Hyde.
EXHIBIT9
  2:18
  59:24
  62:5

10069142 Du
stin.L.
 Hyde.
EXHIBIT10
  2:19
  63:9,11

10069142 Du
stin.L.
 Hyde.
EXHIBIT11
  2:20

84:4,6,15
85:1
87:22

10069142 Du
stin.L.
 Hyde.
EXHIBIT12
  2:21
  84:12
  86:24

10069142 Du
stin.L.
 Hyde.
EXHIBIT13
  2:22
  91:4,16
  92:2
  96:15

10069142 Du
stin.L.
 Hyde.
EXHIBIT14
  2:23
  91:23
  93:17,18

10069142 Du
stin.L.
 Hyde.
EXHIBIT15
  2:24
  123:16
  124:19

10069142 Du
stin.L.
 Hyde.
EXHIBIT16
  3:4
  144:24
  152:8

10069142 Du
stin.L.
 Hyde.
EXHIBIT17
  3:5 145:5

163:10

10069142 Du
stin.L.
 Hyde.
EXHIBIT18
  3:6 154:2

10069142 Du
stin.L.
 Hyde.
EXHIBIT19
  3:7
  156:20

_____

**$**

_____

$1,000
  44:1

$100
  51:4

$113
  102:2

$13
  102:3
  103:4

$300
  42:23
  43:13
  53:7
  147:23

$4,700
  161:16

$50
  154:17
  155:1

$500
  46:2,9,17

$700
  40:3
  42:11

_____

**0**

_____

02/23/1984
  9:5

_____

**1**

_____

1
  5:4 15:5,
  15 37:14
  161:15

1,100
  151:10

1,200
  151:11,12
  155:17
  172:13

10
  60:9
  63:9,11
  167:25

10,000
  38:18,20
  122:22
  124:2

10/2/2020
  43:9,11

100
  34:13
  74:18

101
  18:23,24
  28:7 29:9

1032
  93:21

104
  28:9,11
  29:21

105
  8:19,22



18:25

**1090**
159:9

**1099**
38:8

**10:00**
144:16

**10:06**
5:6

**10:17**
15:4

**10:18**
15:9

**10:50**
95:23

**10K**
38:17,19,
21

**11**
84:4,6,15
85:1
87:22
124:22

**11/11/21**
45:25

**11/21/2019**
19:7,23

**11:00**
136:2
140:22
144:17

**11:33**
67:14

**11:46**
67:19

**12**
72:24
73:1,6,7,
18 76:7,8
84:12

86:24
90:15
93:10
103:4
176:9

**12-hour**
67:9
72:3,18
73:2,4,15
77:3 82:4
83:5,8,10
86:9 97:3
125:17
127:25
128:3
170:20

**122**
122:9

**127**
36:16

**128**
36:14,16
37:1
123:20

**12:00**
154:14

**13**
91:4,16
92:2
96:15

**1317**
95:21

**132**
93:21

**138**
33:6,16

**14**
91:23
93:18
169:17

**141**
32:10

**15**
97:9
123:16,18
124:19

**15,000**
107:25
108:3,7
109:1

**15-**
75:7

**16**
30:1,15
144:24,25
152:8

**17**
145:1,5
158:12
163:10

**178**
48:6

**179**
45:17,18

**18**
114:25
118:21
119:3
154:2
158:12

**19**
17:17
19:14
30:16,21
72:11
99:14
118:12
156:20
159:17
171:22

**1:00**
136:3

**1:03**
132:2

**1:17**
132:5

**1:18**
94:1,23

**1st**
24:10

**2**

**2**
15:10
17:11,16
43:4
46:19
50:22
53:4
67:15
114:20,22

**2,300**
162:17

**20**
10:9 97:9
132:20,22
137:12,14

**20-mile**
75:7

**2000**
10:23

**2012**
30:1

**2018**
16:23
17:22,24
19:16
30:23
42:6

**2019**
16:20,24
17:5 18:3
19:8
20:9,15
31:22

42:4
123:2
158:4,19
159:19
160:12

**2020**
43:22
44:16
53:4
72:20
157:4
160:5

**2021**
21:5,20
22:10,11
23:12,13
24:11
47:5 48:9
49:3,12
60:9
64:18,24
72:12,21
84:18
87:21
93:24
95:23
118:15
124:23
125:4
155:16
156:3

**2022**
24:16
48:10
49:4,12

**2023**
5:5

**208**
48:6

**21**
132:21,22
157:4

**21st**
16:20



19:8 20:9
87:21
123:2

**22**
17:22
99:14
157:4
160:6

**22nd**
84:18
87:21

**23**
10:17

**24**
67:10
73:2
93:24
172:16

**24/7**
71:11,12
72:2,25
83:5
127:24
168:13
177:10

**25**
136:24
173:24

**26**
95:23
174:18

**26,000**
109:12

**27**
68:8,9
79:5
80:6,14

**28**
50:18
162:13
175:19

**28th**
5:5

**2:18**
183:7

**2:22-cv-
103-rws**
5:10

**2nd**
22:11

───────────

─────── **3** ───────

**3**
17:17,18
18:6,11,
16 28:7
35:24
36:1,10,
15 43:21
50:23
67:21
70:7,13
122:7
132:3
140:2

**30**
68:7,23
104:10
136:24
137:12,
14,19

**300**
148:1

**30326**
5:15

**316**
5:8 6:25
16:2,3,6
17:24
18:2,19,
23 19:4,
10 20:10,
16 23:16

24:5,12
25:18
27:3,9,12
30:23
32:9 34:8
37:11,25
38:10
40:10
41:11
42:4,13
44:1
45:14,18
47:12
49:24
52:7
54:17
57:20
58:1
64:9,16
65:7,9
66:22
67:5 69:2
75:20
78:11
80:1
87:8,13
88:19
96:25
97:6
99:13
102:16
106:23
114:2
115:4,18
116:14
119:10
120:16
121:11,19
122:19
123:10
124:11
126:6,11,
20 127:20
128:25
129:6,16
130:13
131:9,10,

22 132:12
133:8,11
145:18
153:8
159:1,7
161:16
165:23,24
166:6
174:25
176:5,23
178:7

**316's**
71:19

**316-127**
36:14

**31st**
21:5

**32**
145:11,20
146:11

**3390**
5:14

**34**
79:4

**35**
42:2 47:2

**36**
19:3

───────────

─────── **4** ───────

**4**
31:8,18
32:5
132:7
135:10,
11,14
183:8

**4,700**
162:15

**40**

141:21,24
142:8
153:3
175:22
176:6,10,
14

**45**
137:13,14

**45-minute**
139:3

**4500**
107:22
108:16
109:2

**4:00**
144:17

───────────

─────── **5** ───────

**5**
40:19
41:17
44:23
48:16
53:2
135:6,10,
14,16

**50**
46:11,17

**5500**
108:12,22

**5:00**
144:17

**5th**
18:3

───────────

─────── **6** ───────

**6**
41:1,5,8
44:23

45:18
49:8
132:20,25
135:21
136:8
163:12

**60**
142:14,15
143:11

**60-**
143:22

---

**7**

**7**
48:22
50:16
67:25
68:8,24
79:4
99:19,21,
22,24,25
100:1
132:19
165:11

**700**
42:20
155:13

**750**
40:1

**7:00**
76:15,16
82:10,11
90:13
143:15,16
154:14
174:4,5
177:16

**7:58**
84:19

---

**8**

**8**
59:16,19
60:25
99:20,21

**80**
142:15,16
143:11

**80-hour**
143:23

**80s**
10:22

**8:00**
82:8,11
83:17,19,
20,21
84:22
85:8
90:13
140:22
144:11,12
177:18

**8th**
24:16

---

**9**

**9**
43:22
44:16
59:24
62:5
99:20
100:4

**90s**
10:22

**95**
153:14,16

**9:00**
82:11

---

**A**

**A-V-I-T-U-S**
14:14

**a.m**
177:18

**a.m.**
5:6  67:19
82:8
83:17,19,
20,21
84:22
85:8
90:13
94:1,23
136:2
140:22
144:11,12
177:16

**ability**
58:5
89:21

**aboard**
22:23

**absolutely**
89:22
124:20
167:18

**acceptable**
7:6

**accident**
37:21

**accurate**
30:17,25
79:20

**acknowledged**
122:18

**acknowledges**
42:3

**acknowledging**
45:8

**acquaint**
50:19

**acquired**
160:12

**acting**
54:25

**action**
35:18

**actively**
80:25
90:9

**activities**
112:2
114:9

**actual**
21:8

**ad**
16:9

**add**
142:3

**adding**
154:16

**addition**
10:25
12:22
13:4  59:2
166:14

**additional**
41:10,14
118:13
126:12
130:12
147:25
154:12,20

**address**
8:23  9:1
71:20,23

**adequately**
142:25
148:6
149:10

**adjustment**
104:18

**admission**
68:7,23
79:4
80:6,14
132:20
133:5
135:6

**admit**
69:1
79:7,10
85:12
89:20

**Admitted**
79:10

**advance**
45:15
46:2,5,6,
9,16,21
47:22,25
56:17

**advanced**
56:15

**advances**
38:3
45:11,12,
13

**advise**
27:13
127:7

**advised**
94:21
124:11

**advises**
9:23
126:23



advising
57:20

affect
10:2

affiliation
92:25

affirmative
54:13
63:13
78:17
84:17
86:25
93:25
98:18
113:6
124:4
125:16
167:15
172:21

affirmatively
92:19

after-hours
76:20

agencies
14:4

agency
14:19,20

agree
6:9 16:25
17:5,7
19:25
78:20
101:11
148:22

agreeable
8:13

agreed
7:16
39:25
42:11
148:19,21

agreed-upon
145:17

agreement
6:6
105:10

agreements
35:15

ahead
48:21
52:22
131:25
154:7

air
97:9

Alan
163:24,25
164:1

allegation
16:25
17:16,23
19:14
30:22
114:25
115:3
118:21
142:8
143:10
146:11
163:12,13
165:11

allegations
118:21

allege
147:12
169:17

alleged
16:22

Amanda
5:24

Amendment
157:24

American
13:20
29:22

amount
13:19
39:24
40:6
42:17
59:8 69:4
148:23
150:20
151:22
179:23

amounts
40:9
153:1

and/or
37:21

anger
62:22

answering
133:6,10

answers
159:5

Anthony
54:5
72:17
163:22
164:6
177:5

anymore
113:19

anytime
57:15
148:8

apologies
27:4

app
89:6,8,11
115:14

Apparently

125:14

appears
20:8
29:22
32:7,12
41:17
45:25
60:7,8
62:15
64:3
84:14
88:3
92:9,14
94:3,19
95:3
115:8
117:3
123:1
154:8
158:21

application
16:16,17,
24 17:4
19:3,6,
23,25
20:2 29:4
31:3 34:8
39:12
61:11,19
70:8,10,
14 71:3
123:19

applications
33:21
57:11
60:23
61:4,7,9,
13,14,15,
21

applied
11:16
19:10
168:4

apply
39:3
168:15

approval
27:15
56:19

approve
151:5

approved
27:16

approximate
10:18

Approximately
8:21

April
17:22
48:10
49:4,12
99:14
155:16

area
71:18
74:6,7,
16,19,22,
24,25
75:5,10,
12 77:20
80:21
97:8,16,
19,20
98:17,21
178:24
181:9,10

arrest
10:25

arrested
10:4,6,24

arrests
11:4

arrival
179:2



**arrive**
  173:25
  174:9

**asks**
  39:2 79:7
  160:11

**asleep**
  83:22
  86:20

**asserted**
  153:14

**assessed**
  106:11

**assigned**
  53:12
  170:12

**assignment**
  172:23
  173:10

**assist**
  57:7,10
  77:17
  94:22

**assistance**
  57:9

**assumed**
  7:15

**assuming**
  53:8

**Athens**
  99:7

**Atlanta**
  5:15

**attach**
  33:22

**attempt**
  7:25
  21:22

**attempted**
  21:21

**attend**
  78:23
  79:9 80:1
  81:10

**attending**
  79:12

**attention**
  15:21
  16:1
  17:15
  22:4
  26:6,7
  28:6
  29:7,10
  32:4
  36:13
  45:17
  50:15
  62:5 68:6
  79:3
  86:23
  91:16
  92:2
  93:17
  95:21
  96:14
  99:19
  114:25
  122:6
  124:18
  132:19
  135:5
  145:10
  152:8
  163:9
  172:7

**attitudes**
  25:11

**attorney**
  6:25 7:4
  9:23
  126:23
  127:1

**attorneys**

**5:19**
  152:13

**audibly**
  8:4

**August**
  23:12
  24:16
  64:18

**authoritati
ve**
  180:18

**authorized**
  6:7 37:16

**auto**
  10:7
  109:3

**Avitus**
  14:14

**awaiting**
  74:2

**aware**
  26:15
  28:22
  75:19
  89:12
  106:22,25
  122:21
  123:4
  126:6
  131:23
  165:10
  168:3,13
  170:23
  173:6

**awhile**
  88:16

_____

_____

**B**

_____

**back**
  6:14
  13:10

**15:9,14**
  17:2
  19:14,20,
  21 20:22
  21:1
  22:12,14,
  21,23
  23:8
  27:11
  28:8
  29:8,21
  30:9
  31:21
  36:19
  42:25
  61:9 65:4
  67:19,23
  68:8
  69:13
  70:7
  72:11
  79:3 81:4
  83:3
  85:20,25
  86:21
  87:22,25
  88:9
  96:14
  98:11
  99:7,19
  100:13
  101:10
  114:22
  117:19,23
  118:4
  126:10
  128:17
  132:5
  136:4
  147:23
  150:13
  156:1,2
  160:22
  163:9

**back-to-
back**

**81:9**

**backed**
  177:17

**background**
  57:25
  111:1

**base**
  39:10
  102:8

**based**
  52:25
  92:9
  100:25
  103:8
  115:8
  142:8

**basic**
  16:17
  119:25

**basing**
  151:22

**basis**
  34:16
  35:5,9
  40:5 58:8
  65:18
  74:24
  147:11,14
  148:4
  152:4
  176:11

**Bates**
  45:18

**bath**
  179:21

**bathroom**
  67:13

**bearing**
  147:1

**beat**
  103:19,25



104:3

**began**
17:24
19:16
20:11

**begin**
8:11
18:23
40:9

**beginning**
5:3 15:10
27:11
52:14
67:9,20
72:12
77:6
88:20
115:13,21
116:6
117:15
118:12
121:21
123:5
132:6
134:18
138:1
141:6

**behalf**
5:7,23
75:20
129:16
146:12

**belief**
51:19

**bell**
14:7

**benefits**
52:9

**bigger**
68:11

**bill**
80:24
81:1

**bird-nested**
139:10
140:25

**bird-nesting**
141:3,10,
16

**birth**
9:4

**birthday**
178:19
181:11

**bit**
97:7
141:17
177:7

**Blackburn**
56:20,22
139:1
165:6

**block**
32:9
161:5

**blow**
26:1

**blue**
119:25
120:3
121:6,7

**bonds**
162:4

**borrow**
68:15

**bottom**
18:18
28:16
29:9
32:17,18
33:6 37:7
43:5
114:23
122:25

123:20

**boxes**
139:12
140:8

**brain**
136:17

**branding**
14:16

**break**
15:22
20:20,21
58:12,14
67:13,23
127:13,15
132:10
141:21
142:8

**breaks**
81:10
140:2

**Brent**
23:3 54:3
146:6,18,
21 147:7
148:11
163:22
173:4
177:7

**Brindley**
53:25

**bring**
24:25
68:17
98:11
99:7
120:19

**bringing**
22:4 25:2
26:5

**Brother**
60:23

**Brovkina**
94:5

**Brown**
63:2
64:1,5
141:14

**Brown's**
64:8

**Browsing**
111:19

**brushed**
66:9

**BS**
125:18

**Bud**
137:22

**bump**
151:17
155:13

**bumped**
67:1
151:10

**Burger**
15:1
23:18,22
24:4,6,8

**burglary**
10:7

**business**
14:10
56:12
57:21
58:5,6
106:18
107:7
117:3,6
136:1
137:4
138:25
158:23
159:1,19,
24

160:12,17
166:6

**businesses**
15:23
33:13

**busy**
50:6
65:18
141:22

**buy**
56:11,14
111:24
136:1

**buying**
138:24

---

**C**

---

**C-H-R-I-S-T-Y**
112:16

**C-O-R-A**
113:10

**cabinet**
87:10

**calendar**
87:25

**call**
13:3 24:2
57:4
62:20
67:10
71:12,13,
17,23
72:2,3,24
73:1,2,
12,21,22
76:2,3,8,
12,17,18,
20,22,25
77:6,7,
11,13,24



78:14,16,
24 79:2,
8,13,15
80:3,15,
21,25
81:2,21
82:17,19
83:1,5,6
88:25
89:23
90:5,6,9,
18 91:6,
11,15,19
92:24
93:14
94:12
95:10,18,
25 100:14
101:18
102:1,4,7
120:25
123:7
129:15,
20,24
130:17
131:8,21
133:19,24
142:1,2,
19 143:12
155:7
176:25
177:1,3,
10,12,14,
16,18,19,
22 178:4,
11,14
179:1,5,
8,14
180:1,17,
21
181:16,25
182:13,14

**called**
16:12
51:3
71:14,24

78:8
107:11
142:1,2
158:22
178:20

**calling**
51:11

**calls**
25:25
73:9,13
79:22
81:10
83:12
90:4,25
95:17
96:6,19
105:5,10,
18 106:6
122:4
129:10
130:13
133:6,10,
20 138:15
142:16
168:17,18
178:3
179:2,4,
16 180:3,
13 181:7

**CAMERA**
15:6,8
67:16,18

**cancel**
91:11,15
95:18
96:6

**canceled**
85:7
94:20
95:18,25
105:1
172:20

**captured**
131:21

133:8,11
134:24
136:5

**car**
87:9 99:8
166:25

**card**
56:19
101:21
104:14,
17,22
117:8,13
118:4
122:21

**cards**
115:7
118:9

**care**
89:16,19
131:4
180:3

**cargo**
99:2

**Carolina**
98:1,6,
10,24
99:16
100:11,20
101:12

**Carolina's**
99:8

**carrying**
165:3,12

**cars**
55:6,7
98:12,23
130:4,5,
7,25
164:25

**case**
5:6,9
101:9

112:8
122:2
147:9
152:13

**cash**
101:22,24
103:2,3,
22,23
104:17,21
113:23

**caused**
69:7

**CDL**
11:14
170:25

**cell**
110:9,13,
16
113:21,24
114:14
115:5,6,
11
116:11,
13,16,17
117:2,4,7
133:14
135:2
144:6

**certificate**
171:2

**certified**
74:20

**chains**
139:9

**chance**
18:15
28:13
36:21
41:7
50:19
70:24
92:5
100:24

138:14
145:8

**chances**
14:20

**change**
12:19
47:20
80:8
81:15,18
82:10
88:1,5
96:4
121:5
133:15
150:19,22
170:22

**changed**
40:1 46:7
112:22

**changing**
58:16
166:24

**charge**
102:5

**charged**
139:12

**charges**
117:24

**chat**
136:25
137:4

**check**
6:13 17:2
26:13,16
37:4 56:6
67:2
182:22

**checkmark**
160:13

**children**
9:8,13



Chinese
    153:12

choose
    64:11
    77:18
    81:13
    82:24

choosing
    129:14

chose
    65:23
    81:6

Christy
    9:20
    112:9

Cindy
    5:17

Cintas
    168:21,22

circled
    37:17,23
    38:4,14,
    25 39:4

circles
    37:4

circumferen
ce
    97:14

city
    10:12

Civil
    6:5,8

claim
    112:5
    128:25

claimed
    129:6
    153:2

claiming
    74:18

75:4
127:19
152:25
159:6

clarificati
on
    146:5

clarified
    118:20

clarify
    8:9 36:8
    61:17
    130:7
    157:3
    182:15

clarity
    104:23

classify
    107:18

clear
    50:11
    104:8
    114:13
    116:21
    118:8,11
    131:7
    160:17

Cleveland
    8:24,25
    9:1

clever
    127:1

clicked
    159:20

clock
    79:1
    85:19
    86:21
    88:9

close
    24:19
    30:17

148:17

closed
    30:3 31:9

closer
    138:1

Clover
    117:12,13
    118:9

co-counsel
    5:24

coincide
    60:16

collect
    102:16,25
    103:1
    115:15
    116:12
    117:7,17

collected
    102:4
    114:14
    117:5

collecting
    102:6,22
    103:2
    104:13,
    16,17
    117:2
    118:4

collection
    104:20

collects
    102:17

color
    109:22

column
    93:21
    152:14

Comdata
    38:4

comment
    81:16
    126:9

comments
    28:8 62:3

commercial
    11:18
    109:20,21
    170:25

common
    8:8
    117:20
    129:23

communicate
    62:23

communicati
on
    84:15

communicati
ons
    152:19

companies
    88:22,24
    97:18
    102:21
    126:3

company
    14:25
    16:12
    24:22
    27:18
    54:21
    56:18,19
    82:12
    83:23
    107:5
    114:11
    125:17
    126:15
    162:3,5,6
    163:18
    165:16,
    17,21

166:11,14
167:8,11,
14,17
168:7,9
175:10

company's
    166:16

compensated
    148:6

compensatio
n
    69:3,6,9,
    16,21,24
    149:10
    150:9
    155:12
    156:4

complained
    69:6

complaining
    150:7

complaint
    16:23
    17:1
    66:11
    114:17
    118:22

complaints
    155:11

complete
    38:2 57:3
    133:23

completed
    92:11

Compliance
    122:15,20

compliant
    161:23

comply
    168:9

concentrate



7:19

**conceptual**
96:18

**concerned**
35:7

**concludes**
183:9

**concrete**
26:10

**condition**
10:1

**conditions**
168:2,6,
12,14

**conducted**
6:4

**confirm**
21:7
34:2,14,
17 85:10
95:5,13

**confirming**
155:21

**confused**
83:9

**connection**
133:3

**consequences**
182:13

**considered**
97:10

**consistent**
144:18
170:11,14
179:16

**consulting**
57:20

**contact**
22:20

**contends**
49:24

**contention**
35:10
142:22
143:18
181:22

**context**
85:11
86:18

**continue**
84:25
133:1

**continues**
38:7,21

**Continuing**
43:20

**continuous**
25:23

**contract**
27:12

**contracting**
33:18

**contractor**
33:7,12,
13 37:11,
15,20
38:8,24
39:3,8
99:13

**contractors**
38:1

**contracts**
38:1
70:15

**contrary**
182:6

**control**
143:7

**controlled**

169:18

**conversation**
8:8 27:25
28:3
44:7,11,
14 69:17
106:12,14
137:21
146:15,
16,19,23
149:23
150:2
151:1

**conversations**
22:1
146:18
149:13

**convey**
162:2

**conveying**
160:16

**convicted**
29:11,15

**convictions**
10:8

**coordinates**
90:5

**copies**
121:25

**copy**
59:22
122:19

**Cora**
113:8,21

**correct**
17:25
18:16
20:11
21:1
22:12

23:17
24:16
30:22
36:2,5
37:5
38:18
42:4,17
43:4 44:2
47:18
51:16
61:18
64:1,5,16
65:8 68:1
69:16
70:8,11
80:2
82:20,22
84:16,23
90:6,9,
11,14
92:13,18
93:5,11,
15 94:16
96:21,25
97:23
98:3
102:18
105:14
107:5
118:22
124:24
126:22
128:18
135:12
145:14,18
148:1
151:10
154:9
155:16
156:5
159:22
165:23
172:14,20
174:7
176:16
178:7
179:11

**correctly**
16:7
155:15

**counsel**
6:6 95:7

**count**
101:10

**couple**
19:18
20:22
21:3 24:9
65:25
117:21
139:6,7

**court**
5:11,16
6:1 7:10
8:5 12:4
156:8

**cover**
49:3
97:19
148:20
154:13

**coverage**
97:20
102:10,17
103:8

**covered**
102:1,11,
12

**covers**
102:10

**created**
159:10

**creating**
161:12
167:22

**credit**
115:7
117:8
118:4



crime
  29:16

CROSS-
EXAMINATION
  6:22

current
  8:18
  112:12,13
  113:4

customer
  77:18
  91:13
  102:11
  104:9
  115:7

customer's
  102:2

customers
  97:22
  101:17
  133:7,10

cut
  128:17

cute
  163:4

———————

        D

D-1
  15:11

D-10
  63:6

D-11
  84:1

D-12
  84:9

D-13
  91:1

D-14
  91:20

D-15
  123:13

D-16
  144:21

D-17
  145:2

D-18
  153:24

D-19
  156:17

D-2
  17:12

D-3
  18:7

D-4
  31:5

D-5
  40:16

D-6
  41:2

D-7
  48:19

D-8
  59:13

D-9
  60:1

D-U-S-T-I-N
  8:17

daily
  38:2
  122:15,20

date
  5:5 9:3
  17:6 18:4
  19:6,13,
  23 20:6
  21:8
  22:11,12
  27:10
  42:4

43:2,3,8,
22 45:23
47:21
60:20
66:1 72:7
93:23
94:18
95:11

dated
  17:4
  39:16
  60:8
  84:18
  123:2
  124:22

dates
  17:3
  20:19
  24:13
  30:2,5,9
  49:5
  60:15
  64:19
  83:3 86:5

day
  19:10
  43:11
  55:14
  58:10
  65:16
  67:10
  73:3
  82:16
  85:18
  86:16
  87:17
  88:10
  95:19
  110:24
  127:22
  128:3,5
  130:15,
  21,25
  131:2
  137:8,9,

15 138:2,
7,9,22
140:1
141:19
144:14
150:1
153:19
170:1,3,
5,6,11,
16,18
176:9

Daylight
  5:6

days
  10:17
  20:22
  137:12
  143:15

daytime
  82:18,21

deadline
  157:19

deal
  9:22

dealership
  98:6,7
  99:4,7,9,
  10

dealership-
to-
dealership
  99:9

dealt
  66:18

December
  16:23
  17:22,24
  18:3
  19:16
  20:15
  30:23
  31:22
  42:4

72:11,20
99:14
118:12

decide
  63:21
  78:3

deciding
  57:16
  61:10

decipher
  70:20
  71:8

decision
  59:10
  62:13,16,
  19,20
  63:25
  64:4
  179:10

declaration
  145:22
  163:10

declined
  105:1

deem
  178:18

deemed
  178:16

defendant
  17:21
  69:7,16,
  20 173:3
  174:1,18

defendants
  5:24
  165:13,20
  168:1,4
  169:18
  171:22
  174:20,
  22,25
  175:20



definitive
86:19,22
104:1,11
106:2
117:22

demand
152:12

denied
105:5,10
113:16
133:9

deny
34:3 69:5
95:14
113:18

depart
24:11

departure
20:14
21:10
24:21

depend
108:23

Depended
77:24,25

depending
82:11
136:3

depends
67:7 83:3
140:9

deposition
5:4,13,18
6:4 7:2
15:17
183:9

derivative
131:9,10

derive
143:9

deriving

143:12

describe
16:5
21:12
56:24
58:8
101:16
119:24
120:12
129:11

description
53:21

desire
22:21

desired
180:21
181:16

detail
25:10

details
150:2

detained
11:6

determined
171:23
174:1

determining
176:12
177:3

developed
88:22
175:2,6

device
117:9

devoted
58:9

dictate
169:23

dictated
170:2

difference
33:17
47:11
77:3

differently
76:12,21

differing
149:2

difficult
7:19
116:20

difficulty
179:24

dig
114:23
141:1

digging
96:6

digitally
133:19

direct
68:3
69:25

directed
68:1

directions
111:22

directly
69:18,22

disagree
26:14

disagreemen
t
25:23

discipline
105:2,24
172:22
173:10

disciplined
104:24

105:4

discovery
156:8

discretion
81:12

discuss
46:23
52:6
69:11,13,
15 96:2
153:4

discussed
39:15,20,
22 53:20
54:20
60:19
69:24
93:14
175:23

discussing
63:25
85:6,13

discussion
15:7
21:20
27:22
39:18
67:17
106:20
121:9
148:7
158:6
182:20,23

discussions
67:25
68:3
69:20
123:9
162:2

dislike
85:2

Dismissal
149:19

Dismissed
22:2

dispatch
74:2
75:9,20
77:14
78:6,9,18
89:1
92:10,16
94:3
96:20
100:20
101:18
102:1
144:5

dispatched
94:12
178:14

dispatcher
94:6 95:8
96:2
104:13
133:12,22

dispatchers
54:22

dispute
93:7
147:22

distinction
76:3,4

distinctly
7:5

District
5:10,11

Division
5:12

divorced
9:10,11

divvying
72:18

dock



51:12

**docked**
44:19,25
45:6,9
47:23
48:2,3
51:4,7,16
105:14,
16,17

**docket**
34:15

**docking**
106:6,10
107:1
172:19

**document**
15:17,19
19:2
31:18,23
32:1
36:7,20,
23 37:9,
10 40:21
45:19,21,
24,25
46:22
49:18,23
50:20
62:6
75:1,2
93:18
122:11,14
123:23
152:9,20
156:24
158:18
161:24

**documentati
on**
34:9
35:5,15
36:10
70:23
156:11

158:3

**documents**
35:21,22,
25 41:6
155:24

**Dodge**
107:22
108:16

**dollars**
44:17
51:12,15
102:2

**door**
109:6
119:10

**dot**
38:22,23
74:16
124:3

**double-
check**
20:19

**doubt**
143:4

**Doubtful**
81:24

**downloading**
89:5

**drastic**
172:6

**drawing**
15:21
16:1
17:15
32:4
36:13
45:17
50:15
95:21
96:14
99:18
122:6

124:18

**drive**
8:19
139:3
171:11

**driver**
12:11,16
17:22
20:10
21:15
23:6,7,8,
10 24:11
27:12
37:15,20
52:13,16,
17,21,23
53:3,10,
18,22
54:2,7,
10,14,25
55:2,3,5,
8 57:9,11
60:12,14,
18 62:17
64:8
65:2,5,7,
9 66:22
72:8
73:8,9,16
75:18
80:1
99:13
114:1
115:25
121:15
123:18
129:9
135:24
156:4
169:15
170:10,15
171:12
172:12

**driver's**
11:19

19:3
122:15,20
170:25

**drivers**
16:11
25:18
38:2
51:23
53:24
54:11,23
56:25
57:6,8,16
59:11
60:24
62:14
72:4,13
73:24
76:21
77:6 83:7
89:2
105:21
106:5,12,
23,25
115:23
116:2,7,
19 118:13
119:20
124:23
125:6
136:10
137:18
138:4
141:5,9,
23
145:21,25
146:3,7,
12 147:12
148:12
163:16,
18,20
164:10
165:12,14
168:1,3,
4,6,7,12,
16
169:14,21

170:3,4,
12 173:3,
25 174:21
175:8,10,
14,19,21,
23,24
176:1,3,
23

**drivers'**
58:15
169:18
171:23
174:19

**driveway**
131:2

**driving**
22:25
73:12,16,
22 74:2
76:23,24
77:11,17
78:13
90:1,6,9,
12,14,15
92:16
93:10
96:21,23
121:10
122:22
133:7,10

**drop**
120:20,23

**drug**
37:22

**due**
40:9
150:13
153:1

**duly**
6:3,20

**duration**
134:17
168:25



**Dustin**
5:4,7
6:19 8:17
32:13
69:2
94:21

**duties**
54:24
58:9 61:3
65:19
135:25
164:9,11,
19,22,24
165:1,12

———————

**E**

———————

**earlier**
20:6
28:8,10,
21 30:22
42:15
48:16
51:6 61:2
67:25
70:6 93:9
112:3
113:16
115:8
123:23
125:3
129:2
132:10
133:15
136:4
139:1
144:4
145:13
170:24
177:6,9,
23 179:9
181:25

**early**
20:14
23:12

72:21
118:15
125:3

**earn**
13:6

**earning**
126:21

**Eastern**
5:6

**easy**
178:12

**eat**
80:4

**education**
11:11

**effect**
61:25

**effort**
6:18

**elaborate**
24:23
119:1
166:4

**Eli**
21:24
22:24
25:6,7,
18,19,21
26:11
27:14,19,
21 28:4
34:24
39:23
40:12
44:5 50:7
51:11,25
53:19
54:20
55:10
57:3,4,5,
6,18
60:6,23

61:23
62:10,12
63:5,15,
19,25
65:11,23
66:5,23
67:3 68:1
69:9,12,
21 70:1,
2,5 78:11
84:16
85:1,8,14
86:4,14
87:5
88:15
97:17
106:1,13,
15 111:3
124:22
126:2
127:7,8
128:13
135:25
136:11,22
137:10
149:11
151:2
154:9
164:15,17
165:23,24
173:4,20
182:3

**Eli's**
26:6
62:20
75:6

**Elliott**
5:25
17:10
18:6
31:7,11
40:25
48:21
59:15,21,
23 63:8
68:15,20

84:3,11
91:3,22
114:19
123:15
144:23
145:4
154:1
156:19
158:12

**employed**
11:21,23
17:21
66:22
143:20
168:1
175:10

**employee**
22:6,22
23:1
33:18
59:6
76:19
150:10
162:8

**employees**
25:17
52:19
165:17
176:2

**employer**
131:5
148:24

**employment**
20:10
52:9 80:1
99:12
115:22
116:6
134:17
151:8
174:20

**en**
92:11
133:22

**end**
6:15 15:5
21:4 32:8
34:17
38:9 48:6
51:2
67:15
72:2
132:3
169:12
174:1
183:8

**ended**
20:21
141:16

**ending**
84:22
140:22

**endorsement**
171:3

**enforcement**
11:7

**engineer**
109:3
143:2

**English**
47:6
162:23

**entailed**
57:1

**entire**
8:10
73:18
102:4
134:17
169:8
173:15

**entitled**
33:7
122:15

**entity**
29:23



30:10
126:21

**entry**
94:1

**environment**
21:11

**equipment**
56:7
58:23
59:1,3
99:2
107:8,10,
13 109:25
110:6
119:7,14
139:3

**equivalent**
78:21

**errand**
129:13
179:11

**errands**
78:24
79:9,12,
23 80:17
81:11
83:24
178:15
180:5,8

**error**
19:20
42:7,8
69:8,10
160:19,
20,21,24

**Esquire**
5:17

**essentially**
20:24
23:13
63:24
118:17

**EST**
152:14

**established**
111:11
125:3

**establishing**
166:11,14

**estimate**
140:11,14
143:9,23
152:15

**estimated**
179:2

**ETA**
179:3

**ETAS**
179:2

**evening**
140:2

**event**
11:3

**Eventually**
151:15

**ex-wife**
112:9,12,
15

**ex-wife's**
9:16

**exact**
18:4
44:11,14
64:19
72:7
100:14

**examined**
6:20

**examiner**
74:20

**examples**

107:1

**exception**
137:14

**exchange**
60:5 62:9
63:14,18

**excuse**
22:23
79:4
83:17
87:21
135:9
144:11

**exhibit**
15:11,15
17:11,12,
16 18:6,
7,11,16
28:7
31:5,8,18
32:5
35:24
36:1,10,
15 40:16,
19 41:1,
2,5,8,17
45:18
48:16,19,
22 49:8
50:16
53:2
59:13,16,
19,24
60:1 62:5
63:6,9,11
67:25
68:8,24
70:7,13
74:10
79:4
84:1,4,6,
9,12,15
85:1
86:24
87:22

91:1,4,
16,20,23
92:2
93:17
96:15
99:19
114:20,22
122:7
123:13,16
124:19
132:19
144:21,24
145:2,5
152:8
153:24
154:2
156:17,20
163:10

**Exhibits**
44:23

**exist**
28:25
29:6,23
30:11

**expecting**
157:6

**expenses**
162:14

**experience**
119:6
126:2
144:19
170:10

**explain**
22:19
29:1
53:17
56:25
72:23
73:4 76:5
85:1
119:19
120:2
125:21

136:7

**explained**
57:25

**explaining**
143:18

**explanation**
143:22

**explanatory**
73:6

**express**
85:2

**expressing**
22:21

**extension**
157:16,19

**extent**
79:10
116:8
118:21
133:9

**extra**
125:19
153:22
154:15,25
155:5

**extract**
172:9

_____

**F**

_____

**face**
165:24

**Facebook**
16:8,10

**fact**
20:9 28:2
35:4
51:16,19
69:15
71:2



80:16
92:17
98:5
126:5
144:4
156:7

**facts**
101:7
119:6
151:13

**failed**
156:25

**falls**
43:11

**false**
29:18

**familiar**
75:23
94:4
107:12,15
152:11
153:13
156:7,14
168:2,11

**family**
94:22
95:4,9
127:16
128:1

**farm**
109:17

**February**
93:24

**federal**
6:5,8
33:13

**feel**
42:20
77:1
127:10
128:12
148:5

152:7

**Feeling**
21:11

**feelings**
151:24
152:3

**felt**
110:19
182:16

**field**
22:17
104:20

**file**
156:12
157:9,14,
15,19,22
159:11
160:3,23

**filed**
159:15
160:5
161:1
162:10

**filing**
87:9

**filings**
158:19

**fill**
16:16
70:10

**filled**
17:6 19:4
70:8,19
159:5
161:20

**filling**
162:2

**finally**
39:2

**finances**
148:17

**find**
16:6
26:14
49:6
99:22
100:13
149:22
156:15

**fine**
31:15

**finish**
136:2

**finished**
17:20
18:13
28:14
31:19
36:17
40:22
41:7
45:19
50:18,25
59:19
62:7
63:12
84:7
87:2,3
91:18
115:1
135:18
154:6
163:14
172:17

**fire**
59:11
61:10
64:5
173:7

**fired**
61:24
62:4
172:25

**firing**
61:15,22

**Firm**
5:21

**fit**
178:16,18

**five-to-ten**
137:15

**fixing**
139:9
140:7

**flagged**
179:3,4

**flatbed**
108:24

**flatbeds**
108:24

**flea**
87:8

**flip**
18:12
40:21
44:24
45:4 48:5
100:4
127:1,3
156:23

**Florida**
10:11

**fluctuate**
169:25

**fluctuated**
128:7

**fluff**
29:3

**fluids**
56:6

**folks**
13:1

**follow**
174:21
175:15

**food**
37:16

**form**
6:10
15:20
38:8,9

**formal**
7:9

**forward**
54:21

**found**
36:15

**frame**
77:8
80:22
83:5
177:15

**fraudulent**
35:8

**free**
42:20
81:10
155:7,10
181:15

**frequency**
55:16

**Friday**
20:21
42:22
64:13
86:17
87:22
88:1,5
103:6

**Fridays**
120:20,24

**friend**
181:12

**friends**
130:8,9

**front**



39:12
136:25

**frustrated**
62:21

**full**
38:13
86:18
153:11
164:2

**fully**
8:12

**function**
55:2
136:17

———————

**G**

———————

**Gainesville**
5:11

**game**
181:5

**gas**
26:12
123:11

**Gatewood**
5:17

**gave**
26:19
96:5
101:3
112:9

**general**
25:9
53:23
74:21
137:21
148:7

**generally**
164:17

**generate**
42:13

**gentlemen**
5:3

**genuinely**
101:4

**geography**
97:8

**Georgia**
5:11,15
8:19,24,
25 12:8
26:15
74:15
97:23
98:8,10,
17

**give**
8:11
25:10
44:23
55:25
86:1,19,
21 101:10
102:9
103:10,
12,20
104:1,11
106:2
117:22
120:4
140:23
175:3

**giving**
26:23
119:5

**glad**
178:12

**good**
5:2 28:15
60:23
147:10
182:22

**Google**
108:4

**GPS**
14:24
75:14,21
89:9,13
90:2,5

**grabbed**
80:23

**graduate**
11:9

**Grand**
10:7

**greater**
55:23

**Grill**
23:25

**gross**
107:11,
15,24
108:22
109:4,11
161:15

**group**
6:18

**guess**
40:24
46:15
76:15
146:13
175:18
182:18

**guys**
146:18
148:11,16
170:15

**GVW**
122:23

**GVWR**
107:17
108:4
109:6

———————

**H**

———————

**H-U-G-H**
164:5

**H-Y-D-E**
8:17

**half**
67:12

**hamburger**
79:15

**hand**
48:21
59:21,23
61:7
91:22
158:11,
13,14

**handed**
18:11

**handful**
15:23

**handing**
15:14
31:7
40:19,25
41:5
59:15
61:7,8
63:8
84:3,11
91:3
123:15
144:23
145:4
154:1
156:19

**handle**
80:16
101:19
104:16,17

**handled**

75:20
113:22

**handling**
104:19

**Handschuh**
5:14,23
6:4,13,
17,23,24
9:21 12:1
15:2,13
17:14
18:9
31:10,13
39:19
40:18
41:4 49:1
59:17,22
60:4
63:10
67:11,22
68:14,17,
22 84:5,
13 91:7
92:1
106:21
114:17,21
123:17
131:24
132:8,9
144:25
145:6
154:4
156:22
158:1,7,
10,17
182:21,24
183:4,6

**handwriting**
28:19
32:15,21
34:14
35:11
37:2
41:20



handwritten
  34:17

hanging
  75:6

happen
  16:16
  19:24
  21:19
  44:13
  49:8 52:6
  104:9,10
  105:8,9
  115:20
  121:25
  138:6
  141:25
  180:7

happened
  19:19
  21:15
  51:17,20
  52:2
  54:11
  56:21
  62:21
  66:3,15
  85:8
  86:14
  100:9
  106:7
  139:5
  166:2
  173:18

happening
  26:17

happily
  20:7

hate
  85:2

haul
  130:4
  131:3

hauled

130:15,18
131:11

hauling
  99:2

head
  8:8 92:19
  129:25

hear
  8:5

heard
  13:15
  14:23
  28:2
  105:24

held
  5:13 15:7
  39:18
  67:17
  106:20
  158:6
  182:20,23

hell
  151:18

helping
  96:8
  131:5

Hemphill
  13:16
  30:10

Hey
  131:2
  137:22
  150:12
  177:17

high
  11:9
  120:3
  121:7

hindered
  181:19

hire

39:7
59:11
61:10
171:12

hired
  18:2
  20:14
  23:4
  24:10
  27:9,13,
  14 37:10
  52:12,15,
  17,19
  57:19
  58:3
  61:24
  72:4,8,
  11,17,20
  83:8
  116:7
  118:11
  124:24
  138:3
  169:21
  170:5,6

hiring
  16:13
  61:15,22
  116:1
  141:9

Hold
  68:10
  112:10

holding
  26:13

home
  57:17
  62:14
  70:15,17,
  18,21,24
  71:3,8,18
  74:6,7,
  16,19,22,
  24,25

75:5,8,
10,12
77:14,20,
23 78:3
82:19
90:22
97:8,10
98:17,21
102:16
104:12
129:13

honest
  32:24

honestly
  14:8
  19:21
  24:13
  31:2

hope
  171:7,9

Hoschton
  12:7

Hospitality
  14:24

hostility
  21:11

hour
  67:12
  131:25

hourly
  125:14,18

hours
  58:10,13
  59:4
  67:10
  72:24
  73:1,2,6,
  7,18
  76:7,8,16
  90:15
  93:10
  121:9,16,
  19,22

124:16
126:7
128:17
137:1
139:4
140:19
141:1,21,
24 142:3,
8,15,16
143:11,17
144:15
148:20
152:14,15
153:3,14,
16
175:22,24
176:6,9,
10,14,17
181:4

house
  80:20
  82:25
  130:15
  131:3,12
  181:5

huge
  59:7

Hugh
  164:3

hundred
  51:12,15
  102:1,11

Hyde
  5:5,7
  6:19 8:17
  32:13
  43:4,21
  53:4
  67:24
  69:2
  94:21
  112:20,23
  113:2
  132:10



157:23
182:24

**hypothetica
lly**
153:1

_____

**I**

**i.e.**
164:15

**identificat
ion**
15:12
17:13
18:8 31:6
40:17
41:3
48:20
59:14
60:2 63:7
84:2,10
91:2,21
123:14
144:22
145:3
153:25
156:18

**identified**
7:1 85:7
94:4
165:15
167:23

**identify**
25:4
35:24
36:9 43:7
48:17
145:22
168:5
175:1

**illegal**
26:15

**illness**

10:2

**image**
74:23

**images**
120:10,11

**imagine**
24:18

**Impact**
14:1,6

**implement**
126:6

**implemented**
88:19

**in-and-out**
124:16

**inaccurate**
7:24

**inadequate**
69:4

**incarcerati
on**
10:19

**incentive**
129:3

**incidence**
52:1

**incidents**
11:1

**include**
12:23
55:9
136:14

**included**
56:1 82:8
110:18

**including**
38:1 48:9

**income**
13:6

126:14,18

**incorrect**
80:6
108:8
115:9
153:3,16

**incorrectly**
133:12

**increased**
172:12

**independent**
27:12
33:7,12
37:11,15,
19 38:1,
8,24
39:3,8
99:13

**indicating**
50:3

**indistingui
shable**
108:19

**individual**
61:10

**individuall
y**
5:7 65:21

**industry**
58:1

**info**
16:18

**information**
133:20

**infrequent**
103:11

**initial**
32:6,17
33:24
34:1
70:22

**initialed**
32:22,25
33:2,16,
20,24
34:10
35:6,22,
25 36:4,
11

**initialing**
31:23
33:3,4
35:20
36:9

**initially**
39:21
40:3
42:11
52:15
54:18
71:10
123:5
124:12

**initials**
32:3,6
34:12
36:6

**initiated**
22:19

**input**
64:7
133:12
164:11
171:24

**inputted**
26:12

**inspect**
136:1
138:9

**inspecting**
56:1,5
138:5,18
139:17,22

**inspection**
138:11,23
139:19,25
140:3

**instance**
21:16
26:11
44:24
46:4
64:15
66:13,15
87:12,13
95:3
130:18
131:12,13
133:18
165:3

**instances**
65:24
66:16
67:2
73:11
91:10
97:25
98:12,22
99:6
140:4

**insurance**
46:7,13,
17,22
97:17
102:10,
15,20

**insurers**
102:17

**intent**
33:11

**intents**
82:13

**interact**
65:21

**interacted**
21:13



interactions
   61:3
   101:16

interest
   22:17
   52:7
   128:25
   159:6,7

interested
   55:17

intermediately
   117:14

Internet
   111:19
   115:6

interrogatory
   50:23
   99:20
   100:4
   135:10,
   16,21
   136:8
   143:10

interview
   16:14,15

interviewing
   57:13

introduce
   5:19
   145:1

invoice
   42:13
   43:8,22,
   23 45:6,
   9,22
   46:19,24
   47:1,4,7,
   18 50:7
   145:17

150:20

invoiced
   47:18

invoices
   40:9,11,
   23 41:11,
   14,23
   42:21
   45:11
   47:1,15
   48:8,12,
   14,17,23
   49:2,8,
   10,13
   50:9 53:1
   105:13
   147:21
   148:23

invoicing
   44:1
   47:19
   50:5
   147:16

invoke
   157:24

involved
   57:16
   59:10
   61:5,7,
   13,14,18,
   21 62:17
   63:2
   102:22
   106:10
   123:9
   167:13,
   16,22

iphone
   115:12,15
   116:9
   117:15,16
   118:1,3,
   9,18

irate
   91:13

irrelevant
   181:13

IRS
   156:12
   157:4
   158:2,19

issue
   21:16
   22:6
   26:22
   66:7 85:6
   94:22
   95:4,9
   106:10
   141:16
   147:17
   148:4

issued
   115:17,24

issues
   21:20
   22:5
   24:22,23,
   25 25:2,
   3,15,21
   26:1,5
   64:1 66:5
   91:11,12

item
   46:1,13
   179:11

items
   56:20
   59:2
   139:18

—————————

J

—————————

jacket
   120:6

January
   84:18
   87:21

Jay
   72:9 77:5
   146:7

Jeremy
   5:23 6:24

job
   16:7
   22:17
   31:3
   38:22
   53:21
   58:3
   78:9,12
   94:20
   104:24
   105:2
   124:2
   126:12
   127:7
   128:16,22
   130:5
   131:1
   133:12,13
   134:1,23
   135:24
   150:11,17
   165:17
   166:21
   175:16

jobs
   13:4
   105:25
   153:20
   167:11

Johnson
   23:3 54:3

join
   147:9

judge
   7:8

July
   21:4,5,20
   22:10

jump
   12:19,23
   42:19
   139:12
   140:7
   167:1,6

June
   30:16,21

jury
   112:11

—————————

K

—————————

K-L-A-M-U-E-L
   12:5

K-U-D-R-I-N
   70:4

Kenworth
   109:9

Kevin
   53:25
   54:1
   146:7,17,
   21
   148:10,15
   163:22
   177:8

kind
   47:23
   75:13
   97:4
   103:24
   110:11
   121:20
   157:18
   159:7
   171:13

King



15:1
23:18,22
24:4,6,8

**kits**
139:13

**Klamuel**
11:24
12:3,13,
14,15,16
13:4,7,9
27:7,8,9

**knew**
110:25
133:23

**knowing**
27:25
66:3
151:18,20
179:24
180:2

**knowledge**
169:13

**Kudrin**
70:2

—————————

L

—————————

**ladies**
5:2

**late**
21:20
22:9 59:6

**laundry**
120:21

**law**
5:13,21
11:6
33:13

**lawsuit**
130:24

**lawyers**
155:21

**lay**
144:16

**learning**
119:6
162:11

**leased**
14:13

**Leasing**
14:1,6

**leaving**
20:21

**led**
64:6

**left**
20:25
26:5
32:18
77:24
114:9
131:25
147:23
168:23
169:3
172:13

**left-hand**
93:20

**legal**
7:9,10

**legally**
29:20

**lengthy**
40:20

**letter**
150:3

**level**
11:11
64:4

**Lewis**

54:5
164:7

**license**
11:19
170:25
171:3,5,
12,15,21

**lie**
127:8,11
128:12,
15,18,23

**lied**
127:15,18
128:20

**life**
153:19

**lift**
108:24

**limit**
102:10

**lines**
99:6

**Linkedin**
16:10

**Lionel**
125:9

**Lisovskiy**
5:9 7:1
65:13
69:7,16,
20

**listen**
26:3
64:11
149:20

**lists**
161:15,16

**literally**
20:20
76:7,18
79:16,19

101:7
143:25
169:22

**live**
8:22 9:1
88:11
153:18

**lived**
8:20

**living**
150:15

**loaned**
14:11

**locate**
22:16
91:13

**located**
12:6

**location**
23:22
71:17
75:8,22
76:23
77:17,18
92:17
99:10
133:22
174:10
180:16

**lockout**
139:13

**lodging**
37:16

**log**
94:20
122:15,20

**logbook**
38:22,23
124:3,11
125:14

**logbooks**

126:1

**logged**
89:14,15,
16 123:12

**logs**
38:2
91:19
121:10,
16,23
123:6,9
125:15,
18,25
126:7
172:20

**long**
8:20,25
10:16
13:18,23
20:15,17
50:18
53:15
72:13
77:20
86:3
90:21
137:9
138:6,8,
11,25
139:16
168:25
179:24

**long-term**
112:5

**longer**
21:14
49:13
54:1
63:21
64:15
65:2,5,7
118:4
156:2,3
168:21

**looked**



87:24,25
105:13
139:19
147:21

**Loss**
158:22

**lot**
30:8
32:25
77:25
103:11
148:11

**ludicrous**
150:2

**lunch**
80:13

——————

**M**

**M-I-L-L-H-O-L-L-A-N-D**
113:14

**made**
26:11
62:3 98:1
99:15
105:21
126:9

**maiden**
112:21

**maintain**
53:23
121:16
123:6

**maintained**
34:7

**maintaining**
124:11

**make**
7:19
34:25

49:23
50:19
62:13
80:18
96:12
101:11
108:5
118:6,7
131:19
139:11
142:6
144:7
155:14,15
179:10

**making**
100:10
110:3
113:20
139:12

**Maksim**
5:9 7:1
65:12

**manage**
53:25

**managed**
65:12

**management**
21:17
58:13
75:14,24

**manager**
23:7,10
52:13,21,
23 53:3,
10,18,22
54:2,12,
18 55:2,8
58:7,9
60:12,14,
18 62:18
65:2,5,7
75:18
76:15,17
114:1

129:9
135:24
156:4
169:15
170:10
172:12

**manager's**
59:8

**managers**
54:7,10,
14

**manages**
65:14

**managing**
54:22
56:25
148:13

**map**
74:8,11,
13,15,16,
19,22
75:5,6,7
97:11

**mapped**
74:8

**March**
30:15
60:9
95:23

**marked**
15:11,15
17:10,12,
15 18:6,
7,11,16
31:5,8,18
32:9
33:6,16
35:24
36:14
40:16,19
41:1,2,5
43:4,21
48:15,19,

22 50:16
59:13,16,
24 60:1
63:6,9
84:1,4,9,
12 86:24
91:1,4,
20,23
114:18,19
122:7
123:13,
16,20
124:19
144:21,24
145:2,5
153:24
154:2
156:17,20
158:14
163:10

**market**
87:8

**marking**
39:13

**marks**
37:4

**marriage**
9:14

**married**
9:6 112:4
113:16

**materially**
159:18,25

**matter**
128:9
144:8
168:20
179:18
180:6

**max**
21:24
27:16,18,
19 28:4

56:23
65:13,20,
21,23
66:8,18,
24,25
67:3 68:4
69:13
97:17
125:14,24
130:18
149:15
151:4
166:1,3
167:4
174:25
175:2,5,
14 182:4

**Max's**
27:15
57:18
130:8,15

**meal**
80:13
150:16

**meaning**
78:5,6
81:6
100:10
125:24
133:6
135:20
141:22
163:19
174:13

**means**
38:10
42:25
73:5
117:8
122:3
124:5
125:22
126:14,17
139:24
152:16,23



153:12
157:11
160:1
174:6

meant
72:24

Media
5:3 15:5,
10 67:15,
20 132:3,
6 183:8

medical
74:20
122:21

meet
136:11
179:3

meeting
69:12
149:17,18

meetings
55:9
135:25
136:22
137:25

memory
42:21
61:4

mentioned
15:22
20:23
22:9
42:15
43:17
66:14
71:10
81:21
84:21
88:2,18
94:15,24
96:20
97:8
100:8

105:7
107:4
113:22
130:14
131:11
139:18
155:11,
12,17
177:6,9
181:11,13

mentioning
154:11

message
62:22
63:4,23,
24 85:11,
12 86:14,
18 87:4,5
124:22
136:6
141:15
150:5
154:9
164:18

messages
63:20
134:7
135:2
144:5

messaging
114:11

method
177:3

middle
158:11

middleman
57:5

mile
97:9

miles
38:20
102:11

Millholland
113:12

mind
7:18
19:13
25:22

mine
47:21
158:13
169:18
171:23
174:19
175:23

minus
46:10,17

minutes
136:24
137:11,
13,14,15,
19 138:12
141:2

missing
44:20

misstated
17:1

misstatemen
t
51:6,8

mistake
19:15

misundersta
nding
160:14

Mitchell
5:14

mixed
83:6
137:5
177:24

model
108:5

moment
15:3 29:8
31:11,17
40:20
44:23
45:3
59:18
64:12
68:10
135:9
182:21

Monday
86:17

money
44:8
56:13,14
69:11
151:4,6

monies
126:21

month
55:21,24

months
10:17
21:1,3
22:10
23:14
141:22
142:9
153:2
168:20

morning
5:2 60:23
140:4
143:15

move
54:21
68:18
123:19
131:7
180:18

moving
90:1

92:18

multiple
55:14
112:18

_____

N

_____

names
14:8,16
94:9
112:19
163:21

nature
21:25
137:4
173:12

necessarily
89:11
90:12
108:9
130:2
133:21
139:24
178:17

needed
22:6 44:8
57:9 59:6
91:11
104:18
121:16
123:9
125:25
128:14
152:7
170:15
178:9

negatively
129:25

negotiate
154:19

negotiated
172:14



negotiation
171:24

nephew's
178:19

night
82:4,14,
23 143:16
170:1,4,
8,11,14

nodded
81:25

nods
8:8 92:19

non-rote
165:9

normal
144:12
164:14

Northern
5:11

notation
44:25

notations
105:4

note
32:5
41:18
42:1
43:10
94:19

notes
96:4
152:14
182:22

nothing's
137:22

notice
6:6 15:16
51:2
78:11

notifying
21:14

notwithstan
ding
126:5

November
16:20,24
17:5 19:8
20:9
22:11
24:10
47:5 48:9
49:3,12
64:24
123:2
156:3

nowadays
24:3

number
5:3,9
15:5,10,
11 17:12
18:7,20
31:5
37:14
40:16
41:2
46:19
48:19
50:23
53:4
59:13
60:1,25
63:6
67:15,21
68:7,23
79:4
80:6,14
84:1,9
91:1,14,
20 93:18
99:19,20
100:4,14
104:2
119:3

123:13
132:3,7,
20,25
135:6,10,
16,21
136:8
144:21
145:2
153:24
156:17,20
161:15
163:12
165:5,11
168:5
183:8

numbers
153:12

numerous
59:7

───────────

───────────

O

objections
6:9 69:2

obligation
7:11

observed
175:22

obtain
11:14

occasion
79:11
133:16

occasional
67:1

occasionall
y
142:8
175:21

occasions
133:17

occupation
19:16

occupationa
l
46:7,13,
17,22

occur
55:12
138:21

occurred
72:6
107:1

occurring
103:9,15
134:9
137:6
141:3

occurs
167:14

October
23:13
43:22
44:16
53:4

off-call
153:20

off-the-
record
15:7
39:18
67:17
106:20
158:6
182:20,23

offense
26:23

offered
54:18,19
129:3

office
27:21
42:2

46:20
47:9,16
49:14,16
50:8,9
54:22
55:9 75:6
101:22
102:16,20
104:13
118:10

Offices
5:14

onboard
119:21

onboarding
31:21
52:5

once-in-a-
while
67:1

ongoing
26:23
148:4

online
16:10

operate
57:21
58:5
107:22
109:9
171:3

operated
80:20

operating
122:22
157:18
165:23

operation
123:10
159:19

opinion
62:23



opportuniti
es
  155:4

opportunity
  8:12 16:6
  23:2
  70:7,9,14
  81:4
  94:24
  119:5
  126:11
  127:20,25
  154:19
  178:13

option
  78:2
  104:21

order
  156:8

outlined
  97:13

overage
  102:3,5
  103:4,22,
  23 104:9,
  14

overages
  102:23,25
  103:9
  104:20

overcharges
  113:22
  117:2,8,
  17,24,25

overhear
  27:20
  69:20
  105:20
  173:2

owed
  151:19

owned

119:7
162:3

owner
  27:18
  65:15
  167:17

owner's
  119:9

ownership
  52:7
  128:25
  129:5,6
  159:7
  162:6

owning
  162:5

——————————

      P
——————————

p.m.
  82:8
  83:18,21
  90:13
  95:24
  132:2,5
  136:3
  144:11,17
  177:16

packet
  35:25

pages
  18:12,22,
  24 32:5
  34:15
  50:18
  70:11
  132:20
  135:14
  158:12

paid
  39:21
  41:16
  45:14

80:24
101:21
102:21
143:16,21
145:14
147:25
149:3
150:13
153:20
173:14
176:21
181:20

pair
  111:24

panties
  111:24

paper
  17:8 18:1
  33:23,24
  121:20
  124:15
  152:16
  153:11

papers
  32:25
  33:1,4,25
  34:12
  39:11
  70:18,19,
  20 71:8
  85:16
  93:6

paperwork
  35:21
  36:24
  38:2
  39:14
  71:24
  103:6

paragraph
  17:17
  145:11
  167:25
  175:25

parent
  14:25

parole
  29:17

part
  33:20
  36:24
  71:4
  76:15
  79:8 83:7
  106:14
  133:9
  139:17,
  22,24,25
  160:17
  161:15
  162:3,5

participate
  159:18
  160:1

participate
d
  162:5

participati
on
  161:11

parties
  33:11

partner
  112:6

parts
  58:25
  165:6

party
  80:19
  178:19
  181:11

pass
  61:21
  164:17

passed
  61:14

150:25

passing
  61:11,15

pay
  42:16,23
  44:19,25
  45:6,9,14
  47:23
  48:2,3
  51:4,7,
  13,16
  68:1
  69:18
  81:1
  102:12,13
  104:22
  105:13,15
  106:6,11
  107:2
  142:20
  153:22
  154:15,20
  155:1,5
  171:23
  172:19
  173:16

paycheck
  150:18

paying
  44:16
  102:3

payment
  42:13
  56:15
  101:20
  103:4
  114:14

payments
  40:6
  101:18
  115:15
  153:8

pays
  37:25



104:9

**Peachtree**
5:14

**pending**
78:4,5
163:7

**Pensacola**
10:13

**people**
25:11,12
51:11
61:8
157:13
160:3,23

**percent**
34:13

**performance**
63:25

**performed**
69:4
132:12
164:10,23

**performing**
97:4
130:11
131:22
133:4,7,
11 134:24

**period**
16:19
20:16,25
21:6
23:12,13,
14 29:25
30:4
47:19
48:8,13,
18 49:3,
8,12
50:4,12
60:11
64:14
65:6

72:12,25
83:10
99:12
116:4
117:6
118:1,18
120:23
144:10
154:12
155:20
168:25
169:6,11
177:10

**permitted**
77:10,16
82:19
83:11
87:18
181:24

**person**
25:1
32:20
39:22
55:9
113:19
122:22
126:21
162:2

**person's**
161:2,8,
10

**personal**
56:13
78:23
79:1,9,
12,23
80:2,16
81:11
83:24
87:9,14
105:15
113:24,25
114:7
115:11
117:4

129:13
133:13
137:4
156:9
178:15
179:11
180:5,8

**personally**
105:3
168:2

**personals**
116:3

**pertaining**
66:5

**Phillips**
112:20

**phone**
80:24
81:1 89:6
110:9,13,
16,20,24
111:7,12,
16
113:21,24
114:4,7,
14 115:5,
6,11,16,
17 116:1,
2,11,13,
16,17
117:3,4,
5,7,9
133:14
135:2
144:6

**phrase**
97:1
174:13

**phrasing**
78:7

**physical**
71:20,23

**physically**
69:19

**pick**
87:9

**picking**
67:23
92:17

**picture**
75:3

**piece**
17:8
147:12

**pieces**
107:8,10
109:25
110:6

**pile**
31:14

**pinpoint**
103:21
110:23

**pins**
75:7
97:11,13

**pipe**
130:4,14,
15,18
131:11,12
165:3

**place**
95:12
129:14
137:2
165:13,
19,25
166:9
167:4,6

**plain**
47:6,15

**plaintiff**
5:22

17:21
69:6
79:11
133:6,13

**plaintiffs**
183:3

**plans**
154:15

**play**
181:5

**pleading**
19:15

**pleasure**
179:15

**pocket**
102:13

**point**
7:23
13:10
16:2 21:9
22:20
24:12
40:8
41:16
42:16
43:25
45:13
53:2
57:19
59:8
60:17
64:3,17
78:3
81:22
83:11
84:22
85:5,23
90:24
107:21
108:11
109:8
116:10
119:16
121:14



127:6
128:24
129:6
142:7
144:13
147:17
149:8,16
150:25
168:19
182:12,13

**pointed**
74:9

**pointing**
74:14,18
93:17

**points**
111:14

**policies**
168:3,15,
16,18
174:19,
21,23
175:1,2,
15

**policy**
102:15
122:20

**pool**
112:11
181:5

**poorly**
174:13

**portion**
19:3 71:2
102:17

**position**
12:10
23:6,24
169:15

**positive**
103:20

**possibility**
121:14

**possibly**
19:20
103:10
155:18
178:20

**post**
37:21

**posting**
16:7

**potential**
89:10
105:6,7

**potentially**
55:22
58:2,11
64:19,25
91:6
100:15
105:11
107:20
111:20
178:22
182:1

**pounds**
38:18
107:25
109:12

**preceding**
36:20
135:6

**precise**
140:24

**predates**
19:25

**preemployme
nt**
37:21

**present**
7:8 69:19

**presented**
74:22
122:1

**presume**
119:9
125:2

**presuming**
27:24

**presumption
s**
35:1

**pretty**
57:2,5
67:3 73:6
88:8
96:13
128:6
144:18
149:19
155:10
169:25
170:10
182:10

**previous**
43:14
63:20

**previously**
7:2
15:15,22
23:9
50:16
122:7

**primarily**
77:7
97:23
165:23
177:5

**primary**
55:5

**printed**
50:8 95:6

**prior**

13:9
53:13

**prison**
10:14

**private**
33:18

**probation**
29:17

**problem**
27:1
96:10

**Procedure**
6:5,8

**proceeding**
7:9 8:2

**process**
16:5
41:15
42:12
57:13
61:15,18,
19,21
139:16
165:21,25
166:9,10,
12,13,15,
21,24,25
167:1,9,
12,13
179:4

**processes**
165:13,19
166:16,22
167:23

**produce**
20:1
156:12

**produced**
35:18
49:20
50:11
134:8

144:8
155:23
157:6
158:18

**product**
93:2

**production**
156:9
157:5
158:2

**Profit**
158:22

**progressed**
138:3

**prohibited**
179:13
180:10,12

**prohibition**
182:3

**promotion**
60:18

**properly**
92:23
142:25

**property**
71:19
131:5

**proposed**
53:18

**proprietor**
158:24

**proven**
182:14

**provide**
26:9
124:14

**provided**
74:17
97:18
115:12



120:11
121:18
124:13

**providing**
164:25

**punished**
51:3
105:11

**punishment**
105:6

**purchase**
56:18,20
139:3

**purchased**
114:3

**purchases**
113:20

**purchasing**
120:14

**Purely**
152:3

**purport**
35:15
158:21

**purpose**
6:7 25:9
56:16
171:6

**purposely**
128:20

**purposes**
21:14
33:14
44:4
57:20
64:8
73:25
82:14
89:1,13
112:11
147:3

175:25

**pursuant**
6:5,6

**put**
31:1,3
39:11
95:7
104:2
140:16
143:14
161:17
165:13,
19,25
166:9
167:4,6,8
170:8
172:13
182:17

**puts**
72:20

**putting**
139:10

─────────

**Q**
─────────

**qualifying**
112:11

**question**
6:10 7:15
8:11,13
9:24 48:1
86:7
100:5
119:4
126:25
153:11
157:14
159:17
163:5,7
171:14

**questioning**
115:10,12

**questions**
7:3,13
37:1
182:25

**quick**
67:13

**quit**
19:19
24:4,6
42:22,25
43:17
64:13
124:17
151:7
156:2
172:8

**quitting**
24:8
172:7

─────────

**R**
─────────

**radius**
75:7
90:22
97:10

**raise**
43:1,13
44:4
53:7,13
60:17,19
69:8
147:17,24
155:16
172:3,11

**raised**
69:2

**raises**
171:25

**raising**
155:11

**Ram**

107:22
108:12,16

**ran**
39:14,15
164:14
168:18
170:18

**random**
37:21
55:13,15,
19 80:19
103:12,
14,21
104:2
137:16

**range**
101:1

**rare**
100:16
134:10,11

**rarely**
52:3
101:22,24

**rate**
42:23
102:8
145:17
172:14

**rating**
107:11
108:22
109:5,12

**reach**
11:12

**reached**
64:4 86:4
88:15

**read**
17:19
29:13
33:10
59:18

62:6
63:11
87:1
115:1
122:11,13
132:25
135:16,20
163:13
172:16
183:5

**reader**
117:13

**reading**
85:15
154:6

**ready**
60:24
62:8
80:25
128:10,11
174:4,8,
14 178:10
179:6,19,
22 180:4
181:3,6
182:17

**real**
24:2

**realize**
7:22

**reason**
21:10
22:14
24:20
26:5
85:22
92:22
95:9,20,
25 96:3
108:7
113:15
136:7
142:21
143:4



155:19
172:20

**reasonable**
37:21
53:24

**reasons**
91:15

**recall**
13:19
14:3
15:24
16:7,19
18:2
20:15
21:9
23:5,21
30:7
31:2,25
32:2,8,22
33:3,4,19
35:20
36:8
39:20
40:13
42:19
44:3,11,
14 45:10
50:4,13
52:1,25
53:15
54:17
60:21
63:1
64:20
65:24
66:2,7,
10,18
70:6,13
72:5,7
78:25
81:20
86:8,11
88:10
91:8
95:8,11,

19 98:9
99:15
105:22
121:20,24
123:8
129:7,17,
22 130:11
131:14,
16,18
132:17
134:8
136:16
146:24
147:2
148:16
150:1
159:16
161:9
165:10
168:24
173:8,21

**recalling**
88:25

**receipt**
122:18

**receipts**
26:12
119:15
123:11
161:15

**receive**
38:8,12
52:6 69:7
78:11
133:13
155:16
171:2

**received**
43:12
45:11
69:3
144:5
152:12
153:22

158:3
170:25
172:1

**receiving**
44:4

**recess**
132:4

**reciprocate**
25:2

**reciprocate
d**
21:18

**recognize**
15:17
36:23
37:10
41:18
44:15
63:14
94:7

**recollectio
n**
28:23,24
46:21
94:23
100:25

**record**
7:2 8:16
15:3,5,
10,14
67:12,15,
20 68:13
132:1,3,6
134:20
183:8

**recorded**
90:4 97:5
133:14

**recording**
96:19

**records**
17:3 18:5

19:2
20:5 33:1
34:8
155:22

**Recovery**
13:11,14,
21 28:17,
22,23
29:5

**recurring**
27:1

**red**
109:22

**refer**
18:5
58:22
78:9,12
125:7
145:21
176:24
177:13

**reference**
75:3
110:3

**referencing**
19:14

**referred**
75:24
161:6

**referring**
58:22
76:12
78:18
83:4
85:18
110:2
141:23
143:12
149:21
163:16,20
165:18
175:9
176:1,24

**refers**
100:8
133:25

**reflect**
48:1
87:4,7
118:2
128:8

**reflected**
100:22
132:13
147:20
160:18

**reflective**
47:22

**reflects**
43:21
85:13
86:14
95:24
128:9
142:15
161:14

**refresh**
28:23
42:21
61:4
94:23

**refreshes**
28:24

**refused**
172:23

**refusing**
106:5
173:9

**refute**
85:21

**registry**
74:20

**regular**
65:18
82:7



112:2

**regularly**
175:21

**rehire**
65:1

**rehired**
23:4
64:13,20,
21

**reject**
90:25
91:6
94:25
149:1

**rejected**
95:3
105:1
149:7

**rejecting**
104:24
105:18,25

**related**
56:8

**relationship**
16:2

**relied**
122:4

**remain**
174:1

**remember**
6:18 9:22
10:18,21
13:23
23:1 30:9
31:22
39:24
66:3,12,
16 71:3
86:10
88:19
123:23

129:18
130:24,25
140:14
141:12

**remotely**
128:21

**renders**
102:2

**repair**
58:25

**repaired**
99:11

**repeat**
27:5

**rephrase**
7:14

**replacement**
140:3

**report**
57:2,3,4,
5 71:22
92:3,9

**reported**
21:13

**reporter**
5:16 6:1
8:5 11:25
12:4

**reporting**
26:1 55:9
63:19

**represent**
5:17 6:25
15:16
87:24
94:20
134:6
147:9
152:12

**represented**
87:20

108:6

**representing**
147:6,8

**request**
68:6,23
69:1
79:4,5
132:20,25
133:5
135:6

**requesting**
157:2,3

**require**
70:22
89:5
174:9

**required**
38:22
71:22
74:1
119:17
124:2,12
173:25
174:14,20
175:14

**requirement**
74:4
110:11
178:6

**reserved**
6:10

**residence**
8:18

**respect**
61:3

**respond**
80:21
81:2
94:12
95:9
178:10

179:1
180:17,19

**responded**
16:8,9,11
79:10
154:13,14
157:4

**responding**
73:9
78:15,24
80:15
81:9
88:25
89:23
90:4,5,9
92:24
93:14
96:19
101:17
122:4
129:10,
15,24
130:13,17
131:8,21
142:16

**response**
29:16,18
51:14
69:5,8
80:5,14
88:1,6
100:5
132:19
133:5
134:23
136:8
140:21
143:10
157:24

**responses**
8:3 37:3

**responsibilities**
12:12,16

79:9,12
80:2,17
81:11
129:23

**responsibility**
55:6 56:1
182:11

**responsible**
37:15
38:10
102:3
104:13
120:14
178:2

**responsive**
166:8

**resting**
75:10
174:7

**retain**
33:12

**retrieve**
98:6

**return**
24:4
70:23
123:19
132:18
162:9

**returned**
42:23
43:12

**returns**
156:9,12
157:3,6,
10 158:3

**review**
18:16
28:13
36:16,21
41:6,8



45:18
50:24
70:15
84:6
100:5
145:8
162:7,9

**reviewing**
29:21
31:22
50:18
57:10
123:23

**revoked**
171:17,19

**Reynaldo**
63:2,19

**Richey**
5:16

**Rick**
5:15 15:2
67:11
132:8

**rid**
141:14

**ridiculous**
128:2

**rights**
157:24

**ring**
14:7

**road**
5:8,15
6:25
37:16
58:17
122:19
159:2

**roadside**
12:17,22,
24 55:7
133:7,11

164:25

**role**
24:11
27:12
39:8
52:13
53:12
54:18
55:8
56:8,24
58:7
62:17
65:2
75:18

**roles**
53:10

**rollout**
119:20

**rote**
164:10,
12,20,23
165:1

**roughly**
78:20
118:19
158:10

**round**
139:4

**route**
92:11
133:22

**routed**
134:1

**routine**
164:10,
12,20,23
165:2,9

**RS**
37:25
38:11

**rules**
6:5,8

63:3
168:10
174:19,
21,22
175:5

**run**
178:14
179:10
180:5,8

**running**
110:25
115:7
126:3

─────────

**S**

─────────

**safety**
56:8
119:25

**salary**
147:18,21
148:19

**sales**
161:16

**Sanford**
5:21

**Saturday**
42:23
64:14
86:17
88:2,3

**scale**
171:23

**schedule**
66:21
67:6
75:11
86:9
144:12
158:9,22
159:10
161:12

170:13
175:20
176:8

**scheduled**
76:15
77:4
79:8,13
83:22
142:19
143:15
144:2,3
174:2,3
175:21
176:20,21
178:19

**schedules**
169:19,25
170:19
175:23

**school**
11:9

**Scott**
8:19

**Sean**
5:21 6:9
158:10,11
183:1

**search**
74:20
100:13

**Security**
38:12

**seeking**
153:7

**seldom**
103:11

**seldomly**
117:20

**self-
explanatory**
96:13

**sell**
155:6,8

**send**
76:8
133:19
156:25

**sentence**
33:9,10

**separate**
11:1 77:2

**separated**
77:2

**separation**
65:4

**September**
5:5

**serve**
10:14

**served**
23:9

**service**
5:9 6:25
12:17,22,
24 14:22
55:7 93:8
97:18
102:2
120:18,21
121:10,
16,22
122:19
126:7
133:23
143:7
164:25

**services**
93:1
133:8,11
159:2
171:24

**serving**
39:7



156:3

**set**
50:11
66:21,24
94:19
129:23
136:6
145:17
174:22
175:1

**setting**
169:19

**settlement**
38:12,13

**settlements**
38:3

**shakes**
129:25

**shameful**
149:17

**shift**
71:11
73:4,7,15
76:3,6,
13,19,22,
24 77:3,
11,14
82:3,4,5,
7,14,16
83:8,10,
12 84:21
85:9,24
86:9,11,
15 90:12
92:15
93:10
94:11
97:3
103:15
110:10,16
125:18
138:16
140:22
143:20,21

144:11
169:23
170:1,2,
6,8,11,
14,18
176:14,24
177:1,13,
15,20,21
178:2,3,
4,6,21
179:5,8,
17
180:16,20
181:19,20

**shifts**
67:9
72:18
73:2
89:13
90:3
127:25
128:3
169:20,24
170:20
174:2

**shop**
75:8
99:11
136:12

**short**
5:21
6:12,16
9:18
15:22
23:18
43:17
116:18
157:23
168:25
169:6,11
183:2,5

**short-lived**
168:20

**shorter**

72:25

**shorthand**
38:17

**shortly**
124:17

**show**
35:5 49:5
65:15
74:9
142:12
158:21
175:7

**showing**
20:6

**sick**
51:3,12
52:3
81:24
88:10

**side**
54:22
119:10

**sign**
34:19
39:12
70:15
183:5

**signature**
6:14
32:2,9
34:18,20
37:7
122:25
183:4

**signed**
32:1
35:2,16
39:16

**similar**
123:10
151:6
175:19,23

**similarly**
5:8

**simply**
61:11
62:21
71:14
126:2
133:16
162:8
181:11

**single**
127:22
128:5
130:21

**sir**
11:20
12:24
13:2,5,8,
25 16:21
18:17
21:2
28:1,12
31:2,24
32:7 35:7
36:7,12
37:18,24
38:6,15
39:9 40:4
44:18
46:25
47:6
49:10
55:24
56:3
61:20
66:12,16,
25 68:13
70:5 71:1
75:2
81:3,5,14
88:16
89:24
90:2
93:16
96:16

98:20
99:5
100:21
101:3
103:19
107:6,9,
17 120:7
121:2
122:2
125:12
126:16,
19,22
132:14
136:18
139:15
140:4,12,
20 142:12
150:21
152:10,
17,21
160:2,23
161:18
162:3
163:7
165:17
167:8
171:20
175:7,10,
12,18
176:4,18
180:2,24
181:17,23
182:25

**sit**
110:23
130:21
137:12
148:14

**sitting**
73:23,25
129:12

**situated**
5:8

**six-day**
176:8



size
  107:18

sleep
  83:12,13

sleeping
  81:22
  82:20
  85:23
  86:3,10,
  11 88:7,
  15 144:12

smaller
  110:3,4

Smith
  112:20

Snappy
  13:11,13
  28:16,22,
  23 29:5

Social
  38:11

software
  88:21
  89:25
  143:1

solid
  101:10
  131:20

solo
  72:14

Solutions
  5:18
  14:22

somebody's
  26:2

someone's
  26:16
  80:19

sought
  164:11

sound
  14:7 21:5
  22:11
  24:16
  72:12
  82:8
  134:13
  153:16
  155:16

sounds
  14:17
  21:7
  55:20
  102:7
  178:12

South
  98:1,6,24
  99:8,15
  100:10,20
  101:12

span
  48:8

spans
  135:12

speak
  21:23
  27:19
  64:10
  65:23
  70:1
  146:12
  149:12,15

speaking
  25:5,7
  46:14
  47:6 70:2
  139:21
  146:1
  162:23
  165:14,16

speaks
  38:16
  155:3
  163:20

173:24

specific
  25:21
  26:19
  95:2,19

specificall
y
  21:4
  66:10
  96:17
  145:22
  148:14
  175:14

specifics
  72:16

spell
  8:16 12:4
  112:10,14
  113:9,13
  164:4

spend
  77:13,21,
  22 79:11
  127:16

spending
  140:7

spent
  122:4
  133:6,9

split
  72:8
  99:17
  132:23

spoke
  20:13
  44:3 58:4
  61:23
  64:12
  69:9
  139:16
  148:15
  172:19

spoken
  97:9
  149:11

sporadic
  179:17

square
  115:14
  171:25

staff
  14:1,6
  49:16

staffing
  14:4,18,
  20

stamp
  43:7
  45:18
  94:1

stamped
  18:19
  29:8

stamps
  92:11

stand
  136:25
  137:18

standard
  16:17
  53:24

stapler
  68:11

start
  19:23
  27:23
  41:23
  42:3 47:2
  106:6
  119:17
  167:1,6

started
  16:23

20:22
  22:25
  23:18
  39:16
  40:14
  52:24
  72:10,17
  115:13
  116:1
  124:15
  141:9,24
  160:12

starting
  30:23
  121:15

starts
  12:19,23
  158:9

state
  8:15,18
  9:3 26:15
  33:13
  69:5
  74:15
  99:6
  100:17
  101:12
  133:16
  141:20
  171:22
  174:13

stated
  16:13
  30:21
  51:21,22
  81:15
  100:9
  103:1
  106:24
  118:13
  126:16,19
  148:5
  164:22
  165:22
  173:17



174:25
182:15

**statement**
26:11

**states**
5:10 18:1
29:10
46:2 51:2
60:22
94:21
115:6
122:14,18
124:1
133:5
154:16
160:11
163:12
164:9
174:18
176:5

**static**
24:22,23

**stating**
100:18
142:5
161:14

**status**
33:7,12
39:3 64:8
98:9

**stay**
174:5

**stayed**
74:24

**step**
133:23

**stick**
25:21
121:21

**stock**
52:7
129:3

**stocks**
162:4

**stop**
141:10
179:4

**stopped**
22:10
50:5
80:24
90:1,18
141:13

**straight**
90:15

**Straightening**
139:9

**strap**
140:1

**straps**
59:1,3
136:11
139:11

**stripes**
119:25
120:4
121:6,8

**stuff**
25:9 31:3
39:13

**style**
109:20
110:4
121:5

**subject**
16:1
105:24
156:8

**subjected**
37:20

**submit**
20:7

40:9,11
42:13
47:7
48:14
49:10
149:1,5,6

**submitted**
40:24
47:11
48:12,18,
24 49:3,
9,13,25
50:14
156:11

**submitting**
148:23

**subparagraph**
33:7

**substance**
22:3
27:25
28:3 44:6
63:17
66:4,19
151:3

**suffer**
10:1
182:13

**sufficient**
26:7
147:18
148:20
149:10
151:16
155:1

**suggest**
108:3

**suit**
120:7

**summarize**
81:7
98:22

162:24

**summoned**
55:11

**supervise**
65:17

**supervised**
65:10,20

**supervisors**
164:11

**supplied**
29:14
64:8

**supplies**
56:11,14
58:20
136:1
138:24

**supply**
112:19

**support**
38:2

**supposed**
25:1
128:10
129:19
181:6,8

**Susan's**
50:7

**Susie's**
181:5

**swapped**
138:23

**swear**
6:2

**switch**
58:16
72:2

**sworn**
6:3,20

**system**
38:4
75:14,24
121:18

———————

T

**T270**
109:9

**tag**
47:12

**taking**
15:16
41:16
129:13
178:3
179:21

**talk**
22:24
25:11
26:2 59:7
66:25
67:1 97:7
106:16
136:10
137:12
146:10
149:9
172:3

**talked**
9:22
21:17
22:24
95:6
112:24
137:7
146:13
147:19
148:11,17
157:20
162:4

**talking**
63:21
67:8



71:20
108:23
115:10
136:15
137:10,
17,19
138:3
145:23
148:12
151:13
153:10

**taught**
137:20

**tax**
156:9,12
157:3,6,
10 158:3
162:9

**taxes**
38:10,11
157:14,
19,22
159:5,11,
15 160:3,
23 161:6

**teach**
38:23

**tearing**
63:22

**technology**
75:19

**telling**
62:12
74:23
119:7
126:2
136:18,19
147:2
160:22
162:19
182:11

**tells**
7:4

**template**
47:20,21

**ten**
9:2,3,12,
13 102:12
112:25
113:17
134:16
136:23
137:11
141:1

**tend**
30:22

**Tenth**
11:13

**term**
61:20

**terminating**
63:2

**terminology**
78:12

**terms**
134:22
138:18

**test**
37:22
71:6

**testified**
6:21
28:10,21
61:2
67:25
70:6
80:12
93:9
105:12
112:3
118:14
129:2
135:23
136:5
144:4
170:24

177:23
181:25

**testify**
145:20
149:9

**testifying**
7:10 71:7
132:11
146:11

**testimony**
10:2 35:4
49:11
51:7
61:12
90:21
115:8
130:10
131:6
132:15
133:3,15
136:4
145:13
148:18
178:5
179:9

**text**
85:12
86:14
87:4
111:3
133:19
134:7
135:2
136:6
141:15
150:5

**texted**
22:23

**theft**
10:7

**theoretical
ly**
65:14

**thing**
11:2
26:19
46:18
67:4
99:10
100:12
118:9
141:1
160:10
166:2,4
167:5

**things**
25:23
58:15,16,
22 59:8
63:22
78:1
111:17
127:1
136:2,15,
20 139:8,
22 140:5,
24 150:17
168:18
177:25

**thinking**
130:21

**thinks**
125:14

**thought**
61:24
125:25

**thousand**
44:13,16
151:9
155:13,17
156:5
172:14

**threat**
173:12

**threaten**
173:7,9

**threatened**
106:11
172:22
173:3

**threats**
105:20

**thumb**
31:17
50:17
91:17
92:5
93:18

**thumbs**
129:20

**Thursday**
20:22

**tied**
53:7
178:25

**time**
5:6
10:14,18
13:11,19
16:19
20:16,25
21:2,5,9
22:12,20
23:5,15,
16,19
24:8,12,
19 26:17,
21,25
29:19
31:1,21
33:3,16,
17 34:8
39:7 40:8
41:16
42:10,16
43:12,16,
25 44:4
45:4,13
48:18
49:8,12



50:4,12
52:5 53:2
54:9,15,
25 56:21,
22 57:19
58:8,13
60:12
62:24
64:3,14
65:1,3,6
67:7
70:14,24
72:12,17
73:15
75:15
76:2
77:8,13,
21,22
78:3
79:8,11,
21,22
80:15,16,
22 81:21,
23,25
82:20
83:2,5,
11,13
84:22
85:5,8,
19,20,24
86:6,10,
21 87:25
88:7,9,10
90:8,24
92:10,11
93:15
94:1
95:19
96:19,23,
24 97:25
98:1
99:19
100:19
101:20
103:3
107:21
108:11

110:7
111:3,14
114:1,3
115:13
116:4,10,
18 117:6,
17 118:1,
18 119:16
120:23
121:14
122:4
125:19
127:7,12,
13,15,16
128:10,
14,17,24
133:9
134:18
136:21
138:3,20
139:3
140:3,6,
16,24
141:16
142:7
143:13
144:10,13
147:17
149:22
150:1,25
151:6,16
152:13
153:8,19
154:12,25
155:4,14,
20 156:2
169:1,8,
11 173:25
174:14
175:11
176:22
177:10,15
178:15
179:2,7,
22 180:3,
20
181:15,

19,21,24
182:1,25
183:2

times
8:4 19:18
20:19
25:25
30:18
43:19
50:6
55:14,17,
21,23,24
56:23
65:25
66:1,18
69:8
78:23
90:17
92:23
93:13
99:17
100:9,10
101:8
103:21
104:10
117:21
128:15
133:18
136:9,23,
24 137:21
139:2,6,7
141:4
142:12
145:16
162:25
172:24
181:3

timing
179:9

tire
12:19
166:25
167:7

tires
56:6

title
53:18

today
7:19 8:2
10:2
15:17
113:16
130:22,24
182:25

Today's
5:5,13

told
23:2
40:11
42:14
51:9,10,
11 95:8
101:13
106:1
115:21
120:19
128:16,19
140:23
148:25
149:5
150:11,24
157:13
160:2
161:9
172:24
173:19,21
181:1

tomorrow
154:14

top
41:18
47:12
55:2
74:19
122:14

tore
57:4

total
162:14

touched
141:19

tow
13:1
16:10
55:6,7
88:22,24
98:9
107:5,7
109:19
125:17
130:4,7
171:3

Towbook
26:13
75:21,25
88:18,21
89:14,15,
21 90:4
92:3,16,
23 93:1
94:20
96:18
97:5
100:13,
18,20,22
110:14,
15,25
114:11
117:23
118:1
122:3
128:8
129:11
131:21
132:13
133:8,12,
14,21
134:1,5,
24 136:5,
7 142:12,
15,24
143:2,3,7
176:17

Towbook's



133:18
142:3

**towed**
98:13
130:25

**towing**
5:8  6:25
11:24
12:20,23
13:16,20
16:2,3,6
18:19,23
19:3,4,11
20:10
22:15
27:4,8,9,
12  29:22
30:10
32:10
37:25
38:11
40:10
41:11
45:14,18
52:7
54:17
57:20,21
58:1,5
69:3
119:10
122:19
126:3
130:5
133:8
159:1,7
164:25
166:7,25

**track**
43:3,21
89:2,8,21
96:21
121:19
157:5
176:16

**tracking**
24:5
75:14
92:10,23
122:4
142:25
155:15

**tractor**
109:14
110:1,2

**trailer**
110:2

**training**
57:7

**transfer**
98:7

**transport**
98:7

**transportat
ion**
75:13,24

**transportin
g**
38:16
98:23
124:1

**trial**
6:11

**trip**
85:6
134:7
139:4
172:20

**trips**
94:25
98:1
99:15
100:10
101:11
134:8

**truck**
13:1

16:11
22:6
39:14
58:21
63:20
75:17
77:22
83:23
87:9,13,
17  107:5,
7,19
108:5,13,
15,17
109:6,19
110:3,4
129:12
131:4
136:11
138:9,11,
22  141:19
174:7
178:10

**truck's**
140:1

**trucks**
53:23
56:2,5
57:17
58:15,17
62:14
119:8
136:1
137:18
138:6,13,
17,19
139:10,
12,17,23
171:3

**true**
51:18
93:12
95:15
113:25
114:3
176:7

**truth**
7:11,12
128:13
160:22

**truthfully**
7:4

**turn**
18:22
28:9  29:9
33:5
36:15,16
37:1
50:22
69:12
103:5
122:9
144:25
145:10

**turned**
28:7  38:3
82:3  86:9
118:3

**turning**
28:6
29:7,10
61:8  62:5
68:6  79:3
86:23
91:16
92:2
114:25
135:5
152:8
163:9

**Twiddling**
129:20

**two-and-a-
half**
139:4

**two-day**
20:21

**two-page**
36:19

**type**
99:1
147:21
148:4

**types**
136:14
137:25

**typical**
90:2

**typically**
138:17

————————

U

————————

**Uh-huh**
18:17
28:12
37:18,24
54:13
63:13
78:17
84:17
86:25
93:16,25
98:18
113:6
124:4
125:16
167:15
172:21

**uh-huhs**
8:9

**ultimately**
151:10,14

**underestima
te**
103:8

**underneath**
37:13

**understand**
7:13,16
9:24  26:4



33:19
37:17,23
38:4,13
42:12
61:20
80:10
104:6,7
114:4
120:8
142:6,11
153:10
160:4
161:18
174:24

**understandi
ng**
27:14
33:15
39:6
78:10
96:12
142:10

**understood**
7:5 8:7,
14 117:1

**undertaking**
129:23

**uniform**
119:20
120:5,7,
8,13,23
168:17,19

**uniforms**
119:17,
24,25
120:3,11,
15 121:3,
4,7
168:24
169:2,4,
6,8

**United**
5:10

**unsure**
34:11

**updated**
122:21
133:22

**upgrade**
108:12

**utilize**
110:9

**utilized**
107:8
110:6

**utilizing**
116:11,13

——————

**V**

——————

**vacation**
127:20,22

**Valeria**
94:4,6,9,
13,15
101:19

**valuable**
58:1

**valued**
150:17

**van**
99:7

**variations**
109:24

**varied**
59:5

**vehicle**
91:13
107:11,
15,24,25
108:22
109:5,11,
20,21

**vehicles**
38:17
98:6
122:22
124:2

**verbal**
105:4,10
151:1

**verbalize**
8:3

**verbally**
51:23
106:1
150:24
173:11

**vernacular**
82:18

**version**
35:6

**versus**
5:8 8:6
23:7
82:16
128:13

**VIDEO**
15:6,8
67:16,18

**video-
recorded**
5:4

**view**
59:9

**viewpoint**
96:18

**Viktoria**
94:9
101:19

**violating**
63:2

**visibility**
120:3

121:7

**visit**
181:11

**volume**
73:21

——————

**W**

——————

**W-2**
38:9

**wait**
74:5
77:19

**waiting**
77:14,22,
23 90:18
129:13,20
178:14
179:8
180:16

**waiver**
6:14

**wake**
85:8
86:15

**walk**
172:3

**wanted**
77:18
79:23
110:19
119:18
120:10
123:11
127:12
148:1
151:7
154:12,25

**wanting**
45:7
80:11
143:24

**wash**
120:17

**washed**
120:18,20
131:2

**wasting**
150:25

**watch**
130:22

**ways**
13:6
98:15
126:25

**wear**
120:23
168:17

**wearing**
119:17

**week**
42:11
43:11,14
44:17
47:18
55:17,18
77:4
103:17,21
104:10
117:21
137:24
138:4,21
140:6
141:4
143:11,15
153:14
156:4
175:22
176:7

**week's**
173:16

**weekend**
20:24
43:18



**weekly**
40:6
41:16
42:16
45:14
58:8 67:6
145:14,17
147:16
148:23

**weeks**
20:25
24:9
55:19

**weigh**
108:25

**weight**
107:11,16
108:22
109:5,11

**weighting**
107:24

**Whatsapp**
60:5 62:9
63:14
84:15
86:14
87:5
111:4
124:21
154:9

**wheel**
108:24

**wife**
111:25
112:4,5,
12,13
113:5

**willy-nilly**
79:23

**winch**
140:7,24

**winches**

**wind**
139:10

**wind**
22:22

**Winder**
8:19
23:23
98:17

**withhold**
26:16
38:11
173:15

**woke**
85:3

**woken**
85:13

**woman**
85:7

**word**
79:19

**worded**
174:13

**wording**
69:10

**wore**
120:6

**work**
13:11,18,
20 14:1
16:3
19:17
21:11
23:14,20
25:9
29:25
30:2,13,
15 37:13
44:20,21
54:12
57:3
66:8,21
69:4
71:15

**work**
73:7
76:7,9,19
77:4
83:16
97:4
102:19
114:8,10
115:17
130:12,13
131:8,22
132:12
133:4
134:23
136:5
138:15
143:2,20
144:2,3,
14 146:20
150:10,15
154:12,
20,25
155:2,7,
10 167:11
169:18
170:19
172:25
173:25
174:4,14
175:22
176:6,8,
20,21
178:19
179:15

**worked**
13:13,23
14:4,21
15:24
19:18
20:16
25:25
27:3
30:18,21
31:4
64:16
65:6
82:23

**working**
126:14
127:20
142:13
146:22
148:4,20
153:14
159:23
168:3
169:23
172:8
175:19,24

**working**
13:9
14:10
16:23
17:24
22:10
25:1
39:16
54:12
67:5
72:14
73:9,10
76:16
82:14
96:25
115:4,14
126:10
127:7,8
128:3,21
141:24
143:11
153:3,8
168:11
169:9,20
175:23
177:12,21

**worry**
150:15

**write**
46:8
124:15
150:3

**writing**
60:22

**written**
32:13,20
34:13,21,
22,24
35:2,4
143:19
145:24

**wrong**
7:23
89:18
93:2,4,7
143:6
150:16

**wrote**
29:3 31:2
133:1

**Y**

**y'all**
20:7
74:11,16,
17,22
100:13
101:7,8
142:2
144:9

**yard**
131:4
136:25

**year**
20:18
30:7 38:9
72:15,19
108:4
118:14
158:19

**years**
8:21 9:2,
3,12,13
10:9,17
13:10
30:4
110:23



```
112:25
113:17
130:23
157:4,7
```

**yelling**
```
91:14
```

**yes-or-no**
```
91:5
```





EXHIBIT

1

9.28.23   CCB

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

DUSTIN HYDE, individually and on )
Behalf of All Other Similarly Situated )
                                                     )

Plaintiff,                   )
                                                     )

    v.                        )    Civil Action File No: 2:22-cv-103-RWS
                                                     )

316 TOWING & ROAD SERVICE,    )    **JURY TRIAL DEMANDED**
INC., and MAKSIM LISOVSKIY      )
                                                     )

Defendants.              )
                                                        )

## FIFTH AMENDED NOTICE TO TAKE DEPOSITION OF DUSTIN HYDE

TO: Dustin Hyde and his attorneys of record: Josh Sandford, Esq. and Colby Qualls,

Esq., Sanford Law Firm, PLLC and Matthew W. Herrington, Esq., Delong,

Caldwell, Bridgers, Fitzpatrick & Benjamin

PLEASE TAKE NOTICE that at 10:00 AM (EST) on September 28, 2023 at the

office located at 3390 Peachtree Road, Suite 520, Atlanta, GA 30326, the Defendants

in the above-styled action will, pursuant to F.R.C.P. Rule 30(b), proceed to take the

videotaped deposition of Plaintiff Dustin Hyde before an authorized court reporter

and videographer. The deposition will continue from day to day until completed.

The deposition will commence before an officer duly authorized by law to

administer oaths for the purposes of discovery and any other purpose allowed under

the Federal Rules of Civil Procedure.

Respectfully submitted this 28th day of July 2023.


MITCHELL - HANDSCHUH
LAW GROUP
3390 Peachtree Road, NE, Suite 520
Atlanta, Georgia 30326
T: (404) 262 - 9488
F: (404) 231 - 3774
E: jeremy@m-hlawgroup.com
E: amanda@m-hlawgroup.com

/s/ Jeremy R. Handschuh
Jeremy R. Handschuh, Esq.
Georgia Bar No. 418099
Amanda I. Elliott, Esq.
Georgia Bar No. 137633
*Counsel for Defendants*


*Counsel for the Defendants certifies that this document complies with N.D.Ga. L.R.
5.1B and the N.D.Ga. Standing Order No. 04-01.*

EXHIBIT

2

9.28.23

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

**DUSTIN HYDE, Individually and on**                         **PLAINTIFF**
**Behalf of All Others Similarly Situated**

vs.                                  No. 2:22-cv-_103-RWS

**316 TOWING & ROAD SERVICE, INC.,**                     **DEFENDANTS**
**and MAKSIM LISOVSKIY**

## ORIGINAL COMPLAINT—COLLECTIVE ACTION

Plaintiff Dustin Hyde ("Plaintiff"), individually and on behalf of all others similarly

situated, by and through undersigned counsel, for his Original Complaint—Collective

Action ("Complaint") against Defendants 316 Towing & Road Service, Inc., and Maksim

Lisovksiy (collectively "Defendant" or "Defendants"), states and alleges as follows:

### I.     PRELIMINARY STATEMENTS

1.     This is a collective action brought by Plaintiff, individually and on behalf of

all others similarly situated, against Defendant for violations of the overtime provisions of

the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. (the "FLSA").

2.     Plaintiff seeks a declaratory judgment, monetary damages, liquidated

damages, prejudgment interest, and a reasonable attorney's fee and costs as a result of

Defendant's policy and practice of failing to pay proper overtime compensation under the

FLSA to Plaintiff and all others similarly situated.

## II.    JURISDICTION AND VENUE

3.      The United States District Court for the Northern District of Georgia has subject matter jurisdiction over this suit under the provisions of 28 U.S.C. § 1331 because this suit raises federal questions under the FLSA.

4.      The acts complained of herein were committed and had their principal effect against Plaintiff within the Gainesville Division of the Northern District of Georgia; therefore, venue is proper within this District pursuant to 28 U.S.C. § 1391.

## III.    THE PARTIES

5.      Plaintiff is an individual and resident of Barrow County.

6.      Separate Defendant 316 Towing & Road Service, Inc. ("316 Towing"), is a domestic, for-profit corporation.

7.      Defendant's registered agent for service of process is Maksim Lisovskiy at 306 Exchange Boulevard, Suite 400 No. 203, Bethlehem, Georgia 30620.

8.      Separate Defendant Maksim Lisovskiy ("Lisovskiy") is an individual and resident of Georgia.

## IV.    FACTUAL ALLEGATIONS

9.      Plaintiff repeats and realleges all the preceding paragraphs of this Complaint as if fully set forth in this section.

10.     Defendant owns and operates a towing company in Winder.

11.     Lisovskiy is a principal, director, officer, and/or owner 316 Towing.

12.     Lisovskiy, in his role as an operating employer of 316 Towing, had the power to hire and fire Plaintiff, often exercised supervisory authority over Plaintiff's work,

including the day-to-day job duties that Plaintiff's job entailed, determined his work schedule, and made decisions regarding Plaintiff's pay, or lack thereof.

13.     Lisovskiy took an active role in operating 316 Towing and in the management thereof

14.     During each of the three years preceding the filing of this Complaint, Defendant employed at least two individuals who were engaged in interstate commerce or in the production of goods for interstate commerce, or had employees handling, selling, or otherwise working on goods or materials that had been moved in or produced for commerce by any person, such as vehicles and fuel.

15.     Defendant's annual gross volume of sales made or business done is not less than $500,000.00 (exclusive of excise taxes at the retail level that are separately stated) in each of the three years preceding the filing of this Complaint.

16.     At all times relevant hereto, Defendant was Plaintiff's employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

17.     At all times relevant to the allegations in this Complaint, Plaintiff was an "employee" of Defendant as defined by the FLSA, 29 U.S.C. § 203(e).

18.     Plaintiff, in the course of his duties for Defendant, regularly used instrumentalities of interstate commerce such as his cell phone, the internet and running customer credit cards.

19.     Defendant employed Plaintiff from December of 2018 until April of 2022 as a Driver.

20.     Defendant classified Plaintiff as exempt from the overtime requirements of the FLSA and paid him a salary.

21.     Defendant also employed other Drivers within the three years preceding the filing of this lawsuit.

22.     At all relevant times herein, Defendants directly hired Plaintiff and other Drivers to work on their behalf, paid them wages and benefits, controlled their work schedules, duties, protocols, applications, assignments and employment conditions, and kept at least some records regarding their employment.

23.     Plaintiff's primary duty was to tow cars for Defendant's customers.

24.     Other Drivers had the same or similar duties as Plaintiff.

25.     Defendant classified Plaintiff as an independent contractor, exempt from the overtime requirements of the FLSA.

26.     Defendant also classified other Drivers as independent contractors.

27.     Plaintiff's and other Drivers' work followed the usual path of employer-employee relationships; Defendant treated them as independent contractors only for tax purposes and for Defendant's convenience.

28.     Defendant, at all times relevant hereto, knew that Plaintiff and other Drivers were acting as employees, rather than as independent contractors, and treated them as employees.

29.     At all times material herein, Plaintiff and other Drivers have been entitled to the rights, protections and benefits provided under the FLSA.

30.     Plaintiff and other Drivers did not financially invest in Defendant's business.

31.     Plaintiff and other Drivers did not share in the profits or losses of Defendant's business.

32.     Defendant, not Plaintiff or other Drivers, set prices for services.

33.   Defendant determined Plaintiff's and other Drivers' pay scale for services without input from or negotiation with Plaintiff and other Drivers.

34.   Defendant, not Plaintiff or other Drivers, decided whether and how many Drivers to hire.

35.   Plaintiff and other Drivers were hired to work for Defendant for a continuous and ongoing period of time.

36.   Plaintiffs and other Drivers did not have any control of or authority over any employee's rate of pay or working hours.

37.   Defendant set the Defendant's business policies and rules and had complete control over the venue.

38.   Defendant required Plaintiff and other Drivers to follow Defendant's business policies and rules.

39.   Defendant made decisions on advertising Defendant's business without Plaintiff's and other Drivers' input.

40.   If Plaintiff and other Drivers refused an assignment from Defendant, they risked discipline, up to and including termination.

41.   Defendant set Plaintiff's and other Drivers' schedules.

42.   Plaintiff and other Drivers were required to arrive at work at the time determined by Defendant and remain until the end of their scheduled shift.

43.   Plaintiff and other Drivers are entitled to wages and compensation based on the standard minimum wage for all hours worked.

44.   Plaintiff and other Drivers are entitled to 1.5 times their base hourly rate for hours worked over 40 each week.

45.     Plaintiff regularly worked over forty hours per week.

46.     Upon information and belief, other Drivers also regularly worked more than forty hours per week.

47.     Defendant paid Plaintiff a weekly rate.

48.     Defendant did not pay Plaintiff 1.5 times his regular hourly rate for hours worked over 40 each week.

49.     Upon information and belief, Defendant also paid other Drivers a weekly rate and did not pay them 1.5x their regular hourly rate for hours worked over 40 each week.

50.     Defendant did not provide Plaintiff or other Drivers with a timekeeping system whereby they could track their hours worked.

51.     Defendant regularly scheduled Plaintiff to work more than 40 hours per week.

52.     Plaintiff was required to be "on call" before and after his regular shift, and he frequently responded to calls outside of his regular working hours.

53.     Upon information and belief, Defendant regularly or occasionally scheduled other Drivers to work more than 40 hours per week.

54.     Defendant knew or should have known that Plaintiff and other Drivers worked over 40 hours in some weeks.

55.     Defendant knew, or showed reckless disregard for whether, the way it paid Plaintiff and other Drivers violated the FLSA.

56.     At all relevant times herein, Defendant has deprived Plaintiff and other Drivers employees of proper overtime compensation for all the hours worked over forty per week.

57.     Defendant knew or showed reckless disregard for whether its actions violated the FLSA.

## V.     REPRESENTATIVE ACTION ALLEGATIONS

58.     Plaintiff repeats and realleges all previous paragraphs of this Complaint as though fully incorporated in this section.

59.     Plaintiff brings this claim for relief for violation of the FLSA as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of all persons similarly situated who were, are, or will be employed by Defendant within the applicable statute of limitations period, who are entitled to payment of the following types of damages:

A.     Overtime premiums for all hours worked over forty each week;

B.     Liquidated damages; and

C.     Attorney's fees and costs.

60.     Plaintiff proposes the following collective under the FLSA:

**All Drivers who worked over 40 hours
in any week within the past three years.**

61.     In conformity with the requirements of FLSA Section 16(b), Plaintiff has filed or will soon file a written Consent to Join this lawsuit.

62.     The relevant time period dates back three years from the date on which Plaintiff's Original Complaint—Collective Action was filed herein and continues forward

through the date of judgment pursuant to 29 U.S.C. § 255(a), except as set forth herein below.

63. The members of the proposed FLSA collective are similarly situated in that they share these traits:

A. They were paid hourly;

B. They worked hours over forty in at least one week within the three years preceding the filing of this lawsuit; and

C. They were subject to Defendant's common policy of failing to pay an overtime premium for hours worked over forty each week.

64. Plaintiff is unable to state the exact number of the collective but believes that the collective exceeds 10 persons.

65. Defendant can readily identify the members of the collective, who are a certain portion of the current and former employees of Defendant.

66. The names and physical and mailing addresses of the probable FLSA collective action plaintiffs are available from Defendant.

67. The email addresses of many of the probable FLSA collective action plaintiffs are available from Defendant.

## VI.    FIRST CLAIM FOR RELIEF
### (Individual Claim for FLSA Violation)

68. Plaintiff repeats and realleges all previous paragraphs of this Complaint as though fully set forth herein.

69. Plaintiff asserts this claim for damages and declaratory relief pursuant to the FLSA, 29 U.S.C. § 201, *et seq.*

70.    At all relevant times, Defendant has been, and continues to be, an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203.

71.    29 U.S.C. §§ 206 and 207 require any enterprise engaged in commerce to pay a minimum wage for all hours worked up to 40 each week and to pay 1.5 times their regular wages for all hours worked over 40, unless an employee meets certain exemption requirements of 29 U.S.C. § 213 and all accompanying DOL regulations.

72.    Defendant misclassified Plaintiff as exempt from the requirements of the FLSA.

73.    Defendant failed to pay Plaintiff a sufficient overtime premium for all hours worked over forty each week.

74.    Defendant knew or should have known that its actions violated the FLSA.

75.    Defendant's conduct and practices, as described above, were willful.

76.    By reason of the unlawful acts alleged herein, Defendant is liable to Plaintiff for monetary damages, liquidated damages and costs, including reasonable attorney's fees provided by the FLSA for all violations which occurred beginning at least three years preceding the filing of Plaintiff's initial complaint, plus periods of equitable and contractual tolling.

77.    Defendant has not acted in good faith nor with reasonable grounds to believe its actions and omissions were not a violation of the FLSA, and, as a result thereof, Plaintiff is entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime premium pay described above pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).

78.     Alternatively, should the Court find that Defendant acted in good faith in failing to pay Plaintiff as provided by the FLSA, Plaintiff is entitled to an award of prejudgment interest at the applicable legal rate.

## VII.   SECOND CLAIM FOR RELIEF
### (Collective Action Claim for FLSA Violations)

79.     Plaintiff repeats and realleges all previous paragraphs of this Complaint as though fully set forth herein.

80.     Plaintiff asserts this claim for damages and declaratory relief on behalf of all similarly situated employees pursuant to the FLSA, 29 U.S.C. § 201, *et seq.*

81.     At all relevant times, Defendant has been, and continues to be, an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203.

82.     29 U.S.C. §§ 206 and 207 require any enterprise engaged in commerce to pay all employees a minimum wage for all hours worked up to 40 each week and to pay 1.5 times their regular wages for all hours worked over 40, unless an employee meets certain exemption requirements of 29 U.S.C. § 213 and accompanying DOL regulations.

83.     Defendant misclassified Plaintiff and other similarly situated employees as exempt from the overtime provisions of the FLSA.

84.     Defendant failed to pay Plaintiff and similarly situated employees a sufficient overtime premium for all hours worked over forty each week

85.     Defendant deprived Plaintiff and similarly situated employees of compensation for all of the hours worked over forty per week, in violation of the FLSA.

86.     Defendant knew or should have known that its actions violated the FLSA.

87.     Defendant's conduct and practices, as described above, were willful.

88. By reason of the unlawful acts alleged herein, Defendant is liable to Plaintiff and all similarly situated employees for monetary damages, liquidated damages and costs, including reasonable attorney's fees provided by the FLSA for all violations which occurred beginning at least three years preceding the filing of Plaintiff's initial complaint, plus periods of equitable tolling.

89. Defendant has not acted in good faith nor with reasonable grounds to believe its actions and omissions were not a violation of the FLSA, and, as a result thereof, Plaintiff and similarly situated employees are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime premium pay described above pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).

90. Alternatively, should the Court find that Defendant acted in good faith in failing to pay Plaintiff and the collective members as provided by the FLSA, they are entitled to an award of prejudgment interest at the applicable legal rate.

## VIII. PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff Dustin Hyde, individually and on behalf of all others similarly situated, respectfully prays that each Defendant be summoned to appear and to answer this Complaint and for declaratory relief and damages as follows:

A. Declaratory judgment that Defendant's practices alleged in this Complaint violate the FLSA and its related regulations;

B. Certification of a collective under Section 216 of the FLSA of all individuals similarly situated, as further defined in any motion for the same;

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DUSTIN HYDE, Individually and on Behalf of All Others Similarly Situated | 316 TOWING & ROAD SERVICE, INC., and MAKSIM LISOVSKIY |

**(b)** County of Residence of First Listed Plaintiff **Barrow**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Matthew W. Herrington, DeLong, Caldwell, Bridgers, Fitzpatrick & Benjamin, LLC; 101 Marietta Street, Suite 2650, Atlanta, Georgia 30303 (404) 979-3150; matthew.herrington@dcbflegal.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability |  | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |  | ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☒ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability | Injury | ☐ 380 Other Personal Property Damage | Relations | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 201, et seq.

Brief description of cause:
Unpaid Wages

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   June 1, 2022

SIGNATURE OF ATTORNEY OF RECORD   *Matthew H___*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____



# DQ FILE

## TAB 1

√ Copy of Current DL/CDL

√ Copy of Current Medical Card (2 years)

    √ Med Card National Registry

√ Application

    √ Employment history CDL 10 years

√ Data Sheet

___ VOE subject to FMCSA__1st,__2nd,__3rd

√ Current MVR

___ Pre-Employment Drug Test

√ Single License

√ Driving Record Authorization

√ Annual Driving Record Review

√ Substance Abuse Awareness Training and Certificate

√ 7 Days HOS (before 1st trip for 6 mnts)





Form MCSA-5876

OMB No. 2126-0006   Expiration Date: 11/30/2021

U.S. Department of Transportation
Federal Motor Carrier
Safety Administration

**Medical Examiner's Certificate**
(for Commercial Driver Medical Certification)

**Public Burden Statement**
A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0006. Public reporting for this collection of information is estimated to be approximately 1 minute per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspects of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, 1200 New Jersey Avenue, SE, Washington, D.C. 20590.

I certify that I have examined:   **Last Name:** _____ HYDE _____   **First Name:** _____ DUSTIN _____   in accordance with *(please check only one):*

◉ the Federal Motor Carrier Safety Regulations (49 CFR 41-391.49) and, with knowledge of the driving duties, I find this person is qualified, and, if applicable, only when *(check all that apply)* **OR**

○ the Federal Motor Carrier Safety Regulations (49 CFR 41-391.49) with any applicable State variances (which will only be valid for intrastate operations), and, with knowledge of the driving duties,
I find this person is qualified, and, if applicable, only when *(check all that apply):*

☒ Wearing corrective lenses        ☐ Accompanied by a _____ waiver/exemption        ☐ Driving within an exempt intracity zone (49 CFR 391.62) *(Federal)*

☐ Wearing hearing aid              ☐ Accompanied by a Skill Performance Evaluation (SPE) Certificate   ☐ Qualified by operation of 49 CFR 391.64 *(Federal)*

                                                                                                        ☐ Grandfathered from State requirements *(State)*

The information I have provided regarding this physical examination is true and complete. A complete Medical Examination Report Form,
MCSA-5875, with any attachments embodies my findings completely and correctly, and is on file in my office.

| | |
|---|---|
| **Medical Examiner's Signature** | **Medical Examiner's Telephone Number** | **Date Certificate Signed** |

**Medical Examiner's Signature**

**Medical Examiner's Telephone Number**

**Date Certificate Signed**   01/25/2020

**Medical Examiner's Name** *(please print or type)*   lyna ashtu

○ MD        ○ Physician Assistant   ◉ Advanced Practice Nurse
○ DO        ○ Chiropractor           ○ Other Practitioner *(specify)* _____

**Medical Examiner's State License, Certificate, or Registration Number**   3848

**Issuing State**   GA

**National Registry Number**   ____3489

**Medical Examiner's Certificate Expiration Date**   01/25/2022

**Driver's Signature**

**Driver's License Number**

**Issuing State/Province**   GA

**Driver's Address**

**Street Address:**    **City:**  WINDER   **State/Province:** GA   **Zip Code:** 30680   ◉ Yes ○ No

**CLP/CDL Applicant/Holder**

*This document contains sensitive information and is for official use only. Improper handling of this information could negatively affect individuals. Handle and secure this information appropriately to prevent inadvertent disclosure by keeping the documents under the control of authorized persons. Properly dispose of this document when no longer required to be maintained by regulatory requirements.**

316Towing  00099

United States Department of Transportation



# National Registry of Certified Medical Examiners Search



Leaflet | OSM Mapnik

**Mrs. Lyna Ashu Nurse Practitioner**
The Little Clinic
505 Dacula Road
dacula, GA 30019
(678) 407-8750

**National Registry Number:** ▮▮98469
**Certification Date:** 03/18/15

**Referred by:** _____
**If a 316 Towing and Road Service
independent contractor referred you,
please name driver above.**

Date of Application _11_ / _21_ / _2019_

## Driver's Application for Qualification

Position Applied for **Independent Contractor**

## *Personal Information*

Name _Hyde_ _Dustin_ _L_   Current Address: ▮▮▮▮▮▮▮▮▮▮▮
   Last     First     MI                   Street
_Winder_ _GA_ _30680_   How long at this address: _15 years_
   City      State     Zip
                    Social Security Number:

Home Number (_____) _____-_____   Cell Phone Number ▮▮▮▮▮▮▮▮▮▮

## *Previous Addresses For Past 3 Years*

| | | | | How Long _____ |
|---|---|---|---|---|
| Street | City | State | Zip | How Long _____ |
| Street | City | State | Zip | How Long _____ |
| Street | City | State | Zip | |

Date of Birth ▮▮▮▮▮▮▮ Can you provide legal proof of age? _yes_
Are you a U.S. Citizen? _yes_    Do you have the legal right to work in the U.S.?    _yes_

Have you ever worked for this company before? _no_    When _____
Reason for leaving _____    Have you ever been bonded? _no_
If Yes, Name of Bonding Co _____
Have you ever been convicted of a crime? _no_   Are you currently on parole or probation? _no_
If yes, please explain fully _____

**Conviction of a crime is not an automatic bar to contracting; all circumstances will be considered**

Is there any reason you might not be able to perform the functions of the job for which you have applied? _no_
If yes, explain _____

### *Drug or Alcohol History (Sec. 40.25(j)*
Have you ever tested positive or refused any pre-employment drug test? Yes____ _ No _✓_
If yes to either, please explain _____
If yes, can you provide proof you've completed all necessary DOT return-to-duty requirement

## *Accident Record for Past 3 years- Preventable or Non Preventable*

(Attach sheet if more space is needed) **THIS SECTION MUST BE COMPLETED**

|  | Dates | Nature of Accident (head-on, Rear-end) | Fatalities | Injuries |
|---|---|---|---|---|
| Last Accident |  |  |  |  |
| Next Previous |  |  |  |  |
| Next Previous |  |  |  |  |

## *Traffic Convictions and Forfeitures for Past 3 Yrs (other than Parking)*
### THIS SECTION MUST BE COMPLETED

| Location City, State | Date | Charge | Penalty | Commercial Vehicle |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

A: Have you ever been denied a license, permit or privilege to operate a motor vehicle?  _no_

B: Has any license, permit or privilege ever been suspended or revoked? _no_

If the answer to either A or B is yes, please explain

_____

C: Have you ever been disqualified under the Federal Motor Carrier Safety Regulations for the following?

_____

D: No Serious Violations? _no_

E: Operating under the influence of alcohol or drugs? _no_

F: Have you ever been convicted of a felony that would preclude your entering any Canadian Province?

If yes, please explain _no_

## *Driving Experience*
### THIS SECTION MUST BE COMPLETED

| Class of Equipment | Circle type of Equipment | Dates From(M/Y) To (M/Y) | Approximate Number of Miles |
|---|---|---|---|
| Straight Truck | Van, Tank, Flat, Refer |  |  |
| Tractor & Semi Trailer | Van, Tank, Flat, Refer |  |  |
| Bobcat Tractor | Van, Tank, Flat, Refer |  |  |
| Motor coach/School Bus |  |  |  |
| Specialized Equipment |  |  |  |
| Other | Rollback w/L | 2006 / 2019 |  |

List states operated in for the last 5 years  _Georgia_

Do you have any mountain driving experience? _Yes_  If yes, what areas of country _GA/TN_

Do you have any Haz/Mat experience? _no_  If yes, what classified materials have you transported?

Have you had any Defensive Driving Courses? _no_

If yes, what course(s) and when _____

Special Courses or training that will help you as a driver

_____ NO _____

List any truck school you have
attended_____ N/A _____

Are you capable of driving a vehicle with a standard transmission? _____

Circle the shift patterns you can drive:    5 speed    10 speed    13 speed    18 speed    other

## Motor Carrier History

All contractor applications to drive in interstate commerce must provide the following information on all work or employment during the proceeding 3 years. Contractor applicants holding a CDL to drive a commercial motor* vehicle in interstate commerce shall provide 10 years information for work for which the applicant operated such vehicle. (Note: list work history in reverse order starting with the most recent. Add more sheets if necessary.) If driving experience was prior to 10 years ago, list it, to support your driving skills.

| Motor Carrier Name: Hemphill Towing | Position Held: Driver |
|---|---|
| | Salary/Wage: 30% |
| Address: Duluth | Dates Employed: From mar 16 To June 19 |
| City, State, Zip: Duluth GA | Position held was subject to the FMCSR'S Y____N____ |
| Contact: Ken hemphill | Reason for Leaving: moved to Remodel Home |
| Telephone Number:<br>Fax Number: | Job was designated as a safety sensitive function, subject to alcohol and controlled substance testing as required by 49 CFR Part 40   Yes____No_____ |

| Motor Carrier Name: ∧ All american Towing | Position Held: Driver |
|---|---|
| | Salary/Wage: 30 % |
| Address: | Dates Employed: From 2012 To mar 16 |
| City, State, Zip: monroe GA | Position held was subject to the FMCSR'S Y____N____ |
| Contact: Bill Ezeal | Reason for Leaving: company closed |
| Telephone Number:<br>Fax Number: | Job was designated as a safety sensitive function, subject to alcohol and controlled substance testing as required by 49 CFR Part 40   Yes____No_____ |

| Motor Carrier Name: Snappy Recovery | Position Held: Repo Agent |
|---|---|
| | Salary/Wage: 1000 por 20 veh |
| Address: Jackson Trail | Dates Employed: From 15 To 18 |
| City, State, Zip: Haushton GA | Position held was subject to the FMCSR'S Y____N____ |
| Contact: | Reason for Leaving: Side Job. Didn't went to Repo full time |
| Telephone Number:<br>Fax Number: | Job was designated as a safety sensitive function, subject to alcohol and controlled substance testing as required by 49 CFR Part 40   Yes____No_____ |

| Motor Carrier Name: | Position Held: |
|---|---|
| | Salary/Wage: |
| Address: | Dates Employed: From          To |
| City, State, Zip: | Position held was subject to the FMCSR'S Y____N____ |
| Contact: | Reason for Leaving: |
| Telephone Number:<br>Fax Number: | Job was designated as a safety sensitive function, subject to alcohol and controlled substance testing as required by 49 CFR Part 40   Yes____No_____ |

| Motor Carrier Name: | Position Held: |
|---|---|
| | Salary/Wage: |
| Address: | Dates Employed: From                To |
| City, State, Zip: | Position held was subject to the FMCSR'S Y___ N___ |
| Contact: | Reason for Leaving: |
| Telephone Number:<br>Fax Number: | Job was designated as a safety sensitive function, subject to alcohol and controlled substance testing as required by 49 CFR Part 40  Yes____No_____ |

| Motor Carrier Name: | Position Held: |
|---|---|
| | Salary/Wage: |
| Address: | Dates Employed: From                To |
| City, State, Zip: | Position held was subject to the FMCSR'S Y___ N___ |
| Contact: | Reason for Leaving: |
| Telephone Number:<br>Fax Number: | Job was designated as a safety sensitive function, subject to alcohol and controlled substance testing as required by 49 CFR Part 40  (circle one)     Yes____No_____ |

\* includes vehicles having a GVWR of 26,001 lbs. or more, vehicles designed to transport 15 or more passengers, or any size vehicle used to transport hazardous materials in a quantity require placarding.
\*\*The federal Motor Carrier Safety Regulations (FMCSRs) apply to anyone operating a motor vehicle on a high-way in interstate commerce to transport passengers or property when the vehicle: 1. weighs or has a GVWR of 10,001 lbs. or more. 2. Is designed or used to transport 9 or more passengers, or 3. Is of any size and is used to transport hazardous materials in a quantity required placarding

# This certifies that this application was completed by me, and that all entries on it and information in it are true and complete to the best of my knowledge.

Applicant's Signature ___Dustin Hyle___ Date ___11-21-19___

Applicant's Printed Name ___Dustin Hyde___

Reviewed by ___Eli Kudrin___ Date ___11-21-19___

Title ___Manager___

316Towing_00105

# INFORMATION DATA SHEET

## NOTICE TO DRIVERS

THE COMMERCIAL MOTOR VEHICLE SAFETY ACT OF 1986 PROVIDES FOR A NEW SET OF CONTROLS OVER DRIVERS OF COMMERCIAL VEHICLES. THE NEW LAW APPLIES TO ALL DRIVERS OPERATING VEHICLES AND COMBINATIONS WITH A GROSS WEIGHT RATING OVER 26,000 POUNDS, AND TO ANY VEHICLE, REGARDLESS OF WEIGHT, TRANSPORTING HAZARDOUS MATERIALS.

THE FOLLOWING PROVISIONS OF THE LEGISLATION BECOME EFFECTIVE JULY 1, 1987:

1. NO DRIVER MAY POSSESS MORE THAN ONE LICENSE, AND NO MOTOR CARRIER MAY USE A DRIER HAVING MORE THAN ONE LICENSE. A LIMITED EXCEPTION IS MADE FOR DRIVERS WHO ARE SUBJECT TO NON-RESIDENT LICENSING REQUIREMENTS OF ANY STATE. THIS EXCEPTION DOES NOT APPLY AFTER DECEMBER 31, 1989.

2. A DRIVER CONVICTED OF A TRAFFIC VIOLATION (OTHER THAN PARKING) IN ANY VEHICLE MUST NOTIFY THE MOTOR CARRIER AND THE STATE WHICH ISSUED THE LICENSE TO THAT DRIVER OF THE CONVICTION WITHIN 30 DAYS.

3. ANY PERSON APPLYING FOR A JOB AS A COMMERCIAL VEHICLE DRIVER MUST INFORM THE PROSPECTIVE EMPLOYER OF ALL PREVIOUS EMPLOYMENT AS THE DRIVER OF THE COMMERCIAL VEHICLE FOR THE PAST 10 YEARS, IN ADDITION TO ANY OTHER REQUIRED INFORMATION ABOUT THE APPLICANT'S EMPLOYMENT HISTORY.

4. THE FEDERAL MOTOR CARRIER SAFETY REGULATIONS REQUIRE THAT A DRIVER WHO LOSES ANY PRIVILEGE TO OPERATE A COMMERCIAL VEHICLE, OR WHO IS DISQUALIFIED FROM OPERATING A COMMERCIAL VEHICLE, MUST NOTIFY THE MOTOR CARRIER THE NEXT BUSINESS DAY.

5. PENALTIES – ANY VIOLATION OF THE ABOVE IS PUNISHABLE BY A FINE NOT TO EXCEED $2,500. WILLFUL VIOLATION OF (1) OR (3), ABOVE, OR FAILURE TO NOTIFY THE MOTOR CARRIER WITHIN 30 DAYS OF THE LOSS OF ANY PRIVILEGE TO OPERATE A COMMERCIAL VEHICLE CAN RESULT IN CRIMINAL PENALTIES NOT TO EXCEED $5,000 AND/OR 90 DAYS IN JAIL.

**THIS CERTIFIES THAT I COMPLETED THIS APPLICATION, AND THAT ALL ENTRIES ON IT AND INFORMATION IN IT ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE. I AUTHORIZE THIS COMPANY TO FURTHER INVESTIGATE MY PAST EMPLOYMENT REFERENCES, CRIMINAL AND CREDIT STANDING AND DRIVING RECORD.**

SIGNED: _____   DATE: 1-24-2020

# PAST EMPLOYMENT VERIFICATION

Sent to:_____   Fax Number:_____

          Previous Employer

Requested by: **316 Towing and Road Service, Inc**        Phone:  678-999-3308
          **3990 Fredricksberg Ct. Loganville, GA 30052**        Fax:    678-298-7958

Name of Applicant:___Dustin Hyde_____   Social Security #: ████████████

Job Title:_____   Hire Date:___March 2016_____
Termination Date:_____ Resigned: Yes /No   Discharged: Yes /No
If Discharged, why?_____

Eligible for Rehire? Yes _____ No _____ Upon Review _____ If No, please explain:_____

Equipment: Type of Tractor/Truck:___Roll back_____ Trailer Length:_____

          Refrigerated _____ Flatbeds _____ Vans _____ Tanker _____ Other _____

Commodities Hauled: Areas of _____

Operation:_____

Overall Performance: Poor _____       Fair _____     Good _____       Excellent _____

          **Accident Information below requested in accordance with FMCSR Part 391.23. (Accidents within last 36 months.)**

Accidents: # Preventable:_____ Description:_____

          # Non-Preventable:_____ Description:_____

          **Drug/Alcohol Information below requested in accordance with DOT 49 CFR Part 40. (Tests done in last 36 months.)**

Tested positive for controlled substance in last 3 years?                                   Yes_____ No ✓

Had a breath alcohol test result with a concentration of .04 or greater in the last 3 years?   Yes_____ No ✓

Ever refused a required test for drugs or alcohol in the last 3 years?                       Yes_____ No ✓
Violated other D.O.T. drug/alcohol regulations?                                           Yes_____ No ✓

Have you received information from a previous employer that this individual has violated
D.O.T. drug/alcohol regulations?                                                         Yes_____ No ✓

If Yes, please give type of test, date of test, and SAP information (if applicable):


          Person Providing Information


1.  I hereby authorize the above-mentioned employer/school to release all information as to my character, work habits, performance, experience, fitness, together with reasons for termination concerning my employment to
316 Towing and Road Service, Inc. (or their authorized agents) which may request such information in connection with my application for employment with 316 Towing and Road Service, Inc.
2.  In conformity with 49 CFR part 40, I hereby authorize the above-mentioned employer/school and their agents to furnish 316 Towing and Road Service, Inc. the above-requested information concerning my D.O.T.
drug and alcohol tests including pre-employment tests during the previous 3 years; the dates when I tested positive; the dates when I tested .04 or greater; the dates when I refused (including a verified adulterated
or substituted result) to be tested for drugs and alcohol; and any other violations of 49 CFR part 40 and any information the above-mentioned employer/school and/or their authorized agents have received
regarding violations of 49 CFR part 40 from my previous employers covered by D.O.T.
3.  I hereby release the above-mentioned employer/school and their authorized agents from any and all liability of any type as a result of providing the above-requested information to 316 Towing
and Road Service, Inc.

By signing below, I certify that I have read and fully understand Parts 1, 2, and 3 of this release and that I executed this release voluntarily, with the knowledge that any and all information released could affect
my being employed with 316 Towing and Road Service, Inc.

It is expressly acknowledged, understood and agreed that the information provided by the applicant regarding the applicant's employment during the previous three (3) years in accordance with Section
391.21(b)(10) of the Federal Motor Carrier Safety Regulations ("FMCSR") may be used; and the applicant's prior employers may be contacted, for the purpose of investigating the applicant's safety performance
history information as required by paragraphs (d) and (e) of Section 391.23 of the FMCSR. The applicant has certain due process rights under the FMCSR regarding the information received as a result of these
investigations, as described below.

Applicant's Due Process Rights: 1) The right to review information provided by previous employers; 2) The right to have errors in the information corrected by the previous employer and for that previous employer to
re-send the corrected information to 316 Towing and Road Service, Inc.; and 3) The right to have a rebuttal statement attached to the alleged erroneous information, if the previous employer and the driver cannot
agree on the accuracy of the information.

Drivers who have previous Department of Transportation regulated employment history in the preceding three years, and wish to review previous employer-provided investigative information, must submit a written request to
the Safety Compliance Manager of 316 Towing and Road Service, Inc., which may be done at any time, including when applying, or as late as thirty (30) days after being employed or being notified of denial of employment.
316 Towing and Road Service, Inc. will provide this information to the applicant within five (5) business days after receiving the written request. If, however, 316 Towing and Road Service, Inc. has not yet received the
requested information from the previous employer(s), then it will provide the information to the applicant within five (5) business days after it receives the requested safety performance history information. If the driver has not
arranged to pick up or receive the requested records within thirty (30) days of 316 Towing and Road Service, Inc. making them available, 316 Towing and Road Service, Inc. will consider the driver to have waived the request
to review the records.

1/23/2020                                  DRIVER'S LICENSE REPORT

**SambaSafety**        PO Box 1970        Rancho Cordova, CA 95741-1970
**GEORGIA Driver Record - E5588**        **Order Date: 01/23/2020**          Seq #: 0

| | | | |
|---|---|---|---|
| Host Used: | Online | Bill Code: | |
| Rec Type: | STANDARD | Reference: | |
| Period: | THREE YEAR | License: | |
| | | Name: | HYDE, DUSTIN LEE |
| | | Address: | |
| | | City, St: | MONROE, GA 30655-1508 |

| | | | | | |
|---|---|---|---|---|---|
| Sex: | MALE | Weight: | DOB: | Age: | 35 |
| Eyes: | | Height: | Iss Date: | 05/26/2015 | |
| Hair: | | | Exp Date: | 02/23/2020 | |

Year License First Issued: 01/25/2008                    STATUS: VALID

MVR Score: 0 CLEAN

**Violations/Convictions      Failures To Appear    Accidents**
*** NONE TO REPORT ***

**Suspensions/Revocations**
*** NO ACTIVITY ***

**License and Permit Information**
License: PERSONAL        Issue: 05/26/2015    Expire: 02/23/2020    Status: VALID
                         Class: C              SINGLE VEH < 26K
                         Restriction: CORRECTIVE LENSES

**Miscellaneous State Data**
TOTAL STATE POINTS: 0
SCORE 0: CLEAN

CONFIDENTIAL INFORMATION - TO BE USED AS PER STATE AND FEDERAL LAWS.
MISUSE MAY RESULT IN A CRIMINAL PROSECUTION

END OF REPORT FOR HYDE, DUSTIN LEE              (CONTROL NUMBER: 876LZQ)

**316Towing_00108**

11/21/2019                               DRIVER'S LICENSE REPORT

**SambaSafety**     PO Box 1970          Rancho Cordova, CA 95741-1970
**GEORGIA Driver Record - E5588**              **Order Date: 11/21/2019**          **Seq #: 0**

| | | |
|---|---|---|
| Host Used: | Online | Bill Code: |
| Rec Type: | STANDARD | Reference: |
| Period: | THREE YEAR | License: |
| | | Name:     HYDE, DUSTIN LEE |
| | | Address: |
| | | City, St:   MONROE, GA 30655-1508 |

| | | | | |
|---|---|---|---|---|
| Sex:   MALE | Weight: | DOB: | Age: | 35 |
| Eyes: | Height: | Iss Date:   05/26/2015 | | |
| Hair: | | Exp Date:   02/23/2020 | | |

Year License First Issued: 01/25/2008                  STATUS: VALID
MVR Score: 0 CLEAN

## Violations/Convictions    Failures To Appear    Accidents
*** NONE TO REPORT ***

## Suspensions/Revocations
*** NO ACTIVITY ***

## License and Permit Information
License: PERSONAL     Issue: 05/26/2015     Expire: 02/23/2020   Status: VALID
                      Class: C              SINGLE VEH < 26K
                      Restriction: CORRECTIVE LENSES

## Miscellaneous State Data
TOTAL STATE POINTS: 0
SCORE 0: CLEAN

CONFIDENTIAL INFORMATION - TO BE USED AS PER STATE AND FEDERAL LAWS.
MISUSE MAY RESULT IN A CRIMINAL PROSECUTION

END OF REPORT FOR HYDE, DUSTIN LEE          (CONTROL NUMBER: 7ZSRSM)

316Towing_00109

CERTITION OF COMPLIANCE
WITH DRIVER LICENSE
REQUIREMENTS

MOTOR CARRIER INSTRUCTIONS: The requirements in Part 383 and 391 apply to every driver who operates in intrastate, interstate, or foreign commerce and operates a commercial vehicle that can transport 15 people or transports hazardous materials that require placarding.

DRIVER REQUIREMENTS: Parts 383 and 391 of the Federal Motor Carrier Safety Regulations contain some requirements of which you as a driver must comply. These requirements are in effect as of July 1, 1987. They are as follows:

1.  POSSESS ONLY ONE LICENSE: You, as a commercial vehicle driver, may not possess more than one motor vehicle operator's license. If you have more than one license, keep the license from your state of residence and return the additional license to the states that issued them. DESTROYING a license does not close the record in the state that issued it; you must notify the state.

2.  NOTIFICATION OF LICNESE SUSPENSION, REVOCATION OR CANCELLATION: Sections 392.42 and 383.33 of the Federal Motor Carrier safety Regulations require that you notify the motor carrier you are contracted to the NEXT BUSINESS DAY of any revocation or suspension of your driver's license. In addition, Section 383.31 requires that any time you violate a state or local traffic law (other than parking), you must report it within 30 days to: 1) the motor carrier with whom you are contracted, and 2) the state that issued your license (if the violation occurs in a state other than the one which issued your license). The notification to both the employer and state must be in writing. This requirement can be met by supplying both with a copy of the citation.

The following license is the only one I posses:

Driver's License Number: ██████████   State: *GA*   Expires: *2-23-2020*

Driver's Printed Name: *Dustin Hyde*   Driver's Signature: *Dustin Hyde* Date: *11-21-2019*

Review by: *Eli Kudrin*   Title: *Manager*

---

## AUTHORIZATION FOR CHECK OF DRIVING RECORD

I, *Dustin Hyde*, authorize 316 Towing and Road Service Inc to perform checks into my driving record, as required by the US DOT Federal Motor Carrier Safety Regulations Part 391.23 (a)(1). I release all parties involved in such investigations from any and all liability resulting from this background check.

A driving record abstract will be obtained from the State of *Georgia* If you have held a driver's license from a state other than the current license issuer in the previous 3 years, list State(s) and license number(s) _____

Driver's Name (Printed): *Dustin Hyde*   Driver's Signature: *Dustin Hyde* Date: *11-21-2019*

Review by: *Eli Kudrin*   Title: *Manager*

ANNUAL CERTIFICATE OF VIOLATIONS AND REVIEW OF DRIVING RECORD

| Driver Name: Dustin Hyde | License #: ████████ | ST: GA |

## ANNUAL CERTIFICATE OF VIOLATIONS

*I certify that the following is a true and complete list of traffic violations (other than parking violations) for which I have been convicted or forfeited bond or collateral during the past 12 months.* **[ ] Violations are as listed below. [ ] I have had no violations.**

| Date of Conviction | Offense | Location | Type of Motor Vehicle operated |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

*If no violations are listed above, I certify that I have not been convicted or forfeited bond or collateral on account of any violation required to be listed during the past 12 months.*

| Date of Certification: 11-21-19 |
| Driver Signature: *Dustin Hyde* |
| Reviewed By: Eli Kudrin | Title: Manager |

## ANNUAL REVIEW OF DRIVING RECORD

*In accordance with 49 Code of Federal Regulations Section 391.25, (Federal Motor Carrier Safety Regulations), all information pertinent to the above driver's safety of operation, including the list of violations furnished by him in accordance with 49 CFR Section 391.27, has been reviewed for the past 12 months.*

| Reviewer: Eli Kudrin | Date: 1/23/20 |

NORTHAMERICAN TRANSPORTATION ASSOCIATION INC.                    DRUG AND ALCOHOL SUBSTANCE ABUSE COMPLIANCE HANDBOOK

# DRIVER
## CERTIFICATE OF SUBSTANCE ABUSE AWARENESS TRAINING
### §382.601

I, _____Dustin Hyde_____ certify that

In accordance with 49 CFR, Part 382.601 (b)(1-10). I have received training and education materials relating to my company's or organization's adherence and implementation of 49 CFR, Part 382, Subparts A-F

I further certify that:

I have received a copy of the SUBSTANCE ABUSE AWARENESS TRAINING DRIVER HANDBOOK, and I have reviewed and understood the material contained therein. I have also been informed of the name of the person designated by my company to answer questions about 49 CFR, Part 382, Subparts A-F.

And

I have received a copy of the Company's Written Substance Abuse Policy and Drive Assistance Policy.

_____Dustin Hyde_____          _____
Driver Printed Name                                          Company Name

_____Dustin Hyle_____          _____
Driver's Signature                                          Program Administrator's Name

Signed this ____Dustin Hyle____ day of ____1 - 24____, 2020____

*This form should be torn out and retained in the Driver's Qualification File.*

## — ONLY THIS ORIGINAL, SIGNED FORM IS VALID —

THE PERFORATED EDGE MUST BE PRESENT IN ORDER FOR THIS FORM TO BE VALID

## SEVEN-DAY PRIOR LOG FORM

### (data sheet for new, casual, or temporary drivers)

NAME: _Dustin Hyde_  SSN#: _[redacted]_

ADDRESS: _[redacted] Winder_  PHONE#: _[redacted]_

DRIVER'S LICENSE #: _[redacted]_  STATE: _GA_

### *Instructions:*

*At the time of initial employment as a driver, or when being employed occasionally, the regulations of the Department of Transportation [FMCSR 395.8 (j)(2)] require the motor carrier to obtain from you a signed statement giving the total time on duty during the immediately preceding 7 days and the time at which you were last relieved from duty prior to beginning work for the motor carrier. In the spaces below, show the number of hours worked (on duty) in each of the last 7 days.*

| DAY | 1 | 2 | 3 | 4 | 5 | 6 | 7 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| DATE | 11/15 | 11/16 | 11/17 | 11/18 | 11/19 | 11/20 | 11/21 | 7 |
| HOURS WORKES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Date and start time of the last <u>qualified</u> 34-hour restart: _____ _____:_____ am/pm

*I hereby certify that the information given above is correct to the best of my knowledge and belief, and that I was last relieved from work at:*

_____ on ___21ˢᵗ___ ___November___ ___2019___
time            day            month            year

Signature: _Dustin Hyde_

Witness: _Eli Rudrin_  Date: _11-21-19_

### Company Representative

316 Towing and Road Service *does not provide legal advice to its customers, nor does it advise insureds on employment related issues, therefore the subject matter is not intended to serve as legal or employment advice for any issue(s) that may arise in the operations of its insureds. Legal advice should always be sought from the insured's legal counsel.* 316 Towing and Road Service *shall have neither liability nor responsibility to any person or entity with respect to any loss, action or inaction alleged to be caused directly or indirectly as a result of the information contained herein.*

# INSPECTIONS/TRAININGS

## TAB 2

 Substance Abuse Training Booklet receipt

CSA / FMCSA Training Booklet Receipt

Other Training Certificates / Inspections

# Driver Receipt

I acknowledge receipt of J. J. Keller's *CSA: Know the BASICs* Driver Handbook, which covers the following topics:

- Introduction
- CSA Overview
- Getting to Know the BASICs
    - Unsafe Driving BASIC
    - Hours-of-Service Compliance BASIC
    - Driver Fitness BASIC
    - Controlled Substances and Alcohol BASIC
    - Vehicle Maintenance BASIC
    - Hazardous Materials Compliance BASIC
    - Crash Indicator BASIC
- Safety Measurement System (SMS) Methodology
- BASIC Scores
- Intervention
- Conclusion
- Frequently Asked Questions
- Quiz

<div style="text-align:right; writing-mode:vertical-rl">REMOVABLE PAGE - PULL SLOWLY FROM TOP RIGHT CORNER</div>

_____

Driver's Name (Printed)

_____

Driver's Signature                                    Date

3l6 Towing and Road Service

Company

_____

Company Official's Signature                    Date



Copyright J. J. Keller & Associates, Inc.

# DRIVER'S RECEIPT

I acknowledge receipt of J. J. Keller's *Alcohol & Drug Testing: What Drivers Need to Know* Driver Handbook containing the following topics:

- Introduction
- Abbreviations and Definitions of Key Terms
- Who is Covered by the Alcohol and Drug Regulations?
- What is a Safety-sensitive Function?
- What are the Alcohol and Drug Prohibitions?
- What Tests are Required and When Will I Be Tested?
  - Pre-employment
  - Post-accident
  - Random
  - Reasonable suspicion
  - Return-to-duty
  - Follow-up
- What Happens if I Refuse to Be Tested?
- How is Alcohol Testing Performed?
- How is Drug Testing Performed?
- What are the Consequences of Violating the Alcohol and Drug Prohibitions?
- Your Alcohol and Drug Testing Records
- Where Can I Go for Help?
- The Effects of Alcohol and Drugs on the Body

| | |
|---|---|
| Driver's Signature | Date |

316 Towing and Road Service
Company

| | |
|---|---|
| Trainer's Signature | Date |

316 Towing and Road Service
Company

**NOTE:** This receipt shall be read and signed by the driver. A responsible company supervisor shall countersign the receipt and place it in the driver's training file.

Copyright J. J. Keller & Associates, Inc.

*(left margin, vertical text:)* REMOVABLE PAGE - PULL SLOWLY FROM TOP RIGHT CORNER

# INSURANCE/ POLICIES

## TAB 3



√ Occupational Accident

√ Company Safety Policy

√ Cell Phone Policy

√ Log Compliance Policy

√ No Rider Policy

OCCUPATIONAL ACCIDENT INSURANCE INDIVIDUAL OWNER-OPERATOR APPLICATION



**GREAT AMERICAN**
INSURANCE GROUP
Trucking

301 E. Fourth Street, 22N
Cincinnati, OH 45202-4201
Toll Free 800-643-7882
Fax 513-333-6998

*"We take care of the Owner-Operator better than anyone!"*

## 1. Schedule of Benefits : Plan D

| DESCRIPTION OF BENEFITS | OCCUPATIONAL | NON-OCCUPATIONAL | PASSENGER | |
|---|---|---|---|---|
| ACCIDENTAL DEATH (MAXIMUM) Survivor Benefit (Lump Sum) ACCIDENTAL DISMEMBERMENT Including Paralysis And Severe Burn Benefits Incurral Period | $200,000 Principal Sum $50,000 + $2000/Mth Up To 125 Mths 104 Weeks | $15,000 Principal Sum $500 Per Month Up To 30 Mths 104 Weeks | $50,000 Principal SUM $25,000 + $1,000/Mth 25 Mths 104 Weeks | This coverage is not Workers' Compensation Insurance or for any other purpose except occupational accidents (unless non-occupational benefits apply). This policy does not cover disease unless otherwise endorsed. |
| ACCIDENTAL MEDICAL EXPENSE Accidental Dental Benefit Deductible Incurral Period | $1,000,000 MAXIMUM BENEFIT AMOUNT $1000 Per Injury/ $10,000 Lifetime 0 104 Weeks | $10,000 Maximum Benefit Amount Not Covered 0 104 Weeks | $50,000 Maximum Benefit Not Covered $100 104 Weeks | The list of benefits is only a brief description of the actual coverages. Certain exclusions and limitations do apply. For complete details please refer to your policy. In the event of any conflict between the information listed here and the actual policy, the insurance policy will govern in all cases. |
| ACCIDENTAL MEDICAL EXPENSE RIDER LIMIT FOR: Hernia or Hemorrhoid or Occupational Disease or Occupational Cumulative Trauma Max Benefit Period | $1,000,000 MAXIMUM $7,500 PER ACCIDENT OR INJURY SUBJECT TO A $15,000 LIFETIME MAXIMUM 10 WEEKS | $10,000 MAXIMUM Not Covered | $50,000 MAXIMUM Not Covered | |
| TEMPORARY TOTAL DISABILITY Waiting Period Duration-Maximum Benefit Period RIDER LIMIT FOR: Hernia or Hemorrhoid or Occupational Disease or Occupational Cumulative Trauma Max Benefit Period | $700 MAX/$200 MIN PER WEEK 7 Days 104 Weeks 10 WEEKS | Not Covered | Not Covered | |
| CONTINUOUS TOTAL DISABILITY Waiting Period Duration-Maximum Benefit Period | $700 MAX/$200 MIN PER WEEK 104 WEEKS Up To Social Security Retirement Age | Not Covered | Not Covered | |
| CERTIFICATE AGGREGATE AND COMBINED SINGLE LIMIT ANY ONE ACCIDENT | $1,000,000 | | | |

## 2. Driver And Beneficiary Information

Indicate type of driver:

☐ Owner-operator  ☐ Co-driver  ☐ Contract-driver  ☐ Scheduled co-driver  ☐ Fleet driver  ☐ Team driver

☑ Other, including an authorized passenger (applicable on plans B or D only) _Towing driver_

Paid by ☑ 1099  ☐ W-2  CDL number _____  Contracted by _316 Towing_

Unit Number/Vehicle Identification Number # 116, 216, 316, 416, 516, 616

316Towing_00118

OCCUPATIONAL ACCIDENT INSURANCE INDIVIDUAL OWNER-OPERATOR APPLICATION

## 2. Driver And Beneficiary Information *Continued*

| Name | Dustin L Hyde | | | | |
|---|---|---|---|---|---|
| Address | [redacted] | City Winder | | State GA | Zip 30680 |
| DOB | [redacted] | Home phone number | [redacted] | | |
| Beneficiary name | Cosa Conway | Relationship | Portner | | |

| History: Please explain all yes answers on a separate sheet of paper | Yes | No |
|---|---|---|
| Have you been injured in a work-related accident during the past 36 months? | ☐ | ☑ |
| Have you received medical treatment for a health-related condition in the past 36 months? | ☐ | ☑ |
| Are you presently under a physicians care or taking any prescription medications? | ☐ | ☑ |
| Do you have any health restrictions or limitations on the type of work you can perform? | ☐ | ☑ |
| Do you load or unload? | ☑ | ☐ |
| Do you have a disability rating? If yes, please provide % of disability and area affected on a separate sheet of paper | ☐ | ☑ |

I ☑ accept ☐ reject the occupational accident insurance offered by the above listed motor carrier. I understand that coverage becomes effective when this application has been received and approved by Great American Insurance Company or its authorized agent. I understand that I will no longer be eligible for coverage upon my 65th birthday and that coverage will therefore cease. I further understand that coverage terminates on the date the policy is terminated; or I am no longer under contract with the above mentioned motor carrier; or my premium is not paid. I also understand that coverage may be available on an individual policy subject to underwriting guidelines in effect at termination of the above policy.

Driver signature _____Dustin L Hyde_____   Date: _____11-02-21_____

**Medical Information Authorization:** I hereby authorize any licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility, insurance company or any other organization, institution or person that has any records, including any medical history for the above named person to furnish such information or copies of records to the insurance companies association or its representatives. A photographic copy of this authorization shall be as valued as the original.

Driver signature _____Dustin L Hyde_____   Date: _____11-02-21_____

## FLORIDA STATUTE 817.234(1)(b)
"Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree."

## NEW MEXICO STATUTE 59A-16C-8
"Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties."

## OHIO INSURANCE CODE 3999.21
"Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insured, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud."

316Towing_00119

## STATEMENT OF COMPANY SAFETY POLICY

It is, and will continue to be the policy of 316 Towing and Road Service, Inc to conduct all operations as safely and efficiently as possible.
As a motor carrier we have the ultimate responsibility to perform our work and driving skills in a professional manner. It is our duty and moral responsibility to drive in a manner that reflects a genuine concern for the motoring public, those with whom we share the nation's highways.

To accomplish this, we are assigning the responsibility for our safety program to all management and supervisory personnel. Management and drivers alike will be held accountable for their actions and performance regarding personal and motor transport safety. Compliance with Motor Carrier regulations is expected from each individual within the organization.

Our safety director will be responsible to administer our safety program to insure that safety standards are met throughout the organization. Each person will have the responsibility of performing his/her job in a safe and efficient manner.

**WHEN IT COMES TO SAFETY, AT 316 TOWING AND ROAD SERVICE, INC, THERE WILL BE NO CUTTING CORNERS.**

The health and safety of our employees and independent contractors, as well as the monitoring public, is of major importance to the success and longevity of this company and will be addressed accordingly.

---

## ACKNOWLEDGEMENT

I hereby acknowledge receipt of a copy of 316 Towing and Road Service's Corporate Safety Policy

_Dustin Hyle_
**Independent Contractor's Signature**

_11-21-2019_
**Date**

_Dustin Hyde_
**Independent Contractor's Printed Name**

**Reviewed By**

**316 TOWING AND ROAD
SERVICE, INC**

Cell Phone Policy

In order to ensure the safety of our company drivers and to comply with state and federal regulations regarding hand held cell phone usage by commercial motor vehicle drivers. 316 TOWING AND ROAD SERVICE, INC has adopted the following policy while operating company vehicles in interstate and intrastate commerce.

1. All independent contractors while driving a commercial motor vehicle (CMV), as defined in 49 CFR Part 390.5, are prohibited from holding, dialing, or reaching for a hand held cellular phone. This includes all push-to-talk type phones, such as Nextel.

2. A driver of a CMV is allowed to initiate, answer, or terminate a call by touching a single button on a mobile phone or headset provided it can be done while seated in a normal manner and seat-belted as required by law. Any such movement must be accomplished without removing the driver's eyes from the roadway. Thus hands-free technology is permissible provide the use does not cause distraction.

3. All independent contractors, operating *any* type of vehicle, are prohibited from texting at all times while operating a company or personal vehicle while engaged in any activity on behalf of the company.

4. All independent contractors must minimize other distractions which take away from concentrating on driving, as driving while distracted constitutes a hazard, and could be a traffic infraction in some states such as Maine. Distractions include, but are not limited to, eating, reading, talking to passengers, and performing other activities which tend to cause the driver to remove their eyes from the road or divert their attention from the task of driving.

**Driving is defined as**: operating a commercial motor vehicle on a highway, including while temporarily stationary because of traffic, traffic control device, or other temporary delays. Driving would not include operating a CMV when the driver has moved the vehicle to the side of, or off, a highway and has halted in a location where the vehicle can remain stationary.

**Exemption:** The regulations and this policy do not prevent drivers of commercial motor vehicles from using a hand held mobile phone to communicate with law enforcement or other emergency services if necessary.

### Acknowledgement

I acknowledge that I have received a written copy of the cell phone and distracted driving policy. I fully understand the policy and agree to abide by the terms, and that I am willing to accept the consequences of failing to follow the policy.

_____
Independent contractor Signature

_11- 21- 2019_
Date

## To: ALL D.O.T. and CDL

## Driver's Daily Log Compliance

## <u>Acknowledgement</u>

**I hereby acknowledge receipt of a copy of 316 Towing and Road Service, Inc Driver's Daily Log Compliance Policy. I am further aware that I must keep an updated medical card on my person when driving or operating vehicles over 10,000 GVW.**

**Independent Contractor's Printed Name:** _Dustin Hyde_

**Independent Contractor's Signature:** _Dustin Hyde_

**Date:** _11-21-2019_

# NO RIDER POLICY

Unless specifically authorized in writing to do so by 316 Towing and Road Service under whose authority the commercial motor vehicle is being operated, no driver shall transport any person or permit any person to be transported in any vehicle of the motor carrier.

The ONLY authorized passengers that may be allowed are defined as follows:

1.   The other driver in a driving team contracted to motor carrier

2.   Another contracted driver of the motor carrier as directed by motor carrier's dispatch person.

## ALL OTHER PERSONS ARE UNAUTHORIZED AND ARE STRICKLY FORBIDDEN TO BE IN ANY TRACTOR.

Any non-contracted driver caught with an unauthorized passenger may be suspended for one (1) week or their contract may be terminated.

Any contracted driver caught with an unauthorized passenger may have their contract terminated.


Independent Contractor's Acknowledgement:

I have read and completely understand the NO-RIDER POLICY. I agree to follow all guidelines as set forth in this policy.


Executed at _____.


For 316 Towing and Road Service                                    INDEPENDENT CONTRACTOR

_____                    _____
By: Authorized Agent                                                   By: Authorized Agent

# AUTHORIZATIONS/CONTRACT

## TAB 4



- ✓ W-9
- ___ PSP Record and Authorization
- ✓ Guidelines for Independent Contractors
- ✓ Application Checklist
- ✓ Independent Contractor Agreement
- ✓ Driver's Rights
- ✓ Fair Credit Reporting Act

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

Give Form to the requester. Do not send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Dustin Lee Hyde

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

- ☑ Individual/sole proprietor or single-member LLC
- ☐ C Corporation
- ☐ S Corporation
- ☐ Partnership
- ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**6** City, state, and ZIP code

Winder GA 30680

Requester's name and address (optional)

**7** List account number(s) here (optional)

---

## Part I — Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

**Employer identification number**

---

## Part II — Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**
Signature of U.S. person ▶

Date ▶ 1-24-2020

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

- Form 1099-INT (interest earned or paid)

- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

# 316 Towing and Road Service's
# Guidelines for Independent Contractors

**The following are our driving criteria standards which may be modified by management when other desirable risk characteristics are present:**

- No major violations in the past five (5) years.
- No more than two minor violations in the past three years or not more than one chargeable accident with one minor violation in the past three years.
- Drivers between the ages of 21 and 25 years old will be allowed to operate light to medium duty units. These drivers will be hired on a case to case basis.
- All drivers operating heavy and extra heavy trucks or tractor trailer units must be 25 years old with at least two (2) years experience driving similar type vehicles.
- A physician statement must be obtained on drivers 65 years of age and older. This statement must be signed and dated by a physician.
- All drivers must be reported at inception and throughout the policy term.
- All drivers must have a valid license for the class of vehicle being operated.
- All accidents are considered "at fault" unless the police report is provided with the initial application showing the driver was "not at fault" or not contributing to the occurrence.

## Minor violations include:

- **Failure to Yield**
- **Speeding**
- **Improper Lights**
- **Illegal Passing**
- **Improper Towing**
- **Improper Turning**

## Major violations include:

- **Driving while intoxicated**
- **Illegal possession of alcohol/narcotics in a vehicle**
- **Unlawful use of vehicle**
- **Speed Contest or Racing**
- **Reckless Driving**
- **Driving while license is suspended**
- **Wrong way on a one way street**
- **Wrong side of the Road**
- **Excessive Acceleration**
- **Fleeing/attempting to Elude a Police Officer**

**Independent Contractor
Application Checklist**

**Name:** Dustin Hyde

**Date:** 11-21-2019

3990 Fredricksberg
Ct
Loganville, GA
30052

When filling out the enclosed forms please make sure you fill out all spaces provided.
**PLEASE PRINT NEATLY** or it will slow down the hiring process. It could also result in your not
being considered as our company requires detailed condition reports to be filled out on each
vehicle you will move.

Please complete this checklist to ensure you application is complete. Incomplete submissions
may result in a delay for your hire, or may not be considered at the discretion of the Driver
Hiring Manager.

- **Regular / DOT Drivers** Must complete the Driver's Application for Qualification to
  include **past 3 years** employment, sign and date the application
- **CDL Drivers** Must complete the Driver's Application for Qualification to include **past
  10 years** employment, sign and date the application
- ☐ Must provide a copy of **DOT Physical Long Form**
- Must provide clear copy of **Driver's License**
- ☐ Must provide **Driver Certification Card**
- ☐ Must provide clear copy of **Social Security Card**
- ☐ Must fill out and sign **Certification of Violations and Annual Review**
- ☐ Must fill out and sign **Employment and Safety History**
- ☐ Must fill out and sign the **Drug and Alcohol Policy Signature Page**
- ☐ Must fill out and sign **Request / Consent for Information** from previous employer on
  alcohol and controlled substance testing
- ☐ Must fill out and sign **Single License and Compliance Certification and MVR Waiver**
- ☐ Must sign the **Driver Questionnaire,** the **Independent Driver** form, and the
  **Independent Contractor form (All** located in the application)
- ☐ You must get a copy of your **past 3 years driving record** from the **Department of Motor
  Vehicles.** This must not be older than **30 days** when we receive it.

All drivers are required to take a 5 Panel DOT Regulated Drug Screen (to include Chain of
Custody form). You will be instructed where to go once your application has been approved.

### 316 Towing and Road Service's Pre-Contract Questionnaire

**Driving**

2. Have you ever been cited for careless, reckless driving or as a habitual traffic offender?
Yes    No

3. Have you ever been cited for driving under the influence or marijuana or other drugs?
Yes    No

4. Has your license ever been suspended or revoked for any reason?   Yes   No
If yes, please explain: _____

5. Have you had more than 2 moving violations in the last 3 years?   Yes___ No___

6. Have you had more than 2 chargeable accidents in the last 3 years?   Yes   No___

7. Have you ever been convicted of a     crime?   Yes   No___

**The Work**

1. You will be an independent contractor driver and responsible for your own food and lodging on the road (unless authorized). Do you understand this?   Yes   No

2. As an independent contractor driver you could be subjected to a Pre-employment, Random, Post Accident, and /or a Reasonable Cause Drug test. Do you understand this?   Yes   No

3. 316 Towing and RS pays independent contractors when contracts including drivers Driver's daily logs and support paperwork are complete and turned in All settlements and advances are on the Com-Data System. Do you understand?   Yes   No

4. As an independent contractor you will receive a 1099 form at the end of the year and not a W-2 form. You will be responsible for your own taxes. This means that 316 Towing and RS will not withhold any taxes or Social Security from your settlement, and you will receive your full settlement. Do you understand this?   Yes   No

5. If transporting vehicles over 10K on this job you are required to keep a DOT Log Book. Do you know how to keep a log book or can someone teach you before you become an Independent Contractor?   Yes   No

**DO YOU STILL WISH TO APPLY FOR INDEPENDENT CONTRACTOR STATUS**   Yes   No
If Yes Sign Below:

(Applicant's Signature) *Dustin Kyle*           (Date) 11-21-2019

(Applicant's Name) Dustin Hyde          (Date) 11-21-2019

# A Driver's Rights Regarding Past References
# And the Qualification Process

Under new federal regulations, which became effective 10-20-2004 motor carriers are required to give more extensive background information on the performance of commercial drivers than ever before. For example, full details of any accidents in the prior three year period must be supplied together with a complete history of all alcohol and drug testing – including refused tests, alcohol tests producing a result of 0.02 or greater as well as alcohol tests producing results of 0.04.

It is a driver's right to see the information provided by former carrier-employers, if he/she wishes. The government has established a protocol for exercising that right which must be followed:

1) You have a right to see the information provided by prior employers, if you request it using the correct form within 30 days of joining a motor carrier.

2) You have a right to request that prior motor carrier employer correct information provided, if you request this using the correct form.

3) You have a right to rebut a prior motor carrier's refusal to correct information, if you use the correct form.

316 Towing and Road Service will provide these forms to you, if you choose to exercise your rights under these new regulations.

**I HAVE READ THE ABOVE AND UNDERSTAND MY DRIVER'S RIGHTS**

_____          _____
(Independent Contractor's Signature)              11-21-2019
                                                  (Date)


_____
        Dustin Hyde
(Independent Contractor's Printed Name)

# Fair Credit Reporting Act Disclosure Statement

In accordance with the provisions of Section 604(b)(2)(A) of the Fair Credit Reporting Act, Public Law 91-508, as amended by the Consumer Credit Reporting Act of 1996 (Title II, Subtitle D, Chapter I, of Public Law 104-208), you are being informed that reports verifying your previous employment, previous drug and alcohol test results, and your driving record may be obtained on you for employment purposes. These reports are required by Sections 382.413, 391.23, and 391.25 of the Federal Motor Carrier Safety Regulations.

Aplicant's Signature _____

Date  11-21-2019

Print Name  Dustin Hyde

Social Security Number _____

## Driver's Agreement with 316 Towing and Road Service

1. Driver should remain professional with staff and customers, please remain respectfull at all times

2. Driver cannot smoke in the truck, truck must be clean at all times (Wash and vacume provided)

3. Being late and leaving early is not excusible on a regular basis, continuing will result in a write up

4. Drivers should only purchase fuel with cards " Ingles, QT, Kroger, Racetrack"

5. Driver should return trucks as they are recieved at the ining of your shift

6. Driver is responsible for fuel and eqipment reciepts

7. For requested days off driver must give at least one week notice, 30 day notice about vacation


Driver's Signature _____

316Towing_00131



## INDEPENDENT CONTRACTOR AND LEASE AGREEMENT

This Independent Contractor Agreement is made between 316 Towing and Road Service (hereinafter referred to as "Carrier") and _____, (hereinafter referred to as "Contractor").

WHEREAS, Carrier is a for-hire motor carrier operating in interstate commerce and subject to the rules and regulations of the Federal Motor Carrier Safety Administration, the U.S. Department of Transportation, and other federal and state agencies; and

WHEREAS, Contractor is a (check where applicable): (1) A Sole Proprietorship ☐; (2) Limited Liability Corporation or Partnership ☐; or (3) A Corporation ☐ which owns or leases the equipment identified in Appendix A attached hereto; and

WHEREAS, the parties desire to enter an independent contractor relationship and lease agreement in accordance with applicable law;

NOW, THEREFORE, the parties agree as follows:

This Agreement shall govern the lease of equipment identified on Appendix A with driver by Contractor to Carrier for the continuing performance of a series of separate transportation contracts, the payment for which shall be determined in accordance with the agreed compensation set forth in Appendix B.

1.      Compliance with Federal Statutes and Regulations. The parties acknowledge and agree that this contract is governed by Federal Regulation, to wit: 49 C.F.R. 376 and it is the intent of the parties that this Agreement fully comply with such regulations without creating indicia of control which would otherwise frustrate the intent of the parties to create an independent contractor relationship. See 49 C.F.R. 376.12(c)(4).

Accordingly, the parties agree as follows:

A.      Carrier shall exercise that level of dominion and control over the leased equipment required by Federal Motor Carrier Safety Regulations including the execution of an original and 2 copies of this Lease by the parties with a copy or notice of this Lease to be kept on the equipment during its term in accordance with 49 C.F.R. 376.11(a) and 49 C.F.R. 376.12(l).

B.      Receipts specifying the identity of the equipment and stating the date and time possession is transferred shall be issued in the form set forth in Appendix C in the time and manner as required by 49 C.F.R. 376.11(b).

C.      During the period of the Lease, Carrier shall identify the equipment in accordance with FMCSA requirements found at 49 C.F.R. 390.21 and Contractor warrants that it will immediately execute a receipt for return of the equipment as provided for in Appendix C, and remove or submit for removal all identification that the equipment is operated subject to the safety duties and obligations of Carrier. Within five calendar days of termination of the lease,

Initial Here: D.H

Contractor shall return to Carrier by mail or in person all identification devices, other than those painted directly on the equipment, as well as the executed receipt. Carrier may withhold final payment to Contractor, pursuant to 49 C.F.R. 376.12(f) until this requirement is complied with.

      D.    <u>Records of Equipment</u>. Carrier shall keep records covering each separate job or trip for which Contractor's services are retained in accordance with 376.11(d). Contractor warrants that it will instruct its driver to issue, obtain and carry while in transit bills of lading covering each trip which identify the lading and indicating the point of origin, the time and date of departure, the point of final destination, and confirm that the transportation is provided under the responsibility of Carrier.

      E.    Contractor warrants that it is the title holder or has equitable ownership of the leased equipment in accordance with 49 C.F.R. 376.12(a).

      F.    The Lease shall commence with the time of the giving of the receipt for possession and shall continue from month to month until terminated by either party in accordance with the termination provisions herein.

      G.    To fulfill the exclusive possession and responsibilities of the regulations, the authorized Carrier shall have exclusive possession, control and use of the equipment for the duration of the lease and the concomitant safety duties imposed by the Federal Motor Carrier Safety Administration's regulations. See 49 C.F.R. 376.12(c) and the safety regulations found at 49 C.F.R. 390-399.

      H.    Contractor recognizes Carrier's regulatory duty to *inter alia* maintain driver qualification files, monitor driver's hours of service, conduct pre-employment and random drug and alcohol screening, verify equipment maintenance and repair, ensure proper securement, transport of freight in accordance with reasonable dispatch and highway restrictions governing the transportation of hazardous and overweight and over-dimensional loads. Contractor certifies that it is familiar with these regulatory requirements, will so instruct its driver personnel in proper compliance and will indemnify and hold Carrier harmless from any breach by it or its employees of this duty or failure to offer reasonable cooperation.

      I.    <u>Calculation of Compensation</u>. Compensation set forth in Appendix B is based upon a percentage of the line haul revenue derived from each load or trip tendered by Carrier to Contractor and accepted for transport. Line haul revenue shall be that amount reflected upon the rated freight submitted by Carrier to its customer for payment for the services rendered by Contractor and accordingly shall exclude charges paid to interline carriers, pickup and delivery fees for services not performed by Contractor, expenses for over-dimensional permits, escort service and accessorial charges not earned by line haul equipment or its drivers such as lumpers or rigging expenses. Other expenses not attributable to the services rendered by Contractor shall also be excluded from line haul revenue. In accordance with 49 C.F.R. 376.12(g), Carrier will give Contractor before or at the time of settlement a copy of the rated freight bill or computer-generated document containing the same information. Upon request, Contractor may view other documents as required by regulation. In addition to the agreed

Initial Here: D.H

percentage of line haul revenue, Contractor shall receive 100% of any fuel surcharge, if any, collectible by Carrier as reflected on its rated freight bill.

      J.    Non-Reimbursable Expenses. For the consideration specified above, Contractor agrees to be solely responsible for the following additional expenses:

    (1)    Identification Devices. (At its expense upon termination of lease, Contractor removing identification devices, offering suitable evidence to Carrier that such devices have been removed, or submit the equipment to Carrier for its removal.)

    (2)    Cost of Fuel.

    (3)    Fuel Taxes.

    (4)    Permits of all types.

    (5)    Tolls, ferries, accessorial services, base plate and licenses.

    (6)    The hiring and settling of wages for its drivers and the payment of all employment taxes, worker's compensation insurance,

    (7)    The maintenance of all equipment in accordance with DOT standards.

    (8)    The payment of all operating expenses including Federal Highway Use Taxes, personal property taxes, fines incurred by it.

    (9)    Furnishing all tools, including tie-downs and load securement equipment, and safety equipment required by the DOT and/or FMCSA.

    (10)    Cost pertaining to the proper training and instruction of Contractor and its employees.

    (11)    Compatible on-board computer and tracing technology to meet Shipper's requirements. Attached hereto as Appendix D is a list of tools and other devices which Contractor is required to provide pursuant to this Agreement which can be purchased or rented to Contractor by Carrier for the fees stated therein. If Contractor elects to purchase or rent these items by executing the addendum in the place provided, the cost of same will be charged back to settlements until such time as the tool or device is returned in good condition, ordinary wear and tear excepted.

Initial Here: D.H.

(12) <u>Property Damage to Carrier's Trailer</u>.  Contractor shall be responsible for any property damage to Carrier's trailer equipment or other equipment beyond ordinary wear and tear.

(13) <u>Fines for Oversize or Overweight Shipments</u>.  Unless trailers are preloaded and sealed or containerized, Contractor or its employees shall be responsible for confirming that all lading is suitable for transportation in accordance with applicable weight and dimensional limitations imposed by in-transit states or authorized by special permits obtained for transportation of the shipment. Contractor shall be responsible for all fines, penalties and claims resulting from failure to comply with this obligation.

(14) With respect to fuel purchases set forth in Subparagraph 3 above, Contractor recognizes that Carrier is required by IFTA to file taxes governing fuel taxes for its services and accordingly agrees to purchase sufficient fuel within each state in which its equipment operates to assure payment of fuel taxes.  Contractor agrees to provide Carrier with satisfactory proof of such purchases and to pay any applicable deficiency.

(15) With respect to base plates, if purchased in the name of Carrier, upon termination of the lease Carrier will transfer the plates to another unit if possible, crediting Contractor with any refund or credit it received.  If Carrier is unable to transfer the plates to another unit, then no refund or credit will be due to Contractor.

(16) Detention time.

K.    <u>Payment</u>.  In accordance with 49 C.F.R. 376.12(f) Carrier agrees to pay Contractor within 15 days after submission of necessary delivery documents to secure payment from shipper and driver log books required by the U.S. DOT.  Because the parties recognize that the U.S. DOT regulations now require the Carrier to maintain supporting documents including but not limited to trip reports, weight tickets, evidence of toll receipts and fees, as well as other documents, Contractor agrees to submit these additional documents with its settlement.  If such documentation is not provided within 5 working days of Carrier's request, Contractor agrees to a settlement deduction of $50 per occurrence to reimburse Carrier for the administrative expense of re-requesting the documentation.  I

L.    <u>Chargeback Options</u>.  Carrier shall be entitled to chargeback to Contractor and deduct from settlement the following: (1) all payments paid by Carrier for authorized advances and costs incurred by Carrier on behalf of Contractor as a result of Contractor's obligations enumerated in J above.  In addition, any advance specifically confirmed in writing, the purchase of any goods or services from Carrier by Contractor as specifically authorized in this Agreement or otherwise and specifically enumerated fine or penalty may be deducted for the

Initial Here: D.H

316Towing_00135

specific amount provided for herein or at Carrier's cost without markup. Contractor will be afforded copies of documents necessary to determine the validity of any charge.

M.    Products, Equipment or Services from Carrier. Contractor is not required to purchase or rent any products, equipment or services from Carrier as a condition of entering this Lease. Any product, equipment or service which Contractor elects to purchase shall be enumerated in Appendix D or by subsequent addenda.

N.    Insurance. Carrier has a legal obligation under federal statute to provide bodily injury and property damage insurance to the public for the use of the leased equipment pursuant to 49 U.S.C. 13906 during the term of this Lease. Contractor agrees to carry non-trucking liability (so-called "deadhead and bobtail") insurance with a combined single limit of not less than $500,000 and will provide proof of such coverage to Carrier during the term of this Agreement. Contractor further agrees that it is its sole duty to require and maintain at its expense worker's compensation insurance or other insurance required by the provision of any applicable employer's liability law on all drivers and any other employees required by Contractor or hired by Contractor to perform the services under this Agreement. A certificate of worker's compensation will be furnished upon request. If Contractor elects to obtain and if Contractor maintains that worker's compensation is not required due to statutory exemption, it will provide evidence of comparable occupational accident insurance and otherwise warrants that it will indemnify and hold harmless Carrier against any allegation of cut-through liability.

If Contractor elects to purchase any insurances from sources available through Carrier, such coverage will be set forth in Appendix D and Carrier will provide Contractor with a copy of each policy upon request, providing to Contractor a certificate of insurance naming the insurer, the policy number, the effective dates, the amount of coverage, the cost to lessor and any deductible.

O.    Cargo and Accident Deductible. Notwithstanding any public liability insurance or cargo insurance maintained by Carrier, Contractor agrees to pay to Carrier an amount equal to the first $2500 of the expense incurred by Carrier and paid to it any cargo claimant or accident victim as a result of the negligence of Contractor or its employees in the performance of this contract. Prior to any such deductions, Carrier shall provide to Contractor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to Contractor.

P.    Notification Requirement. Contractor further agrees to immediately notify Carrier of any potential cargo claim, accident, fine, citation or out-of-service order incurred by Contractor or its employees in order to ensure Carrier's compliance with its customer and safety obligations.

If for any reason Contractor fails to return Carrier's equipment or remove placards within 24 hours of termination, Contractor acknowledges that Carrier may seek a writ of replevin and agrees to pay all attendant attorney's fees and costs as well as the cost of recovery incurred by Carrier in recovering its equipment and removing its placards.

Initial Here: D.H.

316Towing_00136

Q.  Escrow of Funds.  The Contractor shall deposit with the Carrier a performance bond issued by a Surety Company approved by Carrier in the amount of $2,500.00 per vehicle, or at his option, may furnish in lieu thereof a $500.00 cash bond to guarantee the full, complete and competent performance of the Contractor's obligations under this contract. These obligations include the settlement of all accounts between Contractor, its employees or agents, and Carrier, reimbursement of authorized chargeback items, and the return of all regulatory agency permits, tags and identifications issued in the name of the Carrier and the Contractor upon expiration or termination of the Contract or upon the execution of a receipt for the equipment.

The Contractor shall receive notice through the settlement process of any transaction involving the escrow funds, to include any withdrawals or any other adjustments to the escrow account.  Contractor shall have the right to an accounting for transactions involving the escrow fund at any time.  The Carrier shall compute interest on the escrow funds at least quarterly.  For purposes of calculating the balance of the escrow fund on which interest must be paid, the Carrier may deduct a sum equal to the average advance made to the Contractor during the period of time for which the interest is to be paid.  The interest rate that is to be applicable to said interest payments shall be set at a rate equal to the average yield or equivalent coupon issue yield on 13-week Treasury Bills as established in the weekly auction by the Department of Treasury at the beginning of each period for which interest is to be calculated.

If for any reason Contractor fails to return Carrier's equipment or remove placards within 24 hours of request, Contractor acknowledges that Carrier may seek a writ of replevin and agrees to pay all attendant attorney's fees and court costs as well as the cost of recovery incurred by Carrier in recovering its equipment and removing its placards.

Carrier shall return any remaining escrow funds to Contractor no later than 45 days from the date of termination.

R.  Impermissive Use of Equipment.  The parties contemplate that Contractor may use trailer equipment owned by Carrier to provide the contracted services.  Such equipment may be used without additional charge for the purpose of providing services for Carrier or with Carrier's express permission.  During the term of this Agreement, if Contractor moves or pulls Carrier's trailer from Carrier's terminal or other location without Carrier's authorization, Contractor will be assessed 15¢ per mile for the total number of miles and all other charges incurred in securing and returning such trailer subject to a minimum charge of $50 per day.

2.  Contractor Independence/Control of Operations.

A.  Federal and State Laws.  At all times, Independent Contractor shall remain solely responsible for payment of all federal and state taxes accruing as a result of its maintenance and use of the leased vehicle, retention and payment of driver personnel to perform services under this agreement.  Contractor warrants that it is familiar with and shall comply with all applicable employment laws and applicable taxes including and not limited to federal and state income tax, state worker's compensation, unemployment compensation taxes, and overtime

Initial Here: D.H

requirements which may be applicable.  Contractor shall indemnify and hold Carrier harmless from these obligations.

To the extent not inconsistent with federal, state and safety regulations, including but not limited to hours of service requirements, highway speed limits and other restrictions, Contractor shall be free to set the method and time of performance for all delivery of loads accepted by it. The parties agree and understand that federal and state laws and regulations impose duties on carriers including the maintaining of records of Contractor operations, equipment maintenance, hours of service, reporting for state tax purposes all miles run by the vehicle as well as additional obligations imposed by Carrier's insurer whose federal filings are a prerequisite of operations. Contractor agrees to comply with these federal duties and statutes with respect to the equipment leased to Carrier and will provide all necessary supporting documents as required by law. Contractor warrants that it will only permit driver personnel to perform service under this Contract who have been credentialed and approved by Carrier in accordance to US DOT requirements.

B.     Customer-Specific Requirements.  The parties agree that in the performance of this contract, Carrier in its sole discretion will tender Contractor individual loads, subject to its equipment availability on a load-by-load basis.  It is agreed that any load may have customer-imposed service requirements which will be conveyed to the Contractor at time of tender.  Contractor agrees to accept or reject the load tender and is not subject to forced dispatch. In accepting the load, Contractor agrees to perform in accordance with any special ground rules imposed by the customer and further warrants that the expected service can be provided in a safe and non-negligent fashion in accordance with its drivers' available hours of service.

C.     Routes and Methods.  The parties agree that federal regulation requires a Carrier to be responsible for accounting for all miles run by the involved commercial vehicle while under lease and for the hours of service of the driver operating the leased vehicle, regardless of whether the truck is under dispatch.  Notwithstanding these requirements, Contractor is free to select the routing for performing any dispatch consistent with state and federal highway speed limits, weight and other restrictions.  Carrier will assist Contractor by providing practical routing information for its use. Contractor agrees to indemnify and hold harmless Carrier from any claim, fine, loss or damage which arises from the "deadhead or bobtail" use by it of the equipment.

Contractor agrees to indemnify and hold harmless Contractor from any claim, fine or assessment arising out of its failure to comply with the warranties and representations contained in this paragraph.

D.     Independent Contractor Status.  It is the intent of the parties for Contractor to retain the status of an independent contractor in business for federal and state law purposes. Carrier's control over Contractor shall be limited to that control required by federal and state statutes and regulations governing the conduct of motor carriers.  Contractor shall train all of its driver personnel in accordance with U.S. DOT requirements and shall submit all driver personnel to Carrier for qualification, safety and training to the extent required by federal regulations. Neither Contractor nor its driver employees shall be required to attend other employment

Initial Here: D.H.

training meetings held by the company nor shall they be subject to the company employment manual. Contractor shall have the right to substitute other qualified drivers to perform the services subject to Carrier's confirmation that Contractor's driver meets the driver qualifications established by the U.S. DOT and its insurers.

Contractor warrants that no driver will be used until the driver has been qualified by Carrier in accordance with federal safety requirements. At all times, Contractor shall remain responsible for hiring and supervising his employees and for paying their salaries and all relevant taxes. Contractor warrants compliance with all federal and state employment laws and shall indemnify and hold Carrier harmless from its failure to discharge such obligations.

Contractor shall at all times be free to set its hours of operations consistent with the federally imposed hours of service requirements and the scope of the work accepted and the customer's service expectations. Contractor is free to work when and where it chooses and shall accept or reject work assignments on a load by load basis. Contractor agrees to comply with any scope of work requirement imposed by the customer service conditions when accepting a job assignment but is otherwise free to schedule the order of its work.

Where shipper requires same and to facilitate efficient dispatch, Contractor agrees to provide electronic notification of its operating status including when equipment is loaded, unloaded or otherwise available to dispatch. Otherwise no oral or written report other than the supporting documents and logs required by the DOT, bills of lading and shipping documents required by the customer for payments and fuel taxes as required by IFTA shall be required.

Contractor shall be solely responsible for furnishing the power equipment used to provide service and shall keep same in good repair in accordance with federal regulation and inspection requirements. Contractor shall be solely responsible for the payments on the leased equipment on the subject equipment and shall have the right to make all crucial decisions with respect to the maintenance and operation of such equipment.

Consistent with the leasing regulations which require Carrier to have exclusive possession and control of the equipment, Contractor shall be free with notice to work for other carriers or customers. When Contractor works for other carriers or customers, Contractor shall not operate under, or display, the placards or other identifying equipment of Carrier. Contractor shall have the right to discharge any driver it employs at any time. Contractor agrees that it shall reassign any driver which Carrier in its sole discretion determines is unqualified to comply with Carrier's federal imposed safety duties.

Contractor warrants as a condition of this contract that all equipment will be continually operated in accordance with U.S. DOT safety regulations in a non-negligent fashion.

Contractor shall accept work assignments on a job by job or load by load basis and agrees to comply with any ground rules or scope of work requirements established by the shipper as a service condition imposed on the work provided. Carrier does not guarantee Contractor a profit or limit its profit margin for contracts performed.

Initial Here: D.H.

3.    Standard Operating Procedures.  Because Carrier's customers require on-board communication to track delivery times, confirm pickups and deliveries and obtain advice about in-transit conditions, Contractor agrees to obtain on-board communication devices compatible with Carrier's system.  Such equipment may be obtained and installed by Contractor in leased unit at its choosing.  If purchased or leased from Carrier, Contractor's decision will be reflected in Appendix D and deduction from settlement will be authorized.

Unless Contractor or its driver notifies Carrier to the contrary, for the parties' mutual benefit, Carrier will tender loads to Contractor's driver using such on-board communications in real time based upon the availability of shipments, the equipment, and notice provided electronically that the leased equipment is available for a new contract consistent with the driver's available hours of service and its location.  To facilitate these standard operating procedures, Contractor agrees to afford Carrier reasonable notice if its driver or unit is otherwise unavailable to accept additional loads.

4.    Contractors, Warranties, and Indemnification. As consideration for entering into this agreement, Contractor warrants as follows:

    a.  that it is properly licensed and authorized to conduct its independent trade or business in accordance with local and state laws;

    b.  that it will comply with all federal, state, and local taxing authorities that are applicable to its trade or business and will pay all applicable withholding and employment taxes and insurance payments as they come due by reason of its retention of personnel to provide the contracted service;

    c.  that it will not accept or incur any payment obligation on behalf of Carrier without its express written approval; and

    d.  that it will promptly notify Carrier of any acts that result in any type of loss, shortage, citation, fine, or out of service order incurred in the course of its use or maintenance of the lease equipment during the period of this lease.

5.    Contractor agrees to indemnify and hold Carrier harmless from any breach of the above warranties or if other claim laws or damage arising out of the negligent or willful acts or omission of it, its officers, directors, employees, or agent

6.    Integrated Claim. The Parties agree that this contact sets forth the full understanding of the Parties and shall not be modified or changed in any way except by express written addendum.

7.    Termination. This Contract may be terminated by either party on fifteen (15) days written notice.  If, in the sole opinion of Carrier, the driver qualified by Contractor to provide services fails to comply with the Federal Motor Carrier Safety Regulations, Carrier may terminate this Agreement at any time.

Initial Here: D.H.

8.  Claims Notification. The Parties recognize in accordance with federal statute, Carrier has 6 months from the issuance of any freight invoice to file an undercharged claim with its Shipper. Accordingly, the Parties agree that Contractor will review its settlements and notify Carrier not later than 165 days after issuance of its disputed amount or thereafter will be barred.

9.  Alternative Dispute Resolution.  The parties agree that any dispute concerning the terms of this Agreement will be submitted to mediation followed by binding arbitration before a tribunal convened under the rules of the American Arbitration Association at Atlanta, GA.

10.  Venue and Jurisdiction. This agreement is made pursuant to the requirements of federal law and otherwise subject to the laws of the State of Georgia.  The parties agree that that any lawsuit shall be filed in a court of competent jurisdiction in Gwinnett County.

Dated this _____ day of _____, 20____.

[CARRIER]:316 Towing and Road Service

[CONTRACTOR]: 316 Towing

Signature

Dustin Hyde
Signature

Eli Kudrln
Print Name

Print Name

Manager
Title

Driver
Title

Initial Here: D.H

## APPENDIX A

## IDENTIFICATION OF EQUIPMENT

|  | Make | Year | Serial No. |
|---|---|---|---|
| Tractor | RAM 5500 | 2021 | |
| Trailer | | | |
| Trailer | | | |
| Trailer | | | |
| Trailer | | | |
| Trailer | | | |

Name of Contractor: _____

Phone: _____ Fax: _____

Address: _____

FID No. _____ or SSN: _____

I certify that the above named Contractor is the title holder or beneficial owner of the identified equipment authorized to receive payments for the use of this equipment pursuant to the terms of this Agreement.

_____
Signature

_____
Date

Initial Here: _____

## APPENDIX B

## COMPENSATION

For use of Contractor's:    Tractor:    _____ % of adjusted gross revenue

        Trailer:    _____ % of adjusted gross revenue or

            _____ ¢ per mile loaded and

            _____ ¢ per mile empty

Initial Here: D.H.

APPENDIX C

## RECEIPT FOR EQUIPMENT

This Receipt is issued by Carrier to the beneficial owner _____
for VIN No. _____ this date for possession of the
equipment pursuant to an Independent Contractor Agreement.  This Receipt shall serve as
compliance with 49 C.F.R. '376.11 as evidence of a continuing 30 day lease for Carrier to
transport general commodities without exception.  A copy of the original Lease is kept by Carrier
at 796 Bill Rutledge Rd, Winder, GA 30680    [address].

Received this _____ day of _____, 20_____ at _____ A.M. / P.M.

By: _____ (Authorized Agent of Carrier)

**RELEASE OF EQUIPMENT** (To be completed upon termination of agreement)

Independent Contractor hereby acknowledges receipt of Equipment described in this Agreement.

Hour _____ A.M. / P.M.  Date_____ Place_____

Independent Contractor Signature_____

Initial Here: _____

APPENDIX D

Equipment Owner _____

Tractor Number _____   Trailer Number _____

Jeep _____   Booster _____   Stinger _____

## I. INITIAL START-UP COSTS TO BE PAID BY CONTRACTOR:

| | |
|---|---|
| Tractor Base Plate – Owner to furnish own base plate | ☐ Yes   ☐ No |
| CARRIER to furnish base plate at a charge of | $ _____ |
| Trailer Plate – Owner to furnish own trailer plate | ☐ Yes   ☐ No |
| CARRIER to furnish trailer plate at a charge of | $ _____ |
| Permit Package – 48 State | No Charge |
| Truck Escrow – In lieu of providing a Performance Bond as identified in the Independent Contractor Agreement, CONTRACTOR may post escrow money in the amount of | $ _____ |
| Owner to provide Surety Bond | ☐ Yes   ☐ No |
| Owner to escrow money | $ _____ |
| Initial Leasing Cost Total | $ _____ |

CONTRACTOR authorizes CARRIER to withhold from Contractor's weekly settlements in payments of $ _____ for ten (10) of the first eleven (11) settlements to pay the Initial Leasing Cost Total.

## II. INSURANCE:

Insurance Charges – Owner will furnish required insurance at minimum levels as identified in the Independent Contractor Lease Agreement for:

| | |
|---|---|
| Occupational Accident | ☐ Yes   ☐ No |
| Bobtail | ☐ Yes   ☐ No |
| Physical Damage | ☐ Yes   ☐ No |

CARRIER will make available to CONTRACTOR insurance at the following:

| | |
|---|---|
| Occupational Accident | $_____ per week |
| Bobtail | $_____ per month |
| Physical Damage | $_____ per $1000 |

Initial Here: D.H .

316Towing_00145

## III. BANK FEES:

Electronic Financial Transaction Charges – The CARRIER utilizes ComData/Fleet One/EFS services for electronic financial transactions. The following ComData/Fleet One/EFS fee schedule applies and will be deducted as incurred regardless of cost to Company:

| | |
|---|---|
| Service Fee for 1st time card use per day | $ |
| Service Fee for each card use per day after initial 1st time use | $ |
| ATM Withdrawal (U.S.) | $ |
| ATM Withdrawal (international Fee) | $ |
| ATM Balance Inquiry | $ |
| ATM Decline | $ |
| Transfer money to a bank account | $ |
| POS Debit Transactions | $ |
| Comcheck Draft | $ |
| Comdata Answer Plus Phone Service | $_____ per minute* |

* A per call charge of $_____ applies to all calls originating from a payphone.
See ComData informational sheet for additional information regarding ComData services.

## IV. REIMBURSABLES TO CONTRACTOR

Amount to be reimbursed on the first settlement for travel expense to orientation:

_____ X _____ = _____
Total Miles                Travel Pay            Total Reimbursement

Travel Pay will be paid at the rate of $_____ per mile for all miles up to 499 from drivers' place of residence to orientation location and at the rate of $_____ per mile for all miles 500 and greater from drivers' place of residence to orientation location.

## V. MAINTENANCE RESERVE

Maintenance Reserve Participation (circle one)        Accept    Decline

A minimum of $_____ will be deducted from each settlement

2290 Reserve Participation (circle one)        Accept    Decline

A draw will be made until a maximum of $_____ has been escrowed towards payment of your 2290.

I have reviewed this schedule of initial leasing costs and other associated costs and agree to these deductions from my settlements. I have received a complying certificate of insurance for any insurance which I elect to purchase through Company and understand that a copy of the policy/policies will be provided upon request.

Contractor: _____  Date: _____

Witness: _____  Date: _____

Initial Here: _____

316Towing_00146

## ADDENDUM TO CONTRACTOR AGREEMENT

The parties agree as follows:

(a) Contractor is free to accept or reject assignments of any load from 316 Towing and Road Service

(b) Contractor's remuneration is based upon trips or deliveries accomplished.

(c) Services provided by Contractor will be performed utilizing the vehicle or vehicles leased by Contractor pursuant to the lease.

(d) The written Lease to which this addendum is attached is in compliance with O.C.G.A. 34-8-35(n)(17).

(e) Contractor warrants that it knows it is responsible to pay estimated Social Security taxes and federal and state income taxes.

    (i) **Social Security tax Contractor must pay is higher than the Social Security tax an individual would pay if he or she were an employee.**

    (ii) **The services or work provided by Contractor are not covered by unemployment compensation laws of Georgia.**

(f) The written contract does not prohibit Contractor from pickup, transportation or delivery of property for more than one common carrier or any other person or entity when utilizing a motor vehicle agreement other than that leased hereunder.


_____
Contractor Signature

Date: _____


Initial Here: _____





# Invoice

Started
12/18/19
Invoices did not start
until this on for me

Dustin Lee Hyde



Invoice Number:  35

Invoice Date:  8  1  2020

Payment Due:  8  6  2020

Amount Due:  $ 700

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period:
08. 01.2020 to 08. 06.2020

Hyde000001



**316 TOWING**
AND ROAD SERVICES

# Invoice

Dustin Lee Hyde

*Quit on Friday*
*Returned on*
*Saturday*
*By Rex 300*

Invoice Number:  43
Invoice Date:  10 2 2020
Payment Due:  10 2 2020
Amount Due:  $ 735

**Bill To**

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**09. 26 .2020 to 10 . 02 .2020**

Hyde000002



316 TOWING

# Invoice

Dustin Lee Hyde

Invoice Number:  44
Invoice Date:  10  9  2020
Payment Due:  10  9  2020
Amount Due:  $ 1000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period:
10. 02 .2020 to 10 . 09 .2020

Hyde000003



**316 TOWING**

# Invoice

Quit
No longer
Driver manager

Dustin L Hyde

Invoice Number: 87

Invoice Date: 7/30/2021

Payment Due: 7/30/2021

"for weeks 7-22—21 to7-30-21" as
indicated above

Accidental occupational Insurance
+100.00

total 1200.00

Amount Due: 1100.00

**Bill To**

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000004



# Invoice

Dustin Hyde

Invoice Number: 1

Invoice Date: 11/12/21

Payment Due: 11/12/21

Amount Due: $1,000

Occupational Insurance: $50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/9/2021 - 11/15/2021

*Returned week
Before his 3rd
Eli rubbed

Return as Driver only*

Hyde000005



Invoice

Dustin Hyde

Invoice Number: 23

Invoice Date: 4/8/22

Payment Due: 4/8/22

Amount Due: $1,050

Occupational Insurance: $50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 4/4/2021 - 4/10/2022

Hyde000006

# Invoice

Dustin Hyde



Invoice Number: 22

Invoice Date: 4/1/22

Payment Due: 4/1/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 3/26/2021 - 4/1/2022

Hvde000010

# Invoice

Dustin Hyde



Invoice Number: 21

Invoice Date: 3/25/22

Payment Due: 3/25/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 3/19/2021 - 3/25/2022

Hyde000011

# Invoice

Dustin Hyde



Invoice Number: 20

Invoice Date: 3/18/22

Payment Due: 3/18/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 3/12/2021 - 3/018/2022

# Invoice

Dustin Hyde



Invoice Number: 18

Invoice Date: 3/04/22

Payment Due: 3/04/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 2/26/2021 - 3/04/2022

# Invoice

Dustin Hyde

Invoice Number: 17

Invoice Date: 2/25/22

Payment Due: 2/25/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 2/19/2021 - 2/25/2022

Hyde000014

# Invoice

Dustin Hyde



Invoice Number: 16

Invoice Date: 2/18/22

Payment Due: 2/18/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 2/11/2021 - 2/018/2022

Hyde000015

# Invoice

Dustin Hyde



Invoice Number: 15

Invoice Date: 2/11/22

Payment Due: 2/11/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 2/04/2021 - 2/011/2022

# Invoice

Dustin Hyde



Invoice Number: 14

Invoice Date: 2/04/22

Payment Due: 2/04/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 1/28/2021 - 2/04/2022

# Invoice

Dustin Hyde



Invoice Number: 13

Invoice Date: 1/28/22

Payment Due: 1/28/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 1/21/2021 - 1/28/2022

# Invoice

Dustin Hyde



Invoice Number: 12

Invoice Date: 1/21/22

Payment Due: 1/21/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 1/14/2021 - 1/21/2022

Hyde000019

# Invoice

Dustin Hyde



Invoice Number: 11

Invoice Date: 1/14/22

Payment Due: 1/14/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 1/7/2021 - 1/14/2022

# Invoice

Dustin Hyde



Invoice Number: 10

Invoice Date: 1/7/22

Payment Due: 1/7/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/31/2021 - 1/7/2022

Hyde000021

# Invoice

Dustin Hyde



Invoice Number: 9

Invoice Date: 12/31/21

Payment Due: 12/31/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/24/2021 - 12/31/2021

Hyde000022

# Invoice

Dustin Hyde



Invoice Number: 8

Invoice Date: 12/24/21

Payment Due: 12/24/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/18/2021 - 12/24/2021

# Invoice

Dustin Hyde



Invoice Number: 7

Invoice Date: 12/17/21

Payment Due: 12/17/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/10/2021 - 12/17/2021

# Invoice

Dustin Hyde



Invoice Number: 19

Invoice Date: 3/18/22

Payment Due: 3/18/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 3/5/2021 - 3/018/2022

# Invoice

Dustin Hyde



Invoice Number: 6

Invoice Date: 12/10/21

Payment Due: 12/10/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/03/2021 - 12/10/2021

Hyde000026

# Invoice

Dustin Hyde



Invoice Number: 5

Invoice Date: 12/3/21

Payment Due: 12/3/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/26/2021 - 12/3/2021

Hyde000027

# Invoice

Dustin Hyde



Invoice Number: 4

Invoice Date: 11/26/21

Payment Due: 11/26/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/20/2021 - 11/26/2021

Hyde000028

# Invoice

Dustin Hyde



Invoice Number: 3

Invoice Date: 11/19/21

Payment Due: 11/19/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/13/2021 - 11/19/2021

Hyde000029

# Invoice

Dustin Hyde



Invoice Number: 2

Invoice Date: 11/12/21

Payment Due: 11/12/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/9/2021 - 11/15/2021

Hyde000030

# Invoice

Dustin Hyde



Invoice Number: 23

Invoice Date: 4/6/22

Payment Due: 4/8/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 4/4/2021 - 4/10/2022



# Invoice

Dustin L Hyde



Invoice Number:   86

Invoice Date:  7/22/2021

Payment Due:   7/22/2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000032



# Invoice

Dustin L Hyde



Invoice Number:   85

Invoice Date:  7/16/2021

Payment Due:   7/16/2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000033



# Invoice

Dustin L Hyde



Invoice Number:  84

Invoice Date: 7/09/2021

Payment Due:  7/09/2021

Accidental occupational  insurance +100.00

total 1200.00

Amount Due:  1100.00

Bill To

 316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**



# Invoice

Dustin L Hyde



Invoice Number:   83

Invoice Date:   7/02/2021

Payment Due:   7/02/2021

Accidental occupational  insurance +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**



# Invoice

Dustin L Hyde



Invoice Number:   82

Invoice Date:  6/25/2021

Payment Due:   6/25/2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**



# Invoice

Dustin L Hyde



Invoice Number:  81

Invoice Date:  6/18/2021

Payment Due:  6/18/2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000037



# Invoice

Dustin Lee Hyde



Invoice Number:   80

Invoice Date:  6  11 2021

Payment Due:   6  11  2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000038



# Invoice

Dustin Lee Hyde



Invoice Number:   79

Invoice Date:  6  4 2021

Payment Due:   6  4 2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000039



# Invoice

Dustin Lee Hyde



Invoice Number:  78

Invoice Date:  5  28  2021

Payment Due:  5  28  2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000040



# Invoice

Dustin Lee Hyde



Invoice Number:  77

Invoice Date:  5  21  2021

Payment Due:  5  21  2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000041



# Invoice

Dustin Lee Hyde



Invoice Number:  76

Invoice Date: 5   14  2021

Payment Due:  5  14  2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000042



# Invoice

Dustin Lee Hyde



Invoice Number:  75

Invoice Date:  5  07  2021

Payment Due:  5  07  2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

 316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000043



# Invoice

Dustin Lee Hyde



Invoice Number:   74

Invoice Date:   4  30  2021

Payment Due:   4  30  2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

 316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000044



# Invoice

Dustin Lee Hyde



Invoice Number:  73

Invoice Date:  4  23  2021

Payment Due:  4  23  2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000045



# Invoice

Dustin Lee Hyde



Invoice Number:  72

Invoice Date:  4  16  2021

Payment Due:  4  16  2021

Accidental occupational  insurance +100.00

total 1100.00

Amount Due:  1000.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**4. 09. .2021 to 4 . 16 .2021**



# Invoice

Dustin Lee Hyde



Invoice Number:   71

Invoice Date:   4  09  2021

Payment Due:   4  09  2021

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**4. 02. .2021 to 4 . 09 .2021**



# Invoice

Dustin Lee Hyde



Invoice Number:  69

Invoice Date:  3  26  2021

Payment Due:  3  26  2021

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**3. 19. .2021 to 3 . 26 .2021**

Hyde000048



# Invoice

Dustin Lee Hyde



Invoice Number:   67

Invoice Date:   3   19   2020

Payment Due:   3   19   2020

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**3. 13. .2020 to 3 . 019 .2020**

Hyde000049



# Invoice

Dustin Lee Hyde



Invoice Number:  65

Invoice Date:  3  05  2020

Payment Due:  3  05  2020

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**2. 26. .2020 to 3 . 05 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:   64

Invoice Date:   2  26  2020

Payment Due:   2  26  2020

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000

Bill To

 316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**2. 19. .2020 to 2 . 26 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:  63

Invoice Date:  2  19  2020

Payment Due:  2  19  2020

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**2. 12. .2020 to 2 . 19 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:   62

Invoice Date:   2  12  2020

Payment Due:   2  12  2020

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**2. 06. .2020 to 2 . 12 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:   61

Invoice Date:   2  5  2020

Payment Due:   2  5  2020

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**1. 28. .2020 to 2 . 05 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:  60

Invoice Date:  1  28  2020

Payment Due:  1  28  2020

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**1. 22. .2020 to 1 . 28 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number: 58
Invoice Date: 1 15 2020
Payment Due: 1 15 2020
Amount Due: $1000.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**1. 9. .2020 to 1 . 15 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:  57
Invoice Date:  1  8  2020
Payment Due:  1  8  2020
Amount Due:  $1035.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**1. 2. .2020 to 1 . 8 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:  54
Invoice Date:  12  18  2020
Payment Due:  12  18  2020
Amount Due:  $1000.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**12. 11. .2020 to 12 . 18 .2020**

Hyde000058



# Invoice

Dustin Lee Hyde



Invoice Number:   53

Invoice Date:   12  11  2020

Payment Due:   12  11  2020

Accidental occupational
insurance   +$100.00

total   $1100.00

amount due     $1000.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**12. 04. .2020 to 12 . 11 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:  51

Invoice Date:  11  27  2020

Payment Due:  11  30  2020

Amount Due:  $ 1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**11. 20 .2020 to 11 . 27 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:   50
Invoice Date:   11  20  2020
Payment Due:   11  20  2020
Amount Due:   $ 1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**11. 13 .2020 to 11 . 20 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:  49
Invoice Date:  11  13  2020
Payment Due:  11  13  2020
Amount Due:  $ 1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**11. 06 .2020 to 11 . 13 .2020**

Hyde000062



# Invoice

Dustin Lee Hyde



Invoice Number:  48
Invoice Date:  11  06  2020
Payment Due:  11  06  2020
Amount Due:  $ 1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**10. 30 .2020 to 11 . 06 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:   47
Invoice Date:   10  30  2020
Payment Due:   10  30  2020
Amount Due:   $ 1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**10. 23 .2020 to 10 . 30 .2020**

Hyde000064



# Invoice

Dustin Lee Hyde



Invoice Number:  46
Invoice Date:  10  23  2020
Payment Due:  10  23  2020
Amount Due:  $ 1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**10. 17 .2020 to 10 . 23 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:  45
Invoice Date:  10  16  2020
Payment Due:  10  16  2020
Amount Due:  $ 1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**10. 09 .2020 to 10 . 016 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:   44
Invoice Date:   10  9  2020
Payment Due:   10  9  2020
Amount Due:   $ 1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**10. 02 .2020 to 10 . 09 .2020**

Hyde000067



# Invoice

Dustin Lee Hyde



Invoice Number:   43
Invoice Date:   10  2  2020
Payment Due:   10  2  2020
Amount Due:   $ 735

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**09. 26 .2020 to 10 . 02 .2020**



# Invoice

Dustin Lee Hyde



Invoice Number:  42
Invoice Date:  9  12  2020
Payment Due:  9  18  2020
Amount Due:  $ 700

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**09. 12.2020 to 9 . 18 .2020**

Hyde000069



# Invoice

Dustin Lee Hyde



Invoice Number:   37
Invoice Date:   8  14  2020
Payment Due:   8 20  2020
Amount Due:   $ 700

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

Towing Driver

**Period:**
**08. 14.2020 to 13. 20.2020**



# Invoice

Dustin L Hyde



Invoice Number:  87

Invoice Date:  7/30/2021

Payment Due:  7/30/2021

"for weeks 7-22--21 to7-30-21"
as indicated above

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

 316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

Hyde000071

**From:**       Accounting MMM <accounting@mmm-express.com>
**Sent:**       Friday, September 4, 2020 9:54 AM
**To:**
**Subject:**    Re:

Your check is ready, you can come and pick up.
It is just a misunderstanding. How we can not pay you for your hard work.It is just this week Max is not in office because of camping.



- Soune L. -
Accounting Department
Phone: 678-999-3308 Ext: 3

On Fri, Sep 4, 2020 at 10:25 AM ██████████████████████ wrote:

1

**From:** Accounting MMM <accounting@mmm-express.com>
**Sent:** Friday, August 28, 2020 10:35 AM
**To:** ▇▇▇▇▇▇
**Subject:** Re: invoice

thank you



- Soune L. -
Accounting Department
Phone: 678-999-3308 Ext: 3



On Fri, Aug 28, 2020 at 9:50 AM ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ wrote:

1

| From: | Accounting MMM <accounting@mmm-express.com> |
|---|---|
| Sent: | Friday, August 14, 2020 8:14 AM |
| To: | ████████ |
| Subject: | Re: Invoice |

thank you!



- Soune L. -
Accounting Department
Phone: 678-999-3308 Ext: 3



On Fri, Aug 14, 2020 at 7:08 AM ████████ wrote:

 Virus-free. www.avg.com

1

Hyde000074

**From:**
**Sent:** Friday, December 4, 2020 12:24 PM
**To:** Accounting MMM
**Subject:** Re: invoice 52

Ok, no problem. Thank you .

On Fri, Dec 4, 2020, 12:24 PM Accounting MMM <<u>accounting@mmm-express.com</u>> wrote:

Hi Justin.
Please, in next week's invoice reflect Accidental occupational insurance $ 100.
The Company is paying for you.
So, just put $ 1100 and deduct this insurance, so your total will be $ 1000

Thank you
Sincerely



   - Soune L. -
   Accounting Department
Phone: 678-999-3308 Ext: 3



On Fri, Dec 4, 2020 at 11:23 AM                                    wrote:

Hyde000075

| | |
|---|---|
| **From:** | Accounting MMM <accounting@mmm-express.com> |
| **Sent:** | Thursday, January 21, 2021 11:01 AM |
| **To:** | |
| **Subject:** | Re: invoice 59 |
| **Attachments:** | fw9.pdf |

Hello! Please see attached. Fill out the form and send us back.

Thank you!



**- Soune L. -**
**Accounting Department**
**Phone: 678-999-3308 Ext: 3**



On Thu, Jan 21, 2021 at 11:21 AM ▊▊▊▊▊▊▊▊▊▊ wrote:

1

| | |
|---|---|
| **From:** | Accounting MMM |
| **Sent:** | Friday, April 2, 2021 11:08 AM |
| **To:** | |
| **Subject:** | Re: invoice 70 |

Ok, no problem.



**- Soune L. -**
Accounting Department
Phone: 678-999-3308



On Fri, Apr 2, 2021 at 11:47 AM ███████████████████ wrote:
That is the correct invoice . I will not be receiving the 35 for the phone . As of this month the phone will not be on my plan . Thank you for your time .

On Fri, Apr 2, 2021, 11:41 AM Accounting MMM <accounting@mmm-express.com> wrote:
Hello! Please  add $35 for the phone on your report and send correct invoice

thank you!



**- Soune L. -**
Accounting Department
Phone: 678-999-3308 Ext: 3



On Fri, Apr 2, 2021 at 3:55 AM ███████████████████ wrote:

1

Hyde000077

**From:** ████████████████████████
**Sent:** Thursday, September 10, 2020 12:24 PM
**To:** Accounting MMM
**Subject:** Re: invoice

Very welcome.

On Thu, Sep 10, 2020, 12:46 PM Accounting MMM <accounting@mmm-express.com> wrote:

thank you!



    - **Soune L.** -
    **Accounting Department**
**Phone: 678-999-3308 Ext: 3**



On Thu, Sep 10, 2020 at 11:38 AM ████████████████████ wrote:

Hyde000078



EXHIBIT



# Invoice

Dustin Lee Hyde



Invoice Number:  57

Invoice Date:  1  8  2020

Payment Due:  1  8  2020

Accidental occupational insurance +
$100.00, +35 – telephone

Total $1135.00

Amount Due: $1035.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
1. 2. .2020 to 1 . 8 .2020

*11 54*



# Invoice

Dustin Lee Hyde



Invoice Number:  58

Invoice Date:  1  15  2020

Payment Due:  1  15  2020

Accidental Occupational insurance +$100

Total $1100.00

Amount due - $1000.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**1. 9. .2020 to 1 . 15 .2020**

*paid*
*ch . # 1158*



# Invoice

Dustin Lee Hyde



Invoice Number:  59

Invoice Date:  1  22  2020

Payment Due:  1  22  2020

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**1. 16. .2020 to 1 . 22 .2020**

Ch.# 1165.



# Invoice

Dustin Lee Hyde



Invoice Number:  60

Invoice Date:  1  28  2020

Payment Due:  1  28  2020

Accidental occupational  insurance  +100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**1. 22. .2020 to 1 . 28 .2020**

*1172*



# Invoice

Dustin Lee Hyde



Invoice Number:  61

Invoice Date:  2  5  2020

Payment Due:  2  5  2020

Accidental occupational  insurance  +100.00

total 1100.00

Amount Due: 1000   *+ $35 = $1035*

*additional $35 per phon*

*Total amount - $1035.0*

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**1. 28. .2020 to 2 . 05 .2020**

*1180*

316Towing_00152



# Invoice

Dustin Lee Hyde



Invoice Number:   62

Invoice Date:   2  12  2020

Payment Due:   2  12  2020

Accidental occupational  insurance  ₌₁00.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**2. 06. .2020 to 2 . 12 .2020**

*1184*



# Invoice

Dustin Lee Hyde



Invoice Number:  63

Invoice Date:  2  19  2020

Payment Due:  2  19  2020


Accidental occupational  insurance  100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**2. 12. .2020 to 2 . 19 .2020**

1190



# Invoice

Dustin Lee Hyde



Invoice Number:   64

Invoice Date:   2  26  2020

Payment Due:   2  26  2020

Accidental occupational  insurance  +100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**2. 19. .2020 to 2 . 26 .2020**

*1200*



# Invoice

Dustin Lee Hyde



Invoice Number:  65

Invoice Date:  3  05  2020

Payment Due:  3  05  2020

Accidental occupational  insurance +100.00

total 1100.00

Amount Due: 1000  *+ $ 95.00 for the phone*

*Total Amount - $ 1095.00*

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**2. 26. .202 / to 3 . 05 .202 /**

*1202*



# Invoice

Dustin Lee Hyde



Invoice Number:   66

Invoice Date:   3  12  2021

Payment Due:   3 12 2021


Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000

Bill To

 316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**3. 06. 21  to 3 .12 .2021**

*ch # 1210.00*



# Invoice

Dustin Lee Hyde



Invoice Number:  67

Invoice Date:  3  19  202/

Payment Due:  3  19  202/

Accidental occupational  insurance  +100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

**Towing Driver**

**Period:**
3. 13. .202/ to 3 . 019 .202 /

*1 2 13*

316Towing_00158



# Invoice

Dustin Lee Hyde



Invoice Number:  69

Invoice Date:  3  26  2021

Payment Due:  3  26  2021

Accidental occupational  insurance  +100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**3. 19. .2021 to 3 . 26 .2021**

*1215*



# Invoice

Dustin Lee Hyde



Invoice Number:  71

Invoice Date:  4  09  2021

Payment Due:  4  09  2021

Accidental occupational  insurance  +100.00

total 1100.00

Amount Due:  1000.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1229*

**Period:**
**4. 02. .2021 to 4 . 09 .2021**



# Invoice

Dustin Lee Hyde



Invoice Number:  70

Invoice Date:  4  02  2021

Payment Due:  4  02  2021

Accidental occupational  insurance  +100.00

total 1100.00

Amount Due:  1000

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

**Period:**
**3. 26. .2021 to 4 . 02 .2021**

*1224*

316Towing_00161



# Invoice

Dustin Lee Hyde



Invoice Number:  71

Invoice Date:  4  09  2021

Payment Due:  4  09  2021

Accidental occupational  insurance
+100.00

total 1100.00

Amount Due:  1000.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1236*

**Period:**
~~4. 02. 2021 to 4 . 09 .2021~~
*4.9. 21 TO 4.16. 21*



# Invoice

Dustin Lee Hyde



Invoice Number:  73

Invoice Date:  4  23  2021

Payment Due:  4  23  2021

Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1240*



# Invoice

Dustin Lee Hyde



Invoice Number:   74

Invoice Date:   4  30  2021

Payment Due:   4  30  2021

Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1246*



# Invoice

Dustin Lee Hyde



Invoice Number:  75

Invoice Date: 5  07  2021

Payment Due:  5  07  2021

Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1251*



# Invoice

Dustin Lee Hyde



Invoice Number:  77

Invoice Date:  5   21  2021

Payment Due:  5   21  2021

Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1269*



# Invoice

Dustin Lee Hyde



Invoice Number:  76

Invoice Date:  5  14  2021

Payment Due:  5  14  2021

Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

**Towing Driver**

*1261*





# Invoice

Dustin Lee Hyde



Invoice Number:   78

Invoice Date:  5   28  2021

Payment Due:  5  28  2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1275*

316Towing_00168



# Invoice

Dustin Lee Hyde



Invoice Number:   79

Invoice Date:  6  4 2021

Payment Due:  6  4  2021

Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1282*



# Invoice

Dustin Lee Hyde



Invoice Number:  80

Invoice Date:  6  11 2021

Payment Due:  6  11  2021


Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*12 89*

316Towing_00170



# Invoice

Dustin L Hyde



Invoice Number:  81

Invoice Date:  6/18/2021

Payment Due:  6/18/2021

Accidental occupational insurance
+100.00

total 1200.00

Amount Due: 1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1304*

316Towing_00171



# Invoice

Dustin L Hyde



Invoice Number:  82

Invoice Date:  6/25/2021

Payment Due:  6/25/2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1315*



# Invoice

Dustin L Hyde



Invoice Number:   83

Invoice Date:  7/02/2021

Payment Due:   7/02/2021

Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**



1 3 / 9



# Invoice

Dustin L Hyde



Invoice Number:   84

Invoice Date:   7/09/2021

Payment Due:   7/09/2021

Accidental occupational  insurance
+100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

*1329*



# Invoice



Dustin L Hyde

Invoice Number:  85

Invoice Date:  7/16/2021

Payment Due:  7/16/2021

Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

*1333*

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**



# Invoice

Dustin L Hyde



Invoice Number:  86

Invoice Date:  7/22/2021

Payment Due:  7/22/2021

Accidental occupational  insurance  +100.00

total 1200.00

Amount Due:  1100.00

Bill To

316 Towing and Road Service Inc.

**796 BIll Rutledge Road, Winder, GA, 30680**

**Towing Driver**

1339



# Invoice

Dustin L Hyde





Invoice Number:  87

Invoice Date:  7/30/2021

Payment Due:  7/30/2021

"for weeks 7-22--21 to7-30-21" as indicated above

Total $1000

Accidental occupational insurance -

-$100.00

Amount Due: $900.00

Bill To

316 Towing and Road Service Inc.

**796 Bill Rutledge Road, Winder, GA, 30680**

**Towing Driver**

1340

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 1

Invoice Date: 11/05/21

Payment Due: 11/05/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/2/2021 - 11/8/2021

check # 1446

1

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number:  2

Invoice Date: 11/11/21

Payment Due: 11/12/21

Amount Due: $550.00

Advance: $500

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/2/2021 - 11/8/2021

1457

1

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 4

Invoice Date: 11/26/21

Payment Due: 11/26/21

Advance $500

Amount Due: $550

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/22/2021 - 11/28/2021

*1477*

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 5

Invoice Date: 12/3/21

Payment Due: 12/3/21

Advance $500

Amount Due: $550

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/29/2021 - 12/5/2021

*check # 1488*

316Towing_00181

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 3

Invoice Date: 11/19/21

Payment Due: 11/19/21

Total $550

Advance$500

Occupational insurance -$50

Amount Due: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/15/2021 - 11/21/2021

*1468*

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 6

Invoice Date: 12/10/21

Payment Due: 12/10/21

Amount Due: $550

Advance $500

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/06/2021 - 12/12/2021

check 1494

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 7

Invoice Date: 12/17/21

Payment Due: 12/17/21

Advance $550

Amount Due: $500

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/13/2021 - 12/19/2021

*check 1505*

316Towing_00184

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 8

Invoice Date: 12/24/21

Payment Due: 12/24/21

Amount Due: $850

Advance $200

Occupational insurance –$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/18/2021 - 12/24/2021

*/5//*

# Invoice

Dustin Hyde

Winder, GA 30680

Invoice Number: 9

Invoice Date: 12/31/21

Payment Due: 12/31/21

Advance $200

Amount Due: $850

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/27/2021 - 12/31/2021

*check  15-21*

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 1

Invoice Date: 11/05/21

Payment Due: 11/05/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/2/2021 - 11/8/2021

Created with Scanner Pro

316Towing_00187

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 2

Invoice Date: 11/06/21

Payment Due: 11/12/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/18/2021 - 12/24/2021

Created with Scanner Pro

316Towing_00188

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 3

Invoice Date: 11/19/21

Payment Due: 11/19/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/13/2021 - 11/19/2021

Created with Scanner Pro

316Towing_00189

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 4

Invoice Date: 11/26/21

Payment Due: 11/26/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

**Bill To**

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/20/2021 - 11/26/2021

Created with Scanner Pro

316Towing  00190

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 5

Invoice Date: 12/3/21

Payment Due: 12/3/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 11/26/2021 - 12/3/2021

Created with Scanner Pro

316Towing_00191

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 6

Invoice Date: 12/10/21

Payment Due: 12/10/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/03/2021 - 12/10/2021

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 7

Invoice Date: 12/17/21

Payment Due: 12/17/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/10/2021 - 12/17/2021

Created with Scanner Pro

316Towing 00193

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 8

Invoice Date: 12/24/21

Payment Due: 12/24/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/18/2021 - 12/24/2021

Created with Scanner Pro

316Towing_00194

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 9

Invoice Date: 12/24/21

Payment Due: 12/29/21

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/18/2021 - 12/24/2021

Created with Scanner Pro

316Towing_00195

# Invoice

Dustin Hyde

Winder, GA 30680

Invoice Number: 10

Invoice Date: 1/7/22

Payment Due: 1/7/22

Amount Due: $850

Advance $200

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 12/31/2021 - 1/7/2022

*check 1527*

**Invoice**

Dustin Hyde

Winder, GA 30680

Invoice Number: 11

Invoice Date: 1/14/22

Payment Due: 1/14/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 1/7/2021 - 1/14/2022

*check 1528*
*by 1/14/22*

Created with Scanner Pro

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 12

Invoice Date: 1/21/22

Payment Due: 1/21/22

Amount Due: $850

Advance $200

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 1/14/2021 – 1/21/2022

*check 1551*
*by 01/21/22*

**Created with Scanner Pro**

316Towing 00198

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 13

Invoice Date: 1/28/22

Payment Due: 1/28/22

Amount Due: $550

Advance $500

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 1/24/2021 - 1/30/2022

*check 1561
by 01/28/22*

Created with Scanner Pro

316Towing_00199

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 14

Invoice Date: 2/04/22

Payment Due: 2/04/22

Amount Due: $800

Advance $250

Occupational insurance -$50

Total: $1,000

**Bill To**

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 1/31/2021 - 2/6/2022

1570

# Invoice

Dustin Hyde

Winder, GA 30680

Invoice Number: 15

Invoice Date: 2/11/22

Payment Due: 2/11/22

Amount Due: $550

Advance $500

Occupational insurance -$50

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 2/07/2021 - 2/13/2022

*check 1580*

Created with Scanner Pro

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 16

Invoice Date: 2/18/22

Payment Due: 2/18/22

Amount Due: $1,050

Occupational insurance -$50

Total: $1,000

**Bill To**

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 2/11/2021 - 2/018/2022

*check  1591*

*02. 18. 22*

Created with Scanner Pro

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 17

Invoice Date: 2/25/22

Payment Due: 2/25/22

Amount Due: $500

Advance:$500

Total: $1,000

**Bill To**

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

**Towing Driver**

Period: 2/19/2021 - 2/25/2022

*check 1600*

*02.25.22*

Created with Scanner Pro

316Towing_00203

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 18

Invoice Date: 3/04/22

Payment Due: 3/04/22

Amount Due: $1,000

Total: $1,000

**Bill To**

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 2/28/2021 - 3/06/2022

check 1611
03.04-22

Created with Scanner Pro

316Towing_00204

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 19

Invoice Date: 3/18/22

Payment Due: 3/18/22

Advance: $500

Amount Due: $500

Total: $1,000

**Bill To**

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 3/7/2021 - 3/13/2022



check 1624
03.11.22

**Created with Scanner Pro**

316Towing 00205

# Invoice

Dustin Hyde



Winder, GA 30680

Invoice Number: 20

Invoice Date: 3/18/22

Payment Due: 3/18/22

Amount Due: $500

Advance: $500

Total: $1,000

Bill To

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 3/14/2021 - 3/20/2022

*check 1635*
*03.18.22*

Created with Scanner Pro

316Towing_00206

# Invoice

Dustin Hyde

Winder, GA 30680

Invoice Number: 21

Invoice Date: 3/25/22

Payment Due: 3/25/22

Amount Due: $500

Advance $ 500

Total: $1,000

**Bill To**

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 3/21/2021 - 3/27/2022

check 1645

03.25.22

Created with Scanner Pro

316Towing_00207

# Invoice

Dustin Hyde

Winder, GA 30680

Invoice Number: 22

Invoice Date: 4/1/22

Payment Due: 4/1/22

Amount Due: $500

Advance $500

Total: $1,000

**Bill To**

316 Towing and Road Service Inc.

796 Bill Rutledge Road, Winder, GA, 30680

Towing Driver

Period: 3/28/2021 - 4/3/2022

Created with Scanner Pro

316Towing_00208