**In the Matter Of:**

HYDE V. 316 TOWING & ROAD SERVICE

2:22-cv-103-RWS

**DUSTIN L. HYDE**

*September 28, 2023*



800.211.DEPO (3376)
EsquireSolutions.com

1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF GEORGIA
2                          GAINESVILLE DIVISION

3
DUSTIN HYDE, Individually,      )
4  and on Behalf of All Other   )
Similarly Situated,             )
5                               )   CIVIL ACTION FILE
                Plaintiff,      )
6                               )   NO. 2:22-cv-103-RWS
        vs.                     )
7                               )
316 TOWING & ROAD SERVICE,      )
8  INC., and MAKSIM LISOVSKIY,  )
                                )
9               Defendants.     )
   _____)
10

11

12              Videotaped deposition of DUSTIN L. HYDE,

13         taken on behalf of the Defendants, pursuant to

14         Notice and agreement of counsel, in accordance

15         with the Federal Rules of Civil Procedure,

16         before Cynthia B. Gatewood, Certified Court

17         Reporter, at 3390 Peachtre Road NE, Suite 520,

18         Atlanta, Georgia, on the 28th day of September

19         2023, commencing at the hour of 10:06 a.m.

20

21

22

23

24

25



```
 1                    INDEX TO EXAMINATIONS

 2   EXAMINATION                                        PAGE

 3   Cross-Examination by Mr. Handschuh                   6

 4

 5                     INDEX TO EXHIBITS

 6   DEFENDANTS'
        EXHIBIT              DESCRIPTION               PAGE
 7

 8      D-1      Notice of Deposition                   15

 9      D-2      Complaint                              17

10      D-3      Driver Application                     18

11      D-4      Independent Contractor and Lease       31
                 Agreement
12
        D-5      Invoices                               40
13
        D-6      Invoices                               41
14
        D-7      Responses to Defendants' First         48
15               Interrogatories, Requests for
                 Production of Documents and
16               Admissions

17      D-8      3/10/21 Text Message                   59

18      D-9      6/17/21 Text Message                   60

19      D-10     6/24/21 Text Message                   63

20      D-11     1/21/21 Text Message                   84

21      D-12     6/20/21 Text Message                   84

22      D-13     Towbook Log                            91

23      D-14     Canceled Job Log                       91

24      D-15     5/11/21 Text Message                  123

25
```



INDEX TO EXHIBITS
(Continued)

DEFENDANTS'
EXHIBIT              DESCRIPTION                    PAGE

D-16          Damages Spreadsheet                    144

D-17          Declaration of Dustin Hyde             145

D-18          7/16/21 Text Message                   153

D-19          IRS Response                           156

- - -



```
 1    APPEARANCES OF COUNSEL:

 2

      On behalf of the Plaintiff:
 3
              SEAN SHORT
 4            Attorney at Law
              Sanford Law Firm PLLC
 5            Suite 510, Kirkpatrick Plaza
              10800 Financial Centre Parkway
 6            Little Rock, Arkansas 72211
              Phone:  (501) 904-1650
 7            Email:  sean@sanfordlawfirm.com

 8
      On behalf of the Defendants:
 9
              JEREMY R. HANDSCHUH
10            AMANDA I. ELLIOTT
              Attorneys at Law
11            Mitchell-Handschuh Law Group
              3390 Peachtree Road NE
12            Suite 520
              Atlanta, Georgia 30326
13            Phone:  (404) 262-9488
              Email:  jeremy@m-hlawgroup.com
14            Email:  amanda@m-hlawgroup.com

15
      Videographer:
16
              Rick Richey
17            Esquire Deposition Solutions
              Phone:  (404) 495-0777
18

19    Also Present:

20            Maksim Lisovskiy
              Eli Kudrin
21

22                            -   -   -

23

              (Disclosure, as required by the Georgia
24    Board of Court Reporting, was made by the court
      reporter, a written copy of which is attached
25    hereto.)
```



1     Q.    Okay.  Drawing our attention to the subject

2  relationship here with 316 Towing, did you at one point

3  work for 316 Towing?

4     A.    Yes.

5     Q.    Okay.  Can you describe the process by which

6  you came to find the opportunity at 316 Towing?

7     A.    If I recall correctly, it was a job posting

8  on either Indeed or Facebook that I responded to.

9     Q.    Okay.  So you responded to an ad, whether it

10  was Facebook or LinkedIn but online, looking for tow

11  truck drivers, and you responded to that.

12     A.    I called the company and asked if they were

13  hiring.  They stated yes, and I went down for an

14  interview.

15     Q.    Okay.  And during that interview, did they

16  happen to have you fill out an application?

17     A.    It wasn't a standard application, just basic

18  info.

19     Q.    Okay.  And do you recall that period of time

20  being on or about November 21st, 2019?

21     A.    Yes, sir.

22     Q.    Okay.  If you may have alleged in the

23  complaint that you started working in December of 2018,

24  given that your application was in November of 2019,

25  would you agree that perhaps the allegation within the



DUSTIN L. HYDE                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              39

```
1          A.    Okay.

2          Q.    Okay.  And then it asks finally, "Do you

3   still wish to apply for independent contractor status?"

4   And you circled yes.

5          A.    That's what's there.

6          Q.    Okay.  So was there an understanding at the

7   time of hire that you would be serving in an

8   independent contractor role?

9          A.    No, sir.

10         Q.    Okay.  And what do you base that on?

11         A.    Because when all these papers were put in

12  front of me for me to sign up or do the application, it

13  was really just marking stuff down just to get me in a

14  truck.  We ran through this paperwork.  There was

15  nothing discussed.  There was nothing -- I ran through,

16  signed, dated, and we started working.

17         Q.    Okay.

18               (An off-the-record discussion was held.)

19  BY MR. HANDSCHUH:

20         Q.    Do you recall who you discussed how you

21  would be paid initially?

22         A.    The only person I discussed that with was

23  Eli.

24         Q.    Okay.  Do you remember the amount that you

25  agreed to?
```



1     A.    So from that it was a self note that

2   everything before 35 was done by the office.

3     Q.    Okay.  But this acknowledges that your start

4   date with 316 was on or about December 2019; correct?

5     A.    About, yes.

6     Q.    Okay.  Not 2018.

7     A.    Again, that could have been an error.

8     Q.    Okay.  Is this an error?

9     A.    No.

10    Q.    It's not.  Okay.  And so at the time

11  initially you had agreed to $700 a week.  And the

12  process, just so I understand, is that you would

13  generate an invoice and submit it to 316 for payment?

14    A.    That's what I was told to do, yes.

15    Q.    Okay.  You mentioned earlier that at some

16  point in time you did have changes in your weekly pay

17  amount; is that correct?

18    A.    Yes.

19    Q.    Okay.  Do you recall what your next jump

20  from 700 may have been?  And feel free to take a look

21  at some of these invoices to refresh your memory.

22    A.    The very next one says, "Quit on Friday,

23  returned on Saturday, pay rate $300."

24    Q.    Okay.  What does that mean?

25    A.    It means I quit and I came back and I got a



1   raise.

2        Q.    Okay.  Was that -- that one, the date, just

3   so I can track this, is the date -- and you're looking

4   at what's been marked Hyde 2, is that correct, on the

5   bottom right?

6        A.    Yes.

7        Q.    The little stamp?  Okay.  Can you identify

8   the date of that invoice?

9        A.    It's 10/2/2020.

10       Q.    Okay.  And so that note there is about --

11  whatever day of the week 10/2/2020 falls on, on or

12  about that time, that's when you returned and received

13  a raise of $300?

14       A.    It would have been for that previous week,

15  yes.

16       Q.    Okay.  But that's the first time you

17  mentioned having quit, but it was just for that short

18  weekend obviously.

19       A.    That's one of the few times, yes.

20       Q.    Okay.  Continuing to the next one, what's

21  been marked Hyde 3, does this track?  It reflects an

22  invoice date of October 9, 2020.  That would have been

23  the next invoice?

24       A.    It does.

25       Q.    Okay.  And then at that point in time you



1  were invoicing 316 for $1,000.

2      A.    That is correct.

3      Q.    Okay.  Do you recall who you spoke to at the

4  time for purposes of receiving a raise at that time?

5      A.    It was through Eli.

6      Q.    Okay.  And what was the substance of your

7  conversation?

8      A.    Needed more money.

9      Q.    Okay.  Was there anything else other than

10 that?

11     A.    I don't recall the exact conversation.

12     Q.    Okay.  Do you know if you asked for a

13 thousand or did you happen to ask for more?

14     A.    I don't recall the exact conversation.

15     Q.    But you do recognize that at least by

16 October 9, 2020, they were paying you then a thousand

17 dollars a week.

18     A.    Yes, sir, they were.

19     Q.    Okay.  Have you ever been docked for pay

20 from missing work?

21     A.    No, because I don't miss work.

22     Q.    Okay.  If you would, take a look at

23 Exhibits 5 and 6.  And I'll give you a moment to do

24 this, but please flip through looking for any instance

25 where you may have seen a notation of docked pay.



1       Q.    Okay.  But you don't recall an incidence

2    where that actually happened to you.

3       A.    No, because I hardly rarely ever got sick,

4    so --

5       Q.    Okay.  During your time of onboarding, did

6    you ever happen to discuss whether you would receive

7    any stock or ownership interest in 316 Towing?

8       A.    No.

9       Q.    What about any benefits, employment benefits

10   or the like?

11      A.    No.

12      Q.    And when you were hired, did you have the

13   role of driver manager?

14      A.    Not in the beginning.

15      Q.    Okay.  How were you hired initially?

16      A.    I was the only driver.

17      Q.    Okay.  So you were hired as a driver, and

18   then later on --

19      A.    As they hired more employees, I became --

20      Q.    Then you became --

21      A.    -- driver manager.

22      Q.    Go ahead.  I'm sorry.

23      A.    Then that was when the driver manager

24   started.

25      Q.    Okay.  Do you recall I think based on the



1        A.    I think Kevin came after I was no longer

2   driver manager.  I'm not sure.

3        Q.    Okay.  What about Brent Johnson?

4        A.    I believe so.

5        Q.    Okay.  What about Anthony Lewis?

6        A.    Yes.

7        Q.    Were there any other driver managers --

8        A.    No.

9        Q.    -- during your time?

10       A.    No other driver managers.

11       Q.    So if there were other drivers that happened

12  to work while you were working, you were their manager.

13       A.    Uh-huh (affirmative).

14       Q.    Okay.  Were there any other driver managers

15  during your time --

16       A.    No.

17       Q.    -- at 316 Towing?  Okay.  Do you recall why

18  this manager role may have been offered initially?

19       A.    Again, it wasn't really offered.  It was

20  something me and Eli discussed between us to try to

21  help move the company forward.  He would be more so

22  managing the dispatchers and office side, and I would

23  answer to him about the drivers.

24       Q.    Okay.  And did you have any other duties?

25  Were you still acting as a driver at that time?



1      A.    Yes.

2      Q.    So that was driver manager function on top

3  of being a driver.

4      A.    Yes.

5      Q.    Okay.  And as a driver, is their primary

6  responsibility to tow cars?

7      A.    Tow cars and do roadside service.

8      Q.    Okay.  Did your role as driver manager

9  include reporting to office for meetings in person with

10 Eli?

11     A.    Whenever he summoned.

12     Q.    How often would that occur?

13     A.    Random.

14     Q.    Okay.  Multiple times a day or --

15     A.    No.  Just random.

16     Q.    Okay.  Just the frequency of which I'm just

17 interested in.  A few times a week?

18     A.    Maybe once a week.  Maybe twice every two or

19 three weeks.  It was random.

20     Q.    Okay.  But not -- that sounds like it's a

21 few times a month.

22     A.    Potentially.

23     Q.    Okay.  Is it greater than a few times?

24     A.    Sir, a few times a month.  That's the best I

25 can give you on that.



1   issues with Brown; correct?

2        A.    Yes.

3        Q.    Okay.  And at this point in time, it appears

4   it had reached the level of a decision as to whether or

5   not to let Mr. Brown go, correct, or fire him?

6        A.    Yeah.  I mean, that's where it led to, yes.

7        Q.    Okay.  And so your input was at least

8   supplied for purposes of Brown's status as a driver

9   within 316.

10       A.    Sure.  I mean, I could speak, and he could

11   choose to listen or not.

12       Q.    Now, we spoke about that brief moment where

13   you quit on a Friday and then were rehired on a

14   Saturday.  And then we're coming up to a period of time

15   in which we had another instance where you no longer

16   worked for 316; correct?

17       A.    At some point, yes.

18       Q.    Was that on or about August of 2021?

19       A.    Potentially.  I don't know the exact dates.

20       Q.    When you were rehired, do you recall when

21   you were rehired?

22       A.    I don't.

23       Q.    Could it have been around or about

24   November 2021?

25       A.    Potentially.



1      Q.    Okay.  At the time of rehire, did you no
2   longer have the role as driver manager?
3      A.    If that's the last time that there was a
4   separation, then yes.  When I came back, I was no
5   longer driver manager.
6      Q.    Okay.  So the last period of time you worked
7   for 316, you were no longer a driver manager.
8      A.    That's correct.
9      Q.    Okay.  While you were a driver for 316, who
10  supervised you?
11     A.    Eli.
12     Q.    Okay.  Did you ever get managed by Maksim --
13  he goes by Max -- Mr. Lisovskiy?
14     A.    I mean, theoretically he manages the whole
15  show.  He's the owner.
16     Q.    Okay.  But did he in his day to day
17  supervise you?
18     A.    No, not on a regular basis.  He was busy
19  with other duties.
20     Q.    Okay.  When may have Max supervised you, or
21  when did you interact with Max individually?
22     A.    Only if I couldn't get something through to
23  Eli and chose to speak to Max.
24     Q.    Do you recall any instances of that?
25     A.    I mean, there were a couple of times, but I



 1  a once-in-a-while, occasional talk when I bumped into

 2  him getting my check or if -- again, the few instances

 3  about Eli or whatever.  I mean, Max was pretty much

 4  doing his own thing.

 5      Q.    Okay.  While you were working for 316, what

 6  was your schedule, your weekly schedule?

 7      A.    It depends on through what time we're

 8  talking about, and I can't specify.  But it was always

 9  12-hour shifts other than in the beginning when I was

10  24 hours a day on call.

11          MR. HANDSCHUH:  Rick, if we could go off the

12      record.  It's been about an hour and a half.  I'm

13      just going to take a quick bathroom break.

14          THE VIDEOGRAPHER:  11:33, we're off the

15      record.  This is the end of Media Number 2.

16              (VIDEO CAMERA OFF.)

17          (An off-the-record discussion was held.)

18              (VIDEO CAMERA ON.)

19          THE VIDEOGRAPHER:  11:46 a.m.  We're back on

20      the record.  This is the beginning of Media

21      Number 3.

22  BY MR. HANDSCHUH:

23      Q.    All right.  Picking back up after our break,

24  Mr. Hyde, if you would, please take a look at

25  Exhibit 7.  You testified earlier that your discussions



1    Does that just mean that you aren't required to be

2    driving, and you're just awaiting the next dispatch?

3          A.    Yes.

4          Q.    Okay.  Do they -- is there any requirement

5    as to where you wait?

6          A.    In the home area.

7          Q.    Okay.  What does the home area mean?

8          A.    They've got a map.  It's mapped out.

9          Q.    Can you show me?  I think you pointed to an

10   exhibit.  Which exhibit?

11         A.    I mean, if y'all have a map in here, then --

12   there you go.

13         Q.    Okay.  What is this map a map of?  You're

14   pointing to --

15         A.    It's a map of the state of Georgia and the

16   home area with a dot on it.  That's the map y'all

17   provided.  Y'all should know more about it than me.

18         Q.    Okay.  Pointing out 100, you're claiming

19   this is a home area map.  Does it say at the top that

20   it's a registry of certified medical examiner search?

21         A.    I mean, I'm just saying in general of the

22   map, we have a home area.  Y'all presented this to me.

23   I don't -- I'm just telling you, using this image as a

24   basis, we have a home area, and that's where we stayed.

25         Q.    Where does it say home area on this



1  document?

2      A.    Sir, it doesn't on the document.  I was

3  using the picture for reference.

4      Q.    Okay.  So you're -- are you claiming you've

5  seen the home area map?  I haven't seen it.

6      A.    There was a map hanging in Eli's office with

7  pins in it.  It is a 15- or 20-mile radius map from the

8  home location of the shop.

9      Q.    Okay.  And how would the dispatch know

10  whether or not you were resting in the home area?

11      A.    I mean, if you're on schedule, you're in the

12  home area.

13      Q.    Okay.  Was there any kind of transportation

14  management system that may have been tracking GPS at

15  the time?

16      A.    Could have been.  I don't know.  It ain't my

17  truck.

18      Q.    I just mean in your role as driver manager

19  were you aware whether or not there was any technology

20  that handled on behalf of 316 dispatch?

21      A.    I mean, they could have used Towbook for GPS

22  location.

23      Q.    Okay.  So you're familiar with a

24  transportation management system referred to as

25  Towbook?



1   employment as a driver with 316, you did attend to

2   personal responsibilities; correct?

3       A.   If you want to call going out to get

4   something to eat, sure, I may have done that.

5       Q.   Okay.  Does that mean that your response to

6   Admission Number 27 is incorrect?

7       A.   I'm not sure.

8       Q.   Okay.  If it is, will you change that for

9   us?

10      A.   I mean, I would need to understand a little

11  better of what you're wanting.

12      Q.   Well, here you testified just that it may

13  have been just to go get lunch, I believe, or a meal.

14  But here in response to Admission Number 27, when it

15  came to time that you weren't responding to a call, you

16  did, in fact, from time to time handle personal

17  responsibilities or errands.

18      A.   Okay.  But you're trying to make it seem

19  like I could just go for a random party at someone's

20  house.  That's not how that is operated.  When you're

21  on call, you're in an area.  You have to respond within

22  a certain time frame.  So, no, I'm not off just doing

23  whatever.  I may have grabbed something.  I may have

24  stopped and paid a phone bill on my way in, but I am

25  still actively ready to go and on call.

1     A.    7 on 7?

2     Q.    Yeah.

3     A.    Okay.

4     Q.    Now, just flip to Interrogatory Number 9.

5  Please review the question and then your response on

6  the following page.  Let me know when you're done.

7     A.    Okay.

8     Q.    So there this refers to -- you mentioned it

9  happened a few times, and here it stated you did it at

10  least six times, meaning making trips to and from South

11  Carolina.

12     A.    Okay.  So the only thing I can tell you, if

13  y'all want to go back and search Towbook to find every

14  call, have at it.  But I don't know the exact number.

15  I will say between three, six could be potentially, but

16  it's not more than that.  It was very rare that we went

17  out of state like that.

18     Q.    Okay.  And in Towbook what you're stating is

19  that -- was there ever a time that you may have gone to

20  South Carolina but not under dispatch under Towbook?

21     A.    No, sir.

22     Q.    They would have been reflected in Towbook.

23     A.    Yes.

24     Q.    Okay.  Do you think there's a chance that,

25  just based on your recollection, it was more than six?



1  You've given a range between three to four, six.  Was

2  it more?  You just know it was --

3       A.    Sir, I gave an answer.  I don't know what

4  else to tell you.  I genuinely think it was between

5  three and six.

6       Q.    Okay.

7       A.    I mean, y'all literally have all the facts

8  here.  Y'all should know how many times I went, if that

9  was the case.  I haven't been able to look through all

10 this to go back and count to give you a solid answer.

11      Q.    But you do agree that you did make trips out

12 of state to South Carolina.

13      A.    As I told you, yes.

14      Q.    Okay.  To and from.

15      A.    As I said, yes.

16      Q.    Can you describe your interactions with the

17 customers that you were -- on, you know, responding to

18 a call for?  Would you take payments, or did dispatch

19 handle that, Viktoria and Valeria?

20      A.    Most of the time, if there was a payment,

21 they usually paid card, which would go through the

22 office.  Very rarely did we, I, take cash.  I don't

23 like to.

24      Q.    Okay.  So you rarely took cash.  Did you --

25      A.    Okay.  Before that even -- so if you got



1      Q.    If you ever declined or canceled or rejected
2  a job, was there ever discipline?
3      A.    I wouldn't say that I have personally been
4  disciplined, but there was definitely verbal notations
5  that if you denied calls that, you know, there could be
6  a potential punishment.
7      Q.    Okay.  You mentioned potential.  Does that
8  mean did it ever happen to you?
9      A.    I just said it didn't happen to me.  But if
10  we denied calls, there was a verbal agreement with
11  everybody that you could potentially be punished.
12      Q.    Okay.  And we went over and testified and we
13  looked.  We never saw any invoices where your pay had
14  been docked; correct?
15      A.    That was my personal pay.  No, it hasn't
16  been docked.
17      Q.    Okay.  So you were never docked for
18  rejecting other calls.
19      A.    That's exactly what I just said.
20      Q.    Okay.  And did you ever overhear threats
21  made to other drivers?
22      A.    I don't recall.
23      Q.    So you're not sure whether or not you even
24  heard about anyone being subject to discipline for
25  rejecting jobs.



1      A.    I know what I was verbally told by Eli.  And

2  other than that, then I can't give you an definitive

3  answer.

4      Q.    Okay.  And what was -- what did he say?

5      A.    That if the drivers kept refusing to do

6  calls he'd start docking their pay.

7      Q.    Okay.  But that never happened to you.

8      A.    Again, to me, no.

9      Q.    Do you know who was -- you said was anyone

10  else involved in whether or not the issue of docking

11  pay was going to be threatened or assessed against

12  drivers?  Was that just a conversation between you and

13  Eli?

14      A.    That part of the conversation was only

15  between me and Eli, yeah.

16      Q.    Okay.  You didn't talk to anybody else about

17  it.

18      A.    Not my business to tell.

19      Q.    Okay.

20            (An off-the-record discussion was held.)

21  BY MR. HANDSCHUH:

22      Q.    Are you aware whether or not any of the

23  other drivers for 316 actually -- I know you didn't,

24  and you've stated that, and I appreciate that very

25  much.  But any other drivers, are you aware of any



1   Towbook for the period of time when you had the iPhone.

2        A.    It should reflect.

3        Q.    Okay.  But then after the iPhone was turned

4   back in, you were no longer collecting credit card --

5        A.    No.

6        Q.    I just want to make sure because I want to

7   make sure --

8        A.    I'm being very clear with you.  Not after

9   the Clover and iPhone thing we never took cards.  They

10  did it through the office.

11       Q.    Okay.  And just to be clear, you were hired

12  on or about the beginning of December of '19.  And then

13  the additional drivers, as we stated, you were there

14  for -- or you testified for about a year.  So this

15  would have been early 2021 --

16       A.    Yes.

17       Q.    Okay.  So it was essentially -- you know, we

18  know you had that iPhone for about that period of time.

19       A.    Roughly, yes.

20       Q.    Okay.  And so you've clarified now the

21  extent of your allegations in allegation 18 of the

22  complaint; correct?

23       A.    If that's what you need to say, yes.  I

24  mean --

25       Q.    Well, is there anything else that you'd like



1  actually need logbooks.

2       A.   I was simply telling Eli from experience in

3  towing the companies that are running aren't running

4  like this.

5       Q.   Okay.  But that's notwithstanding the fact

6  that you were aware that 316 was trying to implement

7  the use of the hours of service logs.

8       A.   Okay.  Yeah, he asked me about it, and I

9  made a comment.

10      Q.   Okay.  Going back, while you were working

11 for 316, did you ever have an opportunity to have an

12 additional job or --

13      A.   No.

14      Q.   -- means of income?  You never worked for

15 another company?

16      A.   I just stated no, sir.

17      Q.   Okay.  Did you have any other means of

18 income?

19      A.   Sir, I just stated no.

20      Q.   Okay.  So if it wasn't 316, you weren't

21 earning monies from any other person or entity.  Is

22 that correct?  Sir, you need to answer unless your

23 attorney advises you.

24      A.   I'm trying to, but I just answered you the

25 same question three different ways.  I get you're an



1  attorney and you're clever and you can flip things

2  around.  The answer is still the same:  No.

3      Q.   I'm not trying to flip around.  I want to be

4  thorough.

5      A.   And I'm being thorough.  The answer is no.

6      Q.   Okay.  Okay.  And so did you at any point in

7  time advise Eli that you were working a second job?

8      A.   I did lie to Eli and tell him I was working

9  somewhere else.  I did.

10      Q.   Oh, you did.  Okay.  Why did you feel the

11  need to lie?

12      A.   Because I wanted time away.  I couldn't get

13  a break, couldn't get time off.

14      Q.   Okay.

15      A.   So I lied to get time away, to have a break,

16  so I could spend some time with my family.

17      Q.   Okay.

18      A.   That's why I lied to him.

19      Q.   Are you claiming you never had an

20  opportunity while you worked for 316 for a vacation?

21      A.   No.

22      Q.   You never had a single day of vacation.

23      A.   No.

24      Q.   Okay.  So you don't consider going from 24/7

25  down to 12-hour shifts, you didn't have an opportunity



1      Q.    Okay.

2      A.    You have a shift that you're responsible for

3   taking the calls coming in on that shift.  After your

4   shift, if you get a call, that's -- you're on call.

5      Q.    But, again, we've -- your testimony is such

6   that during the shift there was no requirement to be at

7   316; correct?

8      A.    Right.

9      Q.    And then you -- all you needed to do was to

10  be in or near your truck ready to go to respond to a

11  call.

12     A.    I'm glad it sounds that easy, but yes.

13     Q.    Okay.  And then there is an opportunity

14  while you're waiting to be dispatched on a call to run

15  personal errands or to do with that time whatever you

16  deemed fit.

17     A.    No, not necessarily.  You can't say it like

18  that, not whatever I deem fit.  I can't go to my

19  nephew's birthday party if I'm scheduled to work.

20     Q.    Could you possibly not have been called

21  during a shift?

22     A.    Potentially.

23     Q.    Okay.

24     A.    But that don't mean I can go out of the area

25  or go be tied up doing something else.  Because when



1  that call comes in, you have to respond to that call.

2  Those calls have ETAs, estimated time of arrival.  If

3  you don't meet that ETA, you get flagged.  You get

4  flagged, you stop getting calls.  It's all a process.

5  So when you're on call or you're on your shift, you

6  better be ready to go.

7        Q.    Okay.  But for the time that you may be

8  waiting for a call, right, during your shift, your

9  testimony earlier was that you -- if the timing is

10  right, you could make a decision whether to run a

11  personal errand or some other item; correct?

12        A.    Maybe so.

13        Q.    Okay.  Were you prohibited from doing that?

14        A.    If you get a call.  I mean, you are there

15  for work.  You're not there for pleasure.

16        Q.    But the calls were not consistent each

17  shift.  It was sporadic.

18        A.    It doesn't matter.  You've still got to be

19  ready to go.

20        Q.    But, again, you didn't have to be at some --

21        A.    But I could have been taking a bath, but I

22  didn't have time because you've got to be ready to go.

23        Q.    But the amount -- so you're just saying you

24  had difficulty knowing how long you might not be --

25        A.    No.

