# In the Matter Of:

# HYDE V. 316 TOWING & ROAD SERVICE

2:22-cv-103-RWS

# KEVIN BRINDLEY

*September 29, 2023*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF GEORGIA
 2                    GAINESVILLE DIVISION

 3
     DUSTIN HYDE, Individually,    )
 4   and on Behalf of All Other    )
     Similarly Situated,           )
 5                                 ) CIVIL ACTION FILE
                 Plaintiff,        )
 6                                 ) NO. 2:22-cv-103-RWS
            vs.                    )
 7                                 )
     316 TOWING & ROAD SERVICE,    )
 8   INC., and MAKSIM LISOVSKIY,   )
                                   )
 9              Defendants.        )
     _____)
10

11

12           Deposition of KEVIN BRINDLEY, taken on

13      behalf of the Defendants, pursuant to Notice

14      and agreement of counsel, in accordance with

15      the Federal Rules of Civil Procedure, before

16      Cynthia B. Gatewood, Certified Court Reporter,

17      at 3390 Peachtree Road NE, Suite 520, Atlanta,

18      Georgia, on the 29th day of September 2023,

19      commencing at the hour of 2:29 p.m.

20

21

22

23

24

25
```



| | | |
|---|---|---|
| 1 | INDEX TO EXAMINATIONS | |
| 2 | EXAMINATION | PAGE |
| 3 | Cross-Examination by Mr. Handschuh | 4 |
| 5 | INDEX TO EXHIBITS | |
| 6 | DEFENDANTS' EXHIBIT — DESCRIPTION | PAGE |
| 7 | D-1   Third Amended Notice to Take Deposition of Kevin Brindley | 7 |
| 9 | D-2   not tendered | |
| 10 | D-3   Driver Application | 22 |
| 11 | D-4   Plaintiff Kevin Brindley's Responses to Defendants' First Interrogatories, Requests for Production of Documents, and Requests for Admission | 39 |
| 14 | D-5   Independent Contractor and Lease Agreement | 37 |
| 15 | D-6   Towbook Log | 77 |
| 16 | D-7   not tendered | |
| 17 | D-8   Damages Spreadsheet | 88 |
| 18 | D-9   not tendered | |
| 19 | D-10   IRS Response | 94 |

- - -



```
 1   APPEARANCES OF COUNSEL:

 2
     On behalf of the Plaintiff:
 3
             SEAN SHORT
 4           Attorney at Law
             Sanford Law Firm PLLC
 5           Suite 510, Kirkpatrick Plaza
             10800 Financial Centre Parkway
 6           Little Rock, Arkansas 72211
             Phone:  (501) 904-1650
 7           Email:  sean@sanfordlawfirm.com

 8
     On behalf of the Defendants:
 9
             JEREMY R. HANDSCHUH
10           AMANDA I. ELLIOTT
             Attorneys at Law
11           Mitchell-Handschuh Law Group
             3390 Peachtree Road NE
12           Suite 520
             Atlanta, Georgia 30326
13           Phone:  (404) 262-9488
             Email:  jeremy@m-hlawgroup.com
14           Email:  amanda@m-hlawgroup.com

15
     Also Present:
16
             Maksim Lisovskiy
17

18

19

20                         -  -  -

21

22
             (Disclosure, as required by the Georgia
23       Board of Court Reporting, was made by the court
         reporter, a written copy of which is attached
24       hereto.)

25
```



```
 1  of how you first got to know 316?
 2       A.   So as we spoke earlier about Dustin Hyde, he
 3  went to work for 316.  He lived fairly close to where I
 4  did.  We became friends.  Even though we didn't work
 5  together any longer, we still remained friends.  He had
 6  introduced me to Eli once before.  They were trying to
 7  get me to come and work for 316, and I kind of just
 8  brushed them off, and I wasn't ready to make the move.
 9       Q.   Okay.
10       A.   And I'd say probably another year had went
11  by, and after that I met with Dustin and Eli again and
12  kind of talked more about coming to work there.  I
13  didn't quite start then.  I put them off for I'd say
14  probably another month.  And then I went and talked to
15  Eli one day, met up with him and talked to him, and
16  that's when he hired me.
17       Q.   Okay.  When you were -- is it fair to say
18  that it was the application process with 316?  Is that
19  how you would refer to it, meaning just the onboarding
20  or at least, you know, the time until you were hired?
21       A.   No, because once we filled out the
22  application is when I was hired that day.
23       Q.   Okay.
24       A.   But -- or two or three days later I had a
25  drug test to go take.  But I was just meeting them to
```



```
 1   kind of feel the company out, feel them out.
 2        Q.    Okay.
 3        A.    Before I made a major move.
 4        Q.    When you were deciding whether or not to be
 5   hired, were you dealing exclusively with Eli at 316?
 6   Were you dealing with anyone else?
 7        A.    No, I dealt strictly with Eli when I was
 8   hired.
 9              (Exhibit Number D-3 was marked for
10          identification.)
11   BY MR. HANDSCHUH:
12        Q.    All right.  Handing you what's been
13   previously marked as Exhibit 3.  If you would, take a
14   moment for me and thumb through that document, and then
15   let me know once you're finished.
16        A.    All right.
17        Q.    You've had a chance to review Exhibit 3?
18        A.    Yes, sir.
19        Q.    All right.  So at the time -- and this would
20   have brought us to early -- on or about October 5th,
21   2021, a time when you were speaking with Eli.  When you
22   -- did you take the -- you mentioned receiving -- it
23   was a handbook of materials of various information
24   about the company; correct?
25        A.    Yes.
```



1      Q.    An application to review and sign and so
2  forth?
3      A.    Yes, sir.
4      Q.    Now, I just want to make sure of the timing.
5  Did you receive that packet and then wait the month, or
6  did you wait the month and then come back for the
7  packet?  I think you said -- was it just receive the
8  packet, then sign it, and then drug test?
9      A.    Yes, sir.
10     Q.    All right.  But you had time to take the
11 information they'd given to you home to review and
12 sign, do you recall?
13     A.    No, sir.  So, like I said, the month before
14 I hired on, that was just a decision part of mine.
15 That wasn't based on a packet or an application or
16 anything like that.  That was just me waiting my final
17 month to quit my previous job to come work here.  The
18 Monday that I started -- I believe it was a Monday.  It
19 may have been a Tuesday.  I'm not 100 percent sure.
20     Q.    Okay.
21     A.    The day that I started is when I received
22 the packet.
23     Q.    Okay. I appreciate that.  Does October 5,
24 2021, sound about right?
25     A.    Yeah.

1    A.   No, sir.
2    Q.   Okay.  Do you recall whether you were hired
3    at a rate of $900 a week?
4    A.   Yes, sir.
5    Q.   How did that -- how did you come to that
6    number?
7    A.   He lowballed me, to tell you the truth.
8    Q.   Really?
9    A.   He just started me out at 900.
10   Q.   Okay.  Did you -- when you say lowballed,
11   did he go lower than nine and you had to counter?
12   A.   No.  It was supposed to be more, but then
13   come payday it was nine.
14   Q.   Okay.
15   A.   Hundred.
16   Q.   What was it supposed to be?
17   A.   It was supposed to be a thousand.
18   Q.   Okay.  Did you discuss at any time why it
19   was only 900?
20   A.   He said that's what he was going to start me
21   out as.
22   Q.   Okay.  Did you object to that or refuse to
23   work for that amount?
24   A.   I didn't refuse to work for that because I
25   needed a job.  But there was an understanding that I



1     Q.    Okay.  But that was for purposes of the
2  referral, not necessarily just a part of performing
3  your duties.
4     A.    Correct.
5     Q.    Okay.  Any other bonuses besides the new
6  hire referral?
7     A.    No, sir.
8     Q.    Okay.  Did you have the title of driver
9  while you were working for 316?
10    A.    Yes, sir.
11    Q.    Okay.  Can you describe your main job
12 duties?
13    A.    Go out and assist broke down motorists.
14    Q.    Okay.  And so would that mean -- did you
15 refer to them as jobs while you were at -- or did you
16 refer to them as customers or trips?  I want to use
17 your terminology.
18    A.    Calls.
19    Q.    Calls.  Okay.  So you responded to calls,
20 and these would be calls from people for roadside
21 service?
22    A.    Yes, sir.
23    Q.    Whether that be a tow or a lockout or a
24 battery or gas?
25    A.    Correct.



1        A.    No, sir.
2        Q.    Okay.  Did you -- were you supervised by
3   Dustin Hyde?
4        A.    I was supervised by Eli.
5        Q.    Eli.  Okay.  So not -- you didn't believe
6   that you needed to respond to Dustin Hyde.
7        A.    Right.
8        Q.    Okay.  Instead you would correspond and deal
9   with Eli.
10       A.    Yes, sir.
11       Q.    Okay.
12       A.    That's the only person I dealt with.
13       Q.    Okay.  You never dealt with anyone else at
14  316?
15       A.    No, sir.
16       Q.    And we talked about Maksim or Max rather.
17  You know him as the same person?
18       A.    Yes, sir.
19       Q.    Okay.  Only brief conversations seeing each
20  other in the hallway.
21       A.    Yes, sir.
22       Q.    Okay.  Do you have Exhibit 4 there
23  underneath 3?  Yes.  No, I'd like to draw your
24  attention back to 4.  And, if you could, I will direct
25  you to the page.  This is Request for Admission Number



1      Q.   Do you recall if that mailing arrived before
2  Dustin had reached out to you?
3      A.   No, right afterwards.
4      Q.   Afterwards?  Okay.
5      A.   They wouldn't have had my information and
6  address.
7      Q.   Okay.  Okay.  For purposes of your schedule,
8  can you walk me through a little bit what your schedule
9  was and whether it changed over time and then who was
10 responsible for setting that schedule?
11     A.   So originally it was noon to midnight,
12 Monday through Friday.  Then a few weeks later or a few
13 months later, short-staffed for night shift, so I
14 worked from noon until 5:30 in the morning, a.m.  And
15 then I done that for just about I think like a month,
16 give or take maybe a month, a little over a month.  And
17 then my schedule was changed back to noon to midnight.
18     Q.   Okay.  And who was responsible for telling
19 you what your schedule was going to be?
20     A.   Eli.
21     Q.   Okay.  Anyone else involved in that process?
22     A.   No.
23     Q.   Did you at any point in time during the
24 shifts, did you have to report to an office?
25     A.   Yes, sir.  I mean, not necessarily report to



1  the office; but for any kind of repair work or to pick
2  up your check and stuff like that, you reported to the
3  office.
4       Q.   Okay.  But at least when -- when did you --
5  did your shift begin when you logged into Towbook?
6       A.   Yes, sir.
7       Q.   And so when you logged into Towbook, did you
8  need to be in any particular location?
9       A.   Winder.
10      Q.   Winder.  Okay.  So you mean the -- does that
11 mean the coverage area?
12      A.   Yes, sir.
13      Q.   Okay.  Those would be the coverage area for
14 the 316 and the coverage it could handle for reporting
15 roadside assistance from the insurance companies.
16      A.   Correct.
17      Q.   Okay.  But within being nearby for coverage
18 purposes that 316 covered near Winder, Georgia, was
19 there any, you know, limitation as to where you could
20 wait while you were on shift?
21      A.   I had to wait within inside the area.  I
22 couldn't venture out to the other side of town or
23 something to go visit or do anything.  I had to stay
24 within the -- they call it the zone --
25      Q.   Okay.



```
 1      A.    -- area, zone area.
 2      Q.    How big was the zone?  Can you describe --
 3      A.    I considered it 30 miles.
 4      Q.    30 miles.  Okay.
 5      A.    Yeah.
 6      Q.    So 30 miles from Winder.  Within that
 7   30 miles -- is that air miles in like a --
 8      A.    Like a 30-mile radius -- circumference.
 9      Q.    Okay.  Or diameter rather?
10      A.    Yeah.
11      Q.    Like a straight line of 30 miles.
12      A.    Well, a circle.
13      Q.    Oh, circle.  All right.  So within that
14   circle, was there any requirement that you be in any
15   particular place, like you have to come report to 316's
16   office to sign into Towbook?
17      A.    No.
18      Q.    Okay.  Could you be anywhere during that
19   time?
20      A.    Well, truthfully, I stayed logged in 24/7.
21      Q.    Oh, really?  Okay.
22      A.    But, I mean, I just had to be available at
23   noon.
24      Q.    Okay.  Okay.  So it didn't matter where you
25   were during your shift, quote, unquote.
```

1  service.
2       A.   Local, yeah.
3       Q.   Okay.  But from time to time would you be
4  asked to travel to another state for particular calls?
5       A.   Yes.
6       Q.   Okay.  Which states would you travel to?
7       A.   North Carolina, South Carolina.  I believe
8  that's it.
9       Q.   Okay.  And would those trips also have been
10 dispatched to you via Towbook?
11      A.   Yes, sir.
12      Q.   Okay.  Do you recall about how many such
13 trips to the Carolinas you took?
14      A.   Less than five.
15      Q.   Okay.  During your role as a driver for 316,
16 were you ever asked to collect any payments from
17 customers?
18      A.   Most of the stuff was through motor clubs,
19 and they did have some customer pay that paid by credit
20 card.
21      Q.   Okay.  And so would it be limited to your
22 collecting overages, or would you collect the entire
23 amount from calls?
24      A.   Just the overages, whatever the -- whatever
25 it said in Towbook.



1       Q.   Okay.  You testified earlier that you had
2  the opportunity to accept or reject loads.  And I'd
3  like you to look at Exhibit 4 again, Request for
4  Admission Number 28.  This is on page 23.
5       A.   Okay.
6       Q.   So this asks you to "admit that 316 Towing
7  never disciplined or threatened to terminate you for
8  rejecting a request from a potential customer," and
9  then you denied that.  Can you explain for me why you
10 denied that?  Do you know?
11      A.   So there was a time I was sick, and Eli
12 basically told me to bring the truck back, if I wasn't
13 going to work to bring the truck back.  I had COVID,
14 and I still ended up going and doing the tow, but
15 that's the only time I can recall that I was threatened
16 with termination.
17      Q.   Okay.  So let me unpack that.  It sounds as
18 though from time to time you're allowed to take the Ram
19 4500, you could take that back home?
20      A.   Yeah.
21      Q.   Okay.
22      A.   Yes, sir.
23      Q.   And so there's only one instance that you
24 can recall where, you know, being ill with COVID,
25 that's the time you believe you may have been



```
 1   you understood that you were asked to maintain logs.
 2        A.    Towing companies don't use logbooks.
 3        Q.    Okay.  But at least in the documentation you
 4   saw that you were --
 5        A.    Yeah.
 6        Q.    -- supplied a policy --
 7        A.    Yes, sir.
 8        Q.    Okay.  So that was available to you should
 9   you have chosen to utilize it.
10        A.    Correct.
11        Q.    Okay.  Let me ask you, did you ever work for
12   any other companies while employed by 316?
13        A.    No.
14              MR. HANDSCHUH:  Off the record.
15              (A brief recess was taken.)
16   BY MR. HANDSCHUH:
17        Q.    All right.  Mr. Brindley, returning back to
18   our questioning about your time as a driver at 316, I
19   wanted to ask you to please turn to, within Exhibit 4,
20   Request for Admission Number 7.  And this would be on
21   page 19 of 24.  If you could, please read that, and
22   then let me know when you're finished.
23        A.    You said number 7?
24        Q.    Correct.
25        A.    Okay.
```

