**In the Matter Of:**

HYDE V. 316 TOWING & ROAD SERVICE

2:22-cv-103-RWS

---

# REYNALDO BROWN

*September 28, 2023*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF GEORGIA
2                     GAINESVILLE DIVISION

3
DUSTIN HYDE, Individually,       )
4  and on Behalf of All Other    )
   Similarly Situated,           )
5                                )  CIVIL ACTION FILE
              Plaintiff,         )
6                                )  NO. 2:22-cv-103-RWS
         vs.                     )
7                                )
316 TOWING & ROAD SERVICE,       )
8  INC., and MAKSIM LISOVSKIY,   )
                                 )
9             Defendants.        )
_____)
10

11

12            Deposition of REYNALDO BROWN, taken on

13       behalf of the Defendants, pursuant to Notice

14       and agreement of counsel, in accordance with

15       the Federal Rules of Civil Procedure, before

16       Cynthia B. Gatewood, Certified Court Reporter,

17       at 3390 Peachtree Road NE, Suite 520, Atlanta,

18       Georgia, on the 28th day of September 2023,

19       commencing at the hour of 3:10 p.m.

20

21

22  _____

23

24

25



```
 1                    INDEX TO EXAMINATIONS

 2     EXAMINATION                                      PAGE

 3     Cross-Examination by MR. Handschuh                  4

 4

 5                      INDEX TO EXHIBITS

 6     DEFENDANTS'
          EXHIBIT           DESCRIPTION               PAGE
 7
          D-1         Third Amended Notice to Take       5
 8                    Deposition of Reynaldo Ricardo
                      Brown
 9
          D-2         Driver Application                34
10
          D-3         not tendered
11
          D-4         Responses to Defendants' First    30
12                    Interrogatories, Requests for
                      Production, and Requests for
13                    Admission

14        D-5         Independent Contractor and Lease  44
                      Agreement
15
          D-6         Towbook Log                       78
16
          D-7         Canceled Job Log                  81
17
          D-8         Damages Table                     97
18
          D-9         Invoice                          100
19
          D-10        IRS Response                     103
20

21

22                          -   -   -

23

24

25
```



```
 1    APPEARANCES OF COUNSEL:

 2

      On behalf of the Plaintiff:
 3
              SEAN SHORT
 4            Attorney at Law
              Sanford Law Firm PLLC
 5            Suite 510, Kirkpatrick Plaza
              10800 Financial Centre Parkway
 6            Little Rock, Arkansas 72211
              Phone:  (501) 904-1650
 7            Email:  sean@sanfordlawfirm.com

 8
      On behalf of the Defendants:
 9
              JEREMY R. HANDSCHUH
10            AMANDA I. ELLIOTT
              Attorneys at Law
11            Mitchell-Handschuh Law Group
              3390 Peachtree Road NE
12            Suite 520
              Atlanta, Georgia 30326
13            Phone:  (404) 262-9488
              Email:  jeremy@m-hlawgroup.com
14            Email:  amanda@m-hlawgroup.com

15
      Also Present:
16
              Maksim Lisovskiy
17            Eli Kudrin

18

19                           -   -   -

20

21            (Disclosure, as required by the Georgia
      Board of Court Reporting, was made by the court
22    reporter, a written copy of which is attached
      hereto.)
23

24

25
```



REYNALDO BROWN                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              49

1        A.    Oh, the pay rate was supposed to be 950 a

2   week.

3        Q.    Okay.

4        A.    And that was I think a flat rate.

5        Q.    Okay.  Was that paid weekly?

6        A.    I think it was weekly.

7        Q.    Okay.  Do you believe it was paid on some

8   other basis besides weekly?

9        A.    There's weekly and biweekly, but I think it

10  was weekly, I think, yeah.

11       Q.    Did you ever receive any raises while you

12  worked there?

13       A.    No.

14       Q.    Okay.  Did you ever have pay docked for

15  missing work?

16       A.    No.

17       Q.    Okay.  Did you ever negotiate the 950 with

18  anybody?  Did they start you out at a lower rate?  Were

19  you at a higher rate?

20       A.    I was always 950.

21       Q.    950.  Did you ever ask for say 1,100?

22       A.    No.

23       Q.    Or a thousand?

24       A.    Not that I remember.  I don't think so.  I

25  don't think I was there long enough.



REYNALDO BROWN                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              52

1       A.     Yeah, I can read it.  It just might take a
2   while.
3       Q.     Okay.  Take your time.  We have time.
4       A.     All right.
5       Q.     Okay.  And for these two documents, do you
6   recognize these documents as being a part of the
7   application for 316 Towing?
8       A.     If that's what this is, an application.  I
9   know I filled it out, but I don't know if the paper --
10  yeah, I guess.
11      Q.     Whatever the paper --
12      A.     Yeah.
13      Q.     -- that starts with Independent Contractor
14  Application Checklist --
15      A.     All right.
16      Q.     -- on the top left-hand corner that sets
17  forth a name, Reynaldo Brown, that looks like your
18  handwriting.  Is that yours?
19      A.     Which one?
20      Q.     The second one.
21      A.     This one?
22      Q.     Yeah -- no, I'm sorry, the one right before
23  the last, second to last.  See that name --
24      A.     Yep, that's my handwriting.
25      Q.     That's you.



 1  process like that for this particular claim?

 2      A.    No.

 3      Q.    Okay.  Do you know why this matter wasn't

 4  submitted to arbitration in the first place?

 5      A.    No.

 6      Q.    Need to take a break?

 7      A.    No, I'm fine.

 8      Q.    Were you ever -- during the onboarding ever

 9  offered any other benefits or incentives beyond the

10  $950 a week?

11      A.    No.

12      Q.    Okay.  Were you offered any stock or

13  ownership interest in 316?

14      A.    No.

15      Q.    Okay.  After you filled out this

16  application, can you just walk me through -- obviously

17  you became a driver.  Do you remember the timing about

18  how quickly that may have happened?

19      A.    The day I started?

20      Q.    We're back in June.  Do you think it was,

21  you know, relative -- do you recall your start date by

22  chance?

23      A.    No.

24      Q.    Okay.  Do you know if it was relatively soon

25  after your meeting?  Was it --



1      A.   It was soon.  I just don't know the date.

2      Q.   Okay.  Do you think it was a matter of

3   months or just relatively quick?

4      A.   Relatively quick.

5      Q.   Okay.  Can you describe your duties while

6   you were a driver?

7      A.   Yeah.  It was a tow truck driver.  My job

8   was to tow cars.

9      Q.   Go ahead.  I'm listening.

10     A.   Give jump starts, change tires, do

11  lock-outs.  That's where someone locks their keys in

12  their car.

13     Q.   Okay.

14     A.   And just wait for -- you know, wait for a

15  call.  I'd sit at a gas station close by the house or a

16  parking lot, like Walmart or any store really, and just

17  do calls as they come in.

18     Q.   Okay.  So it sounds as though, if I can

19  summarize, they were all driver-type duties related to

20  responding to calls.

21     A.   Driver type, like driving to go get calls?

22     Q.   Correct.  Meaning did you have any other

23  duties that wasn't related to driving the truck?  And,

24  if so, what were those?

25     A.   Do you mean like changing a tire?



REYNALDO BROWN                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              61

```
 1   more duties, please let me know.
 2        A.    (Witness nods head affirmatively.)
 3        Q.    Okay?
 4        A.    All right.
 5        Q.    I just want to be clear on that.  If you
 6   thought you did more, just let me know.
 7        A.    Copy.
 8        Q.    So no one ever asked you to perform any
 9   other duties beyond being a driver.
10        A.    Like what?
11        Q.    I don't know.
12        A.    Me neither.
13        Q.    Okay.  All right.  Who was your supervisor
14   while -- or someone that you reported to while you
15   worked at 316?
16        A.    If I'm not mistaken, I think they made
17   Dustin the supervisor or the go-to guy for me to report
18   stuff to.  But I spoke to -- I think I spoke to Eli
19   kind of regularly doing a text message.
20        Q.    Okay.  Now, when you speak to Dustin, did
21   Dustin at that time have the title of driver manager?
22        A.    Something like that.
23        Q.    You understood that --
24        A.    Yeah.
25        Q.    -- he was perhaps, you know, in a position
```



REYNALDO BROWN                                        September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                            67

1             MR. SHORT:  Well, he doesn't want to know

2        about conversations with the lawyer.

3             THE WITNESS:  All right.

4    BY MR. HANDSCHUH:

5        Q.   I take it you're going to mention scheduling

6    perhaps, but yeah.  Let's see.  At the time, did you

7    understand -- what did you understand Hyde's role to

8    be?

9        A.   A tow truck driver.

10       Q.   Okay.  And he at least was someone -- you

11   weren't sure of his official title, but he did

12   ultimately help train you.

13       A.   Yes.

14       Q.   Okay.  Did you understand whether or not

15   Dustin Hyde had duties different than you, similar to a

16   driver manager?

17       A.   Just driving, towing, jump starts, tire

18   changes, same thing.

19       Q.   Did Hyde ever direct your work or tell you

20   what to do?

21       A.   No.  We were in two separate trucks.

22       Q.   Okay.  Did you ever observe personally --

23   and you may or may not have -- observe Hyde performing

24   any other duties for 316 other than driving the truck?

25       A.   No.



1        Q.    Do you recall who may have set your schedule

2   while you worked at 316?

3        A.    No.

4        Q.    Okay.  Do you remember what your schedule

5   was?

6        A.    7:00 to 7:00, five days a week.

7        Q.    Okay.  And was that 7:00 a.m. to 7:00 p.m.?

8        A.    It was 7:00 a.m. to 7:00 p.m., and then it

9   changed to 7:00 p.m. to 7:00 a.m., or vice versa.  I

10  can't remember which one.

11       Q.    Okay.  Going back to the document you have

12  there, if you turn back to the beginning page 4.

13       A.    All right.

14       Q.    And then if you -- I'm going to ask you to

15  read over Interrogatory Number 3 on the previous page

16  through to the end of your answer, and just let me know

17  when you're done.

18       A.    So --

19       Q.    Yes.  Yeah, right there, Interrogatory 3.

20       A.    All the way to 4?

21       Q.    Yeah.  Just once you're at 4, let me know.

22       A.    You're not going to read this after I

23  finish, are you?

24       Q.    I'll represent I'm interested in the last

25  paragraph, but I want to make sure you have a chance to



REYNALDO BROWN                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              72

1        A.     No.

2        Q.     Okay.  Was it a lot of times or just maybe

3    once or twice?

4        A.     A few.

5        Q.     Okay.  Was there ever variation -- I know

6    you mentioned you went from what appeared to be a

7    nighttime shift to a daytime shift.  Do you recall when

8    that might have occurred?

9        A.     No.

10       Q.     Okay.  Was it pretty consistent?  Did it

11   switch around each week, or was this --

12       A.     I just switched once.

13       Q.     Switched once.

14       A.     I can't remember from what to what though.

15   I can't remember if I started off working 7:00 a.m. and

16   stopped at 7:00 p.m. or if I started off the other way

17   around.

18       Q.     Okay.  Did you ever have to report to the

19   316 office for work, meaning drive there for some

20   reason?

21       A.     If I'm not mistaken, I did.

22       Q.     You did drive there from time to time.  But

23   in order -- were you allowed to during your shift drive

24   to where you'd like while you weren't responding to a

25   job awaiting the next dispatch?



REYNALDO BROWN                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              73

1          A.    I had to either wait at a parking lot or a

2    gas station.  Usually I would wait at a Walmart parking

3    lot in the back away from other cars so I'm not in the

4    way.

5          Q.    Okay.  Who told you that you had to wait

6    somewhere?

7          A.    You always have to wait somewhere when you

8    drive a tow truck.  If you keep driving, you'll burn

9    the gas up.

10         Q.    I'm just asking did anyone point out the

11   specific location, or could you chose?

12         A.    It depends on the area.  Like if I have a

13   call and it's going that way, I have to wait somewhere

14   that way.  It just depends on wherever I drop the car

15   off at.

16         Q.    But, to make it more clear, I'm inquiring --

17   Eli and Max didn't give you like certain places where

18   you had to --

19         A.    As long as it was a parking lot.

20         Q.    As long as it was a parking lot.

21         A.    Yeah, as long as I'm like out on the road.

22         Q.    Were you allowed to return home during the

23   times you were on your shift?

24         A.    While I was on the clock?

25         Q.    Excuse me?



1      A.    Like between the 12 hours while working?

2      Q.    Sure.

3      A.    No.

4      Q.    Okay.  Did you ever try?

5      A.    I'd try to go home to try to get a sandwich

6  or something, but usually I just eat in the street.

7      Q.    Okay.  But you could from time to time go

8  home to eat.

9      A.    No.

10     Q.    You didn't?

11     A.    No.  I ate McDonald's, Burger King, Taco

12  Bell.

13     Q.    But you don't -- was anything prohibiting

14  you, if you so chose, to go home and eat at home?

15     A.    If I'm on the clock, no.  Yeah, I can't go

16  there.

17     Q.    You can't go?

18     A.    No.  Home and eat, no.

19     Q.    Who told you that?

20     A.    The bosses.

21     Q.    Who are they?

22     A.    Max and Eli.

23     Q.    They said you can't go home?

24     A.    From what I recall, yeah.

25     Q.    Okay.  Do you know if that was in writing



```
 1        A.    No.
 2        Q.    So do you have any reason to believe that
 3   these particular trips are inaccurate in any way?
 4        A.    No.
 5        Q.    Do you have any other veri -- or documents
 6   that would reflect any work on behalf of 316 beyond the
 7   month of June 2021?
 8        A.    No, I don't.
 9        Q.    Okay.  If you do have such documents, will
10   you produce them for your attorney to give to us?
11        A.    Uh-huh (affirmative).
12        Q.    Okay.  Had you ever seen the Towbook reports
13   for you prior to today?
14        A.    This one?
15        Q.    Uh-huh (affirmative).
16        A.    No.
17        Q.    Okay.  Do you have any reason to believe
18   that this report is inaccurate?  I think you testified
19   no; correct?
20        A.    No.
21        Q.    Okay.  Do you recall an ability to accept or
22   reject jobs?
23        A.    No.
24        Q.    Okay.
25        A.    I wasn't able to reject a job.
```



1  someone came and fixed the tire for them before I got

2  there, stuff like that.  But I never turned down a job.

3  I never pressed ignore.  When the phone ring, it give

4  you two options, accept or cancel.  I never pressed

5  cancel on neither one ever.

6      Q.    Okay.

7      A.    I just go do the job.

8      Q.    What does "car too big for wheel lift," what

9  does that mean?

10     A.    I don't know.  I never drove a wheel lift.

11     Q.    You never -- okay.

12     A.    I had a flatbed.

13     Q.    Do you recall whether or not any of the tow

14 trips that you would have undertaken, did any of those

15 cross into another state?

16     A.    No.

17     Q.    Okay.  Did you ever go to South Carolina?

18     A.    Another state?  No.

19     Q.    No?  Okay.  So just with certainty, you

20 don't recall South Carolina or another state.

21     A.    Unless I just didn't know I was in another

22 state, but I don't think so.

23     Q.    Okay.  This was in the Winder, Georgia,

24 area?

25     A.    Yes.



REYNALDO BROWN                                    September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                              84

```
 1   it.  I don't remember doing it.
 2        Q.    But it wasn't something that was routine?
 3        A.    No.
 4        Q.    Okay.  Were you ever disciplined for
 5   rejecting a job?
 6        A.    I never rejected a job.
 7        Q.    Okay.  Fair enough.  Hey, easy.  You drove a
 8   Dodge Ram 5500?
 9        A.    Yes, I think so.
10        Q.    Okay.
11        A.    Sounds about right.
12        Q.    Do you know that particular vehicle to have
13   a gross vehicle weight rating of about 19,000 pounds?
14        A.    I don't know how much it -- I wasn't taught
15   that part.
16        Q.    Do you know if it was over 10,000 pounds?  I
17   mean, I know you might not know 19, but did you know it
18   was over 10,000?
19        A.    The tow truck?  I don't know how much a tow
20   truck weighs.
21        Q.    Okay.  If the tow truck simply set forth a
22   gross vehicle weight rating on the door, would you have
23   any reason to doubt that?
24        A.    If it said how much the tow truck weighs on
25   the door?
```



```
 1        A.    Uh-huh (affirmative).

 2        Q.    And it sets forth June 18?

 3        A.    Uh-huh (affirmative).

 4        Q.    That would have been June 18, 2021?

 5        A.    Probably.

 6        Q.    Okay.  Did you ever, while you worked for

 7   316, perform work for any other companies while you

 8   were scheduled on a shift or on call?

 9        A.    No.

10        Q.    Okay.  Did you ever do -- you never worked

11   for A1?

12        A.    No.

13        Q.    Okay.

14        A.    I never bought a truck.

15        Q.    Okay.  Did you earn any other source of

16   income aside from public assistance of any kind?  And I

17   want to get -- I'm getting to income that might be

18   derived, you know, passively from owning property or

19   selling stocks or --

20        A.    Neither.

21        Q.    -- selling sneakers or hats.

22        A.    Nothing.  All I was doing was 316.

23        Q.    It was all 316.  Okay.  Do you recall

24   whether or not you had a good relationship with any of

25   the dispatchers?
```

REYNALDO BROWN                                  September 28, 2023
HYDE V. 316 TOWING & ROAD SERVICE                           105

1  could -- let's see.  It's not numbered, so I'm going to

2  have to draw your attention to it.  Can I borrow yours

3  for a moment?  I'll turn to it.

4       A.    Sure.

5       Q.    Thanks.

6       A.    You're welcome.

7       Q.    Drawing your attention to Form 8995, we

8  mentioned that A1 Quality Towing was an entity that you

9  claimed was created but never had a truck and never

10 started operating; correct?

11      A.    Yes.

12      Q.    Do you know why on this tax return it sets

13 forth an income for A1 Quality Towing of 13,000?

14      A.    No.

15      Q.    Okay.  So you don't have any personal

16 understanding as to why that company reflected $13,000

17 in income that year?

18      A.    No.

19      Q.    Okay.  Do you know whether that to be an

20 error?

21      A.    No.

22      Q.    Okay.  Was --

23      A.    I know we used the card.  I know she had

24 a -- like a credit card in her name for it, for the

25 company.  We used it, but we never did any work with



1   it.  Like we probably transferred money from one

2   account to another to each other, stuff like that, but

3   we never did no work at all.

4        Q.    Okay.  So no customers ever paid A1 Quality

5   Towing.

6        A.    Never.

7        Q.    Okay.  So you just have no basis to

8   understand why --

9        A.    We used the card.  Like we had a credit

10  card, and we transferred money to each other.  But we

11  definitely never did no work.  I never had a truck.  I

12  never changed a tire under that name or anything like

13  that.  Definitely not.

14       Q.    And going back to -- if you flip back about

15  three pages for me, that's not too bad, you'll see --

16  one more page.

17       A.    All right.

18       Q.    Sorry.  I meant the other way.  It's hard to

19  describe.  Yep, one more.  There we go.  Oh, I'm sorry.

20  I'll do it again.  I'll grab it from you and bring us

21  to the page.  Okay.  Bringing you to what's listed here

22  as Form 1040.

23       A.    Uh-huh (affirmative).

24       Q.    If you could, briefly take a look at that

25  and then let me know when you're finished.



1  wouldn't know why A1 was reporting income of about

2  $13,000 for that year?

3      A.    Like I said, we probably send each other

4  money using cards, like transfer money from one account

5  to another.  Or if she can't find her cards, she'll

6  send it to me on my phone, and I use my cards or back

7  and forth, stuff like that.  But that's it.

8      Q.    Okay.  But you weren't using A1 Quality to

9  tow --

10     A.    Never.

11     Q.    -- trucks.

12     A.    Never towed anything.

13     Q.    Okay.

14     A.    Never had a tow truck.  Never used a tow

15  truck, other than being employed.  And -- never.  Never

16  did any roadside assistance or none of that stuff with

17  it.

18     Q.    Okay.  Do you recall who may have prepared

19  this return?

20     A.    No.  I know my wife started -- made the LLC

21  for us because at one point I wanted to buy a tow

22  truck, but I didn't.  Never bought one.

23     Q.    Does she use a software like Turbo Tax, or

24  does she go to like H & R, do you know?

25     A.    I have no idea.

