In the Matter Of:

HYDE V. 316 TOWING & ROAD SERVICE

2:22-cv-103-RWS

---

# BRENT JOHNSON

*September 29, 2023*

---



800.211.DEPO (3376)
EsquireSolutions.com

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF GEORGIA
2                    GAINESVILLE DIVISION

3
DUSTIN HYDE, Individually,       )
4   and on Behalf of All Other     )
Similarly Situated,              )
5                                  )   CIVIL ACTION FILE
              Plaintiff,           )
6                                  )   NO. 2:22-cv-103-RWS
         vs.                       )
7                                  )
316 TOWING & ROAD SERVICE,       )
8   INC., and MAKSIM LISOVSKIY,    )
                                   )
9              Defendants.         )
_____ )
10

11

12              Deposition of BRENT JOHNSON, taken on

13        behalf of the Defendants, pursuant to Notice

14        and agreement of counsel, in accordance with

15        the Federal Rules of Civil Procedure, before

16        Cynthia B. Gatewood, Certified Court Reporter,

17        at 3390 Peachtree Road NE, Suite 520, Atlanta,

18        Georgia, on the 29th day of September 2023,

19        commencing at the hour of 10:09 a.m.

20

21

22

23

24

25



```
 1                    INDEX TO EXAMINATIONS

 2   EXAMINATION                                        PAGE

 3   Cross-Examination by Mr. Handschuh                    4

 4

 5                      INDEX TO EXHIBITS

 6   DEFENDANTS'
        EXHIBIT            DESCRIPTION                  PAGE
 7
        D-1        Fifth Amended Notice to Take           5
 8                 Deposition of Brent Johnson

 9      D-2        Driver Application                    14

10      D-3        not tendered

11      D-4        Plaintiff Brent Johnson's             26
                   Responses to Defendants' First
12                 Interrogatories, Requests for
                   Production of Documents, and
13                 Requests for Admission

14      D-5        Independent Contractor and Lease      23
                   Agreement
15
        D-6        Towbook Log                           66
16
        D-7        Canceled Job Log                      70
17
        D-8        Declaration of Brent Johnson          85
18
        D-9        Invoices                             104
19
        D-10       Invoices                              38
20
        D-11       IRS Response                         121
21

22
                          -   -   -
23

24

25
```



```
 1    APPEARANCES OF COUNSEL:

 2

      On behalf of the Plaintiff:
 3
              SEAN SHORT
 4            Attorney at Law
              Sanford Law Firm PLLC
 5            Suite 510, Kirkpatrick Plaza
              10800 Financial Centre Parkway
 6            Little Rock, Arkansas 72211
              Phone:  (501) 904-1650
 7            Email:  sean@sanfordlawfirm.com

 8

      On behalf of the Defendants:
 9
              JEREMY R. HANDSCHUH
10            AMANDA I. ELLIOTT
              Attorneys at Law
11            Mitchell-Handschuh Law Group
              3390 Peachtree Road NE
12            Suite 520
              Atlanta, Georgia 30326
13            Phone:  (404) 262-9488
              Email:  jeremy@m-hlawgroup.com
14            Email:  amanda@m-hlawgroup.com

15

      Also Present:
16
              Eli Kudrin
17

18

19
                          -  -  -
20

21

22
              (Disclosure, as required by the Georgia
23    Board of Court Reporting, was made by the court
      reporter, a written copy of which is attached
24    hereto.)

25
```



1       A.    I met Dustin.  He was actually the night

2   dispatcher.  So we would talk, conversate from time to

3   time.  He would also dispatch on the weekends.  And

4   Hemphill required us to work at least one weekend, one

5   or two weekends out of the month.  So I had known him

6   from being a weekend dispatcher as well as being a

7   nighttime dispatcher.

8       Q.    And then did you meet Brown and get to know

9   him while he was a driver at 316?

10      A.    No, sir.

11      Q.    No?  Okay.  When did you meet Brown?

12      A.    I never met Brown.

13      Q.    Oh, you never did.  Okay.

14            (Exhibit Number D-2 was marked for

15      identification.)

16            MS. ELLIOTT:  I'm handing you now what's

17      been marked as Exhibit 2.

18  BY MR. HANDSCHUH:

19      Q.    We'll keep a stack, if you will just turn it

20  upside down.  If you would, please take a moment to

21  flip through these pages, and then let me know once

22  you're finished.  You mentioned you recalled having

23  began to work for 316 in April of 2021.  Do you recall

24  at that point in time ever filling out an application?

25      A.    Yes, sir.



1      Q.    Do you recall just the next step in terms of

2   how you went about connecting with 316 and who helped

3   you, you know, become a driver?

4      A.    Really wasn't no help.  I got the tip from

5   Lionel, went and filled out an application, and

6   probably three days later I was driving a truck.

7      Q.    Okay.  If you could, in Exhibit 2 you'll

8   notice there's little numbers on the bottom right.

9   They're stamped with consecutive numbers.  And I'm just

10  going to point out I'll be referring to some of the

11  pages that are within this Exhibit 2.  So as I ask you

12  to kind of go through, if you would, first turn to

13  page 9.  All right.  And, if you would, take a moment

14  for me to read through 9 through 11, and just let me

15  know once you're finished.  Have you had a chance to

16  review those pages?

17     A.    Yes, sir.

18     Q.    Okay.  Going back, you mentioned Lionel.  Do

19  you remember his last name?

20     A.    I don't remember Lionel's last name.

21     Q.    Okay.  Do you know how to spell Lionel?

22     A.    L-i-o-l -- L-i-o-n-e-l.

23     Q.    Okay.  So at this point in time you are

24  given an application.  Do you recall who gave you an

25  application?



1        order.

2              MR. HANDSCHUH:  Oh, no.  Really?

3              MR. SHORT:  Yeah.  13 was before 12 in

4        yours.

5              THE WITNESS:  Yeah.

6              MS. ELLIOTT:  If you'd like, I can turn it

7        to the correct page for you.  Thank you.

8    BY MR. HANDSCHUH:

9        Q.    If you'd take a quick moment just to see 12

10   and 13.  It should be in order in that version of

11   Exhibit 2.  Do you see those pages?

12       A.    Yes, sir.

13       Q.    Okay.  Drawing your attention to page 12, do

14   you recognize this document as one of the documents you

15   signed when you were applying to become a driver for

16   316?

17       A.    Vaguely, but --

18       Q.    Okay.  Is that your name at the top left?

19       A.    Yes, sir.

20       Q.    Is that your handwriting?

21       A.    Yes, sir.

22       Q.    Okay.  And that's dated April 12, 2021?

23       A.    Yes, sir.

24       Q.    Do you recall at the time whether you were

25   allowed to take these documents home?



1       A.    Yes, sir, I was.

2       Q.    Okay.  So do you know whether or not you

3   signed that day, or was this after holding onto it for

4   a few days?

5       A.    I think I may have signed it at home.

6       Q.    Really?  Okay.

7       A.    Yes, sir.

8       Q.    So we can agree at least that you came in on

9   or about April 12, and then you were hired about a week

10  later?

11      A.    Yes, sir.

12      Q.    Okay.  If any of that time line changes,

13  just let me know, but --

14      A.    No, that sounds about right.

15      Q.    Okay.  Turning your attention to page 13,

16  the next page, do you recognize this as an additional

17  page within the application for 316?

18      A.    Yes, sir.

19      Q.    Okay.  And is this your handwriting

20  supplying responses and signature at the bottom?

21      A.    Yes, sir.

22      Q.    And this is also dated April 12, 2021?

23      A.    Yes, sir.

24      Q.    Okay.  Would you change for the driving

25  portion, having had any of -- you know, a chance to



1   document here is May 24th.

2        A.    Uh-huh (affirmative).

3        Q.    And that sets forth a driver receipt.

4        A.    Uh-huh (affirmative).

5        Q.    And that would have been about a month

6   after.  Is that for -- is this a part of the

7   documentation you think was signed after?

8        A.    I have no idea.

9        Q.    You don't know?

10       A.    I have no idea.

11       Q.    Okay.  And then the following page?

12       A.    Again, I don't have -- I have no idea.

13       Q.    So at least currently presently you don't

14  know what paperwork do you believe you signed, if at

15  all, involving MMM Express three to four months after

16  you signed the application and independent contractor

17  agreement for 316?

18       A.    Yes, sir.  I'm not 100 percent sure.

19       Q.    Do you recall who discussed your pay when it

20  came time to your application process and what your pay

21  would be?

22       A.    Eli.

23       Q.    Okay.  How did that discussion go?

24       A.    Quick, simple, to the point.

25       Q.    Okay.  Did he offer an amount that you



1  agreed to?

2      A.    Starting off, I believe it was 800 weekly.

3      Q.    Okay.  Was it 800 or 850?  Was there any

4  negotiation of the starting amount?

5      A.    It may have been 850.

6      Q.    Okay.

7      A.    Because during my tenure with 316, I think I

8  got two pay increases, $50 each.

9      Q.    Okay.  Do you know whether or not when it

10  came time to have Eli set the amount that you were

11  being paid, did Eli consult with anyone?

12      A.    Not that I know of.

13      Q.    Okay.  So you didn't hear about anything

14  from any third party that he had consulted with any

15  other person about your pay?

16      A.    No, sir.

17           (Exhibit Number D-10 was marked for

18      identification.)

19  BY MR. HANDSCHUH:

20      Q.    Okay.  Handing you what's been marked

21  previously as Plaintiff's -- or as Exhibit 10, excuse

22  me.  If you could, thumb through Exhibit 10, and then

23  let me know once you're finished.  All right.  Have you

24  had a chance to review Exhibit 10?

25      A.    Yes, sir.



```
 1        A.    Yes, sir.

 2        Q.    Okay.  And then when you quilt in December

 3   of 2021, you were still at the $950 a week.

 4        A.    Yes, sir.

 5        Q.    Okay.  For this last increase up to $950,

 6   who did you speak to about that increase?

 7        A.    No one.

 8        Q.    Okay.  Again, same question, you just

 9   increased the amount that --

10        A.    No, sir.  Eli had spoken to me about it.

11        Q.    Okay.  So that was -- did you ever state at

12   any point in time that you didn't think you were

13   receiving all the compensation that was due to you?

14        A.    No, sir.

15        Q.    All right.  Did you ever discuss or receive

16   any other benefits or incentives for purposes of being

17   a driver?

18        A.    No, sir.

19        Q.    Okay.  Did you receive any stock or

20   ownership interest or bonuses?

21        A.    No, sir.

22        Q.    Okay.  Can you describe what your main job

23   duties were while you were employed as a driver?

24        A.    Yes, sir.  My main duties were to do the

25   preexisting checklist.
```



```
 1        Q.    Preexisting?

 2        A.    Well, the pre-inspection.  I'm sorry.  My

 3   fault.  To do the preinspection and then drive to --

 4   how can I put this?  Drive to the site of where the

 5   disabled car was, pick it up, and take it from point A

 6   to point B.

 7        Q.    Okay.  So these would be your -- you were

 8   responding to calls -- and if you refer to it a

 9   different way, let me know -- dispatched or responding

10   to calls for customers who --

11        A.    Yes, yes.

12        Q.    -- typically were calling in for roadside

13   service type services.

14        A.    Yes.

15        Q.    Whether a tow or helping with a flat tire or

16   charging a battery or things of the like?

17        A.    Yes, sir.

18        Q.    Okay.  Anything else in addition to pre-trip

19   inspections followed by the -- you know, driving to and

20   from customers?

21        A.    No, sir.

22        Q.    Okay.

23        A.    If I felt that -- if I felt that I was asked

24   to do something that I wasn't comfortable with, I would

25   deny it.
```



1   returned, did he return -- and just to line it up, it

2   sounds like maybe you're in late 2021.

3        A.    Uh-huh (affirmative).

4        Q.    He no longer was the person you were to

5   tender the invoices to.  They were going straight to

6   Eli.

7        A.    Correct.

8        Q.    When he returned, he was no longer the

9   driver manager; correct?

10       A.    Correct.

11       Q.    Okay.  And so at that point in time his

12  duties had changed.

13       A.    Right.

14       Q.    Okay.

15       A.    From that point he was just a driver just

16  like me.

17       Q.    Okay.  Who set your schedule, if any?

18       A.    Well, me and Eli had agreed upon a time slot

19  of 8:00 a.m. to 8:00 p.m.

20       Q.    Okay.  And what days of the week did that

21  schedule include?

22       A.    Monday through Friday.

23       Q.    Okay.  And did you refer to -- how did you

24  refer to that block of time that you had, just the --

25       A.    A shift.



1          A.    Yes.

2          Q.    Okay.  For that period of time when you had

3    not accepted a Towbook job or you weren't under a cash

4    call, what were you doing during that period of time?

5          A.    Mainly sitting out in the field.

6          Q.    Okay.  Sitting out in the field, at any

7    point did Eli tell you that there were certain things

8    you were not permitted to do during that time?

9          A.    Not really, no.

10         Q.    Okay.  What about Dustin?

11         A.    No.

12         Q.    Okay.  So none at 316 told you where you

13   needed to be waiting.

14         A.    No.

15         Q.    Okay.  What about did they ever say that you

16   were not allowed to do certain things while you were

17   waiting?

18         A.    Pretty sure they do.  I just can't remember

19   anything at the moment.

20         Q.    Okay.  What do you mean pretty sure they do?

21         A.    I mean, there's certain moral things that

22   you're not supposed to do while you're sitting.

23         Q.    Moral?

24         A.    Yeah.

25         Q.    Oh, okay.  Well --



1          A.     There's just some things that you're not
2    supposed to do while you're sitting waiting for a call.
3    I mean, you're still working, so --
4          Q.     What do you mean moral?
5          A.     I have no idea.  I'm still trying to grasp
6    the concept of the question, to be honest with you.
7          Q.     Okay.  Yeah, I don't want you to certainly
8    make things up.  I'm just asking did Eli or Dustin ever
9    tell you while you're waiting you can't wait here or
10   you can't do this?
11         A.     No, they never said that.
12         Q.     So did you at any point in time utilize that
13   waiting time perhaps to go home?
14         A.     No.
15         Q.     You never went home?
16         A.     Yeah, I did.
17         Q.     Okay.
18         A.     I did, especially if it was in the area
19   close to my house.
20         Q.     Okay.  What about -- and then you could go
21   home, and there was no restriction on your being at
22   home.  You just needed to be available to respond to a
23   Towbook.
24         A.     Yes.
25         Q.     Okay.  What about did you ever go out to



1  lunch or run a personal errand?

2      A.    In the truck?  I mean, everybody went to

3  lunch, so yeah.  But as far as like running personal

4  errands, no.

5      Q.    Okay.  Did anyone tell you you couldn't?

6      A.    No.

7      Q.    Okay.  Did anyone tell you you had to be

8  waiting in the truck?

9      A.    No.

10     Q.    And you stated that these cash calls were

11  seldom, and it was about one or two per month at most?

12     A.    At least maybe the ones I received.

13     Q.    Okay.

14     A.    I don't know the total of the cash calls

15  that they would accumulate over the course of a month.

16     Q.    But at least for you.

17     A.    Yeah.

18     Q.    Okay.  And that was over eight months' time,

19  so that's going to be maybe ten?

20     A.    Maybe more, yeah.

21     Q.    Okay.  How many do you think you responded

22  to over a --

23     A.    I have no clue.

24     Q.    Hundreds?

25     A.    Over the course of working with 316?



1      Q.    Are you aware whether or not 316 maintains a

2    rejection log?

3      A.    I'm not 100 percent sure.

4      Q.    So if they didn't, you wouldn't believe they

5    did?

6      A.    If they did, if they didn't, I wouldn't

7    know.

8      Q.    Okay.

9      A.    I honestly wouldn't know.

10      Q.    Okay.  But you do recall, you know, like you

11    said, towards the end of your shift being able to, as

12    you put it, reject certain jobs.

13      A.    That's if I -- that's if I got the okay to

14    reject a job.

15      Q.    From who?

16      A.    Eli specifically.

17      Q.    And were those -- were there ever instances

18    where you rejected a job and that wasn't permitted?

19      A.    No.  There were times where I would call him

20    in, tell him, "Hey, man, it's late.  You know, I've

21    been going all day."  And he would accept it.

22      Q.    Okay.

23      A.    He would accept the rejection.

24      Q.    Were there ever times to the contrary where

25    he wouldn't accept it?  Just any specific examples you



 1 | can remember.

 2 |     A.    Yeah, I would say if it was a -- if it was a

 3 | vehicle of somebody that he knew personally that, you

 4 | know, he wanted me to go pick it up for them, so yeah.

 5 |     Q.    Who did he know personally for jobs?

 6 |     A.    Maybe some guys that worked around the

 7 | office.  I never really -- I had never really talked to

 8 | them or anything.  I was rarely in the office.

 9 |     Q.    Okay.

10 |     A.    I was rarely in the office.  Maybe some

11 | friends of his that he knew in another part of town.

12 |     Q.    Would he say it was rejected because of it

13 | was a friend's car?  Would he couch it that way, or how

14 | would you figure that out?

15 |     A.    To be honest, if I took it, I was just doing

16 | it to help him out.

17 |     Q.    Of all your rejections that you can recall,

18 | how many times do you think those rejections weren't

19 | allowed?

20 |     A.    I would say if there was -- if there wasn't

21 | another driver available.

22 |     Q.    Okay.  Do you recall whether or not you ever

23 | traveled to another state while working on behalf of

24 | 316?  South Carolina?

25 |     A.    I really don't recall.  Maybe somewhere far



 1  up north Georgia.  I don't know if I took the truck.  I

 2  can't remember if I took the truck out of state.  Maybe

 3  once.

 4      Q.    Okay.  Do you recall if you went out of

 5  state where you went to?

 6      A.    I would say maybe -- I'd say I think I drove

 7  to South Carolina once.

 8      Q.    Okay.  Do you know if those trips would have

 9  come -- all the trips would have come through Towbook

10  unless they were the cash.

11      A.    Everything came through --

12      Q.    Oh, everything.

13      A.    -- Towbook.

14      Q.    Even the cash trips.

15      A.    From what I can tell based on the cash

16  calls, the cash calls would call into the office, and

17  then they would plug it into Towbook manually.

18      Q.    Okay.  I see.  So all of the trips, whether

19  Towbook related or cash calls, they were all being

20  input into Towbook, and that's the only way you were

21  receiving work.

22      A.    Uh-huh (affirmative).  Based on the Towbook

23  system, if -- what's this -- an NC like Agero or

24  Allstate came in through, it would come in through an

25  email.  And then all that information was automatically



1        A.    No, sir.

2        Q.    Okay.  And you were never asked to review

3   this document?

4        A.    This is my first time me physically seeing

5   the questions.  I believe, like I said, prior to

6   Exhibit 8 and a few others that this is the first time

7   that I -- I do recall these questions perhaps being

8   over the phone.

9        Q.    Okay.  What about just turning to page 5?

10       A.    Page 5.

11       Q.    Is that your signature at the bottom?

12       A.    Yes, sir, it is.

13       Q.    Okay.  So do you recall signing this

14   document?

15       A.    Yes, sir, I guess I do.

16       Q.    Okay.  Turning your attention to the

17   numbered paragraphs number 24.

18       A.    Okay.

19       Q.    Can you read that paragraph, and then let me

20   know once you're finished.

21       A.    "If I or other drivers refused an assignment

22   from defendants, we risked discipline up to and

23   including termination.  I know this was true for other

24   drivers because on occasion -- several occasions I

25   overheard defendants threaten to fire drivers when they



1   said they did not want to take a certain assignment."

2   Which is true.  I didn't necessarily say it was for me.

3        Q.   Okay.  Let me break this up.  Who were you

4   referring to when you speak to other drivers?

5        A.   Oh, man.  We had one driver named Brian.  I

6   want to say his name was Brian.  He worked there

7   briefly, very briefly, maybe three weeks to a month.

8   And I know for -- I know on certain occasions that he

9   was denying drivers -- well, denying -- rejecting calls

10  and that he had been threatened on a few occasions.

11       Q.   Well, let me ask you about that.  How do you

12  know that?

13       A.   He had told me.  I wouldn't be able to

14  contact him or reach him for you or anything like that,

15  but me and him had spoken about it I know a few times.

16       Q.   Okay.  Do you remember Brian's last name?

17       A.   I do not.

18       Q.   Okay.  Who else are you referring to when

19  you're referring to other drivers?

20       A.   I want to say a driver named James.  I don't

21  know if he's still working at 316 at the --

22       Q.   Last name?

23       A.   I don't remember any names.

24       Q.   You don't remember?  Okay.

25       A.   But I know James, he was the only night



1      A.    She was actually in transition herself.

2      Q.    And for the period just the time that you

3  worked at 316, how often were you helping your brother

4  with plumbing?

5      A.    Rarely, rarely.  Mainly on weekends.

6      Q.    Okay.

7      A.    On weekends.  He would ask me if I had a

8  Saturday off because he pretty much knew my day-to-day

9  schedule.  So it was Monday through Friday 316 Towing,

10  8:00 a.m., 8:00 p.m.  And then he would call -- he was

11  like -- he would ask me to do -- "Can you assist me on

12  Saturday or Sunday?"  And then I would help him out.

13      Q.    Okay.

14      A.    You know.  And that rarely happened,

15  maybe -- during the time when I was with 316, maybe

16  two -- maybe two, three times.

17      Q.    Okay.  Did it ever happen during the

18  weekdays, Monday through Friday?

19      A.    No, never, never.

20      Q.    Okay.  Any other -- in talking about it, any

21  other, you know, income of any kind?

22      A.    No.

23      Q.    Okay.  Turning our attention back to

24  Exhibit 4.

25      A.    Okay.



1      Q.    Why would that have been?

2      A.    Well, because I had started the LLC.  I had

3  acquired the EIN number.  And because Relief Road --

4  and because 316 Towing was the only income that I had

5  at the time, I deposited one or two checks into my

6  business bank account just to keep the bank account

7  open.  But it wasn't -- that, it was basically it.  I

8  put in a couple of checks from 316 Towing into my EIN

9  number in order to keep the account active.

10      Q.    Okay.

11      A.    I just wanted to show activity.  That's all.

12      Q.    So there wasn't any deposits being made from

13  customers of Relief Roadside?

14      A.    No.

15      Q.    Okay.

16      A.    Never.

17      Q.    There would have not been any during 2021?

18      A.    No.

19      Q.    Okay.  But you were taking the pay that was

20  being made out to you by 316 Towing, and at least once

21  or twice you deposited that into a Relief Roadside bank

22  account.

23      A.    Yes.

24            (Exhibit Number D-11 was marked for

25       identification.)



1   I told them that something was wrong with the truck,

2   and while I was out on scene the bed of the truck broke

3   while I was lifting a car up onto it.

4        Q.   Okay.  Did you seek any other input from any

5   supervisors?

6        A.   Not -- the only supervisor that I would

7   conversate with was Dustin when he was deemed a

8   supervisor or Eli.  That was all.  I also remember a

9   time -- like I said, going back to maintenance issues.

10  I remember a time where I asked them to put air in my

11  tire for --

12       Q.   Before we speak to further maintenance

13  issues, any other topics that you were seeking input

14  on?

15       A.   No.  Maybe my vacation that I took during

16  September of 2021.  Whether or not -- for me

17  personally, whether or not I can accept or reject a

18  call, you know, based on either the time or it's just

19  unnecessary to tow this vehicle, something like that.

20  Those are the answers I can give you for myself.

21       Q.   What does rote and routine mean?

22       A.   To be honest with you, I have absolutely no

23  idea.

24       Q.   Okay.  So how do you distinguish a duty that

25  is just a duty that you were asked to perform that

