# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

DUSTIN HYDE, Individually and on
behalf of all others similarly situated,

        Plaintiff,

        v.

316 TOWING & ROAD SERVICE,
INC. and MAKSIM LISOVSKIY,

        Defendants.

Civil Action No.

2:22-CV-103-RWS

## ORDER

This case comes before the Court on Defendants 316 Towing & Road

Service, Inc.'s ("316 Towing") and Maksim Lisovskiy's ("Lisovskiy," and

together with 316 Towing, "Defendants") Motion for Decertification of Collective

Action ("Motion") [Dkt. 59]. After reviewing the parties' briefs and the record as a

whole, the Court enters the following Order.

### BACKGROUND

As explained in the Court's prior order,[1] this case involves a company's

alleged failure to pay overtime compensation to its employees as required by law.

---

[1] The Court adopts the factual background and procedural history recited in its
February 6, 2023 order granting conditional certification. [Dkt. 26].

Plaintiff Dustin Hyde ("Hyde") initiated this putative collective action on June 1, 2022, by filing both his Complaint [Dkt. 1] and his Consent to Join Collective Action [Dkt. 2] in this Court. Therein, Hyde alleges that Defendants wrongfully denied their tow truck drivers, who Defendants classified as independent contractors, overtime compensation in violation of section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). [Dkt. 1, at ¶ 59]. Specifically, Hyde alleges that he worked for Defendants as a tow truck driver from December 2019 until April 2022 (with a brief hiatus between late July and November 2021),[2] during which time he and other similarly situated tow truck drivers regularly worked more than 40 hours per week but never received overtime compensation. [Id. at ¶¶ 19, 25–26, 51–54; Dkt. 60-1, at 16:19–18:5, 19:2–23, 42:3–7]. Another former 316 Towing two truck driver, Brent Johnson ("Johnson"), filed his consent to join Hyde's collective action on August 4, 2022. [Dkt. 12].

On August 26, 2022, Hyde filed his Motion for Conditional Certification, for Approval and Distribution of Notice, and for Disclosure of Contact Information, requesting the Court conditionally certify a collective for "All Drivers employed by Defendants since June 1, 2019." [Dkt. 16]. Defendants opposed Hyde's motion, arguing he failed to allege sufficient facts establishing that Hyde was similarly

---

[2] [See Dkt. 60-1, Hyde Dep., at 20:13–21:8, 64:12–25].

situated to the class he sought to represent. [Dkt. 20, Defs.' Resp. in Opp'n to Pl.'s Mot. for Conditional Certification of Collective Action]. In particular, Defendants claimed Hyde (i) assumed unique managerial duties during his time with 316 Towing that distinguished his employment from the other tow truck drivers, and (ii) spent his "on-call" time working for a different company. [See id. at 8–11]. Defendants further argued that (iii) Hyde failed to establish Defendants subjected their tow truck drivers to a common policy or scheme of discrimination that violated the FLSA, and (iv) the instant action was procedurally inappropriate because some of the tow truck drivers signed an "Independent Contractor Agreement" that contained a mandatory arbitration clause. [Id. at 11–13].

The Court ultimately disagreed that Hyde was not similarly situated to the proposed collective, noting the leniency afforded to plaintiffs at the conditional certification stage. [Dkt. 26, at 6]. In light of that leniency, the Court found that Hyde's allegations satisfied the low burden of demonstrating that he and the proposed collective members were similarly situated even despite potentially minor differences in job title and duties. [Id. at 7–9]. Accordingly, the Court granted Hyde's motion on February 6, 2023, and conditionally certified the following collective: "All tow truck drivers who worked for Defendants from three years prior to the Notice mailing date to the Notice mailing date." [Id. at 17, 33].

Shortly after the Court conditionally certified that collective, two additional former 316 Towing tow truck drivers, Renaldo Ricardo Brown ("Brown") and Kevin Brindley ("Brindley," together with Johnson and Brown, the "Opt-In Plaintiffs," and together with Hyde, "Plaintiffs"), filed their own respective consents to join the collective action. [Dkts. 35, 36]. Thereafter, the parties progressed through discovery, which closed on October 20, 2023. [Dkt. 47].

Defendants filed the instant Motion on November 20, 2023, seeking to decertify Plaintiffs' collective. [Dkt. 59]. Plaintiffs timely responded [Dkt. 63, Pls.' Resp. in Opp'n to Defs.' Mot. Mot. for Decertification of Collective Action], and Defendants timely replied [Dkt. 65, Defs.' Reply in Supp.]. Thus, Defendants' Motion is now ripe for consideration.

## DISCUSSION

### I. Legal Standard

Pursuant to the FLSA, employees "engaged in commerce or in the production of goods for commerce" must receive one and a half times their regular rate of pay for each hour worked over forty (40) hours per week. 29 U.S.C. § 207(a)(1). Employers who fail to pay overtime compensation may be subjected to liability for the unpaid overtime plus "an additional equal amount as liquidated damages." Id. § 216(b). To recover unpaid overtime compensation, section 216(b)

of the FLSA permits "one or more employees" to bring a "collective action"—that

is, an action brought "for and in behalf himself or themselves and other employees

similarly situated"—against their employer.[3] Id.

The Eleventh Circuit has established a two-step process for deciding

whether to certify and how to manage a section 216(b) collective action. Morgan,

551 F.3d at 1260. The first stage is called the "notice" or "conditional certification"

stage, which "contemplates two questions: (1) whether there are other employees

who wish to opt-in to the action, and (2) whether those employees are 'similarly

situated' with respect to their job requirements and pay provisions." Saenz v. Old

Dominion Freight Line, Inc., 2019 WL 6622840, at *3 (N.D. Ga. June 7, 2019)

(citing Dybach v. Fla. Dep't of Corr., 942 F.2d 1562, 1567–68 (11th Cir. 1991)).

At this stage, the plaintiff bears the burden of making that factual showing, but the

burden "is not a heavy one and has been described by the Eleventh Circuit as 'not

particularly stringent,' 'fairly lenient,' 'flexible,' 'not heavy,' and 'less stringent

than that for joinder under Rule 20(a) or for separate trials under 42(b).'" Id. at *3

---

[3] Collective actions differ from class actions in that "[p]articipants in a § 216(b) collective action must affirmatively opt into the suit." Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1258–59 (11th Cir. 2008). "The statute of limitations runs for collective action claims until opt-in consent is filed with the court." Brown v. 1888 Mills, LLC, 339 F.R.D. 692, 696 (N.D. Ga. 2021) (citing Grayson v. K Mart Corp., 79 F.3d 1086, 1106 (11th Cir. 1996)).

(cleaned up) (quoting <u>Morgan</u>, 551 F.3d at 1261); <u>see also</u> <u>Grayson</u>, 79 F.3d at

1097 (noting that plaintiffs must offer "detailed allegations supported by affidavits

which 'successfully engage defendants' affidavits to the contrary'" (quotation

omitted)). Because of that lenient standard, the first stage "typically results in

'conditional certification' of a representative class." <u>Hipp v. Liberty Nat'l Life Ins.</u>

<u>Co.</u>, 252 F.3d 1208, 1218 (11th Cir. 2001) (quotation omitted).

      Once the court conditionally certifies a representative class, "putative class

members are given notice and the opportunity to 'opt-in.'" <u>Id.</u> (quotations omitted).

The action then proceeds as a representative one throughout discovery. <u>See</u> <u>id.</u>

      The second stage typically occurs after discovery, and it is usually triggered

by an employer's motion for decertification. <u>Brown</u>, 339 F.R.D. at 696. At this

stage, with the benefit of a more robust record, district courts apply a less lenient

standard and make more informed factual determinations regarding the similarity

of the employees. <u>Id.</u> (citing <u>Morgan</u>, 551 F.3d at 1261). As a result, plaintiffs bear

a heavier burden at this stage to demonstrate that they are similarly situated. <u>Bailey</u>

<u>v. S. Therapy Servs., Inc.</u>, 2022 WL 16951683, at *1 (N.D. Ga. Mar. 28, 2022)

(quoting <u>Morgan</u>, 551 F.3d at 1261); <u>see also</u> <u>Morgan</u>, 551 F.3d at 1258 ("[T]o

maintain a collective action under the FLSA, plaintiffs must demonstrate that they

are similarly situated."). Still, the ultimate decision of whether to decertify a

collective action rests within the court's discretion. <u>Rindfleisch v. Gentiva Health</u>

<u>Servs., Inc.</u>, 22 F. Supp. 3d 1295, 1303 (N.D. Ga. 2014) (quotation omitted).

## II.    Analysis

Defendants move to decertify the collective this Court conditionally certified

on February 6, 2023, arguing the developed record now confirms that Hyde was

not sufficiently similarly situated to the Opt-In Plaintiffs. [Dkt. 59, at 1–2]. In

support of their Motion, Defendants rely on many of the same arguments they

advanced at the conditional certification stage, specifically contending Hyde was

not similarly situated to the Opt-In Plaintiffs because Hyde (i) was uniquely tasked

with managerial responsibilities, and (ii) regularly spent on-call hours attending to

personal matters and performing work for another company. [<u>Id.</u> at 10–12, 14–15].

A thorough review of the whole record, however, reveals the opposite to be true.

"To satisfy the 'similarly situated' standard [to maintain] a collective action,

Plaintiffs must establish, *inter alia*, '*liability* on a class-wide basis.'" <u>Rindfleisch</u>,

22 F. Supp. 3d at 1303 (quotation omitted). In other words, "a group of opt-in

plaintiffs cannot be similarly situated for purposes of a collective action when

individual determinations regarding liability must be made." <u>Id.</u> And although the

FLSA does not require identical facts or circumstances among the plaintiffs, "the

similarities necessary to maintain a collective action under § 216(b) must extend

beyond the mere facts of job duties and pay provisions." <u>Anderson v. Cagle's, Inc.</u>, 488 F.3d 945, 953 (11th Cir. 2007); <u>Benton v. Deli Mgmt.</u>, 396 F. Supp. 3d 1261, 1284 (N.D. Ga. 2019) (quoting <u>Morgan</u>, 551 F.3d at 1260).

Still, neither the FLSA nor the Eleventh Circuit has drawn bright line rules for determining whether plaintiffs are similarly situated for purposes of satisfying this second stage to maintain a collective action. <u>See</u> <u>Benton</u>, 396 F. Supp. 3d at 1284 (quoting <u>Morgan</u>, 551 F.3d at 1259); <u>Rindfleisch</u>, 22 F. Supp. 3d at 1303 (quotation omitted). The Eleventh Circuit has, however, identified three factors for courts to consider at this stage: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations."[4] <u>Rindfleisch</u>, 22 F. Supp. 3d at 1303 (quotation omitted). The Court addresses each of these factors in turn.

---

[4] "[T]here is considerable overlap among" these three factors, such that "[e]ach factor directly influences the others." <u>Knott v. Dollar Tree Stores, Inc.</u>, 897 F. Supp. 2d 1230, 1234 (N.D. Ala. 2012); <u>Florence v. Deli Mgmt., Inc.</u>, 2021 WL 2488910, at *2 (N.D. Ga. Mar. 8, 2021). "Thus, the evidence needed to overcome a defendant's defenses (second factor) may overlap with the evidence needed to prove the plaintiffs' employment settings are similar (first factor)." <u>Florence</u>, 2021 WL 2488910, at *2.

**A.    Factual & Employment Settings**

First, the Court considers whether Plaintiffs' factual and employment settings were similar or disparate. When considering this first factor, courts in the Eleventh Circuit often evaluate whether the plaintiffs (i) held the same job title and performed similar duties, (ii) worked in the same geographic location, (iii) reported to the same supervisor, and (iv) were subjected to the same policies and practices. See, e.g., Whineglass v. Smith, 2013 WL 2237841, at *7 (M.D. Fla. May 21, 2013); Lasseter v. Rest. Delivery Devs., LLC, 2018 WL 4091987, at *2 (M.D. Fla. Aug. 28, 2018); see also Benton, 396 F. Supp. 3d at 1286 (collecting cases and noting that courts in the Eleventh Circuit often allow plaintiffs "to demonstrate similar situation by showing that they are victims of a common policy that violated the law"). In that vein, Defendants support their Motion by highlighting several perceived distinctions between Hyde and the Opt-In Plaintiffs' employment settings and arguing that Plaintiffs were not subject to a common policy while working for 316 Towing. For the following reasons, however, the record refutes Defendants' contentions.

**1.    Perceived Distinctions Between Hyde & Opt-In Plaintiffs**

Defendants first argue that several disparities permeate through the Plaintiffs' respective employment settings. Specifically, Defendants contend that

Hyde (i) held distinct job duties as a driver manager while the Opt-In Plaintiffs exclusively performed driver-related duties; (ii) operated on a 24-hour on-call basis while the Opt-In Plaintiffs were each assigned twelve-hour shifts each week; and (iii) supervised some of the Opt-In Plaintiffs while the remaining Plaintiffs (including himself) reported to Eli Kudrin ("Kudrin"), 316 Towing's General Manager. [Dkt. 59-1, Defs.' Br. in Supp. of Mot. for Decertification of Collective Action, at 1, 11, 12–14, 15]. While some minor differences in working conditions certainly existed, the record reveals that each Plaintiff, including Hyde, generally (i) shared the same job title and duties, (ii) was assigned a twelve-hour shift, and (iii) ultimately reported to the same supervisor.

Beginning with Plaintiffs' respective job titles and attendant duties: each Plaintiff worked for 316 Towing as a tow truck driver. In that role, each Plaintiff was required to field service calls from customers and provide roadside assistance to broken down motorists (which included jump starting disabled vehicles, changing tires, and assisting drivers who had been locked out of their vehicles). [Dkt. 60-1, at 52:12–24, 54:24–55:7; Dkt. 60-5, Brindley Dep., at 56:8–25, 57:3–5; Dkt. 60-3, Brown Dep., at 59:5–60:19; Dkt. 60-4, Johnson Dep., at 49:22–50:21]. Although Hyde held the unique "driver manager" title, he did so for only a finite period of time—after being hired as a driver only—when 316 Towing hired more

drivers, and he ultimately relinquished that title (along with the associated managerial responsibilities) when he returned to 316 Towing after taking a brief hiatus in late 2021. [Dkt. 60-1, at 23:4–11, 52:12–24, 65:6–8]. Hyde also testified that, as driver manager, he spent just two-to-six hours of his days performing managerial duties and spent the rest of his time performing standard driver duties that each of the Opt-In Plaintiffs performed. [Id. at 54:24–55:7, 58:7–11; see also id. at 76:14–20 (insinuating that he performed managerial duties while "on call" after completing a twelve-hour shift)]. Because Hyde still spent the majority of his time performing the same standard driver duties as the Opt-In Plaintiffs, the fact that he spent a fraction of his time performing temporary managerial duties does not significantly distinguish his employment setting from the Opt-In Plaintiffs' settings. See Morgan, 551 F.3d at 1246, 1262–63 (holding collective plaintiffs were similarly situated where 90% of the opt-in plaintiffs spent only a "small fraction of their time performing managerial duties" and spent the remainder of their time performing the same non-managerial duties).

Moreover, Hyde's deposition testimony reveals that even his managerial duties were not substantially different from his driver duties. As the driver manager, Hyde was responsible for inspecting 316 Towing's trucks, retrieving supplies for those trucks, organizing drivers for staff meetings, and reporting issues

to Kudrin. [Id. at 53:21–24, 56:1–7, 56:24–59:12]. And as this Court observed at the conditional certification stage, "[t]hose additional duties do not diminish" Hyde's core allegation that he and each of the Opt-In Plaintiffs were wrongfully denied overtime pay for the towing services they provided to 316 Towing in excess of 40 hours per week. [Dkt. 26, at 8]. That observation still holds true even with the benefit of a more complete record.

Turning next to the Plaintiffs' respective work schedules: the record reveals that each Plaintiff worked a defined twelve-hour shift. [Dkt. 60-1, at 67:5–10, 72:1–72:22; Dkt. 60-5, at 67:7–17, 88:7–10; Dkt. 60-3, at 69:3–8; Dkt. 60-4, at 52:20–21, 57:18–22; see also Dkt. 60-1, at 76:18–20 (testifying that every driver worked a twelve-hour shift)]. Although Hyde began his tenure with 316 Towing on-call 24-hours a day, he later switched to a twelve-hour shift of his own. [Dkt. 60-1, at 67:5–10, 71:10–77:12; see also Dkt. 60-4, at 52:20–21 (testifying that he worked the "day shift" and Hyde worked the "night shift")]. Moreover, Hyde's testimony insinuates that he may have been assigned a twelve-hour shift when he initially joined 316 Towing and that he remained on-call *in addition to* his defined shift. [See Dkt. 60-1, at 76:14–20 ("[D]uring the manager part, if I'm scheduled 7:00 to 7:00, [those are] my working hours. Then me being a manager, they call me after that, I am on call.")]. Thus, even when Hyde was on-call 24-hours a day,

he also worked an assigned twelve-hour shift like each of the Opt-In Plaintiffs.

Finally, regarding supervisors: each Plaintiff ultimately reported to Kudrin. [Dkt. 60-1, at 65:9-11; Dkt. 60-5, at 58:2–15; Dkt. 60-3, at 61:13–19; Dkt. 60-4, at 52:4–9]. Although Brown and Johnson testified that they reported to Hyde when he served as driver manager, they both testified that they ultimately reported to (or were supervised by) Kudrin. [Dkt. 60-3, at 61:13–19 (testifying that he reported to both Hyde and Kudrin, and that he spoke with Kudrin regularly); Dkt. 60-4, at 52:4–9 ("Ultimately, all the decisions went through [Kudrin]."), 53:3–17 (testifying that Hyde supervised him and that he would speak to Hyde regarding issues "and then he would check with [Kudrin]" for confirmation), 129:6–8 ("[T]he only supervisor that I would conversate with was [Hyde] when he was deemed a supervisor or [Kudrin].")]. Moreover, according to Brown and Johnson's testimony, Hyde's supervision appears to have been limited to resolving truck-related questions or offering truck-related advice and training. [See, e.g., Dkt. 60-3, at 67:5–25 (testifying that Hyde never directed him to perform certain tasks and that he never personally saw Hyde perform any duties for 316 Towing other than driving the tow truck); Dkt. 60-4, at 54:9–55:4 (testifying that, although Hyde reported issues to Kudrin, Hyde never directed any of the drivers to perform certain tasks or otherwise controlled their work schedules); see also Dkt. 60-1, at

56:24–58:6, 59:10–12 (testifying that, as driver manager, he did not review applications, he was not involved in interviewing candidates, he did not otherwise make managerial decisions or advise 316 Towing on how to operate the tow truck business, he merely reported issues to Kudrin)]. Thus, Hyde appears to have been Brown and Johnson's supervisor merely in title, not in substance; but that title alone does not render their employment settings dissimilar from the remaining Plaintiffs who, like them, ultimately reported to Kudrin.

Based on the foregoing, the Court finds that, save for just a few immaterial differences, each Plaintiff (i) held the same job title that came with the same responsibilities, (ii) was assigned to the same twelve-hour shift structure, and (iii) ultimately reported to the same supervisor. The minor differences that temporarily existed between Hyde and the Opt-In Plaintiffs do not render Plaintiffs so dissimilarly situated as to warrant decertification because, as discussed above, the FLSA does not require that each plaintiff in a collective action operate under identical circumstances. See Anderson, 488 F.3d at 953; Florence, 2021 WL 2488910, at *2 (quoting Morgan, 551 F.3d at 1261); see also Roussell v. Brinker Int'l, Inc., 441 F. App'x 222, 226–27 (5th Cir. 2011) ("There is need for care in evaluating distinctions among employees, but those distinctions must make a difference relevant to the legal issues presented."). Instead, the FLSA requires only

that the collective plaintiffs experience "substantially similar" employment circumstances. See Morgan, 551 F.3d at 1264. Given that each Plaintiff here devoted the overwhelming majority of their work weeks to performing tow truck driver duties for Defendants, worked twelve-hour shifts, and ultimately reported to Kudrin, the Court finds that the Plaintiffs' employment settings were sufficiently similar to maintain a collective action.

### 2.    316 Towing's Common Policies & Practices

Next, Defendants argue Plaintiffs "did not operate under any 'common policy or practice' of misclassification as defined by the FLSA" while they respectively worked for 316 Towing. [Dkt. 59-1, at 14–15]. Specifically, Defendants contend the policies 316 Towing implemented "varied from Plaintiff to Plaintiff," focusing primarily on the level of autonomy each Plaintiff enjoyed during their shifts. [Id.]. Yet again, however, the record belies that contention.

Indeed, Defendants' own affidavits contradict their general contention that Plaintiffs did not operate under any common policy. Both Lisovskiy and Kudrin aver that Defendants implemented an independent contractor model for all tow truck drivers who performed services for 316 Towing. [Dkt. 59-2, Aff. of Maksim Lisovskiy, at ¶ 13; Dkt. 59-4, Sept. 12, 2022 Aff. of Elisha Kudrin, at ¶ 8]. Under that model, all drivers were assigned six twelve-hours shifts per week, during

which the drivers were "expected to be available to answer or promptly return phone calls from dispatch and confirm whether [they] could assist potential clients." [Dkt. 59-2, at ¶ 14; Dkt. 59-4, at ¶¶ 10–11]. Moreover, it appears that all drivers used a timekeeping software system called Towbook to track time spent responding to calls and that, based on the information logged in Towbook, all drivers prepared and submitted weekly invoices to 316 Towing for payment. [Dkt. 59-2, at ¶¶ 17–18, 23; see also Dkt. 59-3, Nov. 17, 2023 Aff. of Elisha Kudrin, at ¶¶ 7–8; Dkt. 59-4, at ¶ 16]. Those averments contradict Defendants' arguments and suggest that Plaintiffs were subjected to common policies.

The deposition testimony further undermines Defendants' contentions regarding the level of autonomy each Plaintiff enjoyed while working for 316 Towing. For starters, the testimony confirms that each Plaintiff was required to log in to Towbook at the beginning of their respective shifts and use the software system to (i) respond to service calls throughout their shifts and (ii) record their time spent responding to those service calls.[5] [Dkt. 60-1, at 88:18–20; Dkt. 60-5, at

---

[5] Defendants even concede as much in their Motion. [See Dkt. 59-1, at 13 ("With few exceptions, all time spent performing Driver Duties would have been accurately captured by Towbook."); Dkt. 59-4, at ¶¶ 8–10, 16; Dkt. 59-2, at ¶ 18; see also Dkt. 59-3, at ¶¶ 7–8; see also Dkt. 63, at 11 ("[A]s Defendants admit in their Motion, Plaintiffs received calls through an app called Towbook, which tracked calls and gave each Plaintiff his assignments while on shift.")].

53:5–7; Dkt. 60-3, at 78:13–16; Dkt. 60-4, at 57:21–23, 76:8–22].

Next, the deposition testimony rebuts Defendants' argument that each Plaintiff was free to reject service calls without penalty. [See Dkt. 59-1, at 14–15]. According to the record, drivers rarely, if ever, rejected service calls. [See, e.g., Dkt. 60-3, at 80:21–82:5, 84:6 (testifying that he "wasn't able to reject a job" and that he "never rejected a call" because he "had no reason to"); see also Dkt. 60-5, at 81:8–20 (testifying that he "didn't really reject calls unless . . . they were too big for the type [of] truck [he] drove")]. Although Defendants may not have explicitly adopted a policy forbidding drivers from rejecting service calls, the testimony suggests that each Plaintiff uniformly understood they were not allowed to reject calls absent good cause to do so or without receiving Kudrin's prior approval. [See, e.g., Dkt. 60-1, at 105:1–11 (testifying that there were "verbal notations that if you denied calls . . . there could be a potential punishment"); Dkt. 60-4, at 51:18–52:3 (stating that he "never got th[e] opportunity" to reject a call and that he would only do so if "[Kudrin] basically obliged to it"), 75:17–21 (testifying that rejecting calls was not allowed if no other drivers were available)].

Importantly, even the one Opt-In Plaintiff who testified that he was free to reject service calls later recounted Kudrin threatening to terminate him for rejecting a call during his shift. [Compare Dkt. 60-5, at 81:8–20, with id. at 85:6–

16]. And it appears that Kudrin made similar threats on more than one occasion. [Dkt. 60-1, at 106:1–6, 173:9–20 (stating that he "was verbally told by" Kudrin that "if drivers kept refusing to do calls he'd start docking their pay"); Dkt. 60-4, at 87:3–10 (recalling that Kudrin threatened to terminate a driver for rejecting calls)]. That collective testimony suggests that Plaintiffs operated under a uniform policy that prohibited drivers from rejecting service calls during their shifts.

Lastly, the deposition testimony reveals that, despite Defendants' assertions otherwise, Plaintiffs were held to the same general expectations regarding how they spent time between service calls during their shifts. In their Motion, Defendants insist that each Plaintiff was free to spend the down time they enjoyed between service calls however they chose, and that some drivers, including Hyde, often spent that time waiting at home, attending to personal matters, or even working a second job. [Dkt. 59-1, at 12, 14–15]. The deposition testimony, however, paints a very different picture.

According to the depositions, each Plaintiff was required to spend their time between service calls waiting within a fifteen-to-twenty-mile radius of 316 Towing's home location (referred to as the "home area," "service area," or "zone"). [See, e.g., Dkt. 60-1, at 71:13–18, 77:13–20, 97:7–24 (describing the home area as a fifteen-to-twenty-mile radius around 316 Towing's home

office/coverage area); see also Dkt. 60-5, at 68:7–69:12 (stating that he had to "wait within the inside area," which he described to be a thirty-mile diameter around Winder, GA)]. As long as Plaintiffs remained in that area, they were generally free to wait where they wanted; this meant that Plaintiffs typically waited in a parking lot or some other open area along their most recent route so they could be prepared to timely respond to the next service call.[6] [Dkt. 60-3, at 59:14–17 (stating that he would wait for calls "at a gas station close by the house or a parking lot, like Walmart or any [other] store"), 73:1–21 (testifying that he was given directions to wait in a parking lot or at a gas station, and that he often waited in a Walmart parking lot); Dkt. 60-4, at 63:2–5 (testifying that, while he was waiting for calls, he was "[m]ainly sitting out in the field"); Dkt. 60-5, at 69:24–70:6, 72:7–13 (stating that it did not matter where he waited between calls so long as he remained within the service area, and that he "would stop at like Walmart or something if nothing was going on instead of sitting in the truck wasting fuel")].

---

[6] The record confirms that, during their shifts, each Plaintiff was expected to promptly return service calls from Towbook. [See Dkt. 59-2, at ¶ 14; see also Dkt. 59-4, at ¶ 11; Dkt. 60-1, at 79:7–80:4, 80:18–25 (stating that drivers were required to "respond [to calls] within a certain time frame"); Dkt. 60-5, at 72:14–18, 73:23–74:1 (stating that 316 Towing required drivers to be "available when Towbook gave [him] the call")].

Plaintiffs were also prohibited from running errands or otherwise attending to personal matters during their shifts. [Dkt. 60-3, at 73:22–74:24 (stating that he was told by Lisovskiy and Kudrin that he could not go home during his shift, even if it was to eat); Dkt. 60-4, at 65:2–9; see also Dkt. 60-1, at 181:24–182:18 (stating that Defendants did not explicitly say he could not attend to personal matters while waiting between service calls but insinuating that, because drivers were required to promptly respond to calls, they could not run errands during their shifts)]. Although some Plaintiffs testified that they occasionally spent time at home while waiting for service calls, it appears they did so only if their homes were located within the designated service area. [Dkt. 60-1, at 77:13–20 (explaining that he occasionally spent time at he while on call and that he could choose where to wait for service calls "[a]s long as it was in the home area"); Dkt. 60-5, at 71:16–72:13 (stating that he would go home to eat lunch occasionally if it was within the service area); Dkt. 60-4, at 64:12–24 (stating that he went home occasionally "if [the call] was in the area close to [his] home")].

And even then, Plaintiffs consistently testified that they did not use their time between calls to simply wait at home for the next call, run errands, or attend to other personal matters. [Dkt. 60-3, at 76:6–24 (stating that he only went home to use the restroom, not for personal activities); Dkt. 60-4, at 64:12–24 (stating that

he did not use the time between calls to wait at home); see also Dkt. 60-1, at

78:23–80:25 (explaining that he may have grabbed food occasionally or "paid a

phone bill," "[b]ut it wasn't like I just had time to go do personal errands willy-

nilly whenever I wanted to")]. Indeed, not one of the Plaintiffs testified that they

actually spent time between calls attending to personal matters or running errands

in a manner that compromised their duty to promptly respond to service calls

during their shifts. [Dkt. 60-3, at 77:16–24 (stating that he never drove the tow

truck to complete personal errands during his shifts); Dkt. 60-5, at 74:2–12 (stating

that he would wash the truck during his down time because he was told to keep the

truck clean)[7]; Dkt. 60-1, at 80:18–25 ("When you're on call, . . . . [y]ou have to

respond within a certain time frame. . . . I'm not off just doing whatever. I may

have grabbed something. I may have stopped and paid a phone bill on my way in,

but I am still actively ready to go and on call.")].

And despite Defendants' insistence otherwise, none of the Plaintiffs—not

even Hyde—held another job or worked for another company while they worked

for 316 Towing. [Dkt. 60-1, at 126:10–127:5; Dkt. 60-3, at 89:6–22; Dkt. 60-4, at

---

[7] Although Brindley also testified that he believed nothing prohibited him from running an errand during his shift "as long as [he was] available when Towbook gave [him] the call," he stated that he never actually ran personal errands during his shift. [Compare Dkt. 60-5, at 72:14–18, 73:23–74:1, with 74:2–12].

96:6–25]. Although Hyde testified that he told Kudrin at one point that he worked a second job—an isolated statement Defendants blindly latch onto—he immediately followed that statement by explaining that he lied to Kudrin in an effort to take some time off from his 316 Towing duties. [Dkt. 60-1, at 127:6–16 (explaining that he felt the need to lie "[b]ecause [he] wanted time away" and "to have a break, so [he] could spend some time with [his] family"), 128:16–17 ("I told him I took another job so I could get my hours cut back to where I could have time away.")]. And while true that some Plaintiffs opened their own independent companies while they worked for 316 Towing, none of those Plaintiffs performed services for their newly formed companies at that time. [Dkt. 60-3, at 89:6–22 (stating that, although he and his wife started their own LLC while he worked for 316 Towing, he never operated under that LLC while working for 316 Towing); Dkt. 60-4, at 119:5–120:8 (stating that, although he opened his own LLC while working for 316 Towing, he never provided any services through that LLC until after he left 316 Towing)]. Instead, they merely deposited funds received from 316 Towing into their respective business accounts to keep the accounts open. [Dkt. 60-3, at 105:7–106:13, 108:3–22 (testifying that he may have transferred money from one account to another, but also testifying that he never performed work under his LLC's name or received payment from customers under that name); Dkt.

60-4, at 120:22–121:23 (testifying that he deposited some of his 316 Towing income into his LLC account to keep the account open)]. Thus, none of the Plaintiffs actually performed professional services for, or received compensation from, another entity while they worked for Defendants.

In sum, the record confirms that Defendants uniformly (i) classified all Plaintiffs as independent contractors, (ii) required Plaintiffs to log all service calls and time spent responding to those calls through Towbook, (iii) afforded Plaintiffs the same limited control over their respective workload, and (iv) subjected Plaintiffs to the same policies and procedures regarding how they were able to spend their time between service calls. Considering those commonalities, as well as the overwhelming similarities among the Plaintiffs' factual and employment settings described above, the Court finds that Plaintiffs have satisfied their burden of establishing that Hyde and the Opt-In Plaintiffs enjoyed sufficiently similar factual and employment settings and were subject to common policies and practices.[8] See Collinge v. Intelliquick Delivery, Inc., 2015 WL 1292444, at *3–8

_____

[8] Those overwhelming similarities and exposure to common policies and practices far outweigh the minor differences between Hyde's and the Opt-In Plaintiffs' factual and employment settings discussed above. See Alonso v. Uncle Jack's Steakhouse, Inc., 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011) ("The existence of individual differences in number of hours worked or diligence in the use of the timekeeping system will not warrant decertification, as long as Plaintiffs show they are subject to a 'single decision, policy, or plan.'" (quotation omitted)).

(D. Ariz. Mar. 23, 2015) (finding drivers similarly situated with regard to independent contractor status where, among other things, each driver signed the same agreement, were subject to the same operating procedures, and were subject to the same level of supervision and control over their workload).

### B.    Individual Defenses

Second, the Court considers "whether the defenses that apply to the opt-in plaintiffs' claims are similar to one another or whether they vary significantly." Benton, 396 F. Supp. 3d at 1284–85 (quoting Morgan, 551 F.3d at 1261). When evaluating this factor, "courts are concerned with whether representative evidence can be used to make class-wide determinations and the extent to which resolution requires such individualized inquiries that the case cannot proceed collectively." Clay v. New Tech Glob. Ventures, LLC, 2019 WL 1028532, at *13 (W.D. La. Mar. 4, 2019) (quotation omitted). "In other words, if 'many different defenses will be raised with respect to each individual defendant,' decertification may be proper" because "the presentation of individualized defenses for each plaintiff would frustrate the efficiency of a collective action." Id. (quotation omitted).

---

And although the ultimate "extent, existence, and lawfulness of th[o]se company-wide policies are issues for the finder of fact at trial, they are issues that are subject to generalized proof" and "outweigh Defendants' concerns about Plaintiffs' varying job titles, locations, and work schedules." Id.

Defendants contend that decertification is warranted here because their "numerous defenses require individualized adjudication." [Dkt. 59-1, at 16]. Specifically, Defendants highlight five defenses they claim raise individualized inquires: "(i) arbitration, (ii) independent contractor status, (iii) the Motor Carrier Act ("MCA") exemption, (iv) coverage under the FLSA, and (v) failure to perform overtime work." [Id.]. In response, Plaintiffs argue that, in light of the overwhelming factual and employment similarities described above, each of these defenses are susceptible to common proof and, thus, collective resolution. [See Dkt. 63, at 14–15]. For the following reasons, the Court agrees with Plaintiffs.

### 1.    Arbitration

As an initial matter, the Court views Defendants' arbitration argument as a nonstarter. Defendants raised the same argument at the conditional certification phase. At that time, the Court observed that "Defendants ha[d] not moved to compel mediation or arbitration pursuant to the Independent Contractor Agreements, but instead [sought] to use the Agreements as a defense against Plaintiff's Motion [for Conditional Certification]." [Dkt. 26, at 9]. Defendants still have not moved to compel arbitration or to otherwise enforce the terms of the Independent Contractor Agreements. Indeed, Defendants explicitly concede in their reply that they do not seek to enforce those agreements, or the arbitration

clause, at this time.[9] [Dkt. 65, at 13 ("[T]he Court need not reach the merits as to whether Defendants may enforce the arbitration agreement at this stage . . . .")]. As the Court noted in its first order, "[t]he Court will not enforce the Agreements sua sponte, without having been formally asked to do so by a party." [Dkt. 26, at 9].

### 2. FLSA Exemptions

Next, Defendants claim that "all Plaintiffs are exempt from the overtime provisions of the FLSA," and that "individual analysis will be needed to determine the specific way in which each driver is exempt from coverage under the FLSA." [Dkt. 49-1, at 19; see also id. at 21–22]. The Court disagrees.

Generally, the applicability of FLSA exemptions is dependent on the job duties performed by the plaintiffs. See Bradford v. Bed Bath & Beyond, Inc., 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002). Thus, the success of Defendants' argument regarding exemptions at this stage follows the Court's assessment of the

---

[9] The Court acknowledges that, as Defendants point out in their Motion, Hyde is the only Plaintiff who contests whether he signed the Independent Contractor Agreement that contains the supposedly binding arbitration clause. [See Dkt. 59-1, at 16–17]. Still, the Court finds that any individualized inquiry that may arise regarding the enforceability of the arbitration clause (should Defendants ultimately seek to enforce it) does not outweigh the overwhelming factual similarities between the Plaintiffs identified above. Ayers v. SGS Control Servs., Inc., 2007 WL 646326, at *6 (S.D.N.Y. Feb. 27, 2007) ("[T]o the extent Defendants present individual defenses, 'the Court may grant collective action and bifurcate trial, as necessary, to address those defenses.'" (quotation omitted)).

Plaintiffs' factual and employment settings. And because the Court already found that Plaintiffs performed substantially similar job duties and worked under substantially similar working conditions, the Court also finds that fact-intensive issues regarding the applicability of specific exemptions can be adjudicated collectively. Id. (noting where plaintiffs perform similar job duties, issues regarding the applicability of FLSA exemptions "do[] not pose any difficulty related to the collective action"); see also Morgan, 551 F.3d at 1263 (noting that fact-intensive inquiries regarding the applicability of relevant FLSA exemptions "do[] not preclude a collective action where plaintiffs share common job traits").

For example, Defendants argue the Court must conduct individual assessments of the Plaintiffs' working conditions to determine whether any of the Plaintiffs qualify as employees (rather than independent contractors) under the economic realities test.[10] [Dkt. 59-1, at 17–19]. Although the economic realities

---

[10] The economic realities test is used to determine "whether an individual falls into the category of covered 'employee' or exempted 'independent contractor.'" Scantland v. Jeffry Knight, 721 F.3d 1308, 1311 (11th Cir. 2013) (citing Bartels v. Birmingham, 67 S. Ct. 1547, 1550 (1947)). When applying the economic realities test, courts consider a multitude of factors, including "(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration

test requires a fact intensive assessment, see Demauro v. Limo, Inc., 2011 WL

9191, at *3 (M.D. Fla. Jan. 3, 2011), the Court's task at the decertification stage "is

not to consider the merits [of] whether the economic realities test is satisfied, but

rather to decide whether the factual and employment settings of the opt-in

plaintiffs and the named plaintiffs are similar." Collinge, 2015 WL 1292444, at *3.

And as courts have recognized, a plaintiff's factual and employment settings

"relate to the economic-realities-test factors." Id. As observed above, the Plaintiffs

here experienced substantially similar factual and employment settings while

working for Defendants as tow truck drivers: each Plaintiff was classified as an

independent contractor; each Plaintiff operated under the same policies and

practices regarding time tracking, freedom to reject assignments, and ability to

attend to personal matters during time between assignments; and each Plaintiff

ultimately reported to the same supervisor. "This is sufficient to defeat

[D]efendants' decertification motion."[11] Id. at *8.

---

of the working relationship; [and] (6) the extent to which the service rendered is an
integral part of the alleged employer's business." Id. at 1312.

[11] This conclusion is further supported by the fact that Defendants employed a
common policy and practice of treating all tow truck drivers as independent
contractors, thus confirming that "this decision does not turn on a single
individualized factor." Collinge, 2015 WL 1292444, at *8.

Defendants likewise submit the Court must conduct individual assessments to determine which of the Plaintiffs may qualify for the MCA exemption.[12] [Dkt. 59-1, at 20–21 (arguing this exemption may only apply to some Plaintiffs because "[o]nly some Plaintiffs . . . have testified to performing work across state lines")]. But again, the Court's task at this stage is not to consider the merits of the MCA exemption, it is merely to determine whether the Plaintiffs *appear* to be similarly situated regarding whether they were expected to transport goods in interstate commerce (i.e., whether they were expected to travel across state lines). See Collinge, 2015 WL 1292444, at *9. And just as the record refuted Defendants' arguments regarding the Plaintiffs' factual and employment settings above, the record refutes Defendants' MCA exemption argument as well.

The deposition testimony reveals that each Plaintiff likely traveled interstate at least once while working for Defendants. Hyde, Johnson, and Brindley each testified that they traveled to South Carolina for work on at least one occasion.

---

[12] The MCA exemption exempts from the FLSA's overtime requirements "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act of 1935." 29 C.F.R. § 782.1(a). That exemption applies when (i) the employer qualifies as either a "motor carrier" or "motor private carrier" subject to the Secretary of Transportation's jurisdiction, and (ii) the employee engages "in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce." Id. § 782.2(a).

[Dkt. 60-1, at 97:25–98:25, 99:12–17 (stating that he made trips to South Carolina "[maybe three to four times"); Dkt. 60-5, at 82:3–8 (stating that he made trips to North Carolina and South Carolina); Dkt. 60-4, at 75:22–76:7 (stating that he could not recall for certain, but that he thinks he may have gone to South Carolina once)]. And even though Brown testified that he does not believe he traveled out of state, his testimony was far from unequivocal, leaving the door open to the possibility that he "may have" traveled out of state and simply not remembered it. [Dkt. 60-3, at 82:13–22 ("Unless I just didn't know I was in another state, but I don't think so.")]. The possibility that each Plaintiff *could* have been called on to travel interstate to perform their respective duties for Defendants satisfies the Court's inquiry at this stage. See Collinge, 2015 WL 1292444, at *9 ("[A]n employer can satisfy the second [MCA exemption] element merely by showing that each driver '*could* reasonably have been expected to make one of the carrier's interstate runs.'" (emphasis added) (quotation omitted)).

### 3. Overtime Work

Lastly, Defendants argue the Court must individually assess whether any of the Plaintiffs even worked overtime hours. [Dkt. 59-1, at 22; see also Dkt. 65, at 10–12 (claiming some Plaintiffs did not work overtime hours because they spent much of their shift time waiting for calls or attending to personal matters,

rendering that waiting time non-compensable)]. "Courts have specifically found, however, that '[t]he existence of individual differences in numbers of hours worked . . . will not warrant decertification, as long as Plaintiffs show they are subject to a single decision, policy or plan." Lassen v. Hoyt Livery, Inc., 2016 WL 7165716, at *13 (D. Conn. Dec. 8, 201) (alteration in original) (quotation omitted). As discussed above, Plaintiffs have done just that.

Moreover, arguments regarding disparities in hours worked "go largely to the issue of damages, since plaintiffs allege that defendants have maintained and applied certain uniform, across-the-board policies that violate the FLSA." Id. at *15 (quotation omitted). And as Plaintiffs point out in their response,[13] "individualized inquiries into damages do not warrant decertification." McGlone v. Contract Callers, Inc., 49 F. Supp. 3d 364, 369 (S.D.N.Y. 2014); Benton, 396 F. Supp. 3d at 1285 ("'[T]he need for individualized inquiry and calculation of damages is not enough to defeat commonality under Rule 23(a),' and will not decertify a class solely because one element of a claim may be less amenable to classwide resolution than others." (quotation omitted)).[14] Thus, the Court finds that

---

[13] [See Dkt. 63, at 16].

[14] Benton, 396 F. Supp. 3d at 1285 n.14 ("The Court looks to certification under Rule 23 as a guide for what claims and classes of persons are susceptible to

none of Defendants' identified defenses require individualized assessments outweighing the factual and employment similarities discussed above. See <u>Benton</u>, 396 F. Supp. 3d at 1285–86 (finding that commonalities in job descriptions and duties outweigh the need to conduct individualized damages inquires).

### C.    Fairness & Procedural Considerations

Finally, the Court considers "whether it can coherently manage the class in a manner that will not prejudice any party." <u>Collinge</u>, 2015 WL 1292444, at *10 (quotation omitted). This factor often mimics the district court's findings on the preceding two factors. See <u>Lassen</u>, 2016 WL 7165716, at *15 (noting that when a district court finds "the plaintiffs share common factual and employment settings and that defenses are not individualized, then fairness and procedural considerations weigh in favor of certification" (quotation omitted)). Still, those previous findings alone are not dispositive of this final factor; indeed, when evaluating fairness and procedural considerations, district courts must be mindful of the purpose collective actions serve and determine whether, under the circumstances of the instant case, maintaining a collective action fulfills that purpose. See <u>Morgan</u>, 551 F.3d at 1264.

---

classwide resolution because Rule 23's requirements are more stringent than § 216(b) . . . .").

"[C]ollective actions are intended 'to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer.'" Roussell, 441 F. App'x at 227 (quotation omitted); see also Clay, 2019 WL 1028532, at *14 ("The Supreme Court has recognized that in permitting collective actions, Congress intended to provide 'plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.'" (quoting Hoffman-La Roche Inc. v. Sperling, 110 S. Ct. 482, 486 (1989))). To that end, section 216(b) collective actions "(1) reduc[e] the burden on plaintiffs through the pooling of resources, and (2) efficiently resolv[e] common issues of law and fact that arise from the same illegal conduct." Morgan, 551 F.3d at 1264 (citing Hoffmann-La Roche, 110 S. Ct. at 486). Allowing the instant collective to continue at this stage fulfills those purposes.

As discussed at length above, the record reveals overwhelming similarities between Hyde and the Opt-In Plaintiffs' factual and employment settings. Those similarities allow Plaintiffs to reduce the costs of litigation by pooling their resources and presenting representative evidence at trial in a way that promotes efficient resolution. See Ayers, 2007 WL 646326, at *6 (stating that "the policy objectives of reducing cost and increasing efficiency are best furthered by granting collective action" where commonalities between the plaintiffs outweigh individual

issues). Given those similarities, Defendants can hardly argue that allowing this action to proceed collectively would be unfair. See Morgan, 551 F.3d at 1264 ("[T]he more similar the employees, the less likely that collectively litigating [common FLSA claims] can be fundamentally unfair.").

Moreover, the small size of the collective allows the Court to efficiently resolve any individualized inquiries that may arise at trial. The instant collective consists of just four Plaintiffs. The mere possibility that individual inquires may ultimately arise does not render such a small collective unmanageable, [15] particularly considering the overwhelming factual similarities that otherwise promote efficient resolution. See Bobbitt v. Broadband Interactive, Inc., 2013 WL 5720329, at *17 (M.D. Fla. Oct. 21, 2013) ("The fact that common evidence, by itself, will not be sufficient for the damages phase (if liability is proven) does not undermine the judicial economy that can be achieved from this case proceeding as a collective action."); Fezard v. United Cerebral Palsy of Cent. Ark., 2014 WL 12770922, at *2 (E.D. Ark. Sept. 3, 2014) (finding a collective action that included two named plaintiffs and ten opt-in plaintiffs was not "unworkable"); Collinge,

---

[15] Should any issues arise at trial that require individualized assessment, the Court may elect to bifurcate trial or hold other individual hearings to resolve those issues. See, e.g., Bradford, 184 F. Supp. 2d at 1351 (noting that a court may conduct individual damages hearings to address unique issues regarding liability and defenses that arise at trial); Ayers, 2007 WL 646326, at *6.

2015 WL 1292444, at *10 ("Even if there are some differences among the drivers'

work conditions, th[o]se differences do not appear to be so great that they would

render a collective action unmanageable.").

Based on the foregoing assessment, the Court finds that maintaining the

instant collective fulfills the purpose of section 216(b) collective actions by

promoting judicial efficiency without prejudicing Defendants. See Bobbitt, 2013

WL 5720329, at *17. Thus, in this instance, "fairness dictates that the Court allow

the plaintiffs and opt-in plaintiffs to adjudicate their claims as a class because the

expense of individual trials far outweighs any other consideration which has been

presented in favor of decertification." Fezard, 2014 WL 12770922, at *2.

## CONCLUSION

For the reasons stated above, the Court is satisfied that all four Plaintiffs

were sufficiently similarly situated while working for Defendants such that

continued certification of the collective is warranted. Accordingly, Defendants'

Motion for Decertification of Collective Action [Dkt. 59] is **DENIED**.

**SO ORDERED** this 20th day of March, 2024.

_____

**RICHARD W. STORY**
United States District Judge