IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

DUSTIN HYDE, Individually and on
behalf of all others similarly situated,

    Plaintiff,

    v.

316 TOWING & ROAD SERVICE,
INC. and MAKSIM LISOVSKIY,

    Defendants.

Civil Action No.

2:22-CV-103-RWS

## ORDER

This case comes before the Court on Defendants 316 Towing & Road

Service, Inc.'s ("316 Towing") and Maksim Lisovskiy's ("Lisovskiy," and

together with 316 Towing, "Defendants") Motion to Arbitrate and Stay Litigation

("Motion to Compel" or "Motion") [Dkt. 72]. After reviewing the parties' briefs

and the record as a whole, the Court enters the following Order.

### BACKGROUND

As explained in the Court's prior orders,[1] this case involves a company's

alleged failure to pay overtime compensation to its employees as required by law.

---

[1] The Court adopts the factual backgrounds and procedural histories recited in its
prior orders addressing conditional certification and decertification. [Dkts. 26, 67].

Plaintiff Dustin Hyde ("Hyde") initiated this collective action on June 1, 2022, by filing his Original Complaint—Collective Action (the "Complaint") in this Court. [Dkt. 1]. Therein, Hyde challenges Defendants' "policy and practice of failing to pay proper overtime compensation" under the Fair Labor Standards Act ("FLSA"). [Id. at ¶ 59]. Specifically, Hyde alleges Defendants violated the FLSA by wrongly classifying himself and other tow truck drivers as independent contractors to avoid paying overtime compensation as required by section 16(b) of the FLSA, 29 U.S.C. § 216(b). [Id. at ¶¶ 20, 25–29, 45–49, 56, 59, 72–73, 83–84].

According to Defendants, however, each tow truck driver Defendants hired—including Hyde—signed an Independent Contractor and Lease Agreement (the "Independent Contractor Agreement" or "Agreement") that explicitly identified the signatory tow truck driver as an independent contractor. [See, e.g., Dkt. 60-1, at Ex. 4, at ¶ 2(D) ("It is the intent of the parties for [the signatory tow truck driver] to retain the status of an independent contractor in business for federal and state law purposes.")]. Moreover, and most relevant to the instant Motion, that Agreement contains an "Alternative Dispute Resolution" clause (the "Arbitration Clause") that provides as follows: "The parties agree that any dispute concerning the terms of this Agreement will be submitted to mediation followed by binding arbitration before a tribunal convened under the rules of the American Arbitration

Association at Atlanta, GA." [Id. at ¶ 9].

Defendants submit that, upon learning of Hyde's Complaint, their counsel alerted Hyde's counsel to the Agreement's Arbitration Clause, but that Hyde's counsel "refused to acknowledge over the telephone that . . . Hyde signed the Agreement."[2] [Dkt. 72-1, at 4–5]. As a result, Defendants answered the Complaint on July 12, 2022, and raised the arbitration issue as an affirmative defense therein. [Dkt. 5, at 3 ("Plaintiff's Complaint should be dismissed because Plaintiff's claims are subject to a mandatory arbitration provision found within an Independent Contractor and Lease Agreement between 316 Towing and Plaintiff . . . .")].

On August 4, 2022, another former 316 Towing tow truck driver, Brent Johnson ("Johnson"), filed his consent to join Hyde's collective action. [Dkt. 12]. A few days later, on August 9, 2022, the parties filed their Joint Preliminary Report and Discovery Plan ("JPRDP"), proposing deadlines for discovery and pre-trial motions practice. [Dkt. 14]. Again, Defendants raised the issue of arbitration therein, stating that "Plaintiff and Defendant 316 Towing entered into a services agreement governing their relationship wherein the parties acknowledge Plaintiff's

_____

[2] Though Defendants do not submit any evidence memorializing this conversation, Hyde does not dispute that such conversation occurred; in fact, Hyde seems to concede the conversation indeed took place. [See Dkt. 73, at 3 (acknowledging Defendants' "early notice to Plaintiffs' counsel regarding the existence of the Agreements")].

independent contractor status and mandatory arbitration for any claims seeking to enforce the terms of that agreement." [Id. at 3; see also id. at 4 (identifying the issue of arbitrability as a legal issue to be tried)]. The Court entered a scheduling order adopting the deadlines set forth in the JPRDP the following day. [Dkt. 15].

On August 26, 2022, Hyde filed his Motion for Conditional Certification, for Approval and Distribution of Notice, and for Disclosure of Contact Information (the "Motion for Conditional Certification"), requesting the Court conditionally certify a collective for "All Drivers employed by Defendants since June 1, 2019." [Dkt. 16]. Before Defendants could respond, the Court entered an order directing the parties to file their initial disclosures, observing that neither party had served such disclosures to that point. [Dkt. 17]. Defendants filed their initial disclosures just over one week later, and again raised the issue of arbitration. [Dkt. 19, at ¶¶ 3(A)–(C) (asserting that Hyde signed the Independent Contractor Agreement and, thus, is bound by the Arbitration Clause)].

Defendants filed their response in opposition to Hyde's Motion for Conditional Certification on September 12, 2022, raised the issue of arbitration again, and argued that the Court should deny the motion because any tow truck drivers who could potentially join the proposed collective "signed an Independent Contractor Agreement [that] contains the parties' agreement to mediate followed

by binding arbitration." [Dkt. 20, at 12–13, 16]. In reply, Hyde continued to

dispute whether he (or any of the potential opt-in plaintiffs) signed such

Agreement. [See Dkt. 22, at 9–10].

While Hyde's Motion for Conditional Certification remained pending, the

parties continued through discovery. Defendants served Hyde and Johnson with

interrogatories, requests for production, and requests for admission on November

16, 2022, requesting (among other things) that they admit to signing Independent

Contractor Agreements. [E.g., Dkt. 73-1, at 21–22]. Hyde and Johnson responded

to those requests on January 17, 2023, denying they signed the Agreements. [Dkt.

60-2, at Ex. 7, at 23; Dkt. 60-4, at Ex. 4, at 21].

The Court ultimately granted Hyde's Motion for Conditional Certification

on February 6, 2023, and conditionally certified the following collective: "All tow

truck drivers who worked for Defendants from three years prior to the Notice

mailing date to the Notice mailing date." [Dkt. 26, at 17, 33]. Notably, the Court

declined to address the arbitration issue at that time because Defendants had not

yet moved to compel arbitration and, thus, the issue was not properly before the

Court. [Id. at 9 (stating that "[t]he Court will not enforce the Agreements sua

sponte, without having been formally asked to do so by a party")].

On February 13, 2023, the parties filed a Joint Motion to Extend the Period for Discovery, which the Court granted the following day. [Dkts. 27, 28]. Roughly a month-and-a-half later, Defendants then brought a discovery dispute to the Court regarding Plaintiff's alleged failure to produce certain documents Defendants requested. [See Dkt. 32]. The Court resolved that dispute on March 29, 2023, by ordering Plaintiffs to produce the subject documents. [Id.].

On April 4, 2023, two additional former 316 Towing tow truck drivers, Renaldo Ricardo Brown ("Brown") and Kevin Brindley ("Brindley," together with Johnson and Brown, the "Opt-In Plaintiffs," and together with Hyde, "Plaintiffs"), filed their own respective consents to join the collective action. [Dkts. 35, 36]. Defendants served Brown and Brindley with their interrogatories, requests for production, and requests for admission on April 17, 2023, requesting that they admit to signing Independent Contractor Agreements, just as Defendants requested that Hyde and Johnson do the same. [Dkt. 38]. Defendants also noticed depositions for Brown and Brindley that same day. [Dkt. 39].

On May 5, 2023, the parties filed a Second Joint Motion to Extend the Period for Discovery to allow additional time to depose the newly joined Opt-In Plaintiffs. [Dkt. 41]. The Court granted that extension on May 8, 2023. [Dkt. 42]. On May 26, 2023, Brown and Brindley responded to Defendants' interrogatories

and requests and, like Hyde and Johnson, denied signing the Independent Contractor Agreements. [Dkt. 60-3, at Ex. 4, at 19; Dkt. 60-5, at Ex. 4, at 20–21].

On June 6, 2023, Defendants supplemented their initial disclosures to include additional information relevant to the Opt-In Plaintiffs, but Defendants maintained that "[e]ach of the Plaintiffs . . . entered into an Independent Contractor and Lease Agreement with 316 Towing" that contained the Arbitration Clause. [Dkt. 44, at ¶¶ 3(B), (D)]. Later that month, Plaintiffs filed an Unopposed Motion to Extend Certain Deadlines to allow Defendants 90 additional days to produce tax returns Defendants expected to receive from the IRS within that timeframe. [Dkt. 46]. The Court granted that extension the next day. [Dkt. 47].

Three months later, on September 28 and 29, 2023, Defendants deposed all four Plaintiffs. [Dkts. 60-1, 60-3, 60-4, 60-5]. During those depositions, Brown, Johnson, and Brindley admitted—for the first time—that they signed an Independent Contractor Agreement with 316 Towing before they began performing tow truck services for Defendants. [Dkt. 60-3, at 45:2–19; Dkt. 60-4, at 24:4–25:13; Dkt. 60-5, at 38:3–15]. Hyde, however, did not change his tune. Instead, he stated that he could not recall signing an Independent Contractor Agreement, but still acknowledged that he initialed "a lot of papers" before he began working for Defendants. [Dkt. 60-1, at 32:24–33:4, 33:19–34:6].

Defendants then filed a Consent Motion to Amend the Scheduling Order on October 12, 2023, requesting the Court amend the previous deadlines for summary judgment motions to allow the parties to file such motions 30 days after the Court resolved Defendants' then-anticipated Motion for Decertification of Collective Action (the "Motion for Decertification"). [Dkt. 53]. Defendants amended their answer the following day, continuing to raise the arbitration issue as an affirmative defense. [Dkt. 57, at 3].

Defendants filed their Motion for Decertification on November 20, 2023. [Dkt. 59]. Therein, Defendants again raised the arbitration issue, but expressly stated that "the Court need not reach the merits as to whether Defendants may enforce the [Independent Contractor Agreement's Arbitration Clause] at th[at] stage." [Id. at 16–17; Dkt. 65, at 12–13]. In light of that concession—and after observing that "Defendant still ha[d] not moved to compel arbitration or otherwise enforce the terms of the Independent Contractor Agreements"—the Court dismissed Defendants' arbitration argument and ultimately denied Defendants' Motion for Decertification on March 20, 2024. [Dkt. 67].

Eight days later, Defendants filed a Motion for Leave to File a Motion to Arbitrate. [Dkt. 68]. Plaintiffs opposed the motion, arguing Defendants failed to act diligently in enforcing the Agreement's Arbitration Clause by not seeking to

compel arbitration at an earlier stage of litigation. [Dkt. 69]. The Court dismissed Plaintiffs' argument, noting that each of the four Plaintiffs "vehemently disputed signing an agreement containing an arbitration clause until those Plaintiffs sat for their respective depositions, which did not occur until late September 2023." [Dkt. 71, at 3]. Based on that sudden and late change in position, the Court found good cause existed to allow Defendants leave to file a motion to compel arbitration and, thus, granted Defendants' motion on April 15, 2024, with the directive that Defendants file their anticipated motion within 14 days. [Id. at 3–4].

Defendants complied with that directive and filed the instant Motion to Compel on April 29, 2024. [Dkt. 72]. Plaintiffs responded and Defendants replied, [Dkts. 73, 74]; thus, the Motion is ripe for this Court's Consideration.

## DISCUSSION

### I.   Legal Standard

"When a party who has agreed to arbitrate a dispute instead brings a lawsuit, the Federal Arbitration Act (FAA) entitles the defendant to file an application to stay litigation" and compel arbitration. Morgan v. Sundance, Inc., 142 S. Ct. 1708, 1710–11 (2022) (citing 9 U.S.C. § 3). The party seeking to compel arbitration bears the burden of establishing that (i) the non-movant entered into a valid and enforceable written arbitration agreement, and (ii) the claims at issue fall within the

scope of that agreement. <u>Lambert v. Austin Ind.</u>, 544 F.3d 1192, 1195 (11th Cir. 2008). The party opposing arbitration, on the other hand, "must unequivocally deny" that a valid and enforceable arbitration agreement exists and "must offer some evidence to substantiate the denial." <u>Magnolia Cap. Advisors, Inc. v. Bear Stearns & Co.</u>, 272 F. App'x 782, 785 (11th Cir. 2008). When determining whether an enforceable arbitration agreement exists, courts must apply state contract law. <u>See</u> <u>Caley v. Gulfstream Aerospace Corp.</u>, 428 F.3d 1359, 1368 (11th Cir. 2005).

Courts must also treat motions to compel arbitration as procedurally akin to motions for summary judgment. <u>Magnolia Cap. Advisors</u>, 272 F. App'x at 785. Thus, "[o]nly when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." <u>Id.</u> at 785–86; <u>Cox v. Midland Funding, LLC</u>, 2015 WL 12862931, at *7–8 (N.D. Ga. 2015) (noting that because the summary judgment standard requires the moving party to affirmatively show the absence of a genuine issue of material fact regarding the existence of a valid and enforceable arbitration agreement, the party seeking to compel arbitration must also produce evidence showing that the non-movant assented to the agreement).

**II.    Analysis**

Defendants argue—as they have at every stage of litigation thus far—that Plaintiffs' claims are subject to the binding Arbitration Clause contained in the Independent Contractor Agreement. [Dkt. 72]. Specifically, Defendants submit that because each Plaintiff finally admitted during their depositions that they signed the Agreement (save for Hyde, which the Court addresses below), Plaintiffs' claims must now be referred to mediation and, if unsuccessful, to arbitration pursuant to the terms of the Arbitration Clause. [Dkt. 72-1, at 2].

In response, Plaintiffs do not contest the enforceability of the Arbitration Clause, nor do they dispute whether their claims fall within the Arbitration Clause's scope.[3] Instead, Plaintiffs focus their entire response on a singular argument, contending Defendants waived their right to invoke the Arbitration Clause at this stage of litigation. [Dkt. 73].

---

[3] Nor could they reasonably do so. The Arbitration Clause captures "any dispute concerning the terms" of the Independent Contractor Agreement. [E.g., Dkt. 60-1, at Ex. 4, at ¶ 9]. As stated above, the Agreement specifically identifies the signatory tow truck driver as "an independent contractor in business for federal and state law purposes." [Id. at ¶ 2(D)]. Through the Complaint, Plaintiffs directly challenge Defendants' policy and practice of classifying their tow truck drivers as independent contractors exempt from the FLSA's overtime requirements. [Dkt. 1, at ¶¶ 2, 20, 25–26, 72–73, 83–84]. Thus, the Court finds that Plaintiffs' claims fall squarely within the scope of the Agreement's Arbitration Clause.

Waiver "is the intentional relinquishment or abandonment of a known right."

Morgan, 142 S. Ct. at 1713 (quotation omitted). "Like any other right or obligation

under a contract, an agreement to arbitrate may be waived." Warrington v. Rocky

Patel Premium Cigars, Inc., 2023 WL 1818920, at *2 (11th Cir. Feb. 8, 2023)

(citing Ivax Corp. v. B. Braun of Am., Inc., 286 F.3d 1309, 1316 (11th Cir. 2002)).

"To decide whether a waiver has occurred, the court focuses on the actions of the

person who held the right; the court seldom considers the effects of those actions

on the opposing party." Morgan, 142 S. Ct. at 1713.

No bright line criteria exists for deciding whether a party has waived their

right to arbitrate; instead, courts must evaluate waiver on a case-by-case basis,

bearing in mind the doctrine's underlying principles. See Warrington, 2023 WL

1818920, at *2; Lomanaco v. Experian Info. Sols., Inc., 2024 WL 1703112, at *3

(M.D. Fla. Apr. 19, 2024) (noting that "the principles laying out what sort of

conduct evinces waiver are not bright-line rules, but rebuttable presumptions"),

appeal docketed, No. 24-11270 (11th Cir. Apr. 25, 2024). "[T]he purpose of the

waiver doctrine is to prevent litigants from abusing the judicial process."

Warrington, 2023 WL 1818920, at *2 (quoting Gutierrez v. Wells Fargo Bank,

NA, 889 F.3d 1230, 1236 (11th Cir. 2018)). "Acting in a manner inconsistent with

one's arbitration rights and then changing course mid-journey smacks of outcome-

oriented gamesmanship played on the court and the opposing party's dime." Id. Thus, when evaluating waiver, courts must consider whether, "under the totality of the circumstances, the party [pursuing arbitration] has acted inconsistently with the arbitration right." Id. (quotation omitted).

A key factor in that assessment, according to the Eleventh Circuit, "is whether a party has substantially invoked the litigation machinery prior to demanding arbitration." Id. (quoting Gutierrez, 889 F.3d at 1236); see also Bennet v. Sys. & Servs. Techs., Inc., 2022 WL 1470318, at *7 (M.D. Fla. May 10, 2022) (stating that delay is not usually enough to find wavier "unless 'coupled with other substantial conduct inconsistent with an intent to arbitrate'" (quotation omitted)). The Eleventh Circuit further instructs that "the key ingredient in the waiver analysis is fair notice to the opposing party and the district court of a party's arbitration rights and its intent to exercise them." Warrington, 2023 WL 1818920, at *2 (cleaned up) (quoting Gutierrez, 889 F.3d at 1236); see also Gutierrez, 889 F.3d at 1237 (noting that "fair notice at a relatively early stage of litigation is a primary factor in considering whether a party has acted consistently with its arbitration rights").

Plaintiffs argue Defendants waived the right to compel arbitration at this stage because they "substantially invoked the litigation machinery by engaging in

merits-based discovery, failing to adequately preserve their rights, and moving to decertify the collective." [Dkt. 73, at 3 (cleaned up)]. Plaintiffs do not dispute that Defendants provided "early notice" of the Arbitration Clause's existence, however; instead, Plaintiffs characterize that notice as "half-hearted" and contend that, despite providing notice of the Arbitration Clause, Defendants "made no efforts to limit their engagement with the case" in the ensuing months and, thus, failed to preserve their arbitration rights. [Id.]. Plaintiffs suggest, then, that Defendants could and should have limited the scope of their engagement to focus solely on the issue of arbitrability instead of proceeding through conditional certification and decertification. But that suggestion overlooks the role Plaintiffs and their counsel played in creating a formation issue that persisted for nearly sixteen months.

As noted above, Defendants at this stage bear the burden of establishing the existence of a valid and enforceable arbitration agreement. Cox, 2015 WL 12862931, at *7. That burden requires Defendants to first prove that no genuine issue of fact remains as to whether the parties *formed* a binding arbitration agreement. Magnolia Cap. Advisors, 272 F. App'x at 785; Lomanaco, 2024 WL 1703112, at *3 (noting that, when resolving a motion to compel arbitration, courts must first "determine whether the parties formed a written agreement to arbitrate the claims at issue" (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,

Inc., 105 S. Ct. 3346, 3353–54 (1985))). Thus, this Court cannot, as a matter of law, order the parties to arbitration until Defendants make such a showing. See Regan v. Stored Value Cards, Inc., 85 F. Supp. 3d 1357, 1360 (N.D. Ga. 2015) ("A genuine dispute of fact concerning contract formation precludes a court from deciding as a matter of law that the parties did or did not enter into an agreement to arbitrate."); see also Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 530 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid agreement exists."). And because Plaintiffs denied signing the Independent Contractor Agreements throughout this litigation, they effectively prohibited Defendants from moving to compel arbitration until the Opt-In Plaintiffs suddenly reversed course and admitted during their depositions that they signed those Agreements.[4]

Moreover, the record reveals that Defendants diligently attempted to resolve the formation dispute Plaintiffs created by authenticating the Independent

---

[4] The Court further observes that other district courts have held that "motions to compel arbitration cannot be raised in collective action cases until courts first allow plaintiffs to seek FLSA certification and FLSA plaintiffs then join the action." Harris v. Diamond Dolls of Nev., LLC, 2023 WL 8556264, at *4 (D. Nev. Dec. 11, 2023). Thus, Plaintiffs' argument regarding Defendants' participation in the conditional certification and decertification stages is unpersuasive; especially considering that the formation issue persisted through—and Defendants explicitly preserved their arbitration rights during—those stages. [See Dkt. 20, at 12–13, 16; Dkt. 59-1, at 16–17; Dkt. 65, at 12–13].

Contractor Agreements through discovery, yet Plaintiffs thwarted those attempts at every turn. First, Defendants raised the issue with Hyde's counsel before answering the Complaint, but Hyde's counsel refused to acknowledge whether Hyde signed the Agreement. See supra note 2. Defendants also requested—through their interrogatories, requests for production, and requests for admission—that each Plaintiff admit to signing the Agreements, but each Plaintiff denied signing them. [Dkt. 60-2, at Ex. 7, at 23; Dkt. 60-3, at Ex. 4, at 19; Dkt. 60-4, at Ex. 4, at 21; Dkt. 60-5, at Ex. 4, at 20–21]. Finally, Plaintiffs again refused to admit they signed the Independent Contractor Agreements when Hyde moved for conditional certification, and then disputed the applicability of the Arbitration Clause when opposing Defendants' Motion for Decertification when the Opt-In Plaintiffs admitted to signing the Agreements. [Dkt. 22, at 9–10 ("No 'class' of persons has signed arbitration agreements, insofar as the Court now knows. If Defendants might later raise specific affirmative defenses against certain opt-ins—well, that is an issue for another day."); Dkt. 63, at 14–15 (arguing that, regardless of whether all Plaintiffs signed the Agreement, "the mandatory arbitration provision in the [Agreement] is likely no longer available to Defendants")].

The Court finds such evasion analogous to the circumstances present in Jordan v. Comcast Cable Communications Management, LLC, 2016 WL 452145

(N.D. Ga. Feb. 4, 2016). There, the plaintiff sued Comcast alleging the company violated the Telephone Consumer Protection Act by contacting her regarding allegedly outstanding bills even though she did not actually register for a Comcast account. Id. at *1–2. Comcast attempted to ascertain whether the plaintiff may have registered for an account under a different name, but the plaintiff evaded those attempts for over seven months. Id. at *1–3. The plaintiff eventually admitted to using a different name that ultimately proved to be associated with a Comcast account, and Comcast moved to compel arbitration shortly thereafter. Id. In opposing the motion, plaintiff argued that Comcast waived the right to arbitrate because they could have moved to compel arbitration earlier when they first believed plaintiff used another name to register for an account. Id. at *7. The court, however, dismissed plaintiff's argument and found Comcast did not waive the right to arbitrate, stating that "[p]laintiff cannot evade arbitration by hiding basic facts and then claim that [d]efendants waived their right to compel arbitration through the delay that Plaintiff manufactured." Id. That holding is instructive here.

Just like the plaintiff in Jordan, Plaintiffs argue here that Defendants could have moved to compel arbitration earlier when they first suspected Plaintiffs signed the Independent Contractor Agreements containing the Arbitration Clause. But again, just like the plaintiff in Jordan, Plaintiffs ignore that they created a

threshold formation issue by evading Defendants' attempts to authenticate the Agreements, which prohibited Defendants from seeking to enforce the Arbitration Clause at an earlier stage. Plaintiffs cannot now avoid arbitration because of the formation issue they manufactured (and maintained throughout this litigation) that forced Defendants to delay filing the instant Motion to Compel until now.

That result is particularly compelling considering that Defendants repeatedly raised and, thus, preserved their right to pursue arbitration throughout each stage of this litigation. As shown above, Defendants raised arbitration as an affirmative defense or at least noted their intent to pursue arbitration in (i) their initial answer, [Dkt. 5, at 3]; (ii) the parties' JPRDP, [Dkt. 14, at 3–4]; (iii) their initial disclosures, [Dkt. 19, at ¶¶ 3(A)–(C)]; (iv) their response to Hyde's Motion for Conditional Certification, [Dkt. 20, at 12–13, 16]; (v) their supplemental disclosures, [Dkt. 44, at ¶¶ 3(B), (D)]; (vi) their amended answer, [Dkt. 57, at 3]; and (vii) their Motion for Decertification, [Dkt. 59-1, at 16–17; Dkt. 65, at 12–13]. The Court declines to find that these instances of preservation constitute "substantial conduct inconsistent with the right to arbitrate" given the circumstances (particularly considering that Plaintiffs effectively required Defendants to participate in this litigation to such extent given their continued refusal to admit they signed the Independent Contractor Agreements). See, e.g.,

Hodgson v. Royal Caribbean Cruises, Ltd., 706 F. Supp. 2d 1248, 1257–58 (S.D. Fla. 2009) (finding defendant did not waive the right to arbitrate by engaging in discovery, filing a motion to dismiss, and, when that motion was denied, filing an answer raising arbitration as an affirmative defense, all before moving to compel arbitration just three months before trial).

Instead, the Court finds such persistent preservation consistent with—and representative of—Defendants' intent to invoke their right to arbitrate and, thus, sufficient to place Plaintiffs and this Court on notice of their intent to invoke that right when the issue became ripe. Thus, the Court further finds that, based on the totality of the circumstances discussed above, Defendants did not waive their right to pursue arbitration by engaging in litigation to this point and waiting to file the instant Motion to Compel until the Opt-In Plaintiffs admitted to signing the Independent Contractor Agreements. See Gutierrez, 889 F.3d at 1237 (holding defendant did not waive their right to arbitrate when they raised arbitration as an affirmative defense in their answer and other court filings, expressly reserving their right to pursue arbitration "when the matter became ripe"); Bryant v. Toppers Int'l, Inc., 2021 WL 299253, at *2–3 (M.D. Ga. Jan. 28, 2021) (finding defendant did not waive its right to compel arbitration at the conditional certification stage where defendant notified plaintiff of its intent to pursue arbitration "[s]everal times"

throughout the litigation); <u>Leitzke v. JPMorgan Chase Bank, N.A.</u>, 2020 WL

8669703, at *5–6 (M.D. Fla. Jan. 27, 2020) (finding defendant preserved its right

to arbitrate and acted consistently with its intent to arbitrate when the defendant

raised arbitration in a motion to transfer and as an affirmative defense in its

answer, noting that defense counsel additionally notified plaintiffs' counsel about

its right to pursue arbitration shortly after plaintiff filed the complaint).

As for Hyde, Plaintiffs assert one passing argument in a footnote in their

response suggesting that, even if Defendants have not waived the right to compel

arbitration now, they cannot compel Hyde to arbitrate because he still disputes

signing the Agreement.[5] [Dkt. 73, at 9 n.2]. The Court is not convinced. As

Defendants point out, Georgia law acknowledges that "[a]ssent to the terms of a

contract may be given other than by signatures. . . . If one of the parties has not

signed, his acceptance is inferred from a performance under the contract, in part or

in full, and he becomes bound." <u>Burson v. Milton Hall Surgical Assocs., LLC</u>, 343

---

[5] The record reveals that Hyde's dispute is not as unequivocal as Plaintiffs lead the Court to believe. In fact, during his deposition, Hyde initially admitted that he remembered reviewing and initialing the Agreement before he began working for Defendants. [Dkt. 60-1, at 31:17–24]. He quickly changed course, however, disputing whether the initials notated on the Agreement reflected his handwriting. [<u>Id.</u> at 31:25–32:23]. Still, he declined to state unequivocally that he never signed or initialed the Agreement, and instead maintained only that he could not recall signing the Agreement because he signed many other documents before he began working for Defendants. [<u>Id.</u> at 32:24–33:4, 33:19–34:6].

Ga. App. 159, 167 (2017) (quotation omitted); see also Valero Refining v. M/T Lauberhorn, 813 F.2d 60, 64 (5th Cir. 1987) ("[A] party may be bound by an agreement to arbitrate even in the absence of his signature."). Hyde does not dispute whether he performed the same services provided for in the Independent Contractor Agreement, nor does he dispute that he received benefits under the Agreement in exchange for such services. Thus, the Court is persuaded that Hyde assented to the terms of the Agreement through his performance and acceptance of those benefits. See Comvest v. Corp. Secs. Grp., 234 Ga. App. 277, 280–81 (1998) ("Parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract . . . ." (quotation omitted)).

Lastly, Defendants also seek to compel Plaintiffs to mediate (and, if necessary, arbitrate) their claims against Lisovskiy, who is not a signatory to the Independent Contractor Agreements. In support, Defendants argue that, even though Lisovskiy is not a party to those Agreements, the doctrine of equitable estoppel requires Plaintiffs to mediate their claims against Lisovskiy along with their claims against 316 Towing because the claims arise from the same underlying facts. [Dkt. 72-1, at 3, 24–25]. Plaintiffs offer no argument in response.

"State law governs whether a non-party can enforce a specific contract provision." <u>Bailey v. Vulcan Materials Co.</u>, 2021 WL 5860743, at *5 (N.D. Ga. Nov. 16, 2021) (citing <u>Lawson v. Life of the S. Ins. Co.</u>, 648 F.3d 1166, 1167 (11th Cir. 2011)). Georgia law applies equitable estoppel to enforce contractual provisions against non-parties in two scenarios: "(1) when the claims relate to the contract or (2) when the claims against the signatory and the non[-]signatory arise out of interdependent and concerted misconduct by those parties." <u>Id.</u> (quoting <u>Autonation Fin. Servs. Corp. v. Arain</u>, 264 Ga. App. 755, 758–59 (2003)). Here, the second scenario applies in full force.

Plaintiffs allege that Lisovskiy, as "a principal, director, officer, and/or owner [of] 316 Towing," "took an active role in operating [and managing] 316 Towing," which included making "decisions regarding Plaintiff's pay, or lack thereof." [Dkt. 1, at ¶¶ 11–13]. Those allegations form the very essence of Plaintiffs' Complaint. [<u>See, e.g.</u>, <u>id.</u> at ¶¶ 2, 56, 73, 84 (alleging Defendants violated the FLSA by failing to pay Plaintiffs the required overtime compensation)]. Indeed, if Plaintiffs' allegations are ultimately found to be true, 316 Towing would only be liable because of Lisovskiy's decisions regarding employee classification and payment. [<u>Compare</u> <u>id.</u> at ¶¶ 11–13, <u>with</u> <u>id.</u> at ¶ 2 (challenging Defendants' "policy and practice of failing to pay proper overtime

compensation under the FLSA")]. Thus, the Court finds that Plaintiffs' claims against Lisovskiy are "based on the same facts and are inherently inseparable" from those underlying the claims Plaintiffs assert against 316 Towing. <u>Autonation</u>, 264 Ga. App. at 761; <u>Retina Consultants P.C. Defined Benefit Pension Plan v. Benjamin</u>, 2020 WL 1491756, at *11 (S.D. Ga. Mar. 19, 2020) (enforcing arbitration agreement against non-signatory where the claims and allegations asserted against the signatory were based on the actions of the non-signatory). Accordingly, the Court finds that, pursuant to the doctrine of equitable estoppel, Lisovskiy is entitled to enforce the Arbitration Clause against Plaintiffs.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Compel [Dkt. 72] is **GRANTED**. As a result, the parties are hereby **ORDERED** to mediation and, if unsuccessful, to arbitration before a tribunal convened in Atlanta, GA under the rules of the American Arbitration Association. Accordingly, the parties are **DIRECTED** to (i) confer in an attempt to identify a mutually agreed upon mediator, and then (ii) submit a joint notice informing the Court of the result of that conference **within seven (7) days** of the entry of this Order. Alternatively, the parties may request, **within seven (7) days**, that the Court refer the case to a Magistrate Judge of this Court for mediation. In that event, the Court will refer the

case to the Chief Magistrate Judge for the Northern District of Georgia so that the case can be assigned to a Magistrate Judge for mediation.

It is further **ORDERED** that the case is hereby **STAYED** pending mediation and, if necessary, subsequent arbitration. <u>See</u> 9 U.S.C. § 3; O.C.G.A. § 9-9-6(a). The parties are further **DIRECTED** to file a joint status report to inform the Court of the results reached in those forums **within seven (7) days of completion** of mediation and, if necessary, arbitration.

**SO ORDERED** this 20th day of June, 2024.

_____
**RICHARD W. STORY**
United States District Judge